IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.  2:23-cv-735 |
| | ) | |
| v. | ) | |
| | ) | |
| DENKA PERFORMANCE ELASTOMER, | ) | |
| LLC and DUPONT SPECIALTY | ) | |
| PRODUCTS USA, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, the United States of America ("United States"), by authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), files this Complaint and alleges:

## NATURE OF ACTION

1.      This is a civil action alleging that carcinogenic chloroprene emissions from Defendant Denka Performance Elastomer, LLC's ("Denka's") neoprene manufacturing operations at the Pontchartrain Works Site in St. John the Baptist Parish, Louisiana (the "Facility") present an imminent and substantial endangerment to public health and welfare.  The Facility's address is in LaPlace, Louisiana, but its chloroprene emissions also travel into other nearby communities in the Parish, such as Reserve and Edgard, Louisiana.  People living in these communities are being exposed to an unacceptably high risk of developing certain cancers because of Denka's chloroprene emissions.  The United States seeks injunctive relief under

Clean Air Act Section 303, 42 U.S.C. § 7603, requiring that Denka immediately reduce its chloroprene emissions to levels that no longer cause or contribute to unacceptably high cancer risks within the communities surrounding the Facility.

2.      This civil action also seeks relief from DuPont Specialty Products USA, LLC ("DuPont Specialty Products") based on Fed. R. Civ. P. 19(a) and the All Writs Act, 28 U.S.C. § 1651.  DuPont Specialty Products owns the land at the Pontchartrain Works Site on which Denka's neoprene manufacturing operations are located.  DuPont Specialty Products is Denka's landlord and leases that land on which the neoprene manufacturing operations are located to Denka pursuant to a "Ground Lease."  Accordingly, Denka may need DuPont Specialty Products' permission or cooperation to comply with the Court's orders in this matter.  The Ground Lease requires Denka to obtain DuPont Specialty Products' consent before undertaking certain construction activities or equipment modifications involving the neoprene manufacturing operations.

3.      Chloroprene is a liquid raw material that is used to produce neoprene.  It is colorless, flammable, and readily evaporates at room temperature.  Chloroprene is produced using toxic substances, including 1,3-butadiene and chlorine.  And it is, itself, defined by the Clean Air Act as a hazardous air pollutant.  *See* 42 U.S.C. § 7412(b)(1).

4.      Chloroprene is hazardous, in part, because it is a likely human carcinogen. Breathing chloroprene increases the risk of developing cancers, such as lung and liver cancer, over the course of a lifetime.  Chloroprene acts via a mutagenic "mode of action," meaning that when a person breathes chloroprene, it causes mutations in the body's cells.  These mutations increase the likelihood that a person who breathes chloroprene will develop certain cancers over the course of their lifetime.

5.      Infants and children younger than 16 are likely to be especially susceptible to chloroprene's cancer-causing effects.  Chloroprene exposure during a person's early years is therefore particularly significant to their lifetime risk of developing cancer.

6.      The concentrations of airborne chloroprene in the communities surrounding the Facility are exposing thousands of people living there, including children younger than 16, to lifetime cancer risks that are multiples higher than what is typically considered acceptable by several United States regulatory agencies charged with protecting human health.  And the only source of chloroprene emissions in St. John the Baptist Parish is Denka's neoprene manufacturing operations at the Facility.

7.      A 1-in-10,000 cancer risk is a generally accepted threshold for demarcating the ceiling for acceptable excess cancer risk, and it is a benchmark for the level of cancer risk that is considered important to address in most instances by regulatory agencies.  For example, the EPA's policy for setting national emission standards for hazardous air pollutants, like chloroprene, that are emitted by industrial source categories uses a presumptive 1-in-10,000 upper threshold for acceptable excess lifetime cancer risk.  *See* 54 Fed. Reg. 38,044, 38,045 (Sept. 14, 1989) (the EPA's "1989 Residual Risk Policy").  Congress subsequently endorsed this policy in amendments to the Clean Air Act.  *See* 42 U.S.C. § 7412(f)(2)(B).  Other EPA non-air programs also rely on a 1-in-10,000 excess cancer risk as a presumptive risk management standard.  *See* 40 C.F.R. § 300.430(e)(2)(i)(A)(2) (explaining Superfund remedial action cleanup goals).  And other federal agencies, like the National Institute for Occupational Safety and Health ("NIOSH"), also use a 1-in-10,000 excess cancer risk as a threshold for taking action to address cancer risk.  *See* Current Intelligence Bulletin 68 - NIOSH Chemical Carcinogen Policy (July 2017).

