IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| _____ ) | | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:23-cv-735 |
| | ) | |
| v. | ) | Judge Barbier (Section J) |
| | ) | |
| DENKA PERFORMANCE ELASTOMER, | ) | Magistrate Judge North |
| LLC and DUPONT SPECIALTY | ) | |
| PRODUCTS USA, LLC. | ) | |
| | ) | |
| Defendants. | ) | |
| _____ ) | | |

**MEMORANDUM IN SUPPORT OF THE UNITED STATES'
MOTION FOR A PRELIMINARY INJUNCTION
AGAINST DENKA PERFORMANCE ELASTOMER, LLC**

Table of Contents

INTRODUCTION ............................................................................................... 1

BACKGROUND ............................................................................................... 3

    Factual Background ....................................................................................... 3

        A.     Thousands of People Live Near Denka's Facility and Breathe its
              Chloroprene Emissions ............................................................... 3

        B.     The Facility's Operations Produce Carcinogenic Chloroprene
              Emissions .................................................................................... 4

        C.     Chloroprene is a potent, likely human carcinogen ..................... 5

        D.     People in St. John the Baptist Parish should not be exposed to a
              greater than 1-in-10,000 risk of contracting chloroprene related
              cancers ........................................................................................ 8

        E.     Air Monitoring Shows Average Chloroprene Levels Consistently
              Much Greater Than 0.2 $\mu g/m^3$ ................................................ 9

        F.     The Proposed Preliminary Injunctive Relief is Feasible and
              Tailored to Reduce Denka's Chloroprene Emissions ............... 12

              1.     Immediate actions ............................................ 12

              2.     Planning for long-term, permanent emission reductions.. 14

              3.     Monitoring compliance ........................................ 15

               4.     Facility access and consent of landlord ............... 15

    Legal Background .................................................................................... 16

        A.     42 U.S.C. § 7603 – Clean Air Act Section 303 ....................... 16

        B.     Standard for Preliminary Injunctions in Statutory Enforcement
              Cases ........................................................................................ 18

ARGUMENT ................................................................................................. 20

    I.     The United States is Likely to Prove that Denka's Carcinogenic
        Chloroprene Emissions Constitute an Imminent and Substantial
        Endangerment ............................................................................... 21

        A.     Denka's Facility is a "pollution source" ................................. 22

i

B.   Denka is "causing or contributing to" the chloroprene pollution ............ 23

C.   Denka is a "person" ................................................................. 23

D.   The increased cancer risk from Denka's chloroprene emissions is
     presenting an "imminent and substantial endangerment"........................ 23

     1.   Unacceptably high cancer risks are an actionable
          endangerment. ................................................................ 24

     2.   The endangerment from Denka's chloroprene
          emissions is imminent; the threat they pose is
          present now. ................................................................. 24

     3.   Cancer risks that are more than 14 times greater
          than the EPA's presumptive ceiling constitute a
          substantial endangerment.................................................. 27

E.   The Facility "is presenting" an imminent and substantial
     endangerment .......................................................................... 29

II.    Public Health in St. John the Baptist Parish is Likely to Suffer Irreparable
       Harm Without the Requested Preliminary Injunctive Relief ............................. 30

III.   Congress' Statutory Priority to Protect Public Health and Welfare Tips the
       Balance of Equities in the United States' Favor ..................................... 32

IV.    The Injunction is in the Public Interest ............................................ 34

CONCLUSION.............................................................................. 35

### Table of Authorities

Cases                                                                                          Page(s)

*4 Aces Enterprises, LLC v. Edwards*,
    479 F. Supp.3d 311 (E.D. La. 2020) ................................................................................. 32

*Amoco Prod. Co. v. Vill. of Gambell, Alaska*,
    480 U.S. 531 (1987) ......................................................................................... 29, 30, 31, 32

*Andritz Sundwig GmbH v. United States*,
    Civ. No. 4:18-2061, 2018 WL 3218006 (S.D. Tex. 2018) ............................................ 32-33

*Apalachicola Riverkeeper v. Taylor Energy Co., LLC*,
    954 F. Supp. 2d 448 (E.D. La. 2013) ...................................................................... 25, 26, 27

*Burlington N. & Santa Fe Ry. Co. v. Grant*,
    505 F.3d 1013 (10th Cir. 2007) ............................................................... 22, 25, 26, 28

*Canal Auth. of State of Fla. v. Callaway*,
    489 F.2d 567 (5th Cir. 1974) ...................................................................................... 20, 31

*Cox v. City of Dallas, Tex.*,
    256 F.3d 281 (5th Cir. 2001) ....................................................................................... passim

*Dague v. City of Burlington*,
    935 F.2d 1343 (2d Cir. 1991) ............................................................................................. 27

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
    710 F.3d 582 (5th Cir. 2013) ..........................................................................................21

*Davis v. Sun Oil Co.*,
    148 F.3d 606 (6th Cir. 1998) ............................................................................................. 25

*Envtl. Def. Fund, Inc. v. Lamphier*,
    714 F.2d 331 (4th Cir. 1983) ............................................................................................. 32

*Ethyl Corp. v. Env't Prot. Agency*,
    541 F.2d 1 (D.C. Cir. 1976) ............................................................................................... 27

*Francisco Sanchez v. Esso Std. Oil Co.*,
    572 F.3d 1 (1st Cir. 2009) .................................................................................................. 20

*Hecht Co. v. Bowles*,
    321 U.S. 321 (1944) ........................................................................................................... 18

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*,
    263 F. Supp. 2d 796 (D.N.J. 2003), *aff'd*, 399 F.3d 248 (3d Cir. 2005) ................ 25, 26, 28, 30

*Janvey v. Alguire*,
    647 F.3d 585 (5th Cir. 2011) ............................................................................................. 31

*League of Wilderness Def. v. Forsgren*,
    184 F. Supp. 2d 1058 (D. Or. 2002) .................................................................................. 33

*Leese v. Martin*,
    No. 11-5091, 2012 WL 1224573 (D.N.J. April 11, 2012) ................................................... 7

*Maine People's All. and Nat. Res. Def. Council v. Mallinckrodt, Inc.*,
    471 F.3d 277 (1st Cir. 2006) ..................................................................... 19, 25, 29, 32

*Matter of Commonwealth Oil Ref. Co., Inc.*,
    805 F.2d 1175 (5th Cir. 1986) ........................................................................................... 34

*Mitchell v. Robert De Mario Jewelry*,
    361 U.S. 288 (1960) ........................................................................................................... 16

*Monumental Task Comm., Inc. v. Foxx*,
    157 F. Supp. 3d 573 (E.D. La. 2016), *aff'd sub nom.*,

*Monumental Task Comm., Inc. v. Chao*, 678 F. App'x 250 (5th Cir. 2017) ............... 20, 21, 31

*Nat'l Oilseed Processors Ass'n v. Browner*,
924 F. Supp. 1193 (D.D.C. 1996) ................................................................................ 6, 7

*NRDC, Inc. v. U.S. E.P.A.*,
824 F.2d 1146 (D.C. Cir. 1987) ................................................................................. 8, 28

*Price v. United States Navy*,
39 F.3d 1011 (9th Cir. 1994) ......................................................................................... 25

*Schmucker v. Johnson Controls, Inc.*,
No. 3:14-CV-1593 JD, 2019 WL 718553 (N.D. Ind. Feb. 19, 2019) ............................ 25

*Shell Offshore Inc. v. Greenpeace, Inc.*,
864 F. Supp. 2d 839 (D. Alaska 2012) .......................................................................... 31

*Tennessee Valley Auth. v. Hill*,
437 U.S. 153 (1978) ............................................................................................... 19, 20

*Trinity Am. Corp. v. U.S. E.P.A.*,
150 F.3d 389 (4th Cir. 1998) ................................................................................... 16, 23

*U.S. Envtl. Prot. Agency v. Envtl. Waste Control, Inc.*,
917 F.2d 327 (7th Cir. 1990) ........................................................................................ 32

*United States v. Allegheny Ludlum Corp.*,
187 F. Supp. 2d 426 (W.D. Pa. 2002), *rev'd in part*, 366 F.3d (3d Cir. 2004) ....................... 33

*United States v. Apex Oil Co.*,
No. 05-CV-242-DRH, 2008 WL 2945402
(S.D. Ill. July 28, 2008), *aff'd*, 579 F.3d 734 (7th Cir. 2009) ....................................... 23, 28

*United States v. ATP Oil & Gas Corp.*,
955 F. Supp. 2d 616 (E.D. La. 2013) ............................................................................ 16

*United States v. Bethlehem Steel Corp.*,
38 F.3d 862 (7th Cir. 1994) .......................................................................................... 32

*United States v. City of Painesville, Ohio*,
644 F.2d 1186 (6th Cir. 1981) .......................................................................... 18, 19, 30

*United States v. Conservation Chem. Co.*,
619 F. Supp. 162 (W.D. Mo. 1985), *overruled in part*,
*United States v. Ne. Pharm. & Chem. Co.*, 810 F.2d 726 (8th Cir. 1986)............. 20, 24, 26, 28

*United States v. E.I. du Pont de Nemours & Co.*,
341 F. Supp. 2d 215 (W.D.N.Y. 2004) ..................................................................... 17,19

*United States v. Gear Box Z Inc.*,
526 F. Supp.3d 522 (D. Ariz. 2021) .............................................................................. 33

*United States v. Hayes Int'l Corp.*,
415 F.2d 1038 (5th Cir. 1969) ................................................................................. 18, 29

*United States v. Hooker Chem. & Plastics Corp.*,
749 F.2d 968 (2d Cir. 1984).......................................................................................... 16

*United States v. Marine Shale Processors*,
81 F.3d 1329 (5th Cir. 1996) .................................................................................. passim

*United States v. Munic. Auth. of Union Twp.*,
150 F.3d 259 (3d Cir. 1998).......................................................................................... 33

*United States v. New-Indy Catawba, LLC*,
No. 0:21-CV-02053-SAL, 2022 WL 18357257 (D.S.C. Sept. 15, 2022),
*appeal docketed sub nom.*, *Enrique Lizano v. New-Indy Catawba, LLC*,

iv

No. 23-1052 (4th Cir. Jan. 17, 2023) ................................................................. 15

*United States v. Oakland Cannabis Buyers' Co-op.*,
  532 U.S. 483 (2001) ................................................................................ 18, 20

*United States v. Price*,
  688 F.2d 204 (3d Cir. 1982) ................................................................... 20, 30

*United States v. Price*,
  577 F. Supp. 1103 (D.N.J. 1983) ..................................................................... 17

*United States v. Prod. Plated Plastics, Inc.*,
  762 F. Supp. 722 (W.D. Mich. 1991) ............................................................. 32

*United States v. Reilly Tar & Chem. Corp.*,
  546 F. Supp. 1100 (D. Minn. 1982) ........................................... 15, 17, 23, 25

