# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 2:23-cv-735 |
| | ) | |
| v. | ) | SECTION J(5) |
| | ) | |
| DENKA PERFORMANCE ELASTOMER LLC and DUPONT SPECIALTY PRODUCTS USA, LLC, | ) | JUDGE BARBIER |
| | ) | |
| | ) | MAGISTRATE JUDGE NORTH |
| Defendants. | ) | |
| | ) | |

## DENKA PERFORMANCE ELASTOMER LLC'S
## <u>OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION</u>

BRACEWELL LLP

David A. Super (*pro hac vice*)
Jason B. Hutt (*pro hac vice*)
Jeffrey R. Holmstead (*pro hac vice*)
Britt Cass Steckman (*pro hac vice*)
Kevin M. Voelkel (*pro hac vice*)
2001 M Street NW, Ste. 900
Washington, DC 20006
Telephone:  (202) 828-5800
david.super@bracewell.com
jason.hutt@bracewell.com
jeff.holmstead@bracewell.com
britt.steckman@bracewell.com
kevin.voelkel@bracewell.com


Date:  July 18, 2023

JONES WALKER LLP

James C. Percy (La. Bar No. 10413)
445 N. Boulevard, Suite 800
Baton Rouge, LA 70802
Telephone: (225) 248-2130
Facsimile: (225) 248-3130
jpercy@joneswalker.com

Robert E. Holden (La. Bar No. 06935)
Brett S. Venn (La. Bar No. 32954)
201 St. Charles Ave., Suite 5100
New Orleans, LA 70170
Telephone: (504) 582-8000
Facsimile: (504) 582-8583
bholden@joneswalker.com
bvenn@joneswalker.com

***Counsel for Counterclaim-Plaintiff***
***Denka Performance Elastomer LLC***

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

TABLE OF EXHIBITS ................................................................................................... vii

I.   INTRODUCTION ............................................................................................... 1

II.  DPE'S SUPPORTING DECLARATIONS ......................................................... 6

III. ARGUMENT ...................................................................................................... 6

    A.  Applicable Legal Standards. ..................................................................... 6

    B.  EPA Has Failed To Show A Substantial Likelihood Of Success On The Merits. ....................................................................................................... 7

        1.  In issuing the Proposed Rule, EPA expressly conceded that the Facility's emissions are not causing an "imminent endangerment." ........... 7

        2.  EPA's "receipt of evidence" of the Facility's chloroprene emissions for seven years without declaring an emergency refutes its claim of an emergency now. ............................................................... 10

        3.  The lynchpin of EPA's entire case—the IUR—rests upon a series of unrealistic assumptions that overstate risk *by design* and simply cannot be used as a threshold for declaring an alleged imminent and substantial endangerment. ................................................. 13

            i.   The IUR, by design, does not reflect real-world risk. .................... 14

            ii.  The IUR is based on patently false assumptions. .......................... 18

        4.  EPA's allegation of imminent and substantial endangerment is refuted by the available real-world data showing no cancer risk of chloroprene to humans. ............................................................... 22

        5.  EPA misrepresents *current* conditions near the Facility—the only time frame that matters under Section 303's "*is presenting*" standard—by relying upon old, unrepresentative monitoring data. ........... 26

        6.  Congress has made it clear that long-term cancer risks higher than 1-in-10,000 do not constitute an "imminent and substantial endangerment." ...................................................................... 30

        7.  EPA's 1-in-10,000 risk level (borrowed from Section 112) is not a proper benchmark for alleging an emergency under Section 303. ............ 32

        8.  The IUR is refuted by the best available science, which EPA has ignored. ................................................................................ 38

9. The Proposed Order is invalid as a matter of law: its demands are impossible to satisfy and, even if completed, would not abate the alleged emergency. ..................................................................42

  i. EPA's "near term" Proposed Measures endanger the Facility, DPE's workforce, and the community............................43

  ii. EPA's "near term" and "planning" Proposed Measures range from impossible to unrealistic for technical and timing reasons. ...............................................................44

  iii. EPA's Proposed Order is not tailored to the alleged emergency. .....................................................................45

C. EPA Has Failed To Demonstrate A Substantial Threat Of Irreparable Harm. ....................................................................................46

D. DPE Would Be Substantially Harmed If A Preliminary Injunction Were Granted. ....................................................................................48

E. The Public Interest Favors Denying The Requested Preliminary Injunction. .................................................................................50

IV. CONCLUSION ..............................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amoco Production Company v. Village of Gambell, Alaska,*
  480 U.S. 531 (1987)................................................................................48

*Apalachicola Riverkeeper v. Taylor Energy Co., LLC,*
  954 F. Supp. 2d 448 (E.D. La. 2013).........................................................17

*Benisek v. Lamone,*
  138 S. Ct. 1942 (2018) (per curiam) ..........................................................47

*Butler v. DPE, LLC,*
  No. 18-cv-6685, 2020 WL 2747276 (E.D. La. May 27, 2020) (Feldman, J.)
  (quoting EPA.gov), *aff'd in part on other grounds,* 16 F.4th 427 (5th Cir.
  2021) ...............................................................................................15

*Citibank, N.A. v. Citytrust,*
  756 F.2d 273 (2d Cir. 1985).....................................................................47

*Cox v. City of Dallas, Tex.,*
  256 F.3d 281 (5th Cir. 2001) ...............................................................7, 17

*Dallas Safari Club v. Bernhardt,*
  453 F. Supp. 3d 391 (D.D.C. 2020)...........................................................47

*Daniels Health Scis., LLC v. Vascular Health Scis., LLC,*
  710 F.3d 579 (5th Cir. 2013) ...................................................................49

*Doe v. Tex. Christian Univ. & Victor J. Boschini,*
  2022 WL 1573074 (N.D. Tex. Apr. 29, 2022) ..............................................49

*Env'l Integrity Proj. et al. v. Regan,*
  1:20-cv-03119-TNM (D.D.C. Aug. 24, 2022)...............................................27

*Gamble v. Zoellick,*
  23 ITRD 2000, 2001 WL 1823812 (D.D.C. 2001)..........................................50

*In re Limetree Bay Terminals, LLC et al.,*
  *CAA Emergency Order,* EPA Region 4, CAA-02-2021-1003 (May 14, 2021)........12

*Ixmation, Inc. v. Switch Bulb Co.,*
  2014 WL 5420273 (N.D. Ill. Oct. 23, 2014)..................................................47

*Louisiana v. EPA,*
  No. 2:23-cv-00692-JDC-KK (W.D. La. June 27, 2023)......................................3

*Me. People's All. & Nat. Res. Def. Council v. Mallinckrodt, Inc.*,
   471 F.3d 277 (1st Cir. 2006) ................................................................46

*Monumental Task Comm., Inc. v. Foxx*,
   157 F. Supp. 3d 573 (E.D. La. 2016) (Barbier, J.) ....................6, 7, 46, 48

*Navistar, Inc. v. U.S. E.P.A.*,
   No. 11-CV-449 RLW, 2011 WL 3743732 (D.D.C. Aug. 25, 2011) ....................48

*In re New-Indy Catawba, LLC, CAA
   § 303 Emergency Order* ................................................................12

*Oregon Nat. Desert Ass'n v. Bushue*,
   594 F. Supp. 3d 1259 (D. Or. 2022) ....................................................47

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Engineers*,
   279 F. Supp. 3d 846 (D. Minn. 2017) ..................................................50

*S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*,
   No. 2:13-CV-00042-MCE, 2013 WL 4094777 (E.D. Cal. Aug. 13, 2013) ............48

*Tex. Marine & Brokerage, Inc. v. Bennington Marine, LLC*,
   2012 WL 12888827 (E.D. Tex. Oct. 17, 2012) ........................................49

*Texas v. U.S.*,
   328 F. Supp. 3d 662 (S.D. Tex. 2018) .................................................47

*U.S. v. Apex Oil Co.*,
   No. 05-CV-242-DRH, 2008 WL 2945402 (S.D. Ill. July 28, 2008), *aff'd*, 579
   F.3d 734 (7th Cir. 2009) .............................................................17

*U.S. v. Colonial Pipeline Co., Inc.*,
   242 F. Supp. 2d 1365 (N.D. Ga. 2002) .................................................46

*U.S. v. Hayes Int'l Corp.*,
   415 F.2d 1038 (5th Cir. 1969) ....................................................46, 47

*U.S. v. Marine Shale Processors*,
   81 F.3d 1329 (5th Cir. 1996) .........................................................46

*U.S. v. U.S. Steel Corp.*,
   Civil No. 71-1041 (N.D. Ala. 1971) ...................................................17

*Valley v. Rapides Parish Sch. Bd.*,
   118 F.3d 1047 (5th Cir. 1997) ........................................................49

*Wages & White Lion Invs. LLC v. FDA*,
   16 F. 4th 1130 (5th Cir. 2021) .......................................................49

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982) ................................................................................7

*White v. Carlucci*,
   862 F.2d 1209 (5th Cir. 1989) .............................................................46

**Statutes**

33 U.S.C § 1364(a) .....................................................................................7

42 U.S.C. § 6973(a) .....................................................................................7

42 U.S.C. § 7412 .................................................................................. *passim*

42 U.S.C. § 7412(3)(A) ..............................................................................27

42 U.S.C. § 7412(f) ......................................................................................8

42 U.S.C. § 7412(f)(2)(B) .....................................................................33, 34

42 U.S.C. § 7412(f)(4) ...........................................................................8, 27

42 U.S.C. § 7603 ................................................................................. *passim*

42 U.S.C. § 9606(a) .....................................................................................7

Pub. L. No. 101-549, 104 Stat. 2681 .......................................................34

Pub. L. No. 101-549, § 301, 104 Stat. 2531 ......................................32, 34

**Regulations**

54 Fed. Reg. 38,044 (Sept. 14, 1989) ............................................16, 33, 34

70 Fed. Reg. 19,992 (Apr. 15, 2005) ................................................16, 37

72 Fed. Reg. 25,137 (May 3, 2007) ..................................................16, 37

88 Fed. Reg. 22790 (Apr. 13, 2023) ...........................................................9

88 Fed. Reg. 25080 (April 25, 2023) ...................................................... *passim*

**Other Authorities**

America's Children and the Environment Report, 2d. Ed. (Feb. 2003) (emphasis
   added) https://19january2017snapshot.epa.gov/ace/americas-children-and-
   environment-second-edition_.html ........................................................35

EPA, *2019 AirToxScreen: Assessment Results* (last updated Jan. 9, 2023)
(providing access to pollutant-specific data in spreadsheet entitled *2019 AirToxScreen National Cancer Risk by Pollutant (xlsx)*).https://www.epa.gov/AirToxScreen/2019-airtoxscreen-assessment-results#pollutant ...................................................................................................36, 37

EPA, *Ethylene Oxide Risk from Commercial Sterilizers* (last updated Aug. 16, 2022). https://www.epa.gov/hazardous-air-pollutants-ethylene-oxide/forms/ethylene-oxide-risk-commercial-sterilizers#facility-list ....................................36

EPA, *Guidelines for Carcinogen Risk Assessment* (March 2005) .................................16

EPA, *Guidelines for Carcinogen Risk Assessment* (Sept. 1986) ...................................14

EPA, *Key Findings of America's Children and the Environment* (last updated May 16, 2022). https://www.epa.gov/americaschildrenenvironment/key-findings-americas-children-and-environment ..........................................................35

EPA, *Nat'l Emission Stands. for Haz. Air Pollutants: Primary Lead Smelting, Sum. of Pub. Comment and Response*, Docket No. EPA-HQ-OAR-2004-0305 (Nov. 4, 2011) ............................................................................................................9

EPA, *Risk Assessment for Carcinogens*, available at https://www.epa.gov/fera/risk-assessment-carcinogenic-effects (last updated Nov. 21, 2022) ......................................................................................................17

Guidance on Section 303 of the CAA, April 1999 (available at https://www.epa.gov/sites/default/files/2021-05/documents/transmittalofguidanceonsection303ofcaa040199.pdf ..........................11, 12, 20

LSU Health, *About the Registry*, https://sph.lsuhsc.edu/louisiana-tumor-registry/about-the-registry/ ......................................................................................22

LSU Health, *Louisiana Cancer Data Visualization*, https://sph.lsuhsc.edu/louisiana-tumor-registry/data-usestatistics/louisiana-data-interactive-statistics/louisiana-cancer-data-visualization/ ..............................................22

S. Rep. No. 91-1196, 91st Cong., 2d Sess. 35-36 (1970) ...........................................10

*Sax et al.*, Risk Analysis, Vol. 40. No. 2 (2020), *Extended Analysis and Evidence Integration of Chloroprene as a Human Carcinogen* ....................................................23

*Webster's II New College Dictionary* (2001) ................................................................7

## TABLE OF EXHIBITS

| | |
|---|---|
| **Exhibit 1** | DPE July 7, 2023 Comments to EPA Proposed Rule (without exhibits) |
| **Exhibit 2** | EPA Letter to LDEQ, dated October 12, 2022 |
| **Exhibit 3** | Declaration of Dr. Gary Marsh |
| **Exhibit 4** | Declaration of Dr. Michael Lumpkin |
| **Exhibit 5** | Declaration of Dr. P. Robinan Gentry |
| **Exhibit 6** | Declaration of Eric Farstad |
| **Exhibit 7** | Declaration of David Blye |
| **Exhibit 8** | Declaration of Paul Casarez |
| **Exhibit 9** | Declaration of Jorge Lavastida |
| **Exhibit 10** | Declaration of Chris Meyers |
| **Exhibit 11** | EPA Response to DPE Interrogatory No. 3 |
| **Exhibit 12** | Letter from M. Squillace, to S. Coleman, Acting EPA Region 6 Administrator (Nov. 13, 2017) |
| **Exhibit 13** | Letter from S. Coleman, Acting EPA Region 6 Administrator, to M. Squillace (Dec. 15, 2017) |
| **Exhibit 14** | Letter from M. Squillace, to S. Coleman, Acting Region 6 Administrator (Jan. 12, 2018) |
| **Exhibit 15** | Earthjustice Petition to EPA (May 6, 2021) |
| **Exhibit 16** | *In re New-Indy Catawba, LLC, CAA § 303 Emergency Order,* EPA Region 4, (May 13, 2021) |
| **Exhibit 17** | *In re Limetree Bay Terminals, LLC et al., CAA Emergency Order,* EPA Region 2, CAA-02-2021-1003 (May 14, 2021) |
| **Exhibit 18** | Letter from EPA Administrator Regan to DPE (Jan. 24, 2022) |
| **Exhibit 19** | Excerpts of Proposed Rule, 88 Fed. Reg. 25080 (April 25, 2023) |
| **Exhibit 20** | EPA, *Nat'l Emission Stands. for Haz. Air Pollutants: Primary Lead Smelting, Sum. of Pub. Comment and Response*, Docket No. EPA-HQ-OAR-2004-0305 (Nov. 4, 2011) |
| **Exhibit 21** | 2010 Toxicological Review of Chloroprene |
| **Exhibit 22** | EPA, Air Toxics Risk Assessment Ref. Library, Vol 2 (Apr. 2004) |
| **Exhibit 23** | Part 1: EPA, *Guidelines for Carcinogen Risk Assessment* (Sept. 1986) |
| | Part 2: EPA, *Guidelines for Carcinogen Risk Assessment* (March 2005) |
| **Exhibit 24** | Ila Cote Deposition Transcript excerpts (June 20, 2023) |

| **Exhibit 25** | Letter from EPA to LDEQ (Sept. 23, 2019) |
|---|---|
| **Exhibit 26** | Helen Suh Deposition Transcript excerpts (June 22, 2023) |
| **Exhibit 27** | John Vandenberg Deposition Transcript excerpts (June 16, 2023) |
| **Exhibit 28** | EPA's Response to DPE's RFA No. 17 |
| **Exhibit 29** | EPA Cooperative Agreement, Grant No. 01F70601 to LDH (awarded Sept. 19, 2020) |
| **Exhibit 30** | EPA Cooperative Agreement, Grant No. 01F70501 to LDEQ (awarded Sept. 19, 2020) |
| **Exhibit 31** | Sax et al., Risk Analysis, Vol. 40. No. 2 (2020), *Extended Analysis and Evidence Integration of Chloroprene as a Human Carcinogen* |
| **Exhibit 32** | EPA's Response to DPE's Interrogatory No. 12 |
| **Exhibit 33** | Letter from M. Greene, EPA, to J. Lavastida, DPE (July 6, 2022) |
| **Exhibit 34** | EPA's Response to DPE's Interrogatory No. 6 |
| **Exhibit 35** | EPA's Responses to DPE's RFA Nos. 3-4 |
| **Exhibit 36** | March-April 2021 internal EPA email chain regarding "Region 6 IRIS Nomination for Chloroprene" |
| **Exhibit 37** | EPA's Response to DPE's RFA No. 16 |
| **Exhibit 38** | Letter from M. Gwinn, EPA, to P. Walsh, DPE (Mar. 14, 2022) |
| **Exhibit 39** | Jeffrey Harrington Deposition Transcript excerpts (June 28, 2023) |
| **Exhibit 40** | Table Critiquing Feasibility of Proposed Measures in EPA's Proposed Rule |
| **Exhibit 41** | EPA Response to DPE's Interrogatory No. 4 |

## I.      INTRODUCTION

According to the U.S. Center for Disease Control, the average person living in the U.S. has a 1-in-3 risk of getting cancer in his or her lifetime.[1]  While addressing actual cancer risk is unquestionably an important goal, in this case, the Environmental Protection Agency ("EPA") claims that Denka Performance Elastomer LLC's ("DPE") manufacturing facility ("Facility") is causing an "imminent and substantial endangerment" because its chloroprene emissions pose a cancer risk of 5-in-10,000 to a hypothetical person who breathes in those emissions at the fenceline of the Facility *all day, every day for 70 years*.  Even if this counterfactual assumption were true, that hypothetical person's lifetime risk of cancer due to proximity to the Facility would be increased from 1-in-3 (or 3,333-in-10,000) to 3,338-in-10,000.