3

8.      The EPA estimates that breathing chloroprene at concentrations averaging 0.2 micrograms of chloroprene per cubic meter (0.2 $\mu g/m^3$) over a 70-year lifetime increases a person's risk of developing cancer by 1-in-10,000.  And the greater the average chloroprene concentration that a person is exposed to, the faster their chloroprene related cancer risk accumulates.  As people breathe chloroprene at long-term average concentrations greater than 0.2 $\mu g/m^3$, their risk of developing cancer as a result of that exposure will reach and exceed 1-in-10,000 sooner than 70 years.

9.      Average concentrations of airborne chloroprene near the Facility have been consistently greater than 0.2 $\mu g/m^3$ since at least 2016, and likely for years before then.  Two sets of air monitoring stations were installed in 2016 at several locations near the Facility – one set was installed by the EPA, the other by Denka.  Each set of air monitors measured chloroprene concentrations in the ambient air.  Air monitors were installed in residential neighborhoods near the Facility and near schools close to the Facility, including the Fifth Ward Elementary School and East St. John High School.

10.     Both sets of air monitors detected chloroprene at average concentrations that were consistently much greater than 0.2 $\mu g/m^3$.  The air monitors located in the residential neighborhoods just west of the Facility detected some of the highest chloroprene levels.

11.     At the average chloroprene concentrations currently being detected, people are being exposed to risks of developing chloroprene-related cancers that are as much as an order of magnitude greater than multiple federal agencies' presumptive benchmark for acceptable excess lifetime cancer risk.  At the average chloroprene concentrations currently being detected, people exposed to these concentrations will reach unacceptably high cancer risks much sooner than over a 70-year lifetime.  For example, infants born today in the communities surrounding the Facility

who are exposed to the highest measured levels of chloroprene from Denka's neoprene manufacturing operations will exceed an estimated *lifetime* of acceptable excess cancer risk within approximately their first two years of life.

12.     Many people living near Denka's neoprene manufacturing operations already have been exposed to unacceptably high excess cancer risks.  The neoprene manufacturing operations at the Pontchartrain Works Site have existed for decades, and people have lived there just as long.  Those people have been breathing the air there for decades, and the Facility historically emitted even higher levels of chloroprene than it does today.  Those individuals' cancer risk increases every day they continue to breathe Denka's chloroprene emissions.

13.     The increased cancer risk that the communities near the Facility are currently being exposed to because of Denka's chloroprene emissions presents an imminent and substantial endangerment to public health and welfare.  The endangerment is imminent because Denka emits chloroprene at levels that are producing unacceptably high risks of cancer to the people, including children, that are regularly exposed to the Facility's emissions.  Hundreds of children attend school near the Facility and currently breathe the air there.  Many of them likely also live in the neighborhoods surrounding the Facility.

14.     The endangerment is substantial because Denka's emissions of chloroprene cause ambient levels of chloroprene in nearby communities to be many times greater than the generally accepted threshold for demarcating unacceptably high cancer risks, and because children living in these communities and attending the schools close to the Facility are likely to be especially susceptible to the cancer risks posed by chloroprene.  Denka's chloroprene emissions are the cause of this endangerment.

15.     The United States seeks injunctive relief, pursuant to 42 U.S.C. § 7603, to stop Denka from emitting chloroprene at levels that present an imminent and substantial endangerment to public health and welfare in the communities surrounding the Facility.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action pursuant to 42 U.S.C. § 7603, and 28 U.S.C. §§ 1331 and 1345.

17.     This Court has personal jurisdiction over Denka.  Denka is incorporated in the State of Louisiana and does business here, including via its neoprene manufacturing operations at the Facility, which is located in St. John the Baptist Parish at 586 Highway 44, LaPlace, Louisiana, 70068.