*United States v. Waste Indus., Inc.*,
  734 F.2d 159 (4th Cir. 1984) ........................................................................ 30

*Virginian Ry. Co. v. Ry. Emp.*,
  300 U.S. 515 (1937) ...................................................................................... 18

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) ............................................................................ 18, 19, 20

*White v. Carlucci*,
  862 F.2d 1209 (5th Cir. 1989) ................................................................. 18, 29

*Winter v. Natural Resources Def. Council*,
  555 U.S. 7 (2008) .................................................................................. passim

## Statutes

5 U.S.C. § 551 *et seq.* ........................................................................................ 7
33 U.S.C. § 1364(a) ......................................................................... 17, 19, 29
42 U.S.C. § 6973(a) ........................................................................................ 17
42 U.S.C. § 7401(b)(1) ............................................................................ 16, 34
42 U.S.C. § 7410 ............................................................................................ 16
42 U.S.C. § 7411 ............................................................................................ 21
42 U.S.C. § 7412(b)(1) ............................................................................... 4, 21
42 U.S.C. § 7412(d)(1) ..................................................................................... 8
42 U.S.C. § 7412(f) ........................................................................................... 8
42 U.S.C. § 7412(f)(2)(B) ................................................................................ 8
42 U.S.C. § 7413(a)-(d) .................................................................................. 15
42 U.S.C. § 7602(e) ........................................................................................ 22
42 U.S.C. § 7602(g) ................................................................................... 21, 22
42 U.S.C. § 7603 ..................................................................................... passim
42 U.S.C. § 7661-7661f .................................................................................. 16
42 U.S.C. § 7661(2) ........................................................................................ 21
42 U.S.C. § 7661a(a) ...................................................................................... 21
42 U.S.C. § 7661c(a) ...................................................................................... 21
42 U.S.C. § 9606(a) ........................................................................................ 17
44 U.S.C. § 3504(d)(1) ..................................................................................... 7
44 U.S.C. § 3516 .............................................................................................. 7
Pub. L. No. 106-554 (2000), codified at 44 U.S.C. § 3504(d)(1) and 3516 ................... 7

v

Rules

Fed. R. Civ. P. 19(a) .................................................................................................. 5

Legislative History

S. Rep. No. 101-228 (1989) *reprinted in* 1990 U.S.C.C.A.N. 3385................................ 17, 23, 29
H. Rep. No. 101-490 (Part I) (1990) ............................................................................ 4

Regulations

40 C.F.R. § 70.6(f)(3)(i)............................................................................................ 16
54 Fed. Reg. 38,044 (Sept. 14, 1989) ........................................................................ 8

Other Authority

EPA, *Guidance on Section 303 of the Clean Air Act* (April 1999)..………………..…….. 15, 16

**Table of Exhibits**

Exhibit A:      Proposed Preliminary Injunction Order

Exhibit B:      Declaration of James Leathers

Exhibit C:      Declaration of Dr. Nyesha Black

Exhibit D:      Declaration of Dr. John J. Vandenberg

Exhibit E:      Table of 24-hour Canister Air Monitoring Results

Exhibit F:      Declaration of Dr. Ila L. Cote

Exhibit G:      Declaration of Jeffrey R. Harrington

Exhibit H:      Declaration of Dr. Helen Suh

Exhibit I:      Declaration of Nicholas Bobbs

Exhibit J:      Declaration of Jiayang Chien

Exhibit K:      Declaration of Richard A. Wayland

Exhibit L:      Excerpt of October 30, 2015 Memorandum of Ground Lease (Pontchartrain Plant) between E.I. DuPont de Nemours & Co. and Denka Performance Elastomer LLC.

Exhibit M:      January 6, 2017 Administrative Order on Consent, Enforcement Tracking No. AE-AOC-17-00011

**INTRODUCTION**

Every day, thousands of people living in St. John the Baptist Parish breathe the carcinogenic chloroprene emitted from Denka's Neoprene manufacturing operations in LaPlace, Louisiana (the "Facility"). Chloroprene – a hazardous air pollutant under the Clean Air Act and key chemical ingredient for making Neoprene – is a likely, potent "mutagenic" carcinogen. Meaning, when a person breathes chloroprene, it causes DNA mutations in the body's cells. That genetic damage increases the risk of developing potentially fatal cancers, such as lung and liver cancer. The DNA-damaging effects of breathing chloroprene are particularly grave for the still-developing bodies of infants and children. Young people accumulate cancer risks more rapidly than adults, their bodies are less able to repair the genetic damage breathing chloroprene causes, and exposure-related tumors often have shorter latency periods in children than adults— all of which means that children are especially vulnerable to the health risks the Facility poses.

Denka's Facility is the Parish's sole source of chloroprene emissions. These emissions are exposing infants, children, and adults in nearby communities, such as LaPlace, Reserve, and Edgard, Louisiana, to some of the country's highest cancer risks from industrial air pollution. Given their magnitude and the rate at which they are accumulating, these cancer risks constitute an imminent and substantial endangerment to the public health and welfare of Parish residents.

42 U.S.C. § 7603's unmistakably clear text empowers this Court to immediately stop endangerments to public health and welfare caused by air pollution like Denka's carcinogenic chloroprene emissions. This authority, which is intended to prevent harm to public health *before* it actually comes to pass, reigns supreme in the Clean Air Act: the Court is authorized to immediately act "[n]otwithstanding any other provision of [the Act]."

The dangers that Denka's chloroprene emissions present warrant such immediate action. People breathing chloroprene at the levels regularly detected in the communities closest to

1

Denka's Facility – including near homes and an elementary school – will reach and exceed the EPA's and other United States regulatory agencies' presumptive upper threshold for so-called "acceptable" lifetime excess cancer risk within a handful of years.  This threshold is generally expressed as a 1-in-10,000 risk accumulated over the span of an assumed *70-year* lifetime.

Results from multiple air monitoring systems, including a system installed and operated by Denka itself, consistently show long-term average airborne chloroprene concentrations in residential areas closest to the Facility that are more than *fourteen times* greater than 0.2 micrograms of chloroprene per cubic meter of air (0.2 $\mu g/m^3$).  A person may breathe no more than an average chloroprene concentration of 0.2 $\mu g/m^3$ over 70 years in order to remain below a 1-in-10,000 lifetime excess cancer risk.  Breathing higher average concentrations causes the associated risks to accumulate faster.

For infants (< 2 years old) and children (< 16 years old) living near Denka's Facility, these monitoring results mean that their lifetime excess cancer risk threshold is crossed far sooner than 70 years.  Infants who are born today and consistently breathe chloroprene concentrations that average fourteen times greater than 0.2 $\mu g/m^3$ are expected to suffer enough genetic damage to cause double their estimated *lifetime* acceptable excess cancer risk (*i.e.*, 2-in-10,000) by their second birthday – *i.e., 68 years sooner* than they should suffer from half as much risk.  That risk continues to climb as people breathe more of Denka's chloroprene, ultimately reaching more than fourteen times greater than the 1-in-10,000 benchmark over a 70-year lifetime.

The United States' requested preliminary injunction will begin to abate these unacceptably high cancer risks.  *See* Ex. A (Proposed Preliminary Injunction Order).  Under the proposed injunction, Denka must perform a series of specific, near-term actions to immediately

reduce the Facility's chloroprene emissions.  Denka must also begin planning for the long-term

actions the United States will seek as permanent injunctive relief.  These actions, all of which are

technically feasible and reasonable, are intended to make immediate, measurable progress

toward reducing chloroprene related cancer risks from the Facility.  Unless Denka completes

these actions, it must immediately cease chloroprene and Neoprene production at the Facility.

The Court should grant the requested preliminary injunction and order Denka to take

these steps.

## BACKGROUND

### Factual Background

    A.    <u>Thousands of People Live Near Denka's Facility and Breathe its
Chloroprene Emissions</u>

Thousands of people, including young children, live near Denka's Facility.  *See generally*

Ex. C, Decl. of Dr. Nyesha Black.  Approximately 15,000 to 17,000 people live within 2.5 miles

of the Facility's center.  *See id*. ¶¶s 22 and 29.  Over 20% of that population (roughly 3,000-

4,000) is under the age of 18.  *See id*. ¶¶s 32, 35, and 42.  Of those 3,000-4,000 young people,

approximately 800-1,000 are young children under the age of 5.  *See id*. ¶¶s 32, 37, and 42.

Parish residents living as far as 2.5 miles away from Denka's Facility are consistently

exposed to chloroprene concentrations that regularly exceed 0.2 μg/m³.[1]  *See* Ex. D, Decl. of Dr.

John Vandenberg ¶¶s 35, 39–43, Attach. 3 and 4, and Ex. E (Table of 24-hour Canister Air

Monitoring Results).  And many people have lived near the Facility for decades.  *See* Ex. C

¶¶s 49 and 50.  Chloroprene emissions drift across the Facility's fenceline and reach the nearby

residential neighborhoods, schools, and a hospital.  *See id*. ¶¶s 15-19 and 21; *see also* Ex. D

---

[1] Because concentrations of airborne chloroprene generally increase with proximity to Denka's
Facility, so do the cancer risks associated with exposure.  *See* Ex. E.

¶¶s 34-35.  People inevitably breathe these emissions, allowing chloroprene to enter their bodies.  *See* Ex. D ¶ 9 and Ex. F, Decl. of Dr. Ila Cote ¶¶s 15 and 44.  Chloroprene metabolites have been detected in urine samples given by Parish residents.  *See* Ex. F ¶ 44.

Some of the highest chloroprene concentrations detected by ongoing air monitoring are near homes and a local elementary school.  *See* Ex. D ¶¶s 43, 45, and Attach. 4 and Ex. E.  Roughly 300 kindergarteners through fourth graders attend the Fifth Ward Elementary School, which is only about 450 feet away from the Facility's western fenceline.  *See* Ex. C ¶ 45 and Ex. E.  East St. John High School, where about 1,200 students go to school, is roughly a mile-and-a-half north of Denka's Facility.  *See* Ex. C ¶ 44.  Some of these students live in the communities surrounding Denka's Facility and continue to be exposed to its chloroprene emissions even after they go home.  *See id*. ¶¶s 44-45; *see also* Ex. D ¶¶s 35 and 43.

B.      The Facility's Operations Produce Carcinogenic Chloroprene Emissions

Chloroprene is a liquid chemical used to produce the stretchy, synthetic rubber Neoprene.  *See* Ex. D ¶¶s 8–9.  Chloroprene is also a statutorily designated hazardous air pollutant.[2]  *See* 42 U.S.C. § 7412(b)(1).  Congress listed the air pollutants in 42 U.S.C. § 7412(b)(1) because of their "potential for adverse health effects to occur in exposed populations."  *See* H. Rep. No. 101-490 (Part I), at 325 (1990); *see also* Ex. F ¶¶s 2 and 48 (explaining that chloroprene is a likely, potent carcinogen).