EPA's memorandum in support of its motion for preliminary injunction ("PI Motion") argues that DPE's operation of the Facility is causing an "imminent and substantial endangerment" because DPE's emissions result in off-site concentrations of chloroprene that are greater than 0.2 micrograms per cubic meter (0.2 $\mu g/m^3$), a level that, according to EPA, is needed to ensure that the lifetime cancer risk from chloroprene exposure for someone located at the Facility's fence line continuously *all day, every day for 70 years* is no higher than 1-in-10,000.  Thus, even based on EPA's exaggerated claims about the cancer risk of chloroprene, EPA's case is about reducing cancer risk from 5-in-10,000 to 1-in-10,000 (a reduction in risk of 4-in-10,000).  This means that a hypothetical (but completely implausible) person's lifetime cancer risk would be reduced from 3,338-in-10,000 to 3,334-in-10,000.  So dire is this endangerment, according to EPA, that this Court must order DPE to shut down the Facility or take immediate action to implement 12 pages

---

[1] https://www.cdc.gov/chronicdisease/resources/publications/factsheets/cancer.htm ("Fast Stats") (last checked on 6-17-23).

of draconian new requirements, ostensibly to reduce the Facility's emissions to ensure that off-site concentrations are below 0.2 µg/m$^3$.  *See* Proposed Order (Ex. A to PI Motion).  Never before has EPA made a claim even remotely like this one—and for good reason.  As a matter of fact and law, there is no imminent and substantial endangerment.

EPA's PI Motion makes unprecedented demands based on an unprecedented interpretation of what constitutes an "imminent and substantial endangerment" under Section 303 of the Clean Air Act ("CAA").  42 U.S.C. § 7603.  EPA does not base its demands on a violation of law.  In fact, the Facility's chloroprene emissions indisputably comply with the air permits issued by the Louisiana Department of Environmental Quality ("LDEQ") under EPA's *direct oversight*.

EPA's "emergency" action here runs directly counter to the statutory program that Congress created under Section 112 of the CAA to address this exact situation—alleged cancer risks caused by emissions from an industrial facility.  42 U.S.C. § 7412.  Under this program, Congress required EPA to adopt a series of rules over many years to address these risks, including an eventual "residual risk review" in which EPA was *for the first time required to consider* whether more stringent standards were needed to address lifetime cancer risks higher than 1-in-10,000.  But under the timelines adopted by Congress, this residual risk review was not required for all industrial facilities until *18 years* after the statute was adopted.  Surely, if Congress believed that a cancer risk above 1-in 10,000 was an "imminent and substantial endangerment," it would not have given EPA 18 years to do anything about it.

Indeed, under Section 112, on April 25, 2023, EPA issued a proposed rule that includes a "residual risk review" that specifically evaluates the cancer risk posed by chloroprene emissions from the Facility and proposes regulatory requirements to address that risk ("Proposed Rule").  88 Fed. Reg. 25080.  In developing the Proposed Rule, EPA was statutorily required to consider

whether *current* chloroprene emissions *from the Facility* constitute an "imminent endangerment," and EPA determined that they do not. Thus, EPA's assertion here that those *same emissions* constitute an "imminent *and substantial* endangerment" under Section 303 is baseless. This fundamental concession by EPA alone requires dismissal of this action.[2]

But that is just one fatal flaw in EPA's case. Section 303 is triggered by EPA's "receipt of evidence" that a pollution source "is presenting an imminent and substantial endangerment," and yet EPA admits that it has been fully aware of the alleged risks posed by chloroprene for almost 13 years and, for *seven years*, it has possessed emissions monitoring data showing the extent of the Facility's chloroprene emissions. Complaint ¶¶ 44-45. In fact, as EPA's own figure (copied below) clearly shows, the Facility's *current* emissions are the lowest in the Facility's history—more than 85% lower than they were in 2014 and approximately 96% lower than they were for several decades before that when DuPont owned the Facility.[3]

---

[2] As discussed herein, while Section 112 of the CAA, and EPA's Proposed Rule issued under that provision, fully undercut EPA's improper use of its emergency authority under Section 303 in this case, that is not to say that the Proposed Rule itself is proper. To the contrary, on July 7, 2023, DPE submitted comprehensive comments to the Proposed Rule setting out in detail the fundamental flaws in the Proposed Rule. *See* DPE's July 7 Comments (without exhibits) (Ex. 1)

[3] The figure below is from EPA's letter to LDEQ, dated October 12, 2022, addressing EPA's investigation of an administrative complaint filed by the Sierra Club and a neighborhood group alleging that LDEQ violated Title VI of the Civil Rights Act by discriminating against the residents near the Facility by, among other things, failing to scrutinize and strengthen the air permits issued to the Facility and failing to control chloroprene emissions from the Facility. *See* EPA Letter (Oct. 12, 2022) at 28 (excerpt attached as Ex. 2). On June 27, 2023, EPA closed its Title VI investigation, having "made no finding of discrimination or other violation of Title VI." *See Louisiana v. EPA*, No. 2:23-cv-00692-JDC-KK (W.D. La. June 27, 2023), Defendants' Notice of Resolution of Title VI Complaints at 2.

-3-



EPA's failure to act for seven years starkly demonstrates the absence of an emergency, or any basis for a preliminary injunction.

Further, EPA's *entire* case depends on whether it is appropriate to use the inhalation risk unit ("IUR") derived from EPA's 2010 Toxicological Review of Chloroprene ("2010 Review") as the threshold for declaring an emergency.  But the IUR (in EPA's own words) is merely an "upper bound estimate," or the maximum "plausible" cancer risk of chloroprene based on a host of patently unrealistic assumptions.  *See, e.g.*, 88 Fed. Reg. at 25103.  The IUR is not an estimate of *actual* risk that EPA bears the burden of proving in this Court to establish an emergency. Moreover, to artificially inflate the Facility's chloroprene emissions, EPA relies upon older, unrepresentative monitoring data and disregards the recent data that most accurately reflect the Facility's *current* (and dramatically reduced) emissions—the only measure that matters under Section 303's present tense "*is presenting*" standard.

While basing its case on invalid assumptions, EPA disregards the *real-world* evidence showing that the Facility's chloroprene emissions do not pose any increased cancer risk. EPA's IUR, and the resulting 0.2 µg/m$^3$ standard EPA seeks to enforce here, are based *entirely* on 25-year-old laboratory studies of female B6C3F1 mice, the most sensitive species and sex studied. EPA's refusal to consider the best available science in developing the IUR is addressed in DPE's Counterclaims (R. Doc. 22), which DPE incorporates herein. While relying on the female B6C3F1 mice studies, EPA disregards numerous other animal studies showing much lower risk and empirical evidence refuting any connection between chloroprene and cancer *in humans*, including (1) the leading epidemiological study on chloroprene, which focused on chloroprene workers who for multiple decades were subjected to chloroprene concentrations estimated to be more than 450 times higher than for residents living closest to the Facility today and (2) data from the Louisiana Tumor Registry, which show that St. John the Baptist Parish, where the Facility is located, recorded one of the lowest cancer rates of any parish in the state. If EPA's allegations of endangerment were even remotely accurate, then one would expect to find *some* actual evidence of increased cancer near the Facility, particularly given the decades of far higher chloroprene emissions from the Facility before DPE acquired it and installed new pollution controls. The empirical data show the exact opposite and stand as affirmative evidence *rebutting* the risk of harm. For all these reasons, EPA fails to show a substantial likelihood of success on the merits.

EPA also fails to show irreparable harm. Its failure to act for *seven years* refutes any notion of an emergency. Moreover, EPA cannot legitimately claim that an "upper bound" (not actual) risk based on a lifetime of 70 years of continuous exposure will result in harm during the months it will take to try this case on the merits, particularly given EPA's yearslong delay here. In stark contrast, DPE would be irreparably harmed because it is not possible to comply with the draconian

demands of EPA's Proposed Order, and certainly not possible on the timelines prescribed by EPA. As a result, the Proposed Order is tantamount to a shutdown order that would have catastrophic consequences for DPE.  Finally, the public interest is not served by EPA deliberately bypassing the carefully designed rulemaking framework that Congress enacted to deal with alleged cancer risks from industrial facilities. For all these reasons, the PI Motion should be denied.

## II.    DPE'S SUPPORTING DECLARATIONS

The following experts have provided declarations, attached hereto, in response to EPA's allegations:  (i) Dr. Gary Marsh, PhD, epidemiologist (Ex. 3); (ii) Dr. Michael Lumpkin, PhD, toxicologist (Ex. 4); (iii) Dr. P. Robinan Gentry, PhD, toxicologist (Ex. 5); (iv) Eric Farstad, air quality scientist and air modeler (Ex. 6); (v) David Blye, environmental analytical chemist (Ex. 7); and (vi) Paul S. Casarez, chemical plant engineer (Ex. 8).  DPE also provides declarations of Jorge Lavastida, the Facility Manager (Ex. 9), and Chris Meyers, DPE's Environmental Affairs Manager (Ex. 10).

## III.    ARGUMENT

### A.    Applicable Legal Standards.

"A preliminary injunction is an extraordinary and drastic remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Monumental Task Comm., Inc. v. Foxx*, 157 F. Supp. 3d 573, 582 (E.D. La. 2016) (Barbier, J.) (quotations omitted).  "A plaintiff seeking a preliminary injunction must establish (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) that their substantial injury outweighs the threatened harm to the party whom they seek to enjoin; and (4) that granting the preliminary injunction will not disserve the public interest."  *Id.*  "[B]ecause a preliminary injunction is an extraordinary remedy, it 'should not be granted unless the party

seeking it has clearly carried the burden of persuasion on all four requirements.'  Consequently, the decision to grant a preliminary injunction 'is the exception rather than the rule.'"  *Id.*

EPA's discussion of "imminent and substantial endangerment" focuses on cases applying *other* environmental statutes, not Section 303 of the CAA.  PI Motion at 17 (acknowledging "there are no cases discussing [CAA § 303] in detail").  That distinction is critical because Section 303 applies to pollution that "*is* presenting" an endangerment, while the other statutes focus more broadly on pollution that "*may* present" an endangerment.[4]  Because the terms of Section 303 are undefined, this Court must interpret that language applying "the ordinary meaning of the words used."  *Cox v. City of Dallas, Tex.*, 256 F.3d 281, 294, 299 (5th Cir. 2001) (addressing RCRA "may present" language).[5]

## B.    EPA Has Failed To Show A Substantial Likelihood Of Success On The Merits.

EPA must "demonstrate a *substantial* likelihood" that it will prevail on the merits of its claims.  *Monumental*, 157 F. Supp. 3d at 585 (emphasis added).  EPA has failed to do so.

### 1.    In issuing the Proposed Rule, EPA expressly conceded that the Facility's emissions are not causing an "imminent endangerment."

EPA's claim that the Facility's chloroprene emissions are causing an "imminent and substantial endangerment" is directly refuted by EPA's Proposed Rule.  88 Fed. Reg. 25080 (April 25, 2023) (Ex. 19).  In developing the Proposed Rule, EPA was statutorily required to

---

[4]  Compare "is presenting" in 42 U.S.C. § 7603 (CAA § 303) with "may present" in 42 U.S.C. § 6973(a) (RCRA) and 42 U.S.C. § 9606(a) (CERCLA).  The Clean Water Act ("CWA") includes "is presenting," 33 U.S.C § 1364(a), but the only CWA case EPA cites (PI Motion at 20)— *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982)—involved (unlike this case) unpermitted discharges in violation of the CWA and the Court expressly stated that courts applying the CWA maintained "their traditional equitable discretion" in considering injunctive relief.  *Id.* at 319-20.

[5]  *Webster's* defines "imminent" as "about to occur at any moment."  *Webster's II New College Dictionary* (2001).  "Substantial" is defined as "not imaginary: real."  *Id.*  "Endangerment" is defined as "to expose to danger or harm."  *Id.*

consider whether the Facility's current chloroprene emissions constitute an "imminent endangerment." EPA determined they do not. Having determined that the Facility's chloroprene emissions are not causing an "imminent endangerment," EPA twists itself in a knot by asserting here that those *same emissions* constitute an even more dire "imminent *and substantial* endangerment" under Section 303. This fundamental concession requires dismissal of EPA's action.

In Section 112 of the CAA, Congress created a detailed program for regulating industrial emissions posing a risk of cancer. Under Section 112, EPA has issued rules, like the Proposed Rule, to regulate the Facility's chloroprene emissions. Under Section 112(f), when EPA issues new pollution control requirements to address unacceptable cancer risks, there is a statutory presumption that a source must comply with those requirements within 90 days. 42 U.S.C. § 7412(f)(4). However, this default 90-day period may be extended up to two years if EPA grants a compliance "waiver." *Id.* A waiver of the 90-day compliance deadline may be extended only if EPA "finds that [additional time] is necessary for the installation of controls and that *steps will be taken during the period of the waiver to assure that the health of persons will be protected from* ***imminent endangerment***." *Id.* (emphasis added). Simply put, EPA cannot grant a waiver unless it finds that no "imminent endangerment" exists or EPA explains that steps will be taken during the compliance period to protect against an imminent endangerment.