18.     This Court has personal jurisdiction over DuPont Specialty Products.  DuPont Specialty Products conducts business in LaPlace, Louisiana at the Facility.

19.     Venue is proper in this District pursuant to 42 U.S.C. § 7603, and 28 U.S.C. § 1391(b) and (c).  Denka does business in this District and the chloroprene emissions from its neoprene manufacturing operations are occurring in this District.

## NOTICE

20.     Pursuant to 42 U.S.C. § 7603, the United States has provided notice of the commencement of this action to, and has consulted with representatives of, the Louisiana Department of Environmental Quality ("Louisiana DEQ") to attempt to confirm the accuracy of the information upon which the United States is basing this action.  The United States has provided notice of the commencement of this civil action to the Louisiana DEQ.

**PARTIES**

21.      Plaintiff, the United States of America, is acting by authority of the Attorney

General of the United States and through the undersigned attorneys, on behalf of the

Administrator of the EPA.  Authority to bring this action is vested in the Attorney General of the

United States by 42 U.S.C. § 7605, and pursuant to 28 U.S.C. §§ 516 and 519.

22.      Denka is a privately owned limited liability company formed under the laws of

the State of Delaware, headquartered in LaPlace, Louisiana, and authorized to do business in the

State of Louisiana.  Denka is a joint venture between majority owner Denka Company Limited

and minority owner Mitsui & Co. Ltd., both of which are Japanese companies.  Denka is the

current owner and operator, as defined by 42 U.S.C. § 7412(a)(9), of the neoprene manufacturing

operations at the Facility.  At all times relevant to the Complaint, Denka has been a corporate

entity and therefore a "person" within the meaning of 42 U.S.C. §§ 7602(e) and 7603.

23.      Formed in 2018, DuPont Specialty Products is a privately owned limited liability

company that is headquartered in Delaware and maintains its principal place of business in

Delaware.  At all times relevant to the Complaint, DuPont Specialty Products has been a

corporate entity and therefore a "person" within the meaning of 42 U.S.C. §§ 7602(e) and 7603.

24.      Subject to a reasonable opportunity for investigation and discovery, DuPont

Specialty Products owns the land upon which the Facility is located.  Subject to a reasonable

opportunity for investigation and discovery, DuPont Specialty Products leases to Denka the land

upon which the neoprene manufacturing operations are located.  The Ground Lease documents

this lessor/lessee relationship.  The Ground Lease has an effective date of approximately October

30, 2015 and lasts for a 99-year term.

25.     The Ground Lease retains certain rights for DuPont Specialty Products (either directly or as an assignee) that can affect Denka's neoprene manufacturing operations.  Under the Ground Lease, DuPont Specialty Products (either directly or as an assignee) retains rights over certain assets at the Facility.  These assets include fixtures, improvements, and easements, such as: certain of the well injection pumps, carbon beds, wastewater sampling equipment, tanks, process and service lines, sewer lines, electrical equipment, and rights-of-way on certain roadways.  The Ground Lease also requires Denka to obtain DuPont Specialty Products' consent before undertaking certain construction activities or equipment modifications involving the neoprene manufacturing operations.

26.     In order for complete relief to be afforded in this matter, the Court may need to involve DuPont Specialty Products.  DuPont Specialty Products maintains rights or interests under the Ground Lease and as the owner of the land upon which Denka's neoprene manufacturing operations are located.  These rights and interests may be impacted in this matter because the relief that the United States seeks from Denka may, for example, require onsite construction or other work that requires DuPont Specialty Products' consent under the Ground Lease.  DuPont Specialty Products is therefore a required party pursuant to Fed. R. Civ. P. 19(a) and the All Writs Act, 28 U.S.C. § 1651.

## GENERAL ALLEGATIONS

### Denka's Neoprene Manufacturing Operations

27.     Neoprene (*a.k.a.* "chloroprene rubber" or "polychloroprene") is a flexible, synthetic rubber used to produce common goods like wetsuits, beverage cozies, orthopedic braces, and automotive belts and hoses.  Denka began manufacturing neoprene at the Facility on approximately November 1, 2015.  Denka purchased the neoprene manufacturing operations at

the Facility in 2014 from E.I. DuPont de Nemours and Company. E.I. DuPont de Nemours and Company (or a predecessor-in-interest) owned and operated the original neoprene manufacturing operations at the Facility from about 1968 until the sale to Denka.