---

[2] Chloroprene readily evaporates at room temperature.  *See* Ex. G ¶ 16, Decl. of Jeffrey R. Harrington.  It is produced using other toxic ingredients, including 1,3-butadiene and chlorine.  *See id.* ¶ 15; *see also* 42 U.S.C. § 7412(b)(1) (listing 1,3-butadiene and chlorine as hazardous air pollutants).

There is only one known chloroprene source in all of St. John the Baptist Parish: Denka's

Facility, which is located within the fenceline of the 1,100-acre Pontchartrain Works Site.[3]  *See*

Ex. D ¶ 13.  Chloroprene is routinely emitted into the air at various stages of Denka's Neoprene

manufacturing operations.  *See* Ex. G ¶ 23; *see also* Ex. I ¶ 22, Decl. of Nicholas Bobbs.  It is

emitted through vents from the manufacturing equipment that discharge directly to the

atmosphere.  *See* Ex. G ¶¶s 23-24; Ex. I ¶ 22.  It is emitted when tanks and other process vessels

are opened, during normal operations and maintenance work.  *See* Ex. G ¶ 25; Ex. I ¶ 23.  It is

also emitted through more diffuse ("fugitive") sources, like equipment leaks and evaporative

emissions from wastewater generated during Neoprene manufacturing.  *See* Ex. G ¶¶s 25-26 and

29; Ex. I ¶¶s 24-25.

      C.    <u>Chloroprene is a potent, likely human carcinogen</u>

Breathing chloroprene increases the risk of developing potentially fatal cancers, such as

lung and liver cancer.  *See* Ex. F ¶ 42; *see also* Ex. H, Decl. of Dr. Helen H. Suh ¶¶s 32, 36, 42,

and 46, and Ex. D ¶¶s 20–22.  Chloroprene creates this risk because of its mutagenic mode of

action.  *See* Ex. F ¶¶s 34–36; *see also* Ex. D ¶ 22.

Infants and children younger than 16 are likely to be especially susceptible to the cancer-

causing effects of mutagens like chloroprene.  *See* Ex. F ¶¶s 39–41; *see also* Ex. D ¶¶s 22–23

and 64–66.  This is because our cells divide and replicate more rapidly when we are younger,

---

[3] E.I. du Pont de Nemours & Co., Inc. and its predecessors-in-interest (collectively "E.I. DuPont") ran the Neoprene manufacturing operations for many years before selling them to Denka as part of a major corporate restructuring in 2014 and 2015.  *See* Ex. D ¶ 10.  E.I. DuPont, however, retained ownership of the land underneath the entire Pontchartrain Works Site and became Denka's landlord pursuant to a 99-year "Ground Lease."  *See* Ex. L, ¶¶s 1-3.  Defendant DuPont Specialty Products USA LLC ("DuPont Specialty Products") now owns the Pontchartrain Works Site's land.  DuPont Specialty Products is a required party under Fed. R. Civ. P. 19(a) because Denka may need DuPont Specialty Products' permission under the Ground Lease in order to comply with any Court-ordered relief.

leaving less time for the body to repair DNA mutations before the damaged cells replicate. *See* Ex. F ¶ 41. The more rapid replication of mutated cells increases the risk of developing cancer. *See id*. Infants and children are also more susceptible to chloroprene's cancer-causing risks for physiological reasons. *See id*. Because of their smaller, still-developing bodies, they will likely have higher and more persistent blood concentrations of chloroprene or its metabolites than adults exposed to the same air concentrations of chloroprene. *See id*. And cancers in children often present with shorter latency periods, meaning exposure-related tumors are expected to appear sooner than in comparably exposed adults. *See id*. Chloroprene exposure during a person's early years is therefore particularly harmful. *See id*.

The EPA determined that chloroprene is a likely human carcinogen, and that it acts through a mutagenic mode of action, in its peer-reviewed 2010 Integrated Risk Information System assessment of chloroprene (the "2010 IRIS Assessment"). *See* Ex. F ¶¶s 2 and 45–54; *see also* Ex. D ¶¶s 19–24. IRIS assessments identify the types of human health hazards – such as the risk of developing cancer – that exposure to a particular chemical may cause. *See* Ex. F ¶ 46. The EPA then quantifies the correlation between exposure to the chemical and the related health hazards to arrive at a numerical estimate of its carcinogenic potency.[4] *See id*. ¶ 49.

For the relevant health effects of breathing chloroprene, the EPA determined that the average concentration of chloroprene a person may regularly breathe over a 70-year lifetime without being expected to exceed a 1-in-10,000 risk of contracting chloroprene-linked cancers is 0.2 µg/m³.[5] *See* Ex. D ¶ 43, n.23 and ¶ 70 and Ex. F ¶ 51, Table 1.

---

[4] The "inhalation unit risk estimate" is the technical term for EPA's human cancer potency estimate associated with breathing chloroprene. *See* Ex. D, ¶ 21.

[5] The EPA uses a 70-year timeframe for determining an acceptable "lifetime" cancer risk. *See* Ex. D ¶¶s 23, 54, and 56.

IRIS assessments are extensively peer-reviewed by experts inside and outside of the

United States government, and are recognized as the gold standard for chemical assessments for

cancer risks.  *See Nat'l Oilseed Processors Ass'n v. Browner*, 924 F. Supp. 1193, 1199-1200 n.9

(D.D.C. 1996) (IRIS assessments offer "comprehensive hazard assessments conducted by panels

of senior EPA scientists"); *see also* Ex. F ¶ 46.  Although IRIS assessments and their conclusions

are not law, courts recognize that IRIS assessments, because of the rigorous vetting process, are

"generally accepted as a reliable source of information on the potential hazardous effects of those

chemicals that are included in IRIS."  *Nat'l Oilseed Processors Ass'n*, 924 F. Supp. at 1200; *see*

*also Leese v. Martin*, Civ. No. 11-5091, 2012 WL 1224573, at *1 n.2 (D.N.J. 2012) (taking

judicial notice of the trichloroethylene IRIS assessment and suggesting, by reference to Fed. R.

Evid. 201(b), that it is a source whose accuracy cannot reasonably be questioned).  The EPA and

other agencies rely on IRIS assessments as a thoroughly vetted scientific foundation for chemical

regulations and other health risk-based decisions.  *See* Ex. F ¶ 46.

The 2010 IRIS Assessment was based on a comprehensive review of the available

evidence on chloroprene toxicity, including animal toxicology data, evidence of chloroprene's

mutagenic properties, and human epidemiological data.  *See* Ex. F ¶ 47 and Ex. H ¶¶s 11 and 13.

Before it was finalized, the 2010 IRIS Assessment was first subject to a rigorous review process

within the EPA, by other federal agencies and White House offices, and the public.  *See* Ex. F

¶¶s 46–47.  The conclusions of the 2010 IRIS Assessment were then vetted and confirmed by an

independent external peer review panel.  *See* Ex. F ¶ 47.  After Denka raised objections, starting

in 2016, to the then-published 2010 IRIS Assessment, the EPA again convened an independent

external peer-review panel of experts to assess Denka's concerns.[6]  *See* Ex. F ¶ 47 n.50 and ¶ 56.

After thoroughly reviewing Denka's concerns, members of this second peer review panel found

flaws in Denka's submission and its potential application in chloroprene risk assessment.  The

EPA consequently concluded that Denka's submission did not provide a valid basis to change the

2010 IRIS Assessment's findings about chloroprene's cancer-causing potential.  *See* Ex. F ¶ 56.

No post-2010 science undermines the 2010 IRIS Assessment's conclusions about

chloroprene's carcinogenic effects.  *See* Ex. F ¶¶s 55–57; *see also* Ex. H ¶¶s 23-30 (reviewing

Denka's 2021 analysis of Louisiana Tumor Registry data) and 46-51.

D.     People in St. John the Baptist Parish should not be exposed to a
       <u>greater than 1-in-10,000 risk of contracting chloroprene related cancers</u>

A 1-in-10,000 risk is a generally accepted upper threshold for acceptable lifetime excess

cancer risk associated with exposure to a single pollutant.  *See* Ex. D ¶¶s 59 and 67.c., and Ex. F

¶ 59.  EPA air and non-air programs use this threshold.  *See* Ex. D Attach. 8.  So do other federal

agencies that regulate human health risks from carcinogens.  *See id*.

For example, the EPA follows a policy that sets a presumptive 1-in-10,000 upper

threshold for acceptable excess lifetime cancer risk when the agency reviews national emission

standards for hazardous air pollutants ("NESHAPs") governing source categories under Clean

---

[6] Denka filed a series of administrative petitions under the Information Quality Act (Section 515 of Pub. Law 106-554 (2000), codified at 44 U.S.C. §§ 3504(d)(1) and 3516) challenging the 2010 IRIS assessment.  Denka's ultimate goal was to increase the 0.2 µg/m[3] IRIS value by roughly two orders of magnitude.  Denka's chloroprene emissions consistently meet its preferred value.  *See* Ex. E.  After thorough consideration, the EPA denied each of Denka's petitions, most recently in October 2022.  Denka recently filed an action under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*, to challenge the EPA's decisions.  *See Denka Performance Elastomer LLC v. U.S. EPA, et al.*, No. 2:23-cv-147 (E.D. La. 2023).

Air Act Section 112(f), 42 U.S.C. § 7412(f).[7]  *See* 54 Fed. Reg. 38,044, 38,045 (Sept. 14, 1989)

(EPA's "1989 Residual Risk Policy").[8]  Congress subsequently endorsed this policy in the Clean

Air Act's 1990 amendments.  *See* 42 U.S.C. § 7412(f)(2)(B).  A handful of Clean Air Act

NESHAPs, out of dozens, have tolerated greater than 1-in-10,000 cancer risks presented by

individual source categories.  *See* Ex. F ¶ 60.  But these rare exceptions were for narrow, case-

specific reasons that are not relevant to Denka's Facility.  *See* Ex. F ¶¶s 61-66.  Moreover, in no

instance did the allowable estimated risks exceed 2.7-in-10,000, and only about 120 people *in*

*total* were expected to be exposed to such risks.  *See id.* ¶ 65.

     E.     <u>Air Monitoring Shows Average Chloroprene Levels Consistently Much</u>
                  <u>Greater Than 0.2 µg/m³</u>

A substantial, multi-year set of air monitoring data shows that the communities

surrounding Denka's Facility are being exposed to long-term average airborne chloroprene levels

that are between two and over fourteen times greater than 0.2 µg/m³.  *See* Ex. D ¶¶s 25–53, Ex.

E, Ex. J, Decl. of Jiayang Chien, and Ex. K, Decl. of Richard A. Wayland.  Chloroprene

concentrations greater than 0.2 µg/m³ extend about two-and-a-half miles from Denka's Facility.

*See* Ex. D ¶¶s 39–43, Attach. 3 and 4 and Ex. E; *see also* Ex. J and Ex. K.