In the Proposed Rule, EPA provided DPE the full two-year period—the statutory maximum—to comply with the Section 112(f) requirements. 88 Fed. Reg. at 25176 (Ex. 19). As EPA stated: "For all of the requirements we are proposing under CAA sections 112(f), we are proposing a compliance date of 2 years after the effective date of the final rule, . . . to comply with … the proposed chloroprene requirements…." *Id.* As EPA explains, the two-year compliance

period is appropriate because the "proposed provisions will require additional time to plan, purchase, and install equipment for … chloroprene control." *Id.* at 25178.  Under Section 112(f)(4), EPA is precluded from granting the two-year waiver unless it finds that (i) there is no "imminent endangerment" or (ii) steps will be taken to protect against such an endangerment.  In the Proposed Rule, EPA did not include an explicit finding on either point, but this is consistent with EPA's long-standing view that lifetime cancer risks above 1-in-10,000 do not constitute "imminent endangerment" and the fact that, for 30 years, EPA has routinely granted Section 112(f) compliance waivers even when cancer risks are well above this level.  *See, e.g.,* 88 Fed. Reg. 22790, 22853 (Proposed Rule for Sterilization Facilities with 18-month compliance period for 112(f) requirements, where maximum individual risk (or MIR) was 60-in-10,000 (compared to 5-in-10,000 for chloroprene)).  In fact, the Proposed Rule gives ethylene oxide sources, which have upper-bound risk estimates *higher* than chloroprene, the same two-year waiver as the Facility.[6]

EPA's grant of a waiver in the Proposed Rule confirms the basic fact that EPA seeks to avoid in this lawsuit: Congress never intended an upper-bound (maximum) risk estimate to constitute an "imminent endangerment."  EPA routinely grants waivers under Section 112(f), like it has done here, because it recognizes there is no "imminent endangerment."  Indeed, in 2011, EPA made this point emphatically in response to public comments on a Section 112 rulemaking. A commentor argued that a two-year waiver violated Section 112(f)(4) because an "unacceptable" risk would persist during the compliance period.[7]  EPA flatly rejected that argument:

> The commenter has not indicated any specific concern which presents an "imminent endangerment" that will occur during the two-year compliance period,

---

[6]  *See id.* 25116 (one subset of ethylene oxide emissions, releases from pressure relief devices, alone poses maximum individual risk of approximately 15-in-10,000, compared to 5-in-10,000 for chloroprene) (Ex. 19).

[7] *See* EPA, *Nat'l Emission Stands. for Haz. Air Pollutants: Primary Lead Smelting, Sum. of Pub. Comment and Response* at 21, Docket No. EPA-HQ-OAR-2004-0305 (Nov. 4, 2011) (Ex. 20).

merely making general allegations about the risks which formed the basis of the EPA's decision to promulgate regulations. *Since Congress recognized that a 2 year compliance period may be granted despite EPA's determining to promulgate regulations to address risk, it is clear that Congress did not contemplate that any risk addressed by rules under 112(f)(2) created an* **imminent and substantial endangerment** *that would preclude a 2 year compliance date.*

*Id.* (emphasis added). That exact same analysis applies here. But EPA is contorting itself into a 180-degree pivot—*in this case, and this case only*—to argue that the same "general allegations" of risks covered by Section 112(f) constitute an "imminent and substantial endangerment," a phrase that is axiomatically stricter than "imminent endangerment." In doing so, EPA contradicts congressional intent, 30 years of EPA precedent, and its own Proposed Rule published *after* the PI Motion was filed. If the Facility's emissions do not present an "imminent endangerment," as EPA conceded in the Proposed Rule, then EPA cannot plausibly argue here for purposes of Section 303 that there is an "endangerment" both "imminent *and substantial."*

> **2.** **EPA's "receipt of evidence" of the Facility's chloroprene emissions for seven years without declaring an emergency refutes its claim of an emergency now.**

EPA's authority to act under Section 303 is triggered by its "receipt of evidence" of an "imminent and substantial endangerment." 42 U.S.C. § 7603. Section 303 was intended to equip EPA with the ability to take *immediate* action upon "receipt of evidence" of an emergency. *See* S. Rep. No. 91-1196, 91st Cong., 2d Sess. 35-36 (1970) ("The Committee believes that this *emergency authority* is necessary to provide for *immediate, effective action* . . .") (emphasis added). Here, since "at least 2016," *seven years ago*, EPA has possessed emissions monitoring data showing the extent of the Facility's chloroprene emissions. Complaint ¶¶ 9, 44-45.[8] EPA admits

---

[8] As EPA concedes, starting in January 2016, emissions monitoring consistently showed "average airborne chloroprene concentrations in the communities surrounding" the Facility "that are multiples greater than 0.20 μg/m³." *Id.* ¶ 45. *See also* EPA Response to DPE Interrogatory No. 3 (Ex. 11) (EPA admits that possessing monitoring data in 2016 was a time "when the EPA received evidence that supports the basis for a Section 303 action based on chloroprene emissions" from

that, even earlier, prior to its issuance of the National Air Toxics Assessment in December 2015, EPA had "received evidence that supports the basis for a Section 303 action based on chloroprene emissions" from the Facility.  EPA Response to DPE Interrogatory No. 3 (Ex. 11).  Yet in all that time, EPA forewent acting under Section 303 to abate the alleged emergency, but instead dealt with DPE through permitting, regulatory enforcement, and rulemaking.[9]  The bottom line is that EPA was in "receipt of evidence" of the Facility's emissions for seven years and had plenty of time to take action to abate any alleged emergency.  EPA's years-long failure to do so is compelling evidence that there is no emergency under Section 303.[10]

---

the Facility).  In January 2021, on EPA's command, DPE started monitoring fenceline concentrations on a continuous basis, initially at 18 locations, then 21.  *Id.* ¶ 49.  DPE first gave EPA those monitoring results in February 2022, and DPE has done so every two weeks since then.  *See* Declaration of Chris Meyers ("Meyers Decl.") ¶ 32 (Ex. 10).  EPA alleges that those monitoring data, possessed by EPA since early 2022, show "average concentrations of chloroprene significantly greater than 0.20 μg/m³."  Complaint ¶ 49.  In short, the most recent information upon which EPA could have even theoretically found an imminent and substantial endangerment is the fenceline monitoring data that DPE provided to EPA in February 2022, well over a year before EPA filed this "emergency" action.

[9] The issue of an alleged emergency caused by the Facility was expressly raised to EPA years ago.  On November 13, 2017, a law professor and board member of an environmental organization filed a request under the Administrative Procedure Act for EPA to invoke its Section 303 authority at the DPE Facility.  *See* Letter from M. Squillace to S. Coleman, EPA (Nov. 13, 2017) (Ex. 12).  In response, EPA chose not to file a Section 303 action, but rather touted its role in DPE's voluntary commitment in 2017 to reduce emissions.  *See* Letter from S. Coleman to M. Squillace (Dec. 15, 2017) (Ex. 13).  The request letter provided monitoring data from the vicinity of the Facility that showed concentrations levels 375 times the 0.2 μg/m³ value.  On January 12, 2018, the same professor reiterated the request.  *See* Letter from M. Squillace to S. Coleman (Jan. 12, 2018) (Ex. 14).  On May 6, 2021, Earthjustice separately petitioned EPA to take emergency action under Section 303.  This petition alleged "a grave health emergency" due to air monitoring results from 2019-2021 showing chloroprene concentration levels "as high as 16.0 μg/m³ in St. John."  Petition to EPA at 1 (Ex. 15).  Despite those repeated allegations of an emergency made more than five and two years ago, respectively, EPA did not declare an imminent and substantial endangerment under Section 303 until March 2023.

[10] EPA's Section 303 guidance underscores the lack of an emergency here.  EPA declares that Section 303 is "intended to be used *without delay 'upon the receipt of evidence' that an endangerment exists*."  *See* Guidance on Section 303 of the CAA, April 1999 at 13 (available at https://www.epa.gov/sites/default/files/2021-05/documents/transmittalofguidanceonsection303ofcaa040199.pdf.).  EPA  further  states  that

EPA's timing in alleging an emergency here is particularly suspect because the Facility's *present* emission levels are at the lowest level in the Facility's history, resulting in reductions in fenceline concentrations between 33% and 83% compared to earlier monitoring data, including 18 of 21 monitors showing reductions of more than 60%.  *See* Declaration of David Blye ("Blye Decl.") at 15-16 & Attachment K (Ex. 7).  It is inexplicable that there is suddenly an emergency now when emissions levels are at their lowest.  The glaring question is:  Why did EPA actively engage with DPE to reduce chloroprene emissions via permitting, regulatory enforcement, and rulemaking authorities for seven years—all while in "receipt of evidence" of chloroprene emissions higher than they are today—without ever exerting its Section 303 emergency authority?  The reason is simple: there is no emergency.[11]

---

"action may be taken to address unacceptable emissions from a facility, even if that facility has been in operations for decades."  *Id.*  To illustrate that point, EPA points to its 1971 action to address particulate matter from 27 steel mills in Alabama that had been in operation for many years before action was taken.  *Id.*  But EPA confirms that, in that 1971 Alabama action, "[i]t was EPA's *receipt of evidence* (§303), i.e., the particulate matter data, that provided a reasonable cause for concern and allowed EPA to initiate the [enforcement] action."  *Id.* 13-14 (citations omitted) (emphasis added).  Here, EPA points to no "evidence" of imminent and substantial endangerment that it did not possess seven years ago.

[11] It is instructive to compare EPA's conduct here to the two examples of EPA acting under Section 303 in the last two years (it appears that EPA only used Section 303 eleven times between 1971-2021).  In May 2021, EPA issued a Section 303 administrative order alleging an imminent and substantial endangerment regarding a pulp and paper mill in South Carolina.  *In re New-Indy Catawba, LLC*, *CAA § 303 Emergency Order,* EPA Region 4, ¶¶ 46-52 (May 13, 2021) (Ex. 16).  The *New Indy* order came quickly after EPA inspections, monitoring activities, and more than 14,000 reported complaints within five weeks, including from residents as far as 30 miles away from the facility.  *Id.* ¶ 14.  Notably, the order was issued only 19 days after EPA conducted monitoring of the pollutant of concern, hydrogen sulfide.  *Id.* ¶ 23.  Similarly, in May 2021, EPA issued a Section 303 administrative order regarding a marine terminal and petroleum refinery.  *In re Limetree Bay Terminals, LLC et al.*, *CAA Emergency Order,* EPA Region 2, CAA-02-2021-1003 (May 14, 2021) (Ex. 17).  EPA issued that order following four distinct incidents causing the alleged endangerment, one of which was an incident in which droplets of oil were being dispersed over nearby neighborhoods (a "flare rainout"), with concerns of subsequent "burning rain."  *Id.* ¶¶ 3, 34, 43, 79, 90, 115.  The order was issued just two days after the fourth incident.  *Id.* ¶ 90.

Further underscoring the absence of an emergency, EPA spent at least *ten months* deciding to bring this case.  EPA began threatening DPE with a Section 303 action in May 2022.[12]  But EPA elected to forego exercising that authority, notwithstanding the alleged emergency.  On August 1, 2022, *seven months* before filing this action, EPA took the statutorily mandated step of consulting with LDEQ to confirm the accuracy of the evidence supporting the alleged emergency.[13]  But instead of then promptly acting to abate the alleged emergency, EPA failed to invoke its Section 303 authority for seven more months, waiting until February 28, 2023, to finally initiate this action, relying on precisely the same type of evidence it was in "receipt" of in 2016.  And even after filing this lawsuit in February, EPA inexplicably waited three more weeks to file its PI Motion.  This undisputed *seven-year* history utterly defeats the notion that there is any real emergency, particularly one demanding a preliminary injunction.

3.    **The lynchpin of EPA's entire case—the IUR—rests upon a series of unrealistic assumptions that overstate risk *by design* and simply cannot be used as a threshold for declaring an alleged imminent and substantial endangerment.**

EPA's entire case depends on whether it is appropriate to use the IUR—from which EPA derives the 0.2 μg/m$^3$ standard it seeks to enforce here—as the threshold for declaring an imminent and substantial endangerment.[14]  The IUR is *not* an appropriate threshold for declaring an

---

[12]  In fact, four months earlier, on January 24, 2022, Administrator Regan sent a letter to DPE alleging "the serious risks posed by the chloroprene emissions resulting from [the Facility's] neoprene manufacturing operations."  (Ex. 18).  Administrator Regan insisted that DPE take actions to control the Facility's emissions.  *Id.*  Despite Administrator Regan "charging the EPA and the Department of Justice to redouble their efforts and seek more timely and concrete relief," regarding the Facility (*id.*), EPA waited 13 more months to file this action.

[13] *See* R. Doc. 9-4 (Leathers Declaration), ¶¶ 6-7 ("The purpose of the meeting [between EPA and LDEQ] was *to continue consulting* … regarding the United States' basis for an enforcement action pursuant to [Section 303] alleging that chloroprene emissions from … the Facility are presenting an imminent and substantial endangerment to public health and welfare.") (emphasis added).

[14] The 0.2 μg/m$^3$ value is nothing more than the IUR calibrated to a 1-in-10,000 risk level. The value is calculated by dividing 1-in-10,000 by the IUR ($0.2 = \frac{1}{10,000} \div (5 \times 10^{-4})$).

emergency and, for purposes of this lawsuit, the 0.2 μg/m$^3$ value is a meaningless number.  The IUR is based on a series of patently unrealistic assumptions to produce a result that overstates risk *by design*.  DPE's counterclaim alleges that EPA improperly estimated the IUR.  But this Court need not reach that question for purposes of denying EPA's PI Motion.  The assumptions on which the IUR is based mean that the IUR does not reflect a true estimate of risk and cannot be used in this litigation as a threshold for triggering or abating an imminent and substantial endangerment.

### i.   The IUR, by design, does not reflect real-world risk.

EPA touts the IUR as a statistically reliable estimate of real-world risk.  *See, e.g.*, PI Motion at 2.  But, as EPA's statements elsewhere clearly show, that proposition is incompatible with the purpose and development of IURs and the assumptions on which they are based.  Unlike in a regulatory context where EPA uses an IUR to assess a potential risk or to rank risk across various chemicals, in a *litigation* context EPA bears the burden to prove an imminent and substantial endangerment and must rely on an estimate of *actual* or *true* risk.  The IUR provides no estimate of actual or true risk because it is indisputably an "upper bound estimate" of excess cancer risk. *See, e.g.,* 2010 Review at 1 (excerpts attached as Ex. 21).  When EPA uses an "upper bound" estimate for IURs, it means EPA has confidence that the excess cancer risk will not be *greater* than that estimate.  *See* EPA, Air Toxics Risk Assessment Ref. Library, Vol. 2 at 32-33 (Apr. 2004) (Ex. 22).  However, the true excess cancer risk is likely *below* that estimate and could be as low as zero.[15]  The "upper bound" risk level for chloroprene (*i.e.*, 2.7 x 10$^{-4}$ based on female B6C3F1 mice) is just as likely as the "lower bound" risk level (*i.e.*, 1.6 x 10$^{-4}$ based on female

---

[15] EPA, *Guidelines for Carcinogen Risk Assessment* at 13 (Sept. 1986) (approach used in developing IUR "does not necessarily give a realistic prediction of the risk. *The true value of the risk is unknown*, and may be as low as zero.") (emphasis added) (Ex. 23, Part 1); *see also* Cote Dep. Tr. 31:8-10 (Ex. 24) ("The true value for human risk [of chloroprene] is really not known. So this is an estimate based on rodent data. . . .").

B6C3F1 mice), and less likely than every value in between.  Declaration of Michael Lumpkin ("Lumpkin Decl.") ¶ 30 (Ex. 4).  Thus, EPA is simply wrong when it states, *as fact,* that "a person may breathe no more than an average chloroprene concentration of 0.2 µg/m$^3$ over 70 years in order to remain below a 1-in-10,000 lifetime excess cancer risk."  PI Motion at 2.  Here, EPA ignores that the 0.2 µg/m$^3$ value relies entirely on an upper bound estimate.  It is patently incorrect to say—as EPA effectively does here—that the *true* risk is 5 x 10$^{-4}$ and that the IUR should be used as a bright-line threshold to declare or abate an emergency.[16]

EPA derived the 0.2 µg/m$^3$ value it seeks to enforce here based on the upper-bound IUR. But as noted above, EPA also calculated a lower-bound IUR—which is *just as likely* as the upper-bound value—that translates to 0.4 µg/m$^3$.  That difference is critical because air monitoring data from February 2 to June 8, 2023, show that average concentrations at 20 out of 21 locations around the Facility's fenceline were ***below*** 0.4 µg/m$^3$.  *See* Blye Decl., at 15-16 & Attachment K (Ex. 7). But neither of these values derived from the IUR estimate *true risk* because they are both calculated within a hypothetical EPA construct riddled with false assumptions (discussed below).  There is no scientific basis to use the upper-bound IUR as a bright-line for *true* risk, when the equally plausible lower-bound IUR would *double* EPA's "acceptable" 70-year concentration level.  EPA's argument depends entirely on substituting the upper limit estimate for an estimate of true risk. Without this sleight-of-hand, EPA's comparisons to 0.2 µg/m$^3$ are meaningless and its argument and request for injunctive relief collapse.