28.    Since about 2008, neoprene has been manufactured at only one place in the United States: the Facility. According to the EPA's Toxic Release Inventory database, Denka's manufacturing operations at the Facility are the sole source of chloroprene emissions in St. John the Baptist Parish, Louisiana.

29.    Denka's neoprene manufacturing operations consist primarily of three chemical manufacturing process units: the Chloroprene Unit, the Neoprene Unit, and the HCl Recovery Unit. Each of these three units emits chloroprene as well as other hazardous air pollutants.

30.    At all times relevant to the Complaint, chloroprene has been an "air pollutant" within the meaning of 42 U.S.C. § 7602(g). At all times relevant to the Complaint, chloroprene has also been defined as a "hazardous air pollutant" by 42 U.S.C. § 7412(b)(1). The Clean Air Act classifies hazardous air pollutants as substances that, through inhalation or other exposure pathways, present or may present a threat of adverse effects to human health or the environment. *See* 42 U.S.C. § 7412(b)(2).

31.    Chloroprene is routinely emitted into the air at various stages of Denka's neoprene manufacturing operations. Chloroprene is emitted through vents from the manufacturing operations that discharge directly to the atmosphere. Chloroprene is emitted when tanks and other process vessels are opened, during both normal operations and maintenance work. Chloroprene is also emitted through more diffuse ("fugitive") sources, like equipment leaks and evaporative emissions from wastewater generated during neoprene manufacturing.

32.     For example, Denka uses a series of three open-to-the-air, brick-lined pits (collectively called the "Outside Brine Pit") to treat reactive chloroprene-containing sludge, wastewater, and solid waste material generated by the neoprene manufacturing process.  These wastes, which are chemically reactive and volatilize high levels of chloroprene into the air, are skimmed from strainers at the polymerization kettles and poured into open, wheeled bins several times per day.  Liquid wastewater is hosed into open grated trenches that eventually empty into the Outside Brine Pit.  The wastes are wheeled in the open bins to the Outside Brine Pit.  There, employees dump the wastes into the Outside Brine Pit where they are left to finish their chemical reactions.  By design, these wastes volatilize chloroprene to the open air before they are collected for off-site disposal.

33.     Denka's chloroprene emissions drift beyond the Facility's property line and into the ambient air of the surrounding communities in LaPlace, Reserve, and Edgard, Louisiana. Thousands of people, including children, who live, work, and go to school in these communities breathe that air.

34.     Pursuant to a January 6, 2017 Administrative Order on Consent issued by the Louisiana DEQ, Denka agreed to reduce chloroprene emissions from its neoprene manufacturing operations.  Denka upgraded equipment and installed emission control devices, including a Regenerative Thermal Oxidizer which became fully operational in March of 2018.  These actions reduced the Facility's chloroprene emissions.

35.     Despite these emission reductions, Denka continues to emit approximately 18 tons of chloroprene each year.  And despite Denka's emission reductions, chloroprene concentrations in the communities surrounding the Facility have averaged between approximately 0.4 and 2.9 $\mu g/m^3$ since April 2018, depending on the monitoring location – all

significantly exceeding 0.2 μg/m$^3$.  Without further emission reductions, Denka's chloroprene emissions will continue to cause average chloroprene levels to exceed 0.2 μg/m$^3$ in the communities surrounding the Facility.

**The Communities Living Near the Facility**

36.     According to United States census data, between approximately 15,000 to 17,000 people live within two-and-a-half miles of Denka's Facility.  Over 20% of that population (roughly 3,000-4,000) is under the age of 18.  Of those 3,000-4,000 young people, approximately 800-1,000 are young children under the age of 5.

37.     The Fifth Ward Elementary School, which is attended by more than 300 children, is located about half-a-mile from the center of Denka's Facility.  Approximately 1,200 students are enrolled at East St. John High School, which is roughly a mile-and-a-half north of Denka's neoprene manufacturing operations.