In mid-to-late 2016, the EPA and Denka both began monitoring chloroprene

concentrations in the air around Denka's Facility.  *See* Ex. D ¶¶s 39 and 43.  Two monitoring

---

[7] NESHAPs are regulations that limit the amount of hazardous air pollutants from designated industrial source categories.  *See* 42 U.S.C. § 7412(d)(1).  Source categories are groups of stationary sources of air pollution that generally correspond to a common type of manufacturing processes or equipment within a given industry.  For example, there are source category NESHAPs that cover petroleum refineries, the pulp and paper industry, and synthetic organic chemicals manufacturing plants.

[8] The EPA established the 1989 Residual Risk Policy in response to a court order directing the agency to determine the limits of what constitute "safe" or "acceptable" risk levels based on a judgment of "what risks are acceptable in the world in which we live."  *NRDC, Inc. v. U.S. E.P.A.*, 824 F.2d 1146, 1165 (D.C. Cir. 1987).

networks (one operated by Denka, the other by the EPA) were installed.  *See id*. ¶¶s 26–31.  This monitoring was intended to better understand the amount of chloroprene in the air near Denka's Facility and to better characterize the associated health risks to the surrounding communities. *See id*. ¶ 25.

Until the EPA stopped using its original monitors in mid-2020, both the EPA's and Denka's monitors gathered 24-hour air samples to measure for chloroprene every few days.[9]  *See* Ex. D. ¶¶s 27 and 30.  The EPA's six monitors were located in a rough ring *outside* the Facility's property line.  *See id*. ¶ 28, Attach 3.  Denka's six monitors, which continue to collect samples, are located at points *on* the Facility's property line that are close to, but not exactly the same as, the EPA's monitors.  *See id*. ¶ 31, Attach 3.  These air monitors have generated a robust and reliable set of data to assess human exposure and the associated public health risks from Denka's chloroprene emissions.[10]  *See id*. ¶¶s 33-34 (explaining that the available ambient air monitoring data is one of the best sources of exposure data for estimating inhalation cancer risks from Denka's chloroprene emissions).

The results from both Denka's and the EPA's air monitoring networks closely align and consistently show average airborne chloroprene concentrations in the communities surrounding

---

[9] The EPA discontinued its 24-hour monitoring in favor of a different type of monitor that focuses on detecting short-term, higher-level emission "spikes."  *See* Ex. D ¶ 51.

[10] In 2022, Denka also deployed a network of "passive" diffusion tube monitors that measure chloroprene emissions over two-week intervals.  *See* Ex. D ¶¶s 36 and 46.  Twenty-one of these passive monitors were ultimately installed along the Facility's fenceline.  *See id*. ¶ 36. Consistent with the results of the EPA's and Denka's 24-hour air sampling, all 21 of these monitors have measured chloroprene concentrations averaging 0.2 µg/m$^3$ or greater since they began operating.  *See id*. ¶ 49, Attach. 7.

Denka's Facility that are very high – multiples greater than 0.2 μg/m$^3$.[11]  *See* Ex. D ¶ 38, 45 and

Attach. 5 and 6; Ex. E.  These high levels persist even though Denka substantially cut the

Facility's chloroprene emissions after purchasing it.[12]  *See* Ex. D Attach 2.  The hundreds of

people living within one mile of the Pontchartrain Works Site (primarily near the "Chad Baker"

and "Western" monitors) are being exposed to the highest average levels of chloroprene – more

than fourteen times greater than 0.2 μg/m$^3$.  *See id*. ¶ 59; *see also* Ex. C ¶¶s 21 and 30(b).

Indeed, one of the highest chloroprene concentrations (*almost 600 times greater than 0.2 ug/m$^3$*)

was recently measured on Monday, October 10, 2022 – a school day – at Denka's Western Site,

just a few hundred feet from the Fifth Ward Elementary School.  *See* Ex. D ¶ 62 (measurement

of 118 ug/m$^3$).  Even the lowest measured average value for Denka's five closest monitors (out

of the six total) is about four times greater than 0.2 μg/m$^3$.  *See* Ex. D Attach. 4 and Ex. E.

    Although this case focuses on current average airborne chloroprene concentrations, the

cumulative impacts from the Facility's decades of historical emissions cannot be ignored.

Chloroprene emissions and the consequent cancer risks to the public were even higher before

Denka implemented the projects required by the 2017 State AOC.  *See* Ex. D ¶¶s 14, 37, 52, 61,

Attach. 2.

---

[11] Because the newer system of 21 passive fenceline monitors has been operating for less than
one year and uses a different monitoring methodology, we primarily rely on the data from the
24-hour monitors to determine longer-term average chloroprene concentrations.  *See* Ex. D ¶ 36.

[12]  In 2017, Denka and the Louisiana Department of Environmental Quality ("Louisiana DEQ")
entered into an administrative order on consent (the "2017 State AOC"), which committed
Denka to a series of emission control projects to cut its chloroprene emissions by 85%.  *See* Ex.
M at 1, § V.

F.      The Proposed Preliminary Injunctive Relief is Feasible and Tailored to
        Reduce Denka's Chloroprene Emissions

The United States requests that the Court order Denka to perform two basic categories of

actions, all of which are technically feasible, reasonable, and tailored to addressing the imminent

and substantial endangerment caused by the Facility's emissions.  Unless Denka completes these

actions, it must immediately cease chloroprene and Neoprene production at the Facility.  *See* Ex.

A at 1.  First, Denka must take a series of specific, achievable near-term actions to immediately

reduce the Facility's chloroprene emissions.  *See* Ex. A ¶¶s 2-6(a)-(c); *see also* Ex. G ¶¶s 37-73,

78, 86-88, and 91.  Second, Denka must begin planning the long-term air pollution control

equipment needed to permanently reduce the risks from its chloroprene emissions.  *See* Ex. A

¶¶s 6(d)-8; *see also* Ex. G ¶¶s 76-79, 90, and 92.  This permanent relief will ultimately reduce

the chloroprene-related cancer risks from Denka's Facility to acceptable levels.

        1.   Immediate actions

The proposed order requires Denka to physically enclose several known chloroprene

sources so that their now-diffuse, or simply uncontrolled, emissions can be captured and then

routed to effective air pollution control equipment.[13]  *See* Ex. A ¶ 2.  This requirement targets the

Facility's several "Poly Kettle Strainers."  *See id*; *see also* Ex. G ¶¶s 39-44 (explaining what the

Poly Kettle Strainers are) and Ex. I ¶ 26.  Until more permanent structures can be built,

reasonable interim enclosures can and should be constructed relatively quickly.  *See* Ex. G ¶¶s 45

---

[13] Denka has existing air pollution control equipment that is effective at reducing chloroprene emissions.  For example, its existing "Regenerative Thermal Oxidizer" – a type of thermal incinerator for air pollutants – can destroy more than 98% of the chloroprene in waste gases routed to it.  *See* Ex. G ¶ 27.  There are also third-party vendors that can provide similarly effective, trailer-mounted air pollution control equipment that can be quickly brought onsite and installed to reduce Denka's chloroprene emissions.  *See id*. ¶¶s 67, 78, and 86.

and 48-49.  And effective permanent enclosures can be built within a few months.  *See id.*
¶¶s 46-47 and 50-51.

The proposed order also requires Denka to capture and control emissions from certain
emissions-generating waste handling practices, such as cleaning out coagulated waste polymer
from the Poly Kettle Strainers.  *See* Ex. A ¶ 3 and Appd'x; *see also* Ex. G ¶¶s 38-40 and 43;
Ex. I ¶ 25 (explaining how Denka uses the Outside Brine Pit to treat "Waste Coag").  These
requirements can be accomplished using relatively simple covered wheeled containers or drums.
*See* Ex. G ¶¶s 52-54.  Denka has already evaluated the effectiveness of some of these practices.
*See id.* ¶ 53.  And emissions from some of these sources and activities can already be controlled
by taking advantage of unused capacity in existing onsite air pollution equipment, like the
Facility's Regenerative Thermal Oxidizer.  *See id.* ¶¶s 53 and 79.

Denka must also improve how it controls chloroprene emissions from certain common
maintenance activities at the Facility, such as cleaning out other types of tanks and vessels that
handle chloroprene-containing materials.  *See* Ex. A ¶ 4.  These cleaning activities often require
such vessels to be opened to the air, which creates the potential for chloroprene emissions.  *See*
Ex. G ¶¶s 38 and 57-59; Ex. I ¶ 23.  The proposed order requires Denka to control both the air
emissions and wastewater generated from such cleaning activities.[14]  *See* Ex. A ¶ 4; *see also* Ex.
G ¶ 60.  Improved sequencing in the cleaning procedure, as well as including new cleaning steps,
are a first step Denka can take to reduce chloroprene emissions relatively simply and
inexpensively.  *See* Ex. G ¶¶s 61-63 and 66-67.

---

[14] Because chloroprene readily evaporates, it will quickly volatilize from unenclosed wastewater
and become fugitive air emissions.  *See* Ex. G ¶¶s 16, 29, 60, and 90-91.

Denka is also required under the proposed order to improve certain lax, easy-to-fix, housekeeping practices that EPA inspections have identified as sources of excess chloroprene emissions.  *See* Ex. A ¶ 6(a)-(b); *see also* Ex. G ¶ 58 and Ex. I ¶¶s 48-54.  For example, ensuring that hatches and openings to chloroprene-containing vessels are not unnecessarily left open, as well as ensuring that hatch seals are maintained so that they close properly and do not leak chloroprene into the air.  *See* Ex. A ¶ 6(a)-(b); *see also* Ex. G ¶ 58 and Ex. I ¶¶s 54-55.

Lastly, Denka must improve its leak detection and repair ("LDAR") procedures, first at one specific Facility location (the "Poly Building"), then Facility-wide.[15]  *See* Ex. A ¶ 6(b)-(c); *see also* Ex. G ¶¶s 68-73 and Ex. I ¶¶s 56-57.  These improvements include increasing how often Denka inspects equipment components that have the potential to "leak" chloroprene.  *See* Ex. A ¶ 6(b)-(c); *see also* Ex. G ¶¶s 72-73 and Ex. I ¶ 57.  Denka must also lower its leak detection and repair action threshold, so that more leaks are detected and repaired sooner.  *See* Ex. A ¶ 6(b)-(c); *see also* Ex. G ¶ 72 and Ex. I ¶¶s 53 and 58.