---

[16] Judge Martin Feldman of this District recognized this critical limitation, explaining that an analysis relying on the chloroprene IUR was not an "absolute measure of a risk from air toxins." *Butler v. DPE, LLC,* No. 18-cv-6685, 2020 WL 2747276, at *11 (E.D. La. May 27, 2020) (Feldman, J.) (quoting EPA.gov), *aff'd in part on other grounds*, 16 F.4th 427 (5th Cir. 2021).

While the IUR is meaningless as a measure of true risk in this case, that is not to say an IUR has no value.  When developed correctly, IUR values may inform general comparisons or "provid[e] a sense of the magnitude and uncertainty for potential risks, ranking potential hazards, or setting research priorities."  EPA, *Guidelines for Carcinogen Risk Assessment* at 3-2 (March 2005) (Ex. 23, Part 2).  For example, in rulemaking, EPA uses IURs to compare relative cancer risks across numerous hazardous air pollutants.  When IURs are used in rulemakings, they are tempered by other factors, including the science policy assumptions and uncertainties associated with measuring risk.  *See* 54 Fed. Reg. 38,044, 38,045 (Sept. 14, 1989) ("Benzene Rule," discussed further in Part III.B.7 below) ("[R]ather than a rigid line for acceptability, the Agency intends to weigh [upper bound risks] with a series of other health measures and factors").[17]  The IUR, by itself, only considers a worst-case scenario—*i.e.,* upper limit risk—and does not purport to predict actual cancer risks.  When applying an IUR in rulemakings, including in Proposed Rule for chloroprene (however, misguided the Proposed Rule is otherwise), EPA expressly recognizes this important limitation.  *See, e.g.*, 88 Fed. Reg. at 25103 (IUR "represent[s] a 'plausible upper limit to the true value of a quantity'") (emphasis added) (Ex. 19).

Indeed, EPA has consistently made clear that the chloroprene IUR:

is *not based on an evaluation of current, real world exposures*, is not an air quality standard, and it is not used directly for regulatory purposes.  Furthermore, the risks calculated using the [IUR], such as [1-in-10,000], is *not a 'bright line'* for determining whether a risk level is considered safe or acceptable. … [I]n setting emission standards under the [CAA], risk is *one factor that we need to consider*, along with information on costs, energy, safety, control technologies, and *other relevant factors*.  And there are *many other factors*.

---

[17] Indeed, EPA has allowed for maximum individual risk values greater than 1-in-10,000.  *See, e.g.,* 70 Fed. Reg. 19,992, 19,995 (Apr. 15, 2005) (NESHAP for Coke Oven Batteries setting lifetime cancer risk from exposure to coke oven emissions at 2.7-in-10,000); 72 Fed. Reg. 25,137, 25,143 (May 3, 2007) (NESHAP for Halogenated Solvent Cleaning settings risk level of 2-in-10,000).

Letter from EPA to LDEQ (Sept. 23, 2019) at 2 (Ex. 25) (emphasis added).  EPA also admits that "[i]n some circumstances, the true risk [addressed in an IUR] could be as low as zero."  88 Fed. Reg. at 25103 (Ex. 19).

Despite relying on a risk value that "could be as low as zero," the PI Motion offers not a single word on alleged *actual real-world risk* due to chloroprene emissions from the Facility.[18]  As discussed in Part III.B.4 below, the available real-world data refutes the IUR and shows that the Facility's chloroprene emissions do not pose any meaningful risk to the community, much less an emergency.  EPA's utter silence on that point makes sense, because the IUR provides only the *upper limit* of *potential* risk—not any *actual* risk for which EPA claims it needs emergency relief.[19]  Calculating actual real-world risk estimates would require EPA to quantify the "unquantifiable

---

[18] EPA stretches case law applying other statutes to espouse an interpretation of Section 303 that gives EPA virtually unbridled authority. While proposing an interpretation that EPA need only show a "'threatened harm' to public health or welfare that . . . 'gives reasonable cause for concern,'" EPA fails to proffer a definition of "harm" or "reasonable."  PI Motion at 23.  EPA posits that the "*possibility* of being exposed to carcinogenic substances may be enough."  *Id.* 26. But, without an estimate of true risk, EPA seeks to expand its emergency authority to cover *potential* risks that *may* develop based on a series of unrealistically conservative assumptions.  The limited case law does not support this.  *See, e.g., U.S. v. U.S. Steel Corp.,* Civil No. 71-1041 (N.D. Ala. 1971) (halting manufacturing activities in midst of a weather event that trapped pollutants in mountain range); *Apalachicola Riverkeeper v. Taylor Energy Co., LLC,* 954 F. Supp. 2d 448 (E.D. La. 2013) (endangerment involving continuing oil spill in Gulf of Mexico); *Cox,* 256 F.3d at 293 (endangerment due to illegal dumping at two disposal facilities causing contaminated leachate in ground and surface water); *U.S. v. Apex Oil Co.,* No. 05-CV-242-DRH, 2008 WL 2945402, (S.D. Ill. July 28, 2008), *aff'd,* 579 F.3d 734 (7th Cir. 2009) (endangerment at refinery and associated pipelines with series of spills and leaks posing risk to nearby residents, including groundwater and drinking water contamination).  Unlike these cases that address changed conditions and tangible risks, EPA's Proposed Rule, which is also based on the overly conservative IUR, estimates that the risk of cancer incidence is only one tumor every 20 years.  88 Fed. Reg. at 25107 (Ex. 19). EPA's contention that such a risk should be managed through emergency authority is baseless, particularly when EPA has formally proposed new regulatory requirements to address precisely the same risk.

[19]  *See* EPA, *Risk Assessment for Carcinogens* ("Because [EPA's processes for estimating cancer risk for inhalation] reflect unquantifiable assumptions about effects at low doses, their upper bounds are not true statistical confidence limits.") Available at https://www.epa.gov/fera/risk-assessment-carcinogenci-effects (last updated Nov. 21, 2022).

assumptions" incorporated into the IUR.  *Id.*  EPA undisputedly did not grapple with any such assumptions here, yet demands that the IUR, and the resulting 0.2 µg/m$^3$ value, be treated as reflecting actual real-world risk.

       **ii.**       **The IUR is based on patently false assumptions.**

As discussed above, the IUR is not intended to represent *real-world* risk.  In addition to representing only the upper limit of risk, the IUR relies on false assumptions.  First, the IUR counterfactually assumes that individuals are exposed to chloroprene continuously all day, every day for 70 years.  *See, e.g.*, 2010 Review at 138 (Ex. 21).  But EPA's own guidance recognizes the reality that individuals do not remain in a single location for their entire life.[20]  Under its own guidance, EPA addresses this reality by applying a default "residential occupancy period"

---

[20]   Notably, EPA's epidemiology expert, Dr. Helen Suh, while not a risk assessment expert, roundly rejected the assumption that everyone in the vicinity of the Facility would have the same exposure to chloroprene:

> Q:  So you would say that an assumption that all individuals living within St. John the Baptist Parish will have the same chloroprene exposure level is a false assumption? A:  Right.  Q:  It's a false assumption because people live at different distances from the Denka facility, as you said?  A:  That was one example.  Q: Okay.  And it's a false assumption because people live at different directions from the facility?  A:  That's another example.  Q:  It's also a false assumption because people have different activity patterns that will affect exposure?  A:  A third example.  Q:  Some of the activity patterns, would one be it includes people who might be indoors for most of the day versus people who are out of doors most of the day?  A:  That would be one.

Suh Dep. Tr. 165:10-166:9 (Ex. 26).  Further, when asked to explain how EPA's 70-year continuous exposure assumption squares with the complete absence of any cancer cases in the vicinity of the Facility (*see* Part III.B.4 below), Dr. Suh was remarkably candid:

> Q:  Well, you're telling me that a person who was born in the vicinity of the facility several years ago and breathed decades worth of chloroprene may have moved away, so you can't assume that person would be part of a cancer cluster.  A:  We don't know.  Q:  Right.  And because we don't know, doesn't that render the assumption that everyone is going to live near the facility for 70 years and breathe chloroprene continuously a false assumption? … THE WITNESS:  We just don't know; right?  Like I don't know.

Suh Dep. Tr. 241:4-16 (Ex. 26).

adjustment of 33 years (instead of 70 years) representing EPA's estimate of the 95th percentile for how long individuals live in their homes. *See* Lumpkin Decl. ¶¶ 90 n. 51, 96, 97 (Ex. 4) (discussing Exposure Factors Handbook). Applying this default adjustment to the upper-bound IUR would result in a value of $2.4 \times 10^{-4}$ per $\mu g/m^3$, or a 70-year average concentration level above 0.41 $\mu g/m^3$. *Id.* ¶ 97. This point—*by itself*—should be dispositive of this case, given that air monitoring data from February 2 to June 8, 2023, show that average concentrations at 20 out of 21 locations around the Facility's fenceline were ***below*** 0.4 $\mu g/m^3$. *See* Blye Decl. at 15-16 & Attachment K (Ex. 7). Yet EPA disregards this adjustment that is called for by its own guidance, while also failing to meaningfully address all other exposure factors that might make the IUR suitable for real-world application. EPA's own risk assessment expert, Dr. Vandenberg, acknowledged that an individual's risk is reduced when that individual spends time away from the Facility, but has "no knowledge" as to whether individuals near the Facility are actually "staying there for their entire lifetime."[21] Indeed, Dr. Vandenberg has calculated a purely *theoretical* "maximum individual risk" and made no effort to calculate an *actual* risk level or expected rate of cancer incidence.[22] EPA recites the proposition that endangerments can be imminent if the *threat* of harm is present now (*see, e.g.,* PI Motion at 25), but has offered no analysis or evidence of that threat. EPA holds out a "maximum individual risk" value with no reliable evidence that a single person near the

---

[21] Vandenberg Dep. Tr. 143:4-15; 144:19-146:7 (Ex. 27) ("The assumption is that the main concentrations from the monitors represent people being there for, you know, essentially they're not moving outside of the area.").

[22] *Id.* 143:13-15 ("There would be a reduction in that individual's risk. It doesn't necessarily mean that there's a reduction in the maximum individual risk.") (Ex. 27); *id.* 176:17-23 (when asked whether he calculated the expected cancer incidence rate near the DPE Facility, responding: "That was not within the scope of work that I performed. No, I did not.").

Facility meets the "maximum individual risk" criteria.[23]   Such an approach may be suitable as a

first step in rulemaking or internal deliberations, but more is required when asking a court to invoke

emergency authority under Section 303.

EPA also relies upon a second fundamental, and equally false, assumption that divorces

the IUR from any notion of a "real-world" estimate of risk: "that humans are as sensitive to

chloroprene exposure as the female B6C3F1 mouse."  *See* EPA's Response to DPE's RFA No. 17

(Ex. 28).  The IUR is based solely on cancer incidence data observed in a 25-year-old study of

female B6C3F1 mice.  *See* 2010 Review at 141 (Ex. 21).  In exclusively relying upon female

B6C3F1 mice as the basis for the IUR, EPA disregarded tumor data for other species and sexes,

including male B6C3F1 mice, and both sexes of F344 rats, Wistar rats, and Syrian golden

hamsters.  *See* 2010 Review at 128 (Ex. 21); Declaration of P. Robinan Gentry ("Gentry Decl.")

¶ 45 (Ex. 5).  Each of these species showed much lower tumor incidences than female B6C3F1

mice, yet data regarding female B6C3F1 mice are the only data reflected in the IUR.  *Id.*  Like the

counterfactual "continuous exposure" assumption discussed above, this patently unrealistic

"female B6C3F1 mouse/human equivalence" assumption is conservative *by design*.  *See* 2010

Review at 141 (Ex. 21) ("The calculated composite unit risk is based on the most sensitive endpoint

(risk of any tumor type) in the most sensitive species and sex (female mouse).").

---

[23] EPA's demography expert, Dr. Nyesha Black, opines that "there is some evidence that those
who live in the area have been there for many years" (PI Motion, Ex. C ¶ 49), but she fails to make
any effort to quantify such purported evidence and falls well short of justifying EPA's utter failure
to employ residential occupancy period exposure adjustments.  EPA's claim assumes that every
person within 2.5 miles of the Facility has remained within those 2.5 miles since birth and will
remain there through age 70.  Indeed, the most salient point regarding the "many years" that
residents have lived near the Facility is the complete absence of any evidence of increased cancer
incidence and cancer mortality given that chloroprene emissions were more than 25 times higher
during the decades of operation that preceded DPE's ownership.  *See* Part III.B.4 below.

EPA defends this critical default assumption in the 2010 Review by stating that "[t]here is no information on chloroprene to indicate that the observed rodent tumors [*i.e.*, in female B6C3F1 mice] are not relevant to humans." *Id.* at 141. That assertion is wrong, given the overwhelming evidence of differences in sensitivity among rodents and humans. *See, infra*, Part III.B.8. But to deny the PI Motion, this Court need not even reach that question because EPA's default assumption to use data from the most sensitive species and sex of rodent renders the IUR useless for estimating actual risk to *humans* who are exposed to very low concentrations of chloroprene. Like the unrealistic "continuous exposure" assumption, relying exclusively on the most sensitive animal species to develop an overly conservative benchmark may be appropriate in the *rulemaking* context when, unlike for chloroprene (*see, infra,* Part III.B.8), there is no data that support selecting one species over another. Importantly, in the rulemaking context such conservative assumptions can be tempered by sound policy judgment and consideration of all relevant factors, and can be implemented, if at all, through reasonable compliance periods. But such counterfactual assumptions are unquestionably improper in this litigation, where EPA bears the burden of proving an imminent and substantial endangerment based on actual, real-world risk.

In short, EPA mechanically recites that its emergency allegation is based on an upper threshold of risk (*see, e.g.*, PI Motion at 1-2), but fails to address the critical implications of that fact. Likewise, EPA acknowledges that its allegations here depend on the patently unrealistic assumptions (i) that residents are constantly exposed to chloroprene, 24-hours-per-day, for 70 years, and (ii) that humans are as sensitive to chloroprene as female B6C3F1 mice. EPA compounds these unrealistic assumptions by holding out the IUR as a bright line threshold for developing cancer but fails to explain how these assumptions comport with reality. EPA simply cannot meet its burden of proof in this action by relying on such default assumptions. Even without

any IUR adjustments, EPA estimates an annual cancer incidence rate of 0.05 per year, or one tumor manifesting every 20 years.  *See* 88 Fed. Reg. at 25107.  If EPA *had* attempted to convert this value into a "real-world" estimate, any such adjustment would only drive the estimated incidence rate significantly *lower*.  But no such estimate exists in the record.  By relying entirely on the IUR derived from the 2010 Review, EPA has utterly failed to meet its burden of proving any *actual* risk attributable to chloroprene emissions from the Facility, and thus failed to prove an imminent and substantial endangerment.

### 4. EPA's allegation of imminent and substantial endangerment is refuted by the available real-world data showing no cancer risk of chloroprene to humans.