**Chloroprene's Carcinogenic Effects**

38.     Chloroprene is a likely human carcinogen that acts via a mutagenic mode of action.

39.     Infants and children are more susceptible than adults to the cancer risks posed by mutagens like chloroprene.  This is because more rapid cell division during early life results in less time for the body to repair DNA mutations before the damaged cells replicate.  The more rapid replication of mutated cells increases the risk of developing cancer.  Infants and children are also more susceptible to chloroprene's cancer-causing risks because, for physiological reasons, they will likely have higher and more persistent blood concentrations of chloroprene or its metabolites than adults exposed to the same air concentrations of chloroprene.

40.     The EPA's Integrated Risk Information System ("IRIS") program identifies and characterizes the health hazards of chemicals found in the environment.  The EPA develops IRIS assessments to characterize the risks to human health posed by specific environmental hazards. IRIS assessments are conducted by experts in various scientific disciplines such as toxicology, epidemiology, and pharmacokinetics.  Developing an IRIS assessment for a particular chemical involves identifying health hazards associated with human exposure to that chemical, then quantifying the relationship between exposure to the chemical and the related health hazards to arrive at an estimate of cancer potency.

41.     In 2010, the EPA IRIS program published its peer-reviewed assessment of chloroprene (the "2010 IRIS Assessment").  In the 2010 IRIS Assessment, the EPA concluded that chloroprene is "likely to be carcinogenic to humans" and determined that it acts through a mutagenic mode of action.  The 2010 IRIS Assessment also provided a quantitative estimate of carcinogenic risk from breathing (*a.k.a.* "inhalation exposure") chloroprene.  The 2010 IRIS Assessment was based on a comprehensive review of the available evidence on chloroprene toxicity, including animal toxicology data, evidence of chloroprene's mutagenic properties, and human epidemiological data.  The 2010 IRIS Assessment was subject to a rigorous review process within the EPA, by other federal agencies and White House offices, and the public.  The conclusions of the 2010 IRIS Assessment were subsequently confirmed by an independent external peer review panel.

42.     In the 2010 IRIS Assessment, the EPA also quantified the cancer risks associated with long-term chronic inhalation exposure to chloroprene.  Breathing is the primary pathway by which people living near the Facility are exposed to chloroprene.  The EPA's 2010 IRIS Assessment establishes 0.2 $\mu g/m^3$ as the average concentration of chloroprene that a person may

breathe over a 70-year lifetime without being expected to exceed a 1-in-10,000 risk of contracting chloroprene-linked cancers.  1.2 $\mu$g/m$^3$ is the average chloroprene concentration a child may regularly breathe from birth to their second birthday without being expected to exceed a 1-in-10,000 lifetime risk of contracting chloroprene related cancers.

**Denka Consistently Emits Chloroprene at Levels That Cause Unacceptably High Cancer Risk in the Surrounding Communities**

43.     The EPA has determined that Denka's chloroprene emissions are presenting an imminent and substantial endangerment because the average chloroprene concentrations in the ambient air near the Facility from the period of April 2018 through January 2023 at Denka's monitoring stations are 2.89, 2.21, 1.26, 1.06 and 0.89 $\mu$g/m$^3$ for the five closest monitors to the Facility, and 0.41 $\mu$g/m$^3$ for the monitor located approximately two-and-a-half miles away in Edgard, Louisiana.  Even the lowest measured average value for the five closest monitors is more than four times greater than 0.2 $\mu$g/m$^3$, and the highest average is more than 14 times higher.  In the aggregate, the thousands of people breathing this air are incurring a significantly higher cancer risk than would be typically allowed, and they are being exposed to a much greater cancer risk from Denka's air pollution than the majority of United States residents face.

44.     In 2016, the EPA and Denka both began monitoring chloroprene concentrations in the air around the Facility.  This air monitoring was intended to better understand the amount of chloroprene that people living near the Facility were exposed to and to better characterize the associated health risks.

45.     The air monitoring data from both monitoring systems consistently show average airborne chloroprene concentrations in the communities surrounding Denka's neoprene manufacturing operations that are multiples greater than 0.2 $\mu$g/m$^3$.  People living in the

residential area closest to the Facility are currently exposed to average levels of chloroprene that are more than 14 times greater than 0.2 $\mu g/m^3$.