2.   Planning for long-term, permanent emission reductions

The requested preliminary injunction orders Denka to develop plans, in accordance with specifications in the proposed order, that propose the actions Denka will take to permanently reduce the cancer risks from its chloroprene emissions upon entry of a final, permanent injunction by this Court.  *See* Ex. A ¶¶s 6(d)-8.  These plans, which must be filed with the Court by specified deadlines, must propose how Denka will control emissions from the major

---

[15] LDAR is a program designed to identify and reduce fugitive emissions by monitoring certain types of equipment components that have the potential to leak volatile organic compounds and/or hazardous air pollutants (*e.g.*, valves, pumps, piping connectors, hatch seals and gasketing).  *See* Ex. G ¶¶s 69-70 and Ex. I ¶ 4 n.1.  A leak is defined by reference to a specific detected concentration of volatile organic compounds and/or hazardous air pollutants (*e.g.*, 100 parts per million of chloroprene).  *See* Ex. G ¶ 69 and Ex. I ¶ 4 n.1.  Monitoring results that indicate leaks trigger repair requirements to reduce emissions that can eventually reach the atmosphere.  *See id.*

remaining known chloroprene sources at the Facility – the Facility's Poly Kettle Building, Neoprene "wash belts," and wastewater system, including an uncontrolled and unenclosed waste pit (the "Outside Brine Pit").  *See* Ex. A ¶¶s 6(d)-8; Ex. G ¶¶s 78-79 and 91-92 and Ex. I ¶ 25 (explaining the types of coagulated polymer wastes treated in the Outside Brine Pit).  There are commonly available air pollution control technologies and operational practices that Denka can implement to meet the required specifications.  *See, e.g.*, Ex. G ¶¶s 30-31 and 35-36.  The Preliminary Injunction Order also includes the deadlines by which the proposed work must be completed.  *See* Ex. A ¶¶s 6(d)-8.  But Denka need not implement the plans' requirements until it is ordered by the Court to do so.  *See id*.

   3.  Monitoring compliance

Denka must file monthly reports with the Court that describe Denka's compliance with the preliminary injunction.  *See* Ex. A ¶ 9 (describing content of monthly status reports).

   4.  Facility access and consent of landlord

Denka must provide the United States with full access to the Facility to monitor compliance with this Order, including by conducting inspections, monitoring, and sampling.  *See* Ex. A ¶ 1.

Denka must also take all necessary steps to secure the consent of its landlord, DuPont Specialty Products, so that Denka is permitted under the terms of its 99-year Ground Lease to undertake all actions needed to comply with the Court's order.  *See* Ex. A ¶ 1.  Some of the work required by the proposed preliminary injunction might trigger DuPont Specialty Products' rights under the Ground Lease as Denka's landlord.

**Legal Background**

    A.   <u>42 U.S.C. § 7603 – Clean Air Act Section 303</u>

    42 U.S.C. § 7603 is an endangerment provision that, like its counterparts in several other environmental statutes, broadly grants "appropriate government officials the right to seek judicial relief or take other appropriate actions to avert imminent and substantial threats to the environment or public health." *United States v. Reilly Tar & Chem. Corp.*, 546 F. Supp. 1100, 1107 (D. Minn. 1982). The statute's key portion authorizes a civil action to abate such threats from air pollution. *See* 42 U.S.C. § 7603 (authorizing "district court to immediately restrain any person causing or contributing to the alleged pollution to stop the emission of air pollutants…or to take such other action as may be necessary").

    The text of 42 U.S.C. § 7603 empowers this Court to act decisively when presented with compelling evidence that a pollution source, like Denka's Facility, is presenting an imminent and substantial endangerment to public health or welfare. *See United States v. New-Indy Catawba, LLC*, No. 0:21-CV-02053-SAL, 2022 WL 18357257, at *10 (D.S.C. Sept. 15, 2022), *appeal docketed sub nom.*, *Enrique Lizano v. New-Indy Catawba, LLC*, No. 23-1052 (4th Cir., Jan. 17, 2023). And, unlike the Clean Air Act's other enforcement authorities (42 U.S.C. § 7413(a)-(d)), the United States need not prove that an underlying statutory or regulatory requirement was violated in order to invoke 42 U.S.C. § 7603. *See New-Indy Catawba*, 2022 WL 18357257, at *10; *see also Guidance on Section 303 of the Clean Air Act* at 1 (April 1999) ("EPA 303 Guidance") (noting that 42 U.S.C. § 7603 "is a 'gap-filling' authority, providing a basis for injunctive relief… regardless of a pollution source's compliance or noncompliance with the [Clean Air] Act").

    The statute's plain language, as well as the related legislative history, instructs the Court to "giv[e] *paramount importance* to the sole objective of the public health" and "to overlook

technological and economic feasibility" in the name of achieving this objective. *Trinity Am. Corp. v. U.S. E.P.A.*, 150 F.3d 389, 394-95 (4th Cir. 1998) (*citing United States v. Hooker Chem. & Plastics Corp.*, 749 F.2d 968, 988 (2d Cir. 1984)) (emphasis added).  Indeed, 42 U.S.C. § 7603 empowers this Court to immediately enjoin endangerments to public health and welfare caused by air pollution "[n]othwithstanding any other provision of [the Clean Air Act]."  *See Trinity*, 150 F.3d at 394-95 (citing Safe Drinking Water Act legislative history and explaining that "EPA's powers under this provision are 'intended to override *any* limitations upon the Administrator's authority found elsewhere' in the Act") (emphasis in original).[16]

42 U.S.C. § 7603 therefore gives the Court jurisdiction to craft "complete relief" in light of its statutory purposes and the Clean Air Act's broader purposes.  *See Mitchell v. Robert De Mario Jewelry*, 361 U.S. 288, 291-92 (1960); *see also* 42 U.S.C. § 7401(b)(1).  There is no limitation in 42 U.S.C. § 7603 suggesting otherwise.  *Cf. Mitchell*, 361 U.S. at 291-92 (jurisdiction is "not to be denied or limited in the absence of a clear and valid legislative command"); *see also United States v. ATP Oil & Gas Corp.*, 955 F. Supp. 2d 616, 636 (E.D. La. 2013) (courts' equitable powers are "at their apex when the public interest is involved").

Although there are no cases discussing the statutory provision in detail, the Clean Air Act's legislative history is clear that 42 U.S.C. § 7603 is intended "to conform the [EPA's] emergency authority under the [Clean Air Act] to emergency authorities under other environmental laws."  S. Rep. No. 101-228 (1989), 1990 U.S.C.C.A.N. 3385, 3753 (citing the

---

[16] It does not matter that the EPA will soon propose revisions under 42 U.S.C. § 7412(d)(6) to existing regulations at 40 C.F.R. Part 63, Subparts G and U that govern the Facility's chloroprene emissions.  It also does not matter that the Facility's chloroprene emissions are already regulated under one of Denka's "Title V" operating permits (required under 42 U.S.C. §§ 7661-7661f) or the terms of Louisiana's state implementation plan (required by 42 U.S.C. § 7410).  *See* 40 C.F.R. § 70.6(f)(3)(i).  42 U.S.C. § 7603 provides a cause of action notwithstanding any of these other Clean Air Act requirements.  *See* EPA 303 Guidance at 1.

imminent and substantial endangerment authorities under the Resource Conservation and

Recovery Act ("RCRA"), 42 U.S.C. § 6973(a), the Clean Water Act, 33 U.S.C. § 1364(a), and

the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42

U.S.C. § 9606(a)).  The legislative history behind these analogous environmental statutes, as well

as the caselaw interpreting them, would thus be the proper tools to understand 42 U.S.C.

§ 7603 if its plain text was not clear.[17]

    B.    <u>Standard for Preliminary Injunctions in Statutory Enforcement Cases</u>

Private plaintiffs seeking a preliminary injunction must prove: (1) they are likely to

succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of a

preliminary injunction; (3) the balance of equities tips in their favor; and (4) a preliminary

injunction is in the public interest.  *Winter v. Natural Resources Def. Council*, 555 U.S. 7, 20

(2008).  These factors are viewed and weighed differently here, however, because the United

States is bringing a statutory action for injunctive relief on behalf of the public.  Fifth Circuit

precedent explains that, in such cases, the Court may issue an injunction "without making

findings of irreparable harm, inadequacy of legal remedy, or the balance of convenience" if the

United States proves it is likely to succeed on the merits.  *See, e.g.*, *United States v. Marine Shale*

*Processors*, 81 F.3d 1329, 1358-59 (5th Cir. 1996); *White v. Carlucci*, 862 F.2d 1209, 1211 (5th

Cir. 1989); *United States v. Hayes Int'l Corp*., 415 F.2d 1038, 1045 (5th Cir. 1969).

"The Supreme Court emphasize[s] that when a court is called upon to enforce a federal

statutory injunction, its reliance upon the traditional practices of equity must be 'conditioned by

---

[17] Courts look to analogous language in similar endangerment statutes for interpretive guidance.
*See Reilly Tar & Chem. Corp*., 546 F. Supp. at 1107; *see also United States v. Price*, 577 F.
Supp. 1103, 1110-11 (D.N.J. 1983) (comparing CERCLA § 106 and RCRA § 7003 "imminent
hazards" provisions is "inevitable"); *see also United States v. E.I. du Pont de Nemours & Co.*,
341 F. Supp. 2d 215, 246-48 (W.D.N.Y. 2004) (examining RCRA caselaw to interpret
"imminent and substantial endangerment" in a CERCLA case).

the necessities of the public interest which Congress has sought to protect.'" *United States v. City of Painesville, Ohio*, 644 F.2d 1186, 1193 (6th Cir. 1981) (*quoting Hecht Co. v. Bowles*, 321 U.S. 321, 330 (1944)); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 319 (1982).  The Court's traditionally broad discretion in deciding whether to grant injunctive relief is consequently shaped by the "'judgment of Congress, deliberately expressed in [the] legislation.'" *See United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001) (*citing Virginian Ry. Co. v. Ry. Emp.*, 300 U.S. 515, 551 (1937)).

Here, the Court's discretionary injunctive powers are "tempered by its obligation to carry out the congressional mandate contained in the Clean Air Act."  *City of Painesville, Ohio*, 644 F.2d at 1193.  Congress has "deliberately expressed" in 42 U.S.C. § 7603 that enjoining endangerments to public health and welfare should be given paramount importance "[n]othwithstanding" any other part of the Clean Air Act.  *See* 42 U.S.C. § 7603.  Consequently, if the United States proves that it is likely to succeed in its claim that Denka's chloroprene emissions are causing a public health endangerment, the Court cannot dispute that "enforcement is preferable to no enforcement at all."  *Oakland Cannabis Buyers' Co-op.*, 532 U.S. at 497 ("Courts of equity cannot, in their discretion, reject the balance that Congress struck in a statute" or "override Congress' policy choice, articulated in a statute, as to what behavior should be prohibited").  The Court must use 42 U.S.C. § 7603's authority to abate the endangerment.  *See id*. at 497-98; *see also City of Painesville*, 644 F.2d at 1194 (Congress placed "high priority" on controlling air pollution when it enacted the Clean Air Act)  And here, the requested injunctive relief is the best means to vindicate 42 U.S.C. § 7603's objectives.  *See Weinberger*, 456 U.S. at 314 (analyzing *Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978)).