EPA's failure to allege a Section 303 emergency for the past seven years is fully consistent with the fact that all the available real-world evidence shows that chloroprene emissions from the Facility do not pose an increased risk of cancer.  For decades, in conjunction with the National Cancer Institute, Louisiana has had a robust program to track cancer cases throughout the state. The data from the Louisiana Tumor Registry ("LTR") consistently shows no increase in cancer incidence rates in the community surrounding the Facility.  Declaration of Dr. Gary Marsh ("Marsh Decl.") ¶ 63 (Ex. 3).[24]  In fact, LTR data show that St. John the Baptist Parish recorded one of the lower cancer rates state-wide.  Marsh Decl. ¶¶ 68-84; LSU Health, *Louisiana Cancer Data Visualization*, https://sph.lsuhsc.edu/louisiana-tumor-registry/data-usestatistics/louisiana-data-

---

[24] The LTR, maintained by the Louisiana State University School of Public Health, has a mission "[t]o collect and report complete, high-quality, and timely population-based cancer data in Louisiana to support cancer research, control, and prevention."  LSU Health, *About the Registry*, https://sph.lsuhsc.edu/louisiana-tumor-registry/about-the-registry/.  In 2020-2021, Louisiana State University conducted a study confirming that the LTR had not omitted any relevant cancer cases in the 2009-2018 timeframe.  Marsh Decl. ¶¶ 64-67 (Ex. 3).  Dr. Helen Suh, EPA's epidemiology expert, confirmed that the LTR data "seems like it's high-quality" (Suh Dep. Tr. 99:21-100:12 (Ex. 26)), and she had no questions about the completeness and quality of the LTR data.  *Id.* 113:6-12; 151:1-9 (Ex. 26).

interactive-statistics/louisiana-cancer-data-visualization/ (LTR update for 2015-2019 period showing St. John the Baptist Parish within bottom 25% of cancer incidence rates state-wide).[25]

Moreover, beginning in 2007, and continuing in 2021, Dr. Marsh conducted what is widely considered to be the leading epidemiological study of chloroprene.[26]  In 2007, Dr. Marsh studied the impacts of chloroprene on a large cohort of U.S. and European chloroprene workers—individuals who for multiple decades were subjected to chloroprene concentrations estimated to be more than 450 times higher than for residents living closest to the Facility today.  Marsh Decl. ¶¶ 19-26 (Ex. 3).  Dr. Marsh found no increase in cancer mortalities among the chloroprene workers.  *Id.*  In 2021, Dr. Marsh updated the 2007 study, examining ten additional years of data (through 2017) on the same cohort of U.S. chloroprene workers from the 2007 study.  *Id.* ¶¶ 27-31.  Again, Dr. Marsh found no increase in cancer mortalities among U.S. chloroprene workers, a population exposed to far higher concentrations of chloroprene than the communities surrounding

---

[25] Notably, in 2020, EPA granted LDEQ and the Louisiana Department of Health roughly $311,000 collectively "to assess the health risks associated with Chloroprene exposure in St. John the Baptist Parish near the Denka Plant," with the two-fold objective of determining "if there are higher instances of cancer in the community due to" the Facility's emissions, and "if there has been under-reporting of these cases in the [LTR]." (Exs. 29 & 30).  That grant money funded the subsequent LSU study, discussed in note 24 above, that confirmed the completeness of the LTR data.  Thus, EPA fully recognized the value of LTR data in "assess[ing] the health risks" associated with the Facility's emissions.  The problem was, the LTR data showed the exact opposite of what EPA hoped to prove.

[26] Dr. Helen Suh, EPA's epidemiology expert, agrees that Dr. Marsh's epidemiological study of chloroprene workers "was the most comprehensive study," was "head and shoulders above" the other chloroprene studies, and "had the most detailed and precise measure of chloroprene exposures."  Suh Dep. Tr. 87:12-15, 83:3-13, 84:15-18 (Ex. 26).  Dr. Herman J. Gibb, one of two epidemiologists on the peer review panel for the 2010 Review, described Dr. Marsh's 2007 epidemiological study of chloroprene as "[t]he largest and what appears from the document to be the best conducted study" of chloroprene risks.  Marsh Decl. ¶ 58 (Ex. 3) (discussing 2010 Final Reviewer Comments at 27).  *See also*, *Sax et al.*, Risk Analysis, Vol. 40. No. 2 (2020), *Extended Analysis and Evidence Integration of Chloroprene as a Human Carcinogen* at 306 (Marsh study "is the largest and methodologically strongest epidemiology study of chloroprene-exposed workers") ("Sax et al. (2020)") (Ex. 31).

the Facility today.  *Id.*   Like the LTR data, Dr. Marsh's epidemiological study strongly supports

the conclusion that chloroprene does not pose a meaningful cancer risk to humans, particularly

because both data sets reflect significantly higher levels of chloroprene exposure than currently

exist near the Facility.[27]

EPA cites no evidence that cancer rates have actually increased due to chloroprene

emissions from the Facility,[28] which is critical given the decades of DuPont's ownership when

chloroprene emissions were more than 25 times higher than they are today.  EPA's silence on this

point highlights obvious yet critical questions:  Given the "decades of historical emissions" in

concentrations far greater than today (PI Motion at 11), and the fact that "some of the affected

people have lived in the Parish and breathed the air there for decades" (*id.* at 28), if chloroprene

poses the severe risk that EPA now alleges, then where are the increases in cancer incidences and

mortalities in the areas surrounding the Facility?  If, as EPA alleges, "infants who are born today"

will "double their estimated lifetime acceptable excess cancer risk" by their second birthday (*id.*

at 2), then where are all the cancers in the many people born near the Facility in the 1960s, 1970s,

and 1980s who for decades have inhaled levels of chloroprene more than 25 times higher than a

child born today?  While EPA glibly states that "the cumulative impacts of decades of historical

---

[27]   EPA's expert, Dr. Suh, disputes Dr. Marsh's interpretation of the results of his own
epidemiological study, although Dr. Suh herself has never conducted any occupational
epidemiological study, let alone a study of chloroprene.  Suh Dep. Tr. 30:13-14, 31:1-15 (Ex. 26).
Contrary to Dr. Suh's view, one peer reviewed article describes the Marsh study as "the only one
of adequate quality to validly address epidemiologically the cancer risks associated with human
exposure to chloroprene," and concludes that "the strongest studies demonstrate no increased risk
of liver or lung cancers (or any other cancer) from occupational exposure to chloroprene."  Sax et
al. (2020) at 308 (Ex. 31).

[28]   *See* EPA Response to DPE's Interrogatory No. 12 (EPA "not currently aware of specific
incidents of cancer that have been attributed by a medical professional or individual with other
relevant scientific expertise to exposure to Denka's chloroprene emissions.") (Ex. 32); *see also*
Suh Dep. Tr. 230:7-18 (EPA epidemiology expert not aware of any cancer incidence specifically
attributable to chloroprene due to Facility emissions) (Ex. 26).

emissions cannot be ignored" (*id.* at 11), EPA, in fact, does just that.  The available real-world evidence shows that chloroprene emissions from the Facility do *not* pose any increased risk in cancer.  EPA simply disregards that evidence.[29]

The figure below shows the decreasing chloroprene emission rates between 1987 and 2021. Marsh Decl. ¶ 86 (Ex. 3).  The green shading shows the most current period for which LTR data are available (2015-2019), the period in which St. John the Baptist Parish was in the bottom 25% of state-wide cancer incidence rates.  *Id.*  The yellow highlighting reflects the lung cancer latency period of 10-30 years (when chloroprene emissions were substantially higher) that would be applicable to the 2015-2019 period.  *Id.*



*Chloroprene emissions (Source: TRI) shown with cancer rate years and relevant exposure years highlighted in green and yellow, respectively.*

Again, given the decades-long history of chloroprene emissions from the Facility—the vast majority of which was under DuPont's ownership and at concentrations more than 25 times higher

---

[29]  EPA's epidemiologist, Dr. Suh, testified that "it doesn't concern me" that there are no cancer incidences or deaths in the vicinity of the Facility and the lack of such evidence does not impact her opinions.  Suh Dep. Tr. 233:20-234:19 (Ex. 26).

than they are today—if EPA's allegations of endangerment due to chloroprene were even remotely accurate, then logically one would expect to find *some* actual evidence of increased cancer incidences in the vicinity of the Facility.   Marsh Decl. ¶ 87 (Ex. 3).    But the empirical data demonstrate the exact opposite.  *Id.* ¶¶ 68-84.  The absence of any real-world impact alone refutes EPA's case on the merits.   Recognizing the lack of empirical data supporting the alleged emergency, EPA argues that "it is not necessary to prove that actual harm—meaning, in this case, proof of a measurable increase in cancer incidence or resulting deaths—is afflicting Parish residents" to establish a Section 303 emergency.  PI Motion at 28.  But there is not just an *absence* of proof of actual harm here; there is affirmative evidence rebutting the risk of harm.  Section 303 does not grant EPA authority to disregard that critical evidence, and certainly does not prevent this Court from considering it.

5.   **EPA misrepresents *current* conditions near the Facility—the only time frame that matters under Section 303's "*is presenting*" standard—by relying upon old, unrepresentative monitoring data.**

Since May 2022, when EPA threatened to initiate a Section 303 action, DPE has engaged in sustained efforts to further reduce the Facility's chloroprene emissions.  Meyers Decl. ¶¶ 21-31 (Ex. 10).  Many of these emission reductions have been (and are being) implemented pursuant to a Consent Agreement that EPA agreed upon.  *Id.* ¶¶ 22-23 (Ex. 10).  During weekly briefings, DPE has informed EPA of DPE's other emission reduction measures.  *Id.* ¶¶ 8, 22-25, 27 & 57 (Ex. 10). These efforts have been successful, with the Facility's *present* emissions (February 2–June 8, 2023) at the lowest level since monitoring began, resulting in reductions in fenceline concentrations between 33% and 83% compared to earlier monitoring data, including 18 of 21 monitors showing reductions of more than 60%.  *See* Blye Decl. at 15-16 & Attachment K (Ex. 7). Recent air modeling aligns with the most recent monitoring data and projects similar levels into the future.  Declaration of Eric Farstad ("Farstad Decl.") ¶¶ 28-31 (Ex. 6).  Simply put, DPE's

*present* emissions are the lowest they have ever been.  That fact is critical to this case, yet EPA seeks to hide it by intentionally relying upon unrepresentative emissions monitoring data.

EPA's authority under Section 303 is limited to situations where a source "is presenting" an imminent and substantial endangerment, 42 U.S.C. § 7603, meaning the endangerment is occurring *now* and not in the past.  Here, to prop up its allegation of an emergency, EPA seeks to obscure the considerably lower emission levels that exist at the Facility *today*.  EPA assumes, without explanation, that the Facility's emissions today and for *70 years* into the future will be the same as the average emissions that were monitored during the 57-month period from April 2018 to January 2023, and the 29-month period from April 2018 to September 2020.  *See* Complaint at 15, 17, Tables 1 & 2.  That assumption is wrong.  First, the Proposed Rule must be finalized by March 2024, and the final rule's compliance timelines will be set by EPA, but many of the emissions limitations would become effective no later than March 2026.  *See* 42 U.S.C. § 7412(f)(4); 42 U.S.C. § 7412(3)(A).[30]  While DPE is vigorously challenging the Proposed Rule, unless EPA is assuming such challenge will be successful and the Proposed Rule will *not* be finalized by March 2024, that deadline, by itself, renders false EPA's assumption regarding future emission levels.

Moreover, EPA's assumption about current and future emission levels ignores the Facility's significant emission reductions prior to January 31, 2023, which are evident in the 2023 monitoring data.  Meyers Decl. ¶¶ 22-23 (Ex. 10).  DPE estimates that chloroprene emissions have decreased in the past 6 months from roughly 18-20 tons to 16.9 tons or lower per year.  *Id.*  Based

---

[30] By court order, EPA is required to issue a final rule related to the source category of emission standards applicable to DPE.  *Env'l Integrity Proj. et al. v. Regan,* 1:20-cv-03119-TNM (D.D.C. Aug. 24, 2022) (R. Doc. 39) (requiring EPA to issue proposed rule no later than March 29, 2024, for air standards for the Group I Polymers and Resins category).

on these reductions, air modeling predicts chloroprene concentration levels consistent with the 2023 monitoring data and *not* with the average values represented by EPA.  Farstad Decl. ¶ 39 (Ex. 6).[31]  In contrast, the monitoring periods relied upon by EPA do not accurately reflect the level of *current and future* emissions from the Facility, and thus, do not support EPA's allegation of an imminent and substantial endangerment.  EPA relies upon emissions data from as far back as April 2018, five years ago, when chloroprene emissions were higher than they are today.  But to bolster its allegation of an emergency, EPA incorporates those higher April 2018 results into the range of values purportedly reflecting *current* emissions, and thereby artificially increases the average.  For example, in the PI Motion, EPA asserts that monitoring data from one monitoring program—called the TO-15 program[32]—"consistently show long-term average airborne chloroprene concentrations in residential areas closest to the Facility that are more than *fourteen times* greater than 0.2 µg/m$^3$."  PI Motion at 2.  But the more recent TO-15 data from 2023 data show concentrations less than half that amount.  Blye Decl. ¶¶ 39-42, Attachments H-J (Ex. 7) (TO-15 averages from Feb. 4-June 15, 2023, between 0.19-1.27 µg/m$^3$).  Further, the 2023 averages from the other, more representative (*i.e.*, continuous) monitoring program—called the

---

[31] Mr. Farstad, an air quality scientist with over 30 years of experience in air quality dispersion modeling, completed in-depth dispersion modeling to assess chloroprene concentrations in the communities surrounding the Facility.  Farstad Decl. ¶¶ 2-6 (Ex. 6).  As Mr. Farstad explains: "[m]y modeling analysis shows that current chloroprene concentrations in the communities surrounding the Facility have decreased from 2019 due to emission reduction efforts.  The modeling demonstrates that the emission reductions have resulted not only in lower maximum chloroprene concentrations, but also a smaller area with chloroprene concentrations exceeding 0.2 µg/m$^3$."  *Id.* ¶ 39; *see also id.* ¶¶ 10-31.  Mr. Farstad also explains why modeling, instead of relying upon past monitoring data, is a superior approach to assessing *future* emissions.  *Id.* ¶ 24.

[32] Method TO-15 was developed by EPA in 1990 and uses a multi-step process that involves the collection of air samples using specialized canisters followed by analyzing the air in the lab.  Blye Decl. ¶ 18 (Ex. 7).  Samples are periodically collected for laboratory analysis over 24-hour time intervals.  *Id.*

Method 325 program[33]—are even lower, despite being taken at the fenceline of the Facility. Those Method 325 data show that 17 of 21 monitoring locations recorded results 0.3 μg/m³ or lower and that no locations exceeded 0.55 μg/m³. *Id.* at 15-16 & Attachment K (Ex. 7).[34]

EPA's exclusive reliance on the TO-15 data instead of the Method 325 data is unsupportable. First, EPA *required* DPE to utilize Method 325, including specifically to inform EPA's assessment of endangerment under Section 303. *See* Letter from M. Greene, EPA, to J. Lavastida, DPE (July 6, 2022) (Ex. 33); Blye Decl. ¶¶ 17, 29 (Ex. 7). But despite EPA's insistence that DPE follow Method 325, EPA has elected, for purposes of propping up its allegations here, to disregard the Method 325 data and instead use the older, less representative TO-15 data. PI Motion, Ex. D ¶ 36. There is no justification for EPA's change in course. Given that EPA compelled DPE to install and use the Method 325 monitoring program, EPA's rejection of the

---

[33] Method 325 is a newer method developed by EPA in 2015 that provides a better measure of average long-term chloroprene ambient air concentrations than Method TO-15. Blye Decl. ¶¶ 19, 28 (Ex. 7). Unlike the TO-15 program, which collects intermittent samples over 24-hour periods, Method 325 involves continuous monitoring over a 14-day sampling period. *Id.* ¶¶ 18, 20, 23; *see generally id.* ¶¶ 15-31. Given that Method 325 provides for continuous sample collection of ambient air over consecutive 14-day time intervals, it provides a better long term average chloroprene concentration than intermittent Method TO-15 monitoring. *Id.* ¶ 31.