***Denka's Air Monitoring Shows Chloroprene Levels that Indicate Excessive Cancer Risk***

46.     Beginning in August 2016, Denka commenced regular air sampling at several locations near the Facility.  Samples are taken roughly once every three to six days, and measure average chloroprene concentrations over a 24-hour period.  Denka's monitors are identified as:

a.  The "Entergy" monitor, located at or near the Entergy Substation,

b.  The "Railroad" monitor, located at or near the intersection of Highway 44 and the Illinois Central Railroad tracks,

c.  The "Western" monitor, located at or near the Western Edge of the Facility,

d.  The "Levee" monitor, located at or near the Mississippi River Levee on the south side of the Facility,

e.  The "Ochsner Hospital" monitor located at or near the Ochsner Hospital, and

f.  The "Edgard" monitor, located at or near the St. John the Baptist Parish Courthouse in Edgard.

47.     The Western monitor is located near a residential neighborhood that begins only about 50 feet from the Facility's western property line.  The Fifth Ward Elementary School is approximately 1,000 feet from the Western monitor.  The Railroad monitor is located near a residential area and the closest home sits approximately 500 feet from the monitor.  The Levee monitor is located about 2,000 feet from the nearest home.  The Edgard monitor is located approximately two-and-a-half miles southwest of the Facility, across the Mississippi River.  The Entergy, Ochsner Hospital, and Railroad monitors are respectively located approximately one mile north, northeast, and east of the Facility.

48.     Air monitoring data collected at each of Denka's monitoring sites since April 2018 – reflecting air quality after the Regenerative Thermal Oxidizer commenced stable operations – shows that the average chloroprene concentration across all six Denka sampling sites from April 2018 through January 2023 was approximately 1.46 µg/m$^3$— more than 7 times higher than 0.2 µg/m$^3$.  The worst of Denka's sampling locations (the Western monitor, which is closest to the residential neighborhood west of the Facility) showed average concentrations of 2.89 µg/m$^3$, more than 14 times higher than 0.2 µg/m$^3$.  *See* Table 1 below:

| Table 1: Denka Air Monitoring Results, April 2018 – January 2023 ||
|---|---|
| **Denka Monitoring Site** | **Average Monitored Chloroprene Concentration from April 2018 – January 2023** |
| Western | 2.89 µg/m$^3$ |
| Levee | 2.21 µg/m$^3$ |
| Railroad | 1.26 µg/m$^3$ |
| Ochsner Hospital | 1.06 µg/m$^3$ |
| Entergy | 0.89 µg/m$^3$ |
| Edgard | 0.41 µg/m$^3$ |
| **Average Monitored Chloroprene Concentration Across All Denka Monitoring Sites from April 2018 – January 2023** | **1.46 µg/m$^3$** |

49.     In January 2022, Denka deployed 18 diffusion tube air monitors – a different type of monitor than the six 24-hour canisters – around the Facility's fenceline.  Three additional diffusion tube monitors were installed later that year (for a total of 21 diffusion tube monitors).  These new monitors measure the ambient air concentration of chloroprene over a two-week sampling period.  Consistent with the results of the EPA's and Denka's 24-hour air sampling, through late December 2022, 19 of 21 diffusion tube sampling locations are measuring average chloroprene concentrations greater than 0.2 µg/m$^3$.  And two-week average concentrations of chloroprene significantly greater than 0.2 µg/m$^3$ continue to occur near residential areas.

*EPA's Air Monitoring Showed Chloroprene Levels that Indicate Excessive Cancer Risk*

50.     From May 2016 through September 2020, the EPA also regularly collected 24-hour air samples from six locations near the Facility.  The EPA's monitoring sites, which were near, but not exactly where Denka's monitors are located, were identified as:

> a.  The "Acorn and Highway 44" monitor, located at or near the intersection of Acorn Street and Highway 44,
>
> b.  The "Levee" monitor, located at or near the Mississippi River Levee on the south side of the Facility,
>
> c.  The "Fifth Ward Elementary School" monitor, located at or near the Fifth Ward Elementary School,
>
> d.  The "Ochsner Hospital" monitor located at or near Ochsner Hospital,
>
> e.  The "Chad Baker" monitor, located at or near a residence on Chad Baker Street, and
>
> f.  The "East St. John High School" monitor located at or near East St. John High School.