Furthermore, the Court should analyze the individual *Winter* factors in a light more favorable to the United States because the requested injunction seeks to protect a statutory public interest. *See, e.g.*, *Maine People's All. and Nat. Res. Def. Council v. Mallinckrodt, Inc.*, 471 F.3d 277, 296 (1st Cir. 2006) (explaining that the factors for an injunction are "inevitably colored by the nature of the case and the purposes of the underlying environmental statute"); s*ee also Marine Shale Processors*, 81 F.3d at 1358-59 (emphasizing the "the extraordinary weight courts of equity place upon the public interests in a suit involving more than a mere private dispute").

## ARGUMENT

Without the requested injunction, Denka's chloroprene emissions will continue to cause rapidly accumulating and unacceptably high lifetime excess cancer risks to thousands of infants, children, and adults living in St. John the Baptist Parish.  And unnecessarily so.  There are reasonable actions that Denka can immediately take to reduce the public health risks its emissions are causing.  *See generally* Ex. G ¶¶s 37-73, 78, 86-88, and 91.

The Supreme Court has found that the Clean Water Act's virtually identical endangerment provision is a "rule of immediate cessation." *Weinberger*, 456 U.S. at 317 (explaining that 33 U.S.C. § 1364(a) "*directs*…the EPA to seek an injunction to restrain immediately discharges of pollutants [it] finds to be presenting an imminent and substantial endangerment") (emphasis added).  The Court should similarly construe 42 U.S.C. § 7603 and issue an injunction after the United States shows a likelihood of success on the merits. *See City of Painesville*, 644 F.2d at 1194 ("district court was required to order injunctive relief upon its finding of liability"); *see also E.I. du Pont de Nemours & Co.*, 341 F. Supp. 2d at 247 (*citing United States v. Conservation Chem. Co.*, 619 F. Supp. 162, 192 (W.D. Mo. 1985), *overruled on other grounds*, *United States v. Ne. Pharm. & Chem. Co.*, 810 F.2d 726 (8th Cir. 1986)) ("The expansive scope of the terms 'public welfare' and 'environment' mandates the conclusion that

Congress intended injunctive relief to issue whenever any aspect of the nation's interest in a

clean environment may be endangered imminently and substantially").  Congress' "order of

priorities," as expressed in 42 U.S.C. § 7603 would be "deprived of effect" if the Court chose to

deny the requested injunctive relief.  *Id.* (*citing Hill*, 437 U.S. at 173) (finding that the district

court in *Hill* "lacked discretion" to refuse to order an injunction).[18]

It is true that a court is ordinarily "not mechanically obligated to grant an injunction for

every violation of law."  *Weinberger*, 456 U.S. at 313; *Oakland Cannabis Buyers' Co-op.*, 532

U.S. at 496.  But without the requested injunction, Denka's chloroprene emissions will defy the

intent behind 42 U.S.C. § 7603 and continue at levels that present unacceptably high cancer risks

to thousands of Parish residents, particularly infants and young children.  *See, e.g.*, Ex. D ¶¶s 69–

70 and Ex. I ¶ 54.  The Court should therefore act to "stop the emission[s]…causing or

contributing to such pollution."  42 U.S.C. § 7603.

## I.    The United States is Likely to Prove that Denka's Carcinogenic Chloroprene Emissions Constitute an Imminent and Substantial Endangerment

To show a likelihood of success on the merits, the United States must clearly satisfy the

burden of persuasion.  *See Monumental Task Comm., Inc. v. Foxx*, 157 F. Supp. 3d 573, 582

(E.D. La. 2016), *aff'd sub nom. Monumental Task Comm., Inc. v. Chao*, 678 F. App'x 250 (5th

Cir. 2017) (same).  But that does not require the United States to prove that it is entitled to

---

[18] 42 U.S.C. § 7603 authorizes the requested mandatory preliminary injunction and is not limited to prohibitory final injunctions.  *See* 42 U.S.C. § 7603 (Court may immediately "stop" the emissions or require Denka "to take such other action as may be necessary").  Here, the status quo is actively endangering public health.  It is therefore "necessary to alter the situation." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974); *see also United States v. Price*, 688 F.2d 204, 212 (3d Cir. 1982) (mandatory preliminary injunction proper when "the status quo is a condition of action which, if allowed to continue or proceed unchecked and unrestrained, will inflict serious irreparable injury"); *Francisco Sanchez v. Esso Std. Oil Co.*, 572 F.3d 1, 21 (1st Cir. 2009).

summary judgment.  *See Monumental Task Comm., Inc.*, 157 F. Supp. 3d at 585; *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013).

      A.    <u>Denka's Facility is a "pollution source"</u>

      Denka's Facility emits more than one hundred tons of air pollution each year.  *See* Ex. G ¶ 14.  There is no serious dispute that it is a "source" or "combination of sources" of air pollution.  *See* 42 U.S.C. § 7603.  A plain English reading suggests that the Facility fits these terms, and a closer inspection of the statutory text confirms this conclusion.[19]  In addition, each of the Facility's three process units has its own Clean Air Act Title V operating permit because each unit is regulated as a "major" stationary source of air pollution.  *See* Ex. G ¶ 14 and Ex. I ¶ 21.[20]

      There is also no serious dispute that the hazardous chloroprene Denka's Facility emits into the air constitutes "pollution."  *See* 42 U.S.C. § 7603.  Chloroprene is a chemical substance and statutorily designated hazardous air pollutant.  *See* 42 U.S.C. § 7412(b)(1) (listing chemicals designated as hazardous air pollutants).  It is therefore an "air pollution agent" and an "air pollutant."  *See* 42 U.S.C. § 7602(g) (defining "air pollutant" as "any air pollution agent or combination of such agents, including any…chemical substance…which is emitted into or otherwise enters ambient air").

---

[19] The unqualified terms "source" and "pollution source" encompass the more specific "stationary sources" and "moving sources."  *See* 42 U.S.C. § 7603 (confirming that "sources" includes "moving" sources).  Denka's Facility clearly is a "stationary source" – one type of source or pollution source.  *See* 42 U.S.C. § 7411 (defining "stationary source" to include "any building, structure, facility, or installation which emits or may emit any air pollutant").

[20] The Clean Air Act requires Title V operating permits – named for the Clean Air Act subchapter that mandates them – for major sources of air pollution.  *See* 42 U.S.C. § 7661a(a); *see also* 42 U.S.C. § 7661(2) (defining "major source" for purposes of Clean Air Act Title V permitting requirements).  The purpose of a Title V operating permit is to ensure that all "applicable requirements" governing a facility's Clean Air Act compliance are consolidated and expressed in one document.  *See* 42 U.S.C. § 7661c(a).

B.    Denka is "causing or contributing to" the chloroprene pollution

There is no legitimate dispute that Denka is "causing or contributing to" the chloroprene emissions that thousands of people in St. John the Baptist Parish are breathing.  *See* 42 U.S.C. § 7603.  Multiple sets of air monitors have been detecting chloroprene in populated areas of the Parish, including near homes and schools.  *See* Ex. D ¶¶s 25–53, Ex. E, Ex. J, and Ex. K.  The sole source of that chloroprene is Denka's Facility.  *See* Ex. D ¶ 13, Attach 2.

C.    Denka is a "person"

Denka is a "person" within the meaning of 42 U.S.C. § 7603.  Limited liability companies ("LLCs") meet the Clean Air Act's definition of person, even though that type of business entity is not explicitly referenced.  *See* 42 U.S.C. § 7602(e).  The statutory definition uses the term "includes" to preface a non-exhaustive array of private, public, and not-for-profit entities that fall within the broad scope of "person."  *See id.*; *see also Cox v. City of Dallas, Tex.*, 256 F.3d 281, 293 (5th Cir. 2001) (explaining that "includes" indicates a non-exhaustive list).

D.    The increased cancer risk from Denka's chloroprene emissions is
      presenting an "imminent and substantial endangerment"

Distilled to its judicially interpreted essence, 42 U.S.C. § 7603 requires the United States to prove that Denka's chloroprene emissions are presenting a "threatened harm" to public health or welfare that is "serious" or "gives reasonable cause for concern."  *See generally Cox*, 256 F.3d at 299-300; *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1021 (10th Cir. 2007).  That straightforward burden of proof is met here.

The Fifth Circuit, consistent with other courts, makes clear that the statutory terminology "imminent and substantial endangerment" should be broadly interpreted.  *See Cox*, 256 F.3d at 299-300; *see also* S. Rep. No. 101-228 (1989), 1990 U.S.C.C.A.N. 3385, 3753 (confirming that 42 U.S.C. § 7603's authority is intended to match the other environmental endangerment

statutes).  These broad interpretations are warranted, courts recognize, because Congress chose

to give "paramount importance" to the objective of protecting public health when it enacted the

current set of environmental endangerment statutes.  *See Reilly Tar & Chem. Corp.*, 546 F. Supp.

at 1110; *see also Trinity*, 150 F.3d at 399 (Safe Drinking Water Act case); *United States v. Apex

Oil Co.*, No. 05-CV-242-DRH, 2008 WL 2945402, at *79 (S.D. Ill. July 28, 2008), *aff'd*, 579

F.3d 734 (7th Cir. 2009) (protecting human health and the environment is the "primary intent" of

RCRA's endangerment statute).

      1.    Unacceptably high cancer risks are an actionable endangerment.

      Thousands of infants, children, and adults living in St. John the Baptist Parish face the

exact types of endangerments that motivated Congress to enact the environmental endangerment

statutes.  Being overexposed to carcinogenic agents, like Denka's chloroprene emissions, is one

such scenario.  *See Reilly Tar & Chem. Corp.*, 546 F. Supp. at 1110 (citing other relevant

examples of *substantial* endangerments in the Safe Drinking Water Act's legislative history).

      2.    The endangerment from Denka's chloroprene emissions is
               imminent; the threat they pose is present now.

      Denka's chloroprene is in St. John the Baptist Parish's air.  People need to breathe that

air.  And at the long-term average chloroprene concentrations that many people living in the

Parish are currently being exposed to, they will exceed (if they have not already exceeded) a 1-

in-10,000 lifetime excess cancer risk far sooner than over an assumed 70-year lifetime.  *See* Ex.

D ¶¶s 53–63, Ex. E, Ex. J, and Ex. K.  Every day that passes is another day that the communities

near Denka's Facility remain exposed to its chloroprene emissions, with lingering biological

effects.  *See* Ex. F ¶ 43.  Urinalysis testing confirms that chloroprene has entered the bodies of

some Parish residents.  *See id.* ¶ 44.

The speed at which chloroprene-related cancer risks accrue in infants and young children is particularly alarming.  Infants who are born today in LaPlace and Reserve, Louisiana and consistently breathe the current average levels of chloroprene detected by the "Western Monitor" (by the neighborhood just west of Denka's Facility) will suffer double their lifetime acceptable excess cancer risk from chloroprene exposure by their second birthday – 68 years sooner than they should amass half as much.  *See* Ex. D ¶¶s 64–66, Attach. 10 & 11 and Ex. E.  A two-year old who moves into that neighborhood and attends the Fifth Ward Elementary School will amass their lifetime acceptable excess cancer risk before they can legally drive a car.  *See* Ex. D ¶ 65.  And a teenager living there who begins breathing Denka's chloroprene emissions at age 16 will surpass their lifetime acceptable excess cancer risk decades before the end of their assumed 70-year lifetime.  *See id.*; *see also* Ex. C ¶¶s 32, 37 and 44-45.