[34] Mr. Blye, an expert in environmental chemistry with substantial experience applying EPA air monitoring methods (Blye Decl. ¶¶ 1, 3-9 (Ex. 7)), conducted comparisons of various sets of monitoring data from the Facility and concluded that average chloroprene concentrations in the vicinity of the Facility measured in 2023 are lower than any prior measured period. *Id.* Opinion 2 at pages 11-15 & Attachments E-K (Ex. 7). For both Method TO-15 and Method 325, Mr. Blye compared the recent data from January 31, 2023, to the present, with the historical emissions data relied upon by EPA's expert, Dr. Vandenberg—specifically, data from January 7, 2022, through December 22, 2022 (for Method 335 data), and April 2, 2018, through January 31, 2023 (for TO-15 data). *Id.* ¶¶ 35, 39 (Ex. 7). Attachments F (using Method 325 data) and I (using TO-15 data) to the Blye Declaration, respectively, compare the average chloroprene concentrations for the period used by Dr. Vandenberg with the more recent period in 2023. *Id.* ¶¶ 37, 41 (Ex. 7). Mr. Blye also explains that Method 325 provides a better measure of average long-term chloroprene concentrations than Method TO-15. *Id.* Opinion 1 at pages 7-11 (Ex. 7).

more representative Method 325 data seems intended more to artificially inflate the numbers than to truly assess current emission levels.

### 6.     Congress has made it clear that long-term cancer risks higher than 1-in-10,000 do not constitute an "imminent and substantial endangerment."

Congress has created a comprehensive statutory program to address cancer (and other) risks attributable to emissions of "hazardous air pollutants" ("HAPs") from chemical plants and other industrial facilities.  This program is set forth in Section 112 of the CAA, where Congress laid out deadlines for EPA to take several regulatory steps:

- Within one year after the statute was signed into law, EPA was required to identify "source categories"—different types of industrial facilities—that included "major sources" of such pollutants.

- Within ten years, EPA was required to go through a series of notice-and-comment rulemakings to set technology-based standards to reduce HAP emissions from each of these source categories.

- Within eight years after setting technology-based standards for a category, EPA was required to conduct another notice-and-comment rulemaking to do a "residual risk review"—*i.e.*, an evaluation of the "risk to public health remaining" after the implementation of the technology-based standards.  As part of this rulemaking, EPA was *for the first time required to consider* whether more stringent standards were needed to address lifetime cancer risks higher than 1-in-10,000.

Thus, when Congress adopted the 1990 CAA, it clearly understood that many people were exposed to lifetime cancer risks higher than 1-in-10,000 because of industrial pollutants, and *Congress determined that it was acceptable to allow people to be exposed to these risks for up to 18 years*.  Surely, if Congress believed that lifetime, upper bound cancer risks higher than 1-in-10,000 posed an "imminent and substantial endangerment," it would not have given EPA 18 years to address those risks.  The premise of EPA's action here—that the Court must take emergency action to reduce the risk of chloroprene exposure before a trial on the merits—runs counter to the separate, rulemaking regime under Section 112 that Congress created to address precisely this type of risk.  This statutory regime focuses on reducing risk over the long-term through a series of

notice-and-comment rulemakings and does not require curtailment of emissions *during* the rulemaking process.

Making EPA's "emergency" action here even more incongruous and inappropriate is the fact that, through the Proposed Rule, EPA *is simultaneously* pursuing a Section 112 rulemaking that specifically addresses chloroprene emissions from the Facility. EPA makes little effort to hide the near-perfect redundancy between its PI Motion and the Proposed Rule. Both seek to directly apply the IUR to address the upper-bound (maximum) cancer risk associated with breathing chloroprene continuously for 70 years. *See* PI Motion at 6; 88 Fed. Reg. 25097-98 (Ex. 19). Both seek to require DPE to comply with a series of prescriptive requirements to control emissions from the same sources. The fact that Congress gave EPA the tools through the Section 112 rulemaking process to address the exact risk at issue here and seek nearly identical emission reductions belies any notion that Congress viewed this scenario as an emergency under Section 303.

To be sure, there are important substantive (as well as procedural) differences between this emergency action and the Proposed Rule. For one, the Proposed Order includes compliance deadlines that cannot be implemented in a "safe and compliant manner." Declaration of Paul Casarez ("Casarez Decl.") ¶ 38 (Ex. 8); Meyers Decl. ¶ 39 (Ex. 10). Indeed, the Proposed Order's compliance deadlines are *years* shorter than those in the Proposed Rule. For example, the Proposed Rule requires DPE to control emissions from the Polymerization Kettle Strainers within *two years* of the final rule's publication (roughly two and a half years from now), 88 Fed. Reg. at 25178 (Ex. 19), while the Proposed Order requires DPE to implement the same requirements within *30 days* of the Court's order. *See* Proposed Order, ¶ 2(a). EPA explains in the Proposed Rule that the two-year compliance period is necessary because the requirements will "require additional time to plan, purchase, and install equipment for . . . chloroprene control." 88 Fed. Reg.

at 25178 (Ex. 19).  Yet here, EPA declares that the task will only take 30 days.  These are patently incompatible positions under any scenario, but they are arbitrary and capricious when dictated by a single agency within the space of a few short weeks.[35]

In sum, as the Proposed Rule demonstrates, Congress created the Section 112 rulemaking process for EPA to deal with any long-term cancer risks posed by the Facility.  But EPA is short-circuiting that rulemaking process by simultaneously pursuing this incompatible lawsuit.  If EPA were to begin addressing risks due to HAPs through "emergency" actions under Section 303, it would undermine the carefully calibrated process created by Congress in Section 112, including the provisions allowing for participation by affected companies like DPE.[36]

### 7.  EPA's 1-in-10,000 risk level (borrowed from Section 112) is not a proper benchmark for alleging an emergency under Section 303.

As discussed above, EPA's allegation of an emergency under Section 303 here is simply incompatible with Section 112's regime for addressing long-term cancer risks and the Proposed Rule.  But even if Section 303 *were* an appropriate vehicle to address such long-term risks, EPA's use of the 1-in-10,000 risk level (borrowed from Section 112) cannot be used to declare an

---

[35] As another example of EPA's unexplainable inconsistency, EPA declares in the PI Motion that 15,000 to 17,000 people are exposed to a cancer risk level greater than 1-in-10,000 due to the Facility's chloroprene emissions.  *See* PI Motion at 3.  But in the Proposed Rule, EPA says that roughly 2,100 people are exposed to the same risk.  *See* 88 Fed. Reg. at 25107 (Ex. 19).

[36] EPA argues that the "notwithstanding" language in Section 303 provides EPA with the necessary authority to take this emergency action.  *See, e.g.,* PI Motion at 17 n. 16.  But the issue is not whether EPA has the *authority* under Section 303 to address an "imminent and substantial endangerment" from HAPs, but whether a risk that is *already addressed* in a separate section of the CAA constitutes an "imminent and substantial endangerment."  The "notwithstanding" language in Section 303 does not preclude this Court from looking to other sections of the CAA to interpret what Congress viewed as an emergency, particularly when Congress amended Sections 112 and 303 in the same legislation.  *See* Pub. L. No. 101-549, § 301, 104 Stat. 2531 (amending CAA Section 112); *id.* § 704 (amending CAA Section 303).

emergency (or establish when the alleged emergency is abated) because it flatly contradicts the purpose of Section 112's 1-in-10,000 risk benchmark.

Congress endorsed using the 1-in-10,000 risk level *solely within the context of Section 112 rulemaking*. Section 112(f)(2)(B) of the CAA expressly preserved EPA's approach in the Benzene Rule to guide what constitutes an "ample margin of safety" under Section 112.[37]  In the Benzene Rule, EPA stated that it would "generally presume that if the risk to [the maximum exposed] individual is no higher than approximately one in 10 thousand, that risk level is considered acceptable." 54 Fed. Reg. at 38,045 (Sept. 14, 1989).  Importantly, as made clear in the Benzene Rule, this "presumptive" risk level of 1-in-10,000 is the *beginning* of EPA's framework for rulemaking, which includes significant safeguards to prevent reflexive reliance on a bare number. Here, however, EPA casts those safeguards aside and demands that this Court should *end* the analysis based solely on a rote application of the 1-in-10,000 risk level.

In the Benzene Rule, EPA set out a flexible process, requiring consideration of a range of factors, including scientific uncertainties and weight of evidence.  *See* 54 Fed. Reg. at 38,045. EPA explained that the 1-in-10,000 risk level "does not necessarily reflect the true risk, but displays a conservative risk level which is an upper-bound that is unlikely to be exceeded." *Id.* EPA also acknowledged that consideration of risk level "must take into account the strengths and weaknesses of this measure of risk*,*" specifically noting that "the same weight cannot be accorded to" a "known human carcinogen, and to a pollutant considered a possible human carcinogen based on limited animal test data." *Id.* at 38,045-46.  Here, based solely on female B6C3F1 mice studies,

---

[37] 54 Fed. Reg. 38,044 (Sept. 14, 1989) ("Benzene Rule").  As EPA acknowledges, the Benzene Rule "remains the primary model for establishing emission standards in the context of CAA Section 112(f) rulemaking.  The approach developed in this rule was endorsed by Congress in the CAA's 1990 Amendments.  *See* 42 U.S.C. § 7412(f)(2)(B)."  EPA's Response to DPE's Interrogatory No. 6 at 12 (Ex. 34).

EPA seeks to enforce the 1-in-10,000 risk level as the true risk, without considering other relevant factors, let alone the real-world evidence described in Part III.B.4 above.

In establishing the 1-in-10,000 risk level in the Benzene Rule, EPA made clear that, "rather than a rigid line for acceptability, the Agency intends to weigh [the risk level] with a series of other health measures and factors."  54 Fed. Reg. at 38,045.  For chloroprene, EPA expressly confirmed that the 1-in-10,000 risk level "is *not based on an evaluation of current, real world exposures*," and "is *not a 'bright line'* for determining whether a risk level is considered safe or acceptable." *See, supra*, at 16-17 (quoting Ex. 25 at 2) (emphasis added).  But here, EPA is unabashedly treating 1-in-10,000 as a "bright line" standard for determining true risk, without giving any consideration to the uncertainties of the science, much less costs, energy, safety, control technologies, and other relevant factors.  Declaring an emergency every time a risk level exceeds 1-in-10,000, without bothering to consider the other relevant factors, would render meaningless the approach authorized in the Benzene Rule and endorsed by Congress.  If Congress wanted to automatically deem risks above 1-in-10,000 as emergencies, then Congress easily could have included such a directive in Section 112(f)(2)(B), instead of mandating a rulemaking approach that requires full consideration of the "many relevant factors" and takes years to complete and implement.[38]

Tellingly, even in Section 112 rulemakings, EPA has previously accepted risk levels over 1-in-10,000 without declaring an emergency.  According to EPA, in 1996, 18% of U.S. children "lived in counties in which hazardous air pollutants combined to *exceed the 1-in-10,000 cancer*

---

[38] Notably, Congress amended Section 303 in the *same bill* it created the Section 112 framework and endorsed the Benzene Rule.  *See* Pub. L. No. 101-549, 104 Stat. 2681 (Section 704 amending Section 303 of the CAA); *see also id.* 104 Stat. 2531 (Section 301 amending Section 112 of the CAA).  In so doing, Congress was well aware of the 1-in-10,000 risk level and plainly opted to address that risk through the rulemaking regime of Section 112 and not the emergency provisions of Section 303.

*risk benchmark.*"[39]  But instead of invoking its emergency authority under Section 303 to address that situation, EPA properly addressed the HAPs through Section 112 rulemaking.  In 2022, EPA found that, by 2014, only 0.3% of children lived in census tracts in which HAPs combined to exceed the 1-in-10,000 risk level.[40]  But throughout the entire 1996-2014 period when EPA was combating the 1-in-10,000 risk level exceedances, EPA did not initiate a single emergency action under Section 303.  Instead, EPA addressed that risk through the Section 112 rulemaking procedures, including welcoming public comment, considering all the relevant factors, and ensuring the use of appropriate science.  Here, EPA disregards all those factors, by incongruously alleging an imminent and substantial endangerment under Section 303.

Importantly, EPA's 1-in-10,000 risk level does not estimate any number of expected cancer incidences.  Because the 1-in-10,000 risk level is based on the IUR, it assumes every individual is exposed "to the maximum level of a pollutant for a lifetime."  88 Fed. Reg. at 25089 (Ex. 19).  EPA offers no *actual* cancer risk estimate in this action.  *See, supra,* Part III.B.3.  But, even relying on the *maximum* individual cancer risk estimated by EPA in the Proposed Rule, the absence of an imminent and substantial endangerment here is clear.  In the Proposed Rule, EPA estimates that there will be 0.05 cancer incidences per year due to emissions from the Facility, or one cancer case every 20 years.  88 Fed. Reg. at 25120-21 (Ex. 19).  Again, this estimate is based on the 2010 Review's IUR and therefore is already adjusted to account for the allegedly higher risk to infants and adolescents.

---

[39] *See* America's Children and the Environment Report, 2d. Ed. (Feb. 2003) (emphasis added) https://19january2017snapshot.epa.gov/ace/americas-children-and-environment-second-edition_.html.

[40] *See* EPA, *Key Findings of America's Children and the Environment* (last updated May 16, 2022).   https://www.epa.gov/americaschildrenenvironment/key-findings-americas-children-and-environment.

EPA is required by court order to issue a final rule no later than March 29, 2024. *See, supra* at 27 n.30. EPA's Proposed Rule estimates that the cancer incidence following implementation of the final rule—a time period which EPA controls—will fall to near zero. 88 Fed. Reg. at 25120-21 (Ex. 19). In other words, EPA estimates (using the IUR) that during the mere *months* before a final rule will be published, there would be only a fraction-of-a-fraction of a cancer incidence (again, assuming *maximum* exposure for a lifetime). And, if EPA's final rule allows for reasonable compliance periods or revisits unreasonable proposed control requirements, it will be a product of EPA's reasoned policy judgement or the product of appropriate judicial oversight of agency rulemaking—just as Congress intended.

Moreover, if the Court were to accept EPA's unprecedented allegation of an emergency here, then comparable (or far worse) Section 303 emergencies would exist at dozens of existing facilities across the country. EPA's website lists 23 ethylene oxide facilities posing risks equal to or greater than the 1-in-10,000 risk level that EPA declares is an emergency here, but EPA has not alleged an emergency as to those facilities. *See* EPA's Responses to DPE's RFA Nos. 3-4 (Ex. 35).[41] In fact, EPA estimates that there are twelve U.S. census tracts where ethylene oxide poses a higher cancer risk than chloroprene poses in the tract at issue here.[42] EPA has also concluded

---

[41] *See also* EPA, *Ethylene Oxide Risk from Commercial Sterilizers* (last updated Aug. 16, 2022). https://www.epa.gov/hazardous-air-pollutants-ethylene-oxide/forms/ethylene-oxide-risk-commercial-sterilizers#facility-list. Notably, three days after DPE provided its responses to DPE's RFA Nos. 3-4, EPA revised its webpage to state that the information "is no longer current" and that "EPA has proposed two new actions to address emissions of ethylene oxide from commercial sterilizers and to reduce risks for people who live, work, or go to school near these facilities." *Id.* (last updated May 31, 2023). Tellingly, EPA has still not taken any action under Section 303 to address an alleged imminent and substantial endangerment relating to those facilities.

[42] *See* EPA, *2019 AirToxScreen: Assessment Results* (last updated Jan. 9, 2023) (providing access to pollutant-specific data in spreadsheet entitled *2019 AirToxScreen National Cancer Risk by Pollutant (xlsx)*).https://www.epa.gov/AirToxScreen/2019-airtoxscreen-assessment-results#pollutant).

that ethylene oxide operates through a "mutagenic mode of action," meaning EPA estimates the alleged risks to children are *higher* in those twelve tracts than in the tract at issue here—and in three of those tracks the risk is *twice* as high.[43]  In other words, if EPA believes that infants near the DPE Facility exceed the 1-in-10,000 threshold "by their second birthday," then EPA's own analyses shows that infants in at least twelve other tracts—near other facilities—would exceed the same threshold *even faster*.  PI Motion at 2.  Yet EPA has declared an emergency only here.