51.     Air monitoring data collected at each of the EPA's monitoring sites, starting in April 2018, show that the average chloroprene concentration across all the EPA's sampling sites from April 2018 through September 2020 was 1.43 $\mu g/m^3$—7 times higher than 0.2 $\mu g/m^3$.  The worst of EPA's sampling locations (the Chad Baker site, in the residential neighborhood west of the Facility) showed average concentrations of 2.22 $\mu g/m^3$, more than 11 times higher than 0.2 $\mu g/m^3$.  *See* Table 2 below:

| Table 2: EPA Air Monitoring Results, April 2018 – September 2020 ||
|---|---|
| **EPA Monitoring Site** | **Average Monitored Chloroprene Concentration from April 2018 – September 2020** |
| Chad Baker | 2.22 µg/m$^3$ |
| Levee | 1.90 µg/m$^3$ |
| Fifth Ward Elementary School | 1.73 µg/m$^3$ |
| Acorn and Hwy 44 | 1.17 µg/m$^3$ |
| Ochsner Hospital | 1.15 µg/m$^3$ |
| East St. John High School | 0.44 µg/m$^3$ |
| **Average Monitored Chloroprene Concentration Across All EPA Monitoring Sites from April 2018 – September 2020** | **1.43 µg/m$^3$** |

***Infants and Young Children Will Exceed Unacceptable Lifetime Cancer Risk Levels Much More Quickly Than Adults***

52.     Current chloroprene concentrations near the Facility present a risk that is especially grave for infants and children under the age of 16.  For example, infants and children who begin consistently breathing chloroprene starting in infancy at the average concentrations measured near the Western and Chad Baker air monitors (listed in Tables 1 and 2) will surpass their lifetime 1-in-10,000 excess cancer risk within approximately two years after their exposure begins (68 years sooner than the 70-year period over which lifetime excess cancer risks are determined).  Adolescents and adults who consistently breathe Denka's current chloroprene emissions will similarly surpass a 1-in-10,000 excess cancer risk in far less time than the 70-year timeframe that the EPA uses to identify "lifetime" cancer risks.

***The Cancer Risks from the Facility's Chloroprene Emissions are Cumulative***

53.     Chloroprene has been released into the environment for decades as a result of neoprene manufacturing operations at the Pontchartrain Works Site.  Historical sampling,

17

emission data, and air modeling show that, before April 2018 and during the decades when the

Facility was owned and operated by E.I. DuPont de Nemours and Company (and its predecessors

in interest), people living near the Facility were exposed to chloroprene at average concentrations

multiples higher than current levels.  Until recently, the neoprene manufacturing operations often

emitted more than one hundred tons of chloroprene each year.

54.     Residents in communities surrounding the Facility have been and continue to be

chronically exposed to unacceptably high levels of chloroprene and the consequent cancer risk.

**Clean Air Act Section 303**

55.     Congress enacted the Clean Air Act "to protect and enhance the quality of the

Nation's air resources so as to promote the public health and welfare and the productive capacity

of its population."  42 U.S.C. § 7401(b)(1).

56.     Section 303 of the Clean Air Act, 42 U.S.C. § 7603, provides:

> Notwithstanding any other provision of this chapter, the Administrator, upon
> receipt of evidence that a pollution source or combination of sources (including
> moving sources) is presenting an imminent and substantial endangerment to
> public health or welfare, or the environment, may bring suit on behalf of the
> United States in the appropriate United States district court to immediately
> restrain any person causing or contributing to the alleged pollution to stop the
> emission of air pollutants causing or contributing to such pollution or to take such
> other action as may be necessary.

57.     The increased cancer risks to people living near Denka's neoprene manufacturing

operations that are being caused by long-term exposure to Denka's chloroprene emissions

represent an "endangerment to public health [and] welfare" within the meaning of 42 U.S.C.