The pace at which these risks accumulate is measured in years, which may not sound alarming or strikingly imminent.  But endangerments are "imminent" so long as the *threat of harm* is present now, even though actual resulting harms may not immediately materialize.  *See Cox*, 256 F.3d at 299; *Conservation Chem. Co.*, 619 F. Supp. at 193–94 ("an endangerment is 'imminent' if factors giving rise to it are present, even though the harm may not be realized for years").

Denka's current chloroprene emissions are therefore still causing an *imminent* endangerment even if they create only a latent threat of developing cancer.  That conclusion makes sense given the insidious reality of cancer's furtive, slow-moving development – cancers generally have years-long "incubation" periods.  *See* Ex. F ¶ 41.  Even a twenty-year latency period does not disqualify Denka's emissions as a near-term, imminent endangerment.  *See Mallinckrodt, Inc.*, 471 F.3d at 279 n.1 (even if there is "a reasonable prospect that a carcinogen

released into the environment today may cause cancer *twenty years hence*, the threat is near-term

even though the perceived harm will only occur in the distant future") (emphasis added).

Congress clearly intended the endangerment statutes to protect against cancer risks despite the

inherent uncertainty of whether exposure will ever actually materialize into diagnosable cancer.

*See Reilly Tar & Chem. Corp.*, 546 F. Supp. at 1110.

 Furthermore, to prove imminence, the United States does not need to show an increased

number of deaths or an increased cancer rate among Parish residents, *i.e.*, that actual harm has

occurred or will necessarily ever occur.[21]  *See Cox*, 256 F.3d at 299-300 ("imminence" requires

that the harm pose a near-term threat, but there is no requirement for proof or certainty that

actual harm will necessarily occur); *Apalachicola Riverkeeper v. Taylor Energy Co., LLC*, 954 F.

Supp. 2d 448, 459 (E.D. La. 2013) (serious threat of harm suffices); *see also* Ex. H ¶¶s 23-30

(refuting Denka's assessment of cancer rates in the Parish and associated census tracts).  That

interpretation of imminence makes sense because Congress enacted statutes like 42 U.S.C.

§ 7603 to stop endangerments *before* they result in actual harm.  *See, e.g.*, *Schmucker v. Johnson

Controls, Inc.*, No. 3:14-CV-1593 JD, 2019 WL 718553, at *26 (N.D. Ind. Feb. 19, 2019)

(emphasizing that the purpose of RCRA's statute "is preventative, and allows courts to order

relief to keep those risks from coming to pass"); *see also* Ex. F ¶ 41.  Even the *possibility* of

being exposed to carcinogenic substances may be enough.  *See Apalachicola Riverkeeper*, 954 F.

---

[21] Conversely, it should not matter that people have been exposed to the Facility's chloroprene emissions for years.  *See Davis v. Sun Oil Co.*, 148 F.3d 606, 610 (6th Cir. 1998) ("An 'imminent hazard' may be declared at any point in a chain of events which may ultimately result in harm to the public"); *see also Burlington N. & Santa Fe Ry. Co.*, 505 F.3d at 1021 (*citing Price v. United States Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994)); *see also Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 263 F. Supp. 2d 796, 837 (D.N.J. 2003), *aff'd*, 399 F.3d 248 (3d Cir. 2005) ("[i]mminence refers 'to the nature of the threat rather than identification of the time when the endangerment initially arose'").

Supp. 2d at 459 (oil spill that was 11 miles offshore and to which no plaintiff had yet been directly exposed sufficiently alleged an imminent and substantial endangerment to overcome a motion to dismiss); *see also Interfaith Cmty. Org. v. Honeywell Int'l*, 399 F.3d 248 (3d Cir. 2005) (affirming injunction under RCRA to abate the endangerment posed simply by current exposure pathways to carcinogenic hexavalent chromium-containing contamination).

Here, multiple reliable data sets, including from Denka, consistently show long-term average chloroprene levels that will lead to unacceptably high lifetime excess cancer risks in a handful of years. *See* Ex. D ¶ 53, Ex. E, Ex. J, and Ex. K. These conditions are present now.

3. Cancer risks that are more than 14 times greater than the EPA's presumptive ceiling constitute a substantial endangerment.

The excess lifetime cancer risks that Denka's chloroprene emissions are causing are serious. *See* Ex. D ¶ 67 and Ex. F ¶ 66. And an endangerment is "substantial" if it is serious. *See, e.g.*, *Cox*, 256 F.3d at 300. Proving that a risk or threat is serious "'does not require quantification of the endangerment (*e.g.*, proof that a certain number of persons will be exposed…or that a [resource] will be contaminated to a specific degree).'" *Interfaith Cmty. Org.*, 399 F.3d at 259 (*quoting Conservation Chem. Co.*, 619 F. Supp. at 194); *see also Burlington N. & Santa Fe Ry. Co.*, 505 F.3d at 1021 (same). Rather, an endangerment is substantial if there is "reasonable cause for concern that someone or something may be exposed to risk of harm by release, or threatened release, of hazardous substances in the event remedial action is not taken." *Burlington N. & Santa Fe Ry. Co.*, 505 F.3d at 1021; *see also Apalachicola Riverkeeper*, 954 F. Supp. 2d at 459 (visible sheen from offshore oil spill sufficiently alleged substantial endangerment to overcome a motion to dismiss).

Although not required, the United States is presenting proof quantifying the excess lifetime cancer risks from Denka's chloroprene emissions. *See* Ex. D Attach. 9. Here, more than

ten thousand Parish residents, including as many as one thousand that are younger than five years old, are being exposed to a serious risk of harm from Denka's carcinogenic chloroprene emissions.  *See* Ex. C ¶¶s 29, 32, and 37.  There is ample reason to have cause for concern.  The air monitoring data are clear.  *See* Ex. E.  They show that people who live close to the Facility are currently exposed to average levels of chloroprene that are estimated to result in lifetime excess cancer risks that may reach more than fourteen times greater than the EPA's presumptive 1-in-10,000 threshold (*i.e.*, 14-in-10,000, or roughly 1-in-1,000).  *See* Ex. D ¶ 62, Ex. E, and Ex. C ¶¶s 22 and 29-30.  People living more than two miles away from the Facility are being exposed to a greater than 1-in-10,000 lifetime excess cancer risk.  *See* Ex. D ¶¶s 65, 67 and Ex. E; *see also* Ex. C ¶¶s 22 and 29-30.  The affected population includes the most vulnerable among them – infants, as well as young children who attend the local elementary school and live nearby.  *See* Ex. C ¶¶s 32, 37, and 44-45 and Ex. E.  And some of the affected people have lived in the Parish and breathed the air there for decades.  *See* Ex. C ¶¶s 49 and 50.  The risks to the surrounding communities from breathing Denka's carcinogenic chloroprene emissions are substantial.

It is not necessary to prove that actual harm – meaning, in this case, proof of a measurable increase in cancer incidence or resulting deaths – is afflicting Parish residents in order to establish that Denka's chloroprene emissions are causing a substantial endangerment under 42 U.S.C. § 7603.  *See Cox*, 256 F.3d at 299.  The caselaw is clear that no actual injury need ever occur.  *See id.*; *see also Ethyl Corp. v. Env't Prot. Agency*, 541 F.2d 1, 13 (D.C. Cir. 1976).  Serious threatened or potential harm suffices.  *See Apalachicola Riverkeeper*, 954 F. Supp. 2d at 459; *Dague v. City of Burlington*, 935 F.2d 1343, 1356 (2d Cir. 1991) (affirming finding that landfill presented imminent and substantial endangerment under RCRA).  The

unacceptably high lifetime excess cancer risks caused by breathing Denka's chloroprene emissions are exactly this type of serious or potential harm.

It also does not matter that estimating cancer risk necessarily tolerates some scientific uncertainty. *See NRDC, Inc.*, 824 F.2d at 1165 (recognizing "the inherent limitations of risk assessment and the limited scientific knowledge of the effect of exposure to carcinogens at various levels"); *see also Apex Oil Co.*, 2008 WL 2945402, at *79 (explaining that the United States need not meet a standard of "exactitude" to prove up an endangerment). The point of 42 U.S.C. § 7603 and its statutory brethren is to authorize courts to intervene and prevent the worst public health outcomes from ever happening. Therefore, "'if an error is to be made in applying the endangerment standard, the error must be made in favor of protecting public health, welfare and the environment.'" *Interfaith Cmty. Org.*, 399 F.3d at 259 (*quoting Conservation Chem. Co.*, 619 F. Supp. at 194); *see also Burlington N. & Santa Fe Ry. Co.*, 505 F.3d at 1021 (same).

E.     The Facility "is presenting" an imminent and substantial endangerment

Long-term average chloroprene concentrations – and the resulting unacceptably high cancer risks to Parish residents – will not meaningfully decrease without intervention. *See* Ex. D ¶¶s 62, 69–70, and Attach 2 (showing consistent TRI air emission data for the three most recent reported years); *see also* Ex. I ¶ 54. Denka's Facility "is presenting" an imminent and substantial endangerment to public health and welfare. *See* 42 U.S.C. § 7603.

Any difference in statutory language between 42 U.S.C. § 7603 – which includes the phrase "is presenting" – and other endangerment statutes like RCRA – that include the phrase "may present" – is immaterial here.[22] The legislative history of 42 U.S.C. § 7603 makes clear

---

[22] Some courts that have considered other endangerment statutes, such as RCRA's, note that "may" is an operative and more probabilistic term. *See, e.g., Mallinckrodt, Inc.*, 471 F.3d at 287-89 (citing decisions that "emphasized the preeminence of the word 'may' in defining the degree of risk needed to support [an imminent and substantial endangerment claim]").

that Congress did not intend that section to result in less protection for public health or the environment than other environmental endangerment statutes.  To the contrary, the statute's legislative history explains that 42 U.S.C. § 7603 was intended to match the other endangerment statutes, including the Clean Water Act's analogue, which also uses the phrase "is presenting." *See* S. Rep. No. 101-228 (1989), 1990 U.S.C.C.A.N. 3385, 3753; *see also* 33 U.S.C. § 1364(a). Even assuming 42 U.S.C. § 7603 requires a higher standard than the other endangerment statutes, the cancer risks caused by Denka's chloroprene emissions meet that standard.