EPA has also promulgated final regulations that expressly allow for "maximum individual lifetime cancer risk" greater than 1-in-10,000.[44]  According to EPA's theory here, these final EPA rules would be tantamount to sanctioning an imminent and substantial endangerment through rulemaking.  Moreover, when EPA identifies a risk level greater than 1-in-10,000 in the context of a rulemaking, EPA does not limit emissions from the regulated facilities during the pendency of the rulemaking process or while the rule is being implemented.  Instead, the regulated facilities are allowed to operate while the administrative rulemaking process is completed, and, once EPA issues a final rule, facilities typically have at least two years to make the required emission reductions.  Again, EPA's own rules allow a facility to operate under circumstances that EPA here claims constitute an emergency.  In fact, if EPA could simply use its Section 303 emergency authority to limit emissions *during* the rulemaking and implementation period, then there would be no need to complete the rulemaking process.

---

[43] *Id.* (identifying Tracts 72123953100, 13217100300, and 48141010338 each as having a total cancer risk of 4-in-10,000).

[44] *See* 70 Fed. Reg. 19,992, 19,995 (Apr. 15, 2005) (NESHAP for Coke Oven Batteries setting lifetime cancer risk from exposure to coke emissions at 2.7-in-10,000); 72 Fed. Reg. 25,137, 25,143 (May 3, 2007) (NESHAP for Halogenated Solvent Cleaning settings risk level of 2-in-10,000).

In sum, the very purpose of the 1-in-10,000 benchmark is to facilitate a robust rulemaking process, not to circumvent it.  Endorsing the radical shift that EPA seeks would transform how EPA regulates and would allow enforcement via Section 303 to supersede bedrock principles of risk management and the rulemaking process established by Congress.

8.     **The IUR is refuted by the best available science, which EPA has ignored.**

As alleged in DPE's counterclaims (R. Doc. 22), the 2010 Review and the resulting IUR and 0.2 $\mu g/m^3$ value are fundamentally flawed and not based on the best available science.  In setting the 0.2 $\mu g/m^3$ value, EPA erroneously relied upon a default assumption that humans are as sensitive to chloroprene as female B6C3F1 mice, the most sensitive animal species and gender in the 25-year-old EPA studies on the effects of chloroprene exposure.  *See* EPA's Response to DPE's RFA No. 17 (Ex. 28); Lumpkin Decl. ¶ 28 (Ex. 4); Gentry Decl. ¶ 36 (Ex. 5).  While EPA relied entirely on female B6C3F1 mice studies, it disregarded study results of all other animal species, including male B6C3F1 mice, all of which found a dramatically lower (even zero) cancer risk.  Gentry Decl. ¶ 37, Table 1 (Ex. 5).  This was a fundamental error due to the substantial toxicokinetic differences between female B6C3F1 mice and humans, resulting in EPA's 0.2 $\mu g/m^3$ value dramatically overstating human cancer risks associated with exposure to chloroprene.  *Id.* ¶ 41 (Ex. 5).[45]  Peer reviewers in the 2010 Review recognized this fundamental shortcoming and raised concerns regarding the toxicokinetic differences between humans and female B6C3F1 mice.

---

[45] Notably, EPA's only dose response expert in this action, Dr. Ila Cote, admitted that she lacks the expertise to consider this issue: "Q: So you don't have any data there to counteract, to outweigh the default assumption that the female B6 mouse is to be used a default in tables 3-4 and 3-5, because you don't know what model was used to generate those numbers? … A: It's not that I don't think what model was used. There's a lot of layers of complexity about the model that I am unfamiliar with. So the only thing I have to go on is the external peer review."  Cote Dep. Tr. 189:2-14 (Ex. 24).

*Id.* ¶ 39-40 (Ex. 5).[46]  EPA compounded this incorrect conservative assumption with a series of other conservative assumptions.  Three steps were used to translate the B6C3F1 mouse data into EPA's 2010 IUR: (i) developing an "upper bound" composite risk estimate for all tumor sites observed in the study of **2.7 x 10$^{-4}$** per µg/m$^3$; (ii) rounding the estimate upward to one significant digit, to **3 x 10$^{-4}$** per µg/m$^3$;[47] and (iii) applying the age adjustment factors to increase the IUR by 67% to **5 x 10$^{-4}$** per µg/m$^3$.  *See* 2010 Review at 137-38 (Ex. 21).  The 2010 peer review comments supported EPA's preference to develop a physiologically-based pharmacokinetic ("PBPK") model, a specialized computer model specifically designed to adjust risk assessments due to the different toxicological effects of a chemical from one species to another.  Lumpkin Decl. ¶ 41-50 (Ex. 4).

In his Declaration, Dr. Lumpkin explains that, since the 2010 Review in which EPA rejected the use of a PBPK model, there have been new advancements in PBPK modeling capabilities that reduce the uncertainties for extrapolating animal cancer data to human risk.  *Id.* ¶ 64 (Ex. 4).  Specifically, Dr. Lumpkin opines regarding the PBPK model developed by scientists at Ramboll US Consulting, Inc. ("Ramboll PBPK model") over a three-year period with EPA's

---

[46] Unbeknownst to DPE at the time, in spring 2021, EPA Region 6 nominated chloroprene for an IRIS review specifically to revisit the IUR.  *See* March-April 2021 internal EPA email chain regarding "Region 6 IRIS Nomination for Chloroprene" (Ex. 36); *see also* EPA's Response to DPE's RFA No. 16 (Ex. 37).  EPA's denial of DPE's 2021 Request for Correction of the 2010 Review failed to consider or disclose EPA Region 6's nomination of chloroprene, which would have re-opened consideration of the IUR.  DPE was not aware of the EPA Region 6 nomination of chloroprene until March 2023, when that information was revealed through a Freedom of Information Act request.

[47] EPA's expert, Dr. Cote, testified that this rounding-up was merely a "mathematical convention."  Cote Dep. Tr.  36:1-7 (Ex. 24).  But its impacts are real.  Despite having no scientific or biological basis, EPA's rounding-up changed the 70-year average concentration level by more than 10%— from 0.2 µg/m$^3$ to over 0.22 µg/m$^3$.  Indeed, based on this rounding "convention," EPA seeks to declare an "emergency" at levels (*i.e.,* 0.2-0.22 µg/m$^3$) that even its own flawed science would find is above the 1-in-10,000 risk level.

consultation and support.  *Id.* ¶ 68-76 (Ex. 4).  Similarly, Dr. Gentry, one of the Ramboll scientists who developed the Ramboll PBPK model, explains the process by which the Ramboll team addressed all the meaningful critiques of the model raised by peer reviewers in two separate EPA-sponsored peer reviews.  Gentry Decl. ¶¶ 20-32, 50-64 (Ex. 5).  Dr. Lumpkin opines that the Ramboll PBPK model provides a substantially more accurate derivation of an IUR than the method used by EPA, which was simply relying by default on particularly sensitive female B6C3F1 mice. Lumpkin Decl. Opinion 2 at pp. 25-30 (Ex. 4).  The Ramboll PBPK model allows one to translate female B6C3F1 mouse data to other species of laboratory animals and humans, resulting in an IUR that is 35-fold lower than the 2010 IUR applied by EPA in this case.  *Id.* ¶ 99.  When making this adjustment, human exposure modeling demonstrates a maximum estimated cancer risk of 0.05-in-10,000.  Farstad Decl. ¶ 37 (Ex. 6).[48]  Even if one were to accept and apply EPA's misguided assumption that the Ramboll PBPK model would only reduce estimated cancer risk by a factor of 2—a position EPA took in denying DPE's administrative challenge to the 2010 Review[49]—the *maximum estimated cancer risk* (*i.e.*, using the false assumption of continuous 70-year exposure and the upper bound value) would be 2.2-in-10,000 for the estimated exposed population of 1,000. Farstad Decl. ¶ 37 (Ex. 6).[50]  Further, EPA's error in rejecting the Ramboll PBPK model is

---

[48]  Mr. Farstad ran the EPA-endorsed Human Exposure Model ("HEM") to develop the maximum estimated cancer risk for the IUR estimated by the Ramboll PBPK model (*i.e.*, the 2010 Review divided by 35). *Id.* ¶¶ 32, 37 (Ex. 6).

[49]  Letter from M. Gwinn, EPA, to P. Walsh, DPE (Mar. 14, 2022) at 6-7 (Ex. 38).

[50]  As Dr. Gentry explains, EPA's assumption that the Ramboll PBPK model would only reduce estimated risk by a factor of 2 is misguided because combining individual animal tumor incidence accounts for 85% or more of the total animals with tumors in the study used by EPA in the 2010 Review. Gentry Decl. ¶ 65-66 (Ex. 5).  As noted above, application of the Ramboll PBPK model results in an IUR that is *35-fold lower* than the 2010 IUR applied by EPA in this case.  *Id.* ¶ 71.

highlighted by the fact that EPA previously has accepted PBPK models for other chemicals that were less robust than the Ramboll PBPK model.  Lumpkin Decl. ¶ 89 (Ex. 4).

Not only do DPE experts Dr. Lumpkin and Dr. Gentry have significant expertise in PBPK modeling (Lumpkin Decl. ¶ 12 (Ex. 4); Gentry Decl. ¶ 5 (Ex. 5), they are the *only* experts in this action with such expertise.  EPA's relevant experts, Dr. Vandenberg and Dr. Cote unequivocally denied expertise on PBPK modeling.  *See* Vandenberg Dep. Tr. 158:13-15 (Ex. 27) ("Dr. Cote would be better positioned to review that science review of the PBPK model than I am."); Cote Dep. Tr. 162:19-163:1 (Ex. 24) ("[A]s we've already discussed, [] I'm not an expert in pharmacokinetics.").  Dr. Lumpkin's and Dr. Gentry's opinions that the Ramboll PBPK model, which has been peer reviewed three times, should be applied to calculate the chloroprene IUR is unrebutted in this action, either by qualified EPA experts or any prior EPA decision in the record.

Further, EPA's assumption that children are more susceptible to chloroprene-induced cancer is premised on EPA's hypothesis that chloroprene affects cells through a mutagenic mode of action (*i.e.*, it directly mutates DNA in cells).  *See, e.g.*, PI Motion at 5-6.  Based on its hypothesis of mutagenicity, EPA applied "Age-Dependent Adjustment Factors" in estimating the alleged increased risk to children, specifically estimating a 10-fold greater risk for children ages 0-2, and 3-fold for ages 2-16.  *Id.* Ex. F at 22-24.  Dr. Lumpkin refutes EPA's mutagenicity hypotheses, explaining that the lines of evidence on which EPA relies do not support EPA's conclusion.  Lumpkin Decl. Opinion 3 at pages 30-34 (Ex. 4).  Dr. Lumpkin opines that, based on the best available scientific information for assessing the risks of chloroprene, specifically the Ramboll PBPK model, there is no endangerment in the communities surrounding the Facility, a conclusion that Dr. Lumpkin further opines is corroborated by all the empirical evidence, including

Dr. Marsh's epidemiological studies of chloroprene workers and the LTR data.  *Id.* Opinion 5 at pages 35-40 (Ex. 4); *see also, supra,* Part III.B.4.

9.      **The Proposed Order is invalid as a matter of law: its demands are impossible to satisfy and, even if completed, would not abate the alleged emergency.**

EPA's Proposed Order presents a Hobson's choice between (i) an immediate shutdown of the Facility, and (ii) two categories of emission reduction projects: near-term actions; and planning for long-term, permanent emission reductions (the "Proposed Measures").  The "choice" is false because a shutdown, while it is entirely unjustified, is the only *viable* relief demanded by EPA. EPA's "near term" Proposed Measures cannot (and should not) be done as EPA's dictates.  Several of these measures are simply not possible, others are completely infeasible, and most cannot be completed safely within the timelines prescribed.  Moreover, EPA has done nothing to demonstrate that the Proposed Measures are tailored to the alleged emergency.  A shutdown would force emissions reductions far below 0.2 μg/m$^3$, the concentration level at which EPA believes the alleged "emergency" would be abated.  *See* EPA's Response to DPE Interrogatory No. 4 (Ex. 41). EPA offers no evidence as to why or how the Proposed Measures would achieve 0.2 μg/m$^3$.

As to feasibility and reasonableness, EPA relies almost entirely on the analysis of Jeffrey Harrington (*see* PI Motion, Ex. G), an air permitting consultant who had never seen a Neoprene plant, acknowledged that DPE's chloroprene manufacturing process was unique, and has played only a limited permitting and compliance advisory role in relation to capital projects to reduce emissions.  PI Motion, Ex. G ¶ 19 n.7; Harrington Dep. Tr. 119:16-17; 170:9-172:15 (Ex. 39). Relying on just 60 hours of tabletop work over five months, Mr. Harrington opined that EPA's Proposed Measures were feasible and reasonable, based mostly on whether anyone else had completed a similar task.  PI Motion, Ex. G ¶ 12; Harrington Dep. Tr. 41:12-17; 48:10-19 (Ex. 39). He did not refer to the issues specific to the Facility or to chloroprene, with its unique

characteristics, or even whether such work could be done at an operating plant. *Id.* 47:2-10; 60:12-61:3 (Ex. 39). He failed to identify a facility that had completed all the prescribed measures EPA demands, and never analyzed the complications, staffing, or timing challenges associated with completing them all concurrently. *Id.* 19:9-12; 87:1-6 (Ex. 39). His staff supplemented his analysis with a mere survey of vendor websites, none of which he could even identify.[51]

In contrast, Mr. Meyers, DPE's Environmental Affairs Manager, has worked at the Facility for 7 years, helped to implement the control measures that reduced DPE's chloroprene emissions by 85%, and leads a multi-disciplinary task force on emission reduction opportunities at the Facility. Meyers Decl. ¶¶ 1-3 (Ex. 10). Having led a multi-disciplinary team since May 2022 that spent over 5,000 hours on the specific challenges of reducing the Facility's chloroprene emissions (with significant success), Mr. Meyers concludes that he would recommend shutting down the Facility rather than attempting to implement the Proposed Measures in the timelines prescribed. Meyers Decl. ¶¶ 13, 39 (Ex. 10). Mr. Jorge Lavastida, DPE's Plant Manager for over 7.5 years, reaches the same conclusion. Declaration of Jorge Lavastida ("Lavastida Decl.") ¶ 5 (Ex. 9).

> ### i. EPA's "near term" Proposed Measures endanger the Facility, DPE's workforce, and the community.

Despite touting the feasibility of EPA's Proposed Measures and prescribed timelines, Mr. Harrington admitted that the "near term" actions and timelines ignore fundamental safety requirements that would endanger personnel and the community. Harrington Dep. Tr. 90:8-10; 91:16-18; 106:8-16 (Ex. 39). DPE's expert, Paul Cesarez[52], explains fully what is required in

---

[51] *Id.* 108:11-110:9; 336:18-337:4; 337:16-338:1 (no direct communications with RTO vendors) (Ex. 39); *id.* 338:2-17 (no direct communications with condenser vendors); *id.* 336:18-338:17 (inability to identify websites).

[52] Paul Casarez is a chemical engineer with over three decades of experience, including management of chemical manufacturing operations, management of capital projects, and a specific focus on process safety and management of change. Casarez Decl. ¶¶ 1-3 (Ex. 8).

"[s]afely planning and implementing changes at an operating chemical plant."  Casarez Decl., p. 2 Intro. para. (Ex. 8).[53]  Mr. Harrington ultimately conceded that the safety requirements identified by Mr. Casarez are necessary based upon his own experience but acknowledged that he accounted for none of those factors in his analysis.  Harrington Dep. Tr. 106:8-107:10; 237:4-8; 276:15-19; 277:1-3; 331:18-21 (Ex. 39).   After touring the facility, reviewing key documents, and interviewing relevant personnel, Mr. Casarez opines that the time periods prescribed by EPA for the Proposed Measures are not doable for DPE to safely and legally design, evaluate, modify, and implement these changes.  Casarez Decl., p. 3 Intro. para. (Ex. 8).