§ 7603.  The Clean Air Act explains that effects on welfare include, but are not limited to, harm

to "personal comfort and well-being, whether caused by transformation, conversion, or

combination with other air pollutants."  42 U.S.C. § 7602(h).

58.     The endangerment posed by Denka's chloroprene emissions is "imminent" in that the conditions giving rise to it – the currently measured average concentrations of airborne chloroprene – are present now.  The endangerment is also "substantial" given the proximity of the surrounding communities to Denka's chloroprene emissions, the number and age distribution of the exposed population, the magnitude of Denka's current chloroprene emissions and the communities' ongoing exposure to them, and the consequent greater than 1-in-10,000 lifetime excess cancer risk.  Based on these circumstances, Denka's current chloroprene emissions represent a serious threat of harm to public health and welfare.

59.     The serious threats to public health and welfare caused by Denka's chloroprene emissions will continue until Denka significantly reduces its emissions.  Even after Denka's more recent efforts to reduce its chloroprene emissions, chloroprene concentrations in the ambient air around the Facility still average well above 0.2 $\mu g/m^3$.  If Denka continues to emit chloroprene at its current levels, chloroprene concentrations in the communities surrounding the Facility will continue to present an imminent and substantial endangerment.

### CLAIM FOR RELIEF
### (Injunctive Relief under 42 U.S.C. § 7603)

60.     Paragraphs 1 through 59 are re-alleged and incorporated herein by reference.

61.     At all times relevant to the Complaint, Denka's neoprene manufacturing operations at the Pontchartrain Works Site have been a "pollution source" within the meaning of 42 U.S.C. § 7603.  The Chloroprene Unit, Neoprene Unit, and HCl Recovery Unit constitute a "combination of sources" within the meaning of 42 U.S.C. § 7603.

62.     Emissions of chloroprene from Denka's neoprene manufacturing operations are "pollution" within the meaning of 42 U.S.C. § 7603.

63.     At all times relevant to this Complaint, Denka has caused and continues to cause the observed concentrations of chloroprene in the air in, around, and outside of the Facility's property line at the air monitoring locations listed in Tables 1 and 2.

64.     Based on the information described in Paragraphs 3 - 54, the EPA has received evidence that the current concentrations of chloroprene in the air in and around the Facility present an imminent and substantial endangerment to public health or welfare, including but not limited to unacceptably high lifetime excess cancer risks to residents of LaPlace and Reserve, Louisiana.

65.     Based on the terms of the Ground Lease, Denka may need permission or cooperation from DuPont Specialty Products in order to take the necessary actions to abate the imminent and substantial endangerment posed by its current chloroprene emissions.

66.     Any delay or refusal by DuPont Specialty Products to authorize Denka under the Ground Lease to comply with the requirements of any order of this Court will contribute to the emission of air pollutants within the meaning of 42 U.S.C. §§ 7602(g) and 7603.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff the United States of America respectfully requests that the Court provide the following relief:

1.     Order Denka to immediately take all necessary measures to eliminate the imminent and substantial endangerment posed by chloroprene emissions from the Facility;

2.     Order Denka to take all other actions as may be necessary to address and mitigate the harm to public health and welfare that Denka's chloroprene emissions have caused;

3.      Order DuPont Specialty Products to authorize and not impede, under the terms of the Ground Lease, all construction and other necessary measures for Denka to comply with any order issued by the Court in this matter; and

4.      Award Plaintiff such other and further relief as the Court deems just and proper.

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA**

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

Trial Attorney:      STEVEN D. SHERMER
Senior Attorney
District of Columbia Bar No. 486394
DAVIS H. FORSYTHE
Senior Counsel
HANNAH L. FRAZIER
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, DC  20044-7611
(202) 514-1134
Steven.Shermer@usdoj.gov

OF COUNSEL:

ROBERT PARRISH
Attorney-Advisor
U.S. Environmental Protection Agency
Office of Civil Enforcement, Air Enforcement Division
1200 Pennsylvania Avenue, NW (2242A)
Washington, D.C. 20460

JUSTIN LANNEN
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 6
1201 Elm Street, Suite 500 (ORCEA)
Dallas, TX 75270