## II.     Public Health in St. John the Baptist Parish is Likely to Suffer Irreparable Harm Without the Requested Preliminary Injunctive Relief

The Court can presume that irreparable harm exists if it finds that the United States is likely to prove that Denka's chloroprene emissions are presenting an imminent and substantial endangerment to public health.  *See, e.g.*, *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) ("irreparable harm need not be proven if (1) the injunctive relief is sought pursuant to statute by the appropriate government officer or agency and (2) all of the statutory prerequisites are met"); *United States v. Hayes Int'l Corp.*, 415 F.2d 1038, 1045 (5th Cir. 1969); *see also Marine Shale Processors*, 81 F.3d at 1358-59 ("when the United States or a sovereign state sues in its capacity as protector of the public interest, a court may rest an injunction entirely upon a determination that the activity at issue constitutes a risk of danger to the public").  This presumption of *irreparable harm* logically flows from the predicate finding that an imminent and substantial *endangerment to public health or welfare* exists.  *See Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 545 (1987) ("[e]nvironmental injury, by its nature, can seldom be adequately remedied by monetary damages and is often permanent or at least of long duration, *i.e.*, irreparable"); *see also City of Painesville, Ohio*, 644 F.2d at 1194 (finding it "unnecessary" to hold a hearing to determine the presence of irreparable injury).

This presumption also serves Congress' intent that the environmental endangerment statutes, like 42 U.S.C. § 7603, should enhance courts' traditional equitable powers.  *See United States v. Waste Indus., Inc.*, 734 F.2d 159, 165 (4th Cir. 1984).  One manifestation of these enhanced powers is "a more lenient standard than the traditional requirement of threatened irreparable harm" to establish the need for a preliminary injunction.  *See Price*, 688 F.2d at 211 (citing legislative history of the Safe Drinking Water Act and RCRA).  As explained above, courts uniformly hold that it is not necessary to prove that actual harm to public health is occurring in order to establish that an endangerment exists.  *See, e.g.*, *Cox*, 256 F.3d at 299; *see also Interfaith Comm. Org.*, 399 F.3d at 258.  This more lenient standard for irreparable harm – *i.e.*, needing to show only threatened or potential harm – is therefore met if the United States proves it is likely to succeed on the merits of its claim that the unacceptably high lifetime excess cancer risks caused by breathing Denka's chloroprene emissions are an imminent and substantial endangerment to public health and welfare.  *See id*.

Regardless of whether the Court presumes irreparable harm or engages in a more searching analysis of this *Winter* factor, the result is the same.  The same facts that demonstrate the United States' likelihood of success on the merits – rapidly accumulating excess cancer risks caused by exposure to unacceptably high levels of a mutagenic carcinogen – also demonstrate that Parish residents will continue to suffer irreparable harm without the requested injunctive relief.  And it is the irreparability of the threatened harm, not the magnitude of it, that should drive the Court's conclusion.  *See Callaway*, 489 F.2d at 575.

Breathing chloroprene causes irreparable harm.  *See Winter*, 555 U.S. at 22.  It causes mutations in the DNA of the people breathing it.  *See* Ex. F ¶¶s 34-36 and 43.  No amount of money can reverse this harm – the lingering and latent biological mechanism by which breathing

chloroprene increases cancer risk.  *See Daniels Health Scis., L.L.C.*, 710 F.3d at 585 (defining irreparable harm as "harm for which there is no adequate remedy at law," such as monetary damages); *accord Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011).  Like environmental damage, harm to public health and welfare can "seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e. irreparable."  *Amoco*, 480 U.S. at 545; *see also Shell Offshore Inc. v. Greenpeace, Inc.*, 864 F. Supp. 2d 839, 851 (D. Alaska 2012) ("demonstrated risks to health and safety constitute the type of irreparable harm for which there is no adequate remedy at law.").

Without the requested injunction, the cancer risks that flow from Denka's mutagenic chloroprene emissions will continue.  *See Monumental Task Comm., Inc.*, 157 F. Supp. 3d at 582-83 ("[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered"); *see also* Ex. D ¶¶s 69–70.  Indeed, some of the highest short-term levels of chloroprene emitted from Denka's Facility were detected in just the past few months – for instance, a recent monitoring result at Denka's Western Site, just a few hundred feet from the Fifth Ward Elementary School, measured almost *600 times greater* than 0.2 ug/m$^3$ on a school day.  *See* Ex. D ¶ 62.  And the higher the average concentration of chloroprene people living near Denka's facility are exposed to, the faster their associated cancer risk will exceed "acceptable" levels.  *See* Ex. D Attach. 10 & 11.

## III.     Congress' Statutory Priority to Protect Public Health and Welfare Tips the Balance of Equities in the United States' Favor

Congress chose unambiguous text in 42 U.S.C. § 7603 to express the "extraordinary weight" it places on the public interest at stake here – protecting public health and welfare from endangerments caused by air pollution like Denka's carcinogenic chloroprene emissions.  *See*

*Marine Shale Processors*, 81 F.3d at 1358-59.  42 U.S.C. § 7603 authorizes action "[n]otwithstanding" any other part of the Clean Air Act.  The statutory text thus puts a heavy "'congressional thumb on the scale'" in favor of protecting the public health and welfare of Parish residents.  *See Mallinckrodt, Inc.*, 471 F.3d at 296-97; [23] *Amoco*, 480 U.S. at 545.  That thumb definitively tips the balance of equities required under *Winter* in the United States' favor, even though the Court can grant the requested preliminary injunction without a balancing of the equities.  *See, e.g.*, *Amoco*, 480 U.S. at 545 (if environmental injury is sufficiently likely, "the balance of harms will usually favor the issuance of an injunction"); *cf. Winter*, 555 U.S. at 20.[24]

Even without any presumption, the equities favor the United States here.  Protecting thousands of Parish residents from the ongoing public health threats from Denka's chloroprene emissions outweighs any financial costs or inconvenience to Denka contemplated by the United States' requested relief.  *See Andritz Sundwig GmbH v. United States*, Civ. No. 4:18-2061, 2018 WL 3218006, at *11 (S.D. Tex. 2018) (government interest in protecting pine forests "heavily outweighs" any financial harm to company); *United States v. Gear Box Z Inc.*, 526 F. Supp.3d 522, 529 (D. Ariz. 2021) (financial loss to company from government injunction does not outweigh the harm to human health and the environment at issue); *League of Wilderness Def. v.*

---

[23] *Mallinckrodt, Inc.* involves a permanent, not preliminary, injunction.  But the standards are "'essentially the same.'"  *4 Aces Enterprises, LLC v. Edwards*, 479 F. Supp.3d 311, 322 (E.D. La. 2020) (*quoting Winter*, 555 U.S. at 32).

[24] Several courts have explained that "when the plaintiff is a governmental entity…and the activity may endanger public health, injunctive relief is proper without undertaking a balancing of the equities."  *United States v. Prod. Plated Plastics, Inc.*, 762 F. Supp. 722, 728 (W.D. Mich. 1991); *see also United States v. Bethlehem Steel Corp.*, 38 F.3d 862, 867-68 (7th Cir. 1994) (finding that it was "not improper for the district court to have awarded injunctive relief … without conducting an equitable balancing."); *U.S. Envtl. Prot. Agency v. Envtl. Waste Control, Inc.*, 917 F.2d 327, 332 (7th Cir. 1990) ("where the plaintiff is a sovereign and where the activity may endanger the public health, 'injunctive relief is proper, without resort to balancing.'"); *Envtl. Def. Fund, Inc. v. Lamphier*, 714 F.2d 331, 337-38 (4th Cir. 1983).

*Forsgren*, 184 F. Supp. 2d 1058, 1070-71 (D. Or. 2002) (*potential* harm to environment outweighs even a *certain* financial loss).  It is also technically feasible for Denka to comply with the preliminary injunction, which requires specific actions that are focused on reducing the Facility's chloroprene emissions.  *See* Ex. G ¶¶s 30, 46, 48-55, 58, 60-61, 63-67, 72-73, 76-79, 84, 86-88, and 90-92.  And Denka has not revealed that it is financially unable to do so.[25]  The required actions will cost money, more than what Denka has already commendably spent to reduce chloroprene emissions since purchasing the Facility.  But the actions under the 2017 State AOC were simply not enough to end the endangerment that the Facility's chloroprene emissions continue to cause.

Parish residents have few viable alternatives to reduce the cancer risks they are exposed to because of Denka's chloroprene emissions.  They should not be forced to choose between continuing to suffer these risks or fleeing their homes in order to escape them.  Some people have lived in their homes for years.  *See* Ex. C ¶¶s 49 and 50.  The balance of equities tips in the United States' favor.

## IV.   The Injunction is in the Public Interest

Fifth Circuit law allows this Court to rest injunction entirely upon a determination that activity at issue constitutes a risk of danger to the public.  *See Marine Shale Processors*, 81 F.3d at 1359.  Nevertheless, for many of the reasons already discussed, the United States' requested preliminary injunction is in the public interest.  *See Winter*, 555 U.S. at 20 and 26.

---

[25] The Court may consider the finances of Denka's parent companies – Mitsui & Co. Ltd. ("Mitsui") and Denka Company Limited ("Denka Ltd.") – when assessing Denka's ability to finance the requested relief.  Courts may consider the financial condition of a parent company when evaluating the economic impact of, for example, assessing a civil penalty, even where the parent is not a named party to the action and the corporate veil has not been pierced.  *See, e.g.*, *United States v. Allegheny Ludlum Corp.*, 187 F. Supp. 2d 426, 442 (W.D. Pa. 2002), *rev'd in part on other grounds*, 366 F.3d 164 (3d Cir. 2004) (assessing Clean Water Act penalty); *United States v. Munic. Auth. of Union Twp.*, 150 F.3d 259, 268 (3d Cir. 1998) (same).

"Enforcement of the environmental laws is in the public interest." *Matter of Commonwealth Oil Ref. Co., Inc.*, 805 F.2d 1175, 1190 (5th Cir. 1986).  Issuing the preliminary injunction serves both the specific interest expressed in 42 U.S.C. § 7603 and the Clean Air Act's overarching purpose as expressed in 42 U.S.C. § 7401(b)(1).  Reducing unacceptably high cancer risks to infants, children, and adults in St. John the Baptist Parish fully aligns with "protect[ing] and enhance[ing] the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population."  42 U.S.C. § 7401(b)(1). The Court's action is needed here to guard that public interest.

## CONCLUSION

For these reasons, the United States asks this Court to grant this motion and issue the proposed Preliminary Injunction Order.

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA**

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice


<u>    s/Steven D. Shermer            </u>

Trial Attorney:      STEVEN D. SHERMER
Senior Attorney
District of Columbia Bar No. 486394
DAVIS H. FORSYTHE
Senior Counsel
HANNAH L. FRAZIER
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, DC  20044-7611
(202) 514-1134
Steven.Shermer@usdoj.gov

OF COUNSEL:

ROBERT PARRISH
Attorney-Advisor
U.S. Environmental Protection Agency
Office of Civil Enforcement, Air Enforcement Division
1200 Pennsylvania Avenue, NW (2242A)
Washington, D.C. 20460

JUSTIN LANNEN
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 6
1201 Elm Street, Suite 500 (ORCEA)
Dallas, TX 75270