> ii.    EPA's "near term" and "planning" Proposed Measures range from impossible to unrealistic for technical and timing reasons.

Many of EPA's "near term" Proposed Measures are infeasible or not doable.  *See* Ex. 40 (table critiquing feasibility of Proposed Measures). Separately, and importantly for a preliminary injunction setting, many of the compliance deadlines prescribed by EPA's Proposed Order are unrealistic or unsupported by EPA's experts.  *See id.*   Notably, EPA's only support for the prescribed timelines comes from Mr. Harrington.  Mr. Harrington's opinion of what DPE "can and should" do is based entirely on generic experience on air consulting matters.  Harrington Dep. Tr. 353:13-20 (Ex. 39).  For the tasks he describes, Mr. Harrington failed to provide ranges of time for completion or a breakdown of associated tasks, nor did he assess the challenges due to concurrent workstreams or the number or capabilities of DPE's workforce.  *Id.* 41:2-7; 284:21-285:2; 395:6-396:11 (Ex. 39).   He even conceded that his timelines were not certain for completion, that his analysis simply ignored DPE's Management of Change process, and that he

---

[53] Mr. Casarez cautions that "[c]hemical industry accident history demonstrates that implementing change, small or large, in a rush, under duress, or without full evaluation of associated risks results in significant injuries and fatalities for employees, contractors, and the surrounding community." *Id.* p. 2 Intro. para.

did not include time for process hazard analyses.  *Id.* 36:20-37:4; 90:21-91:4; 91:16-18; 106:8-17 (Ex. 39).  In stark contrast, Mr. Meyers offers perspective from the Facility's actual operations and makes clear that many of EPA's prescribed timelines cannot be achieved.  Meyers Decl. ¶¶ 43, 63, 75-78, 83-84, 89 (Ex. 10).

       **iii.**      **EPA's Proposed Order is not tailored to the alleged emergency.**

      The Proposed Measures are not tailored to the emergency and EPA offers no support otherwise.  First, it is irrefutable that (i) a shutdown reduces emissions far beyond EPA's alleged emergency, and (ii) EPA's "planning" measures cannot reduce emissions prior to implementation and, thus, cannot abate the alleged emergency.  Nevertheless, ahead of a trial, EPA's Proposed Order forces DPE to choose between a shutdown or dedicating to a complex, multi-work stream planning process with regular reports to the Court (despite continued compliance with its permits). Second, Mr. Harrington and EPA engineer Nicholas Bobbs (see Doc. 9-11) offer no opinion that the Proposed Measures are, in fact, tailored to the alleged emergency.  Mr. Harrington even concedes that he was given no stopping point in identifying emission reduction opportunities. Harrington Dep. Tr. 43:5-44:17; 253:22-254:8 (Ex. 39).  Yet, EPA's Proposed Order adopts every single project identified by Mr. Harrington (without him previously stepping foot in the Facility) as "feasible and reasonable" without any determination of when is enough to abate the alleged emergency.  Third, as EPA knows, DPE had already completed several of the Proposed Measures before EPA commenced this action.  Emissions controlled by these measures could not have caused or contributed to the alleged emergency, and emission reductions associated with the alleged emergency cannot abate the alleged harm.  Meyers Decl. ¶¶ 42-43, 53, 69-73 (Ex. 10) (describing applicable measures completed before this action).

      For all the above reasons, EPA has failed to show a substantial likelihood of success on the merits and its PI Motion should be denied.

**C.**     **EPA Has Failed To Demonstrate A Substantial Threat Of Irreparable Harm.**

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Monumental*, 157 F. Supp. 3d at 582-83 (quotations omitted). EPA asserts that this Court need not find irreparable harm if EPA "proves it is likely to succeed on the merits." PI Motion at 18 (citing *U.S. v. Marine Shale Processors*, 81 F.3d 1329, 1358-59 (5th Cir. 1996)). That is incorrect. *Marine Shale* explains that "unless Congress has narrowed an equity court's flexibility in the context of a particular statutory scheme, the issuance of an injunction remains an exercise of the district court's discretion." *Id.* at 1359.[54] EPA is *not* "entitled to an injunction whenever it proves a violation" of an environmental statute. *Id.* at 1360. Here, EPA does not even *allege* a violation of the CAA or DPE's air permits; EPA is demanding emissions reductions far below the Facility's permitted levels. Nothing in Section 303 suggests that "Congress intended to narrow" this Court's "traditional exercise of discretion." *E.g., id.* at 1359-60 ("We find nothing in RCRA which, in so many words, or by necessary and inescapable inference, restricts the court's jurisdiction in equity.") (quotations omitted).[55]

EPA has failed to show irreparable harm. First, with the 2010 Review and emissions data in hand, EPA has known *for years* about far higher levels of chloroprene emissions from the

---

[54] In its quote of *Marine Shale* (PI Motion at 18), EPA substitutes its own words ("if the United States proves it is likely to succeed on the merits") for the Fifth Circuit's actual words: "provided that traditional equitable principles permit such a course of action." *Id.* 1358.

[55] *Accord Me. People's All. & Nat. Res. Def. Council v. Mallinckrodt, Inc*., 471 F.3d 277, 296-97 (1st Cir. 2006) ("[I]n an environmental case, [the court] should consider the balance of relevant harms before granting injunctive relief, even though the statute itself authorizes such relief. ... [I]t is true that a district court is not commanded, regardless of the circumstances, to issue an injunction after a finding of liability" under RCRA.). EPA's reliance (PI Motion at 18, 30) on *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989), and *U.S. v. Hayes Int'l Corp.*, 415 F.2d 1038, 1045 (5th Cir. 1969), is equally misplaced because both cases involve Title VII discrimination actions, not environmental statutes. *See, e.g., U.S. v. Colonial Pipeline Co., Inc.*, 242 F. Supp. 2d 1365,

Facility yet did not take any action to abate the alleged harm.  *See*, *supra*, Part III.B.2.  Courts recognize that "[a]n unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm."  *Dallas Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 403 (D.D.C. 2020) (quotations omitted).[56]

Second, as discussed in Part III.B.3 above, the IUR value on which the alleged harm is based represents an "upper bound" estimate of *lifetime* risk.  EPA cannot legitimately claim that an "upper bound" (not actual) risk that is estimated over a lifetime of 70 years will result in harm in the time it will take to try this case on the merits, particularly given EPA's yearslong delay here. The lack of irreparable harm is further underscored by the undisputed facts that (i) the Facility's *present* chloroprene emissions—which are the only relevant emissions under Section 303's "*is presenting*" standard—are lower than they have ever been and, (ii) not surprisingly, off-site levels of chloroprene are at their lowest levels since monitoring began.  *See, supra,* at 26-27 (describing

---

1375 (N.D. Ga. 2002) ("The case law Plaintiff cites [*i.e.*, *Hayes* and similar cases] in support of this proposition relate to racial discrimination in violation of fair housing statutes and Title VII. … The United States Supreme Court has made clear that district courts are not 'mechanically obligated to grant an injunction for every violation of the law.' … Considering these cases, it appears that the Court may *not determine permanent injunctive liability under the CWA without a showing of irreparable injury, inadequacy of legal remedy, and a balancing of the equities*.") (emphasis added) (internal citations omitted).

[56] *Accord Benisek v. Lamone,* 138 S. Ct. 1942, 1944 (2018) (per curiam) (party requesting preliminary injunction "must generally show reasonable diligence" and "unnecessary, years-long delay in asking for preliminary injunctive relief weigh[s] against their request"); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (delay in seeking injunctive relief "undercuts the sense of urgency" and may "indicate an absence of the kind of irreparable harm required to support a preliminary injunction"); *Texas v. U.S.*, 328 F. Supp. 3d 662, 738 (S.D. Tex. 2018) ("A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction."); *Ixmation, Inc. v. Switch Bulb Co.*, 2014 WL 5420273, at *7 (N.D. Ill. Oct. 23, 2014) ("[U]excused delay on the part of parties seeking extraordinary injunctive relief is grounds for denial of a motion because such delay implies a lack of urgency and irreparable harm."); *see also Oregon Nat. Desert Ass'n v. Bushue*, 594 F. Supp. 3d 1259, 1266 (D. Or. 2022) (collecting cases).

2023 fenceline reductions of 33%-83%).  Further, all the real-world evidence shows no meaningful present risk due to chloroprene.  *See*, *supra*, Part III.B.4.

Even if EPA's Proposed Order were granted, it indisputably would fail to abate the alleged harm absent a shutdown prior to adjudication on the merits.  As a purported abatement alternative, EPA demands some requirements that would take up to *five months* to complete.  Proposed Order, ¶ 2(c).  The Proposed Order also includes relief requiring DPE to *plan* various capital-intensive projects to reduce emissions, but such projects would not actually be implemented—and, thus, not actually reduce emissions—until DPE is "ordered by the Court to do so" at some later, undefined date.  *Id.* ¶ 6(d).  Thus, EPA's own Proposed Order impliedly acknowledges the lack of irreparable harm if the Proposed Order is *not* granted before the trial on the merits.[57]

## D.     DPE Would Be Substantially Harmed If A Preliminary Injunction Were Granted.

EPA "must establish that [its] substantial injury outweighs the threatened harm" to DPE.  *Monumental*, 157 F. Supp. 3d at 605.[58]  Here, because the Proposed Order contains draconian demands that are impossible to meet within the timelines prescribed by EPA, the preliminary injunctive relief that EPA seeks is tantamount to a shutdown order.  *See supra*, Part III.B.9; *see also* Casarez Decl. ¶¶ 74-79 (Ex. 8); Meyers Decl. ¶ 39 (Ex. 10); Lavastida Decl. ¶¶ 5-6 (Ex. 9).

---

[57] *See Navistar, Inc. v. U.S. E.P.A*., No. 11-CV-449 RLW, 2011 WL 3743732, at *3 (D.D.C. Aug. 25, 2011) (citations omitted) ("Because an injunction will not redress its alleged injuries, Navistar's claim that it will suffer irreparable harm in the absence of a preliminary injunction is tenuous at best . . . 'If the relief requested does little, if anything, to alleviate the alleged injuries, it is difficult to comprehend how the refusal to grant that relief could cause irreparable harm.'"); *see also S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv*., No. 2:13-CV-00042-MCE, 2013 WL 4094777, at *7-8 (E.D. Cal. Aug. 13, 2013) (citations omitted) ("The relevant inquiry for preliminary injunction purposes is whether the requested relief is necessary to avoid irreparable harm during the interim period that the relief is to be provided.").

[58] EPA cites *Amoco Production Company v. Village of Gambell, Alaska*, 480 U.S. 531, 545 (1987), for the proposition that environmental harm is necessarily irreparable.  PI Motion at 30.  But in *Amoco*, the Supreme Court reversed a preliminary injunction and expressly rejected the argument that irreparable harm should be presumed.  480 U.S. at 544.

The consequences of a shutdown would be catastrophic, including complete loss of revenue streams, substantial loss of work force, supply chain disruptions and contractual impacts, and regulatory challenges. *See* Lavastida Decl. ¶¶ 7-14 (Ex. 9). EPA's shutdown order would "deprive DPE of its only source of revenue and require a series of detrimental and largely irreversible actions to be taken." *Id.* ¶ 8 (Ex. 9). EPA's shutdown order would also immediately cause detrimental impacts to the livelihoods of DPE's employees and contracts. *Id.* In addition, indefinitely shuttering a chemical facility causes extreme practical challenges for retaining existing personnel and attracting new personnel. *Id.*

Further, to the extent DPE *could* implement certain of the Proposed Order's requirements (which would require far more time than the Proposed Order allows), DPE would incur substantial costs to do so. *See, supra*, Part III.B.9; *see also* PI Motion, Ex. G ¶ 80 & Table 1; Casarez Decl. ¶139 (Ex. 8); Meyers Decl. ¶¶ 44, 46, 65, 79, 82, 88-89 (Ex. 10). But due to EPA's sovereign immunity, even if DPE were to prevail at trial, it would have no ability to recover any of those costs. *Wages & White Lion Invs. LLC v. FDA*, 16 F. 4th 1130, 1142 (5th Cir. 2021) (harm irreparable where "[n]o mechanism … exists" to recover losses).

Finally, "[i]njury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable." *Doe v. Tex. Christian Univ. & Victor J. Boschini*, 2022 WL 1573074, at *11 (N.D. Tex. Apr. 29, 2022) (quotation omitted).[59] By declaring that the Facility's day-to-day operations are actively endangering the community in which DPE operates, the

---

[59] *See, e.g.*, *Tex. Marine & Brokerage, Inc. v. Bennington Marine, LLC*, 2012 WL 12888827, at *5 (E.D. Tex. Oct. 17, 2012) (citing *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1055-56 (5th Cir. 1997)); *see also Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 585 (5th Cir. 2013) (finding irreparable harm where reputational harm likely).

Proposed Order would further negatively impact DPE's commercial reputation and goodwill, Lavastida Decl. ¶ 14 (Ex. 9), for which DPE could seek no recovery if it prevails on the merits.

**E.      The Public Interest Favors Denying The Requested Preliminary Injunction.**

The entire premise of EPA's action—that it must address potential risk from chloroprene through its emergency Section 303 authority—runs counter to the separate, rule-making regime under Section 112 of the CAA that Congress created to address precisely this type of situation. *See, supra*, Part III.B.6.  Indeed, the Proposed Rule and this lawsuit incongruously seek to address alleged cancer risks from the same chemical (chloroprene) emitted by the same facility (DPE's Facility) based on the same scientific basis (the 2010 Review), but the Proposed Rule—albeit with fundamental substantive flaws that DPE is challenging—is doing it through the process, and on the timetable, that Congress specifically prescribed (and that EPA historically followed until now) to address these risks.  The intent of Congress as expressed in Section 112 mirrors the public interest, and strongly supports rejecting EPA's action here, which is completely at odds with the Proposed Rule and the regulatory regime of Section 112.[60]

## IV.   CONCLUSION

For the foregoing reasons, DPE requests that EPA's PI Motion be denied.

---

[60] *See, e.g.*, *Gamble v. Zoellick*, 23 ITRD 2000, n. 13, 2001 WL 1823812, at *7 n.13 (D.D.C. 2001) (denying PI motion on grounds that public interest disfavored injunction because it would thwart intent of Congress); *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Engineers*, 279 F. Supp. 3d 846, 880-81 (D. Minn. 2017) (public interest favored granting PI enjoining construction of project to ensure compliance with state law in keeping with Congress's intent).

Dated:  July 18, 2023                                    Respectfully submitted,

JONES WALKER LLP                                          /s/ David A. Super
                                                         David A. Super (*pro hac vice*)
James C. Percy (La. Bar No. 10413)                       Jason B. Hutt (*pro hac vice*)
445 N. Boulevard, Suite 800                              Jeffrey R. Holmstead (*pro hac vice*)
Baton Rouge, LA 70802                                    Britt Cass Steckman (*pro hac vice*)
Telephone: (225) 248-2130                                Kevin M. Voelkel (*pro hac vice*)
Facsimile: (225) 248-3130                                BRACEWELL LLP
jpercy@joneswalker.com                                   2001 M Street NW, Ste. 900
                                                         Washington, DC 20006
Robert E. Holden (La. Bar No. 06935)                     Telephone:  (202) 828-5800
Brett S. Venn (La. Bar No. 32954)                        david.super@bracewell.com
201 St. Charles Ave., Suite 5100                         jason.hutt@bracewell.com
New Orleans, LA 70170                                    jeff.holmstead@bracewell.com
Telephone: (504) 582-8000                                britt.steckman@bracewell.com
Facsimile: (504) 582-8583                                kevin.voelkel@bracewell.com
bholden@joneswalker.com
bvenn@joneswalker.com

                                                         ***Counsel for Plaintiff***
                                                         ***Denka Performance Elastomer LLC***