*United States v. Denka Performance Elastomer, LLC et al. (2:23-cv-735)*

*Denka's Opposition to Motion for Preliminary Injunction*

# **EXHIBIT 27**

```
 1                UNITED STATES DISTRICT COURT

 2                EASTERN DISTRICT OF LOUISIANA

 3
    UNITED STATES OF AMERICA          CIVIL ACTION NO.
 4             Plaintiff              2:23-cv-735

 5  VERSUS                            SECTION J

 6  DENKA PERFORMANCE ELASTOMER, LLC  JUDGE BARBIER
    and DUPONT SPECIALTY PRODUCTS
 7  USA, LLC                          MAGISTRATE JUDGE
               Defendants             NORTH
 8

 9   * * * * * * * * * * * * * * * * * * * * * *

10       Deposition of DR. JOHN J. VANDENBERG, 2260
    Cranford Road.  Durham, North Carolina, 27705, taken
11  in the Law Offices of Jones Walker, LLP, 201 St.
    Charles Avenue, Suite 5100, New Orleans, Louisiana,
12  on Friday, June 16, 2023, at or about 9:02 a.m.

13

14

15

16

17

18

19

20

21  REPORTED BY:

22      Kathleen A. Wells, RPR
        Certified Court Reporter
23      Certificate No. 91023

24

25
```

Page 38

1  selection of the female B6 C3 mouse.
2  EXAMINATION BY MR. HOLDEN:
3  Q.  And that's not --
4  A.  On the basis of --
5  Q.  That's not an area where you feel
6  qualified to speak to it?
7  A.  That's correct.  She's more qualified.
8  Q.  Okay.  Do you know whether the selection
9  of the female B6 mouse is something that would be
10 referred to in the EPA guidance as a default
11 judgment, as a default determination?
12 A.  I'm not sure.
13 Q.  Okay.  Do you know whether there is any
14 number that is set out in the 2010 toxicological
15 review for chloroprene that is designed to be the
16 best estimate of human response?
17     BY MR. SHERMER:
18         Objection.  Form.
19     BY THE WITNESS:
20         Best?  Could you, could you clarify
21     what you mean by best?
22 EXAMINATION BY MR. HOLDEN:
23 Q.  Well, I'm trying to distinguish between
24 upper limit number, which we all agree the 2010 IUR
25 is, and true human response.  Right?  And we're

Page 39

1  trying to estimate with the IUR an upper limit of
2  true human response is what I appreciate.  Am I
3  saying that correctly?
4  A.  Close.
5  Q.  Okay.  How, how would you say it?
6  A.  I think what we're saying is that the
7  IUR is used as the basis for coupling with exposure
8  estimates to predict risk in humans that are exposed
9  to those concentrations.  So the IUR is the upper
10 confidence limit on the dose response shape, the
11 shape of the dose response relationship.
12     And it is, again, based on the B6 C3 F1
13 mice, female mice.  And is used as the probably best
14 say science policy default you use the most
15 sensitive species and sex, when estimating human
16 risk due to the uncertainty in the human response to
17 exposures to chemicals like chloroprene.
18 Q.  And why, and by that science policy
19 default, the 2010 report has put out a number that
20 is generally used for risk assessments such as the
21 one you've helped with, with respect to your
22 declaration?
23     BY MR. SHERMER:
24         Objection.  Form.
25     BY THE WITNESS:

Page 40

1  A.  Yes.  That's correct.
2  EXAMINATION BY MR. HOLDEN:
3  Q.  Okay.  But your testimony is you don't
4  know what information there is to indicate whether
5  that is a true measure of human response as opposed
6  to response of the B6 mouse?
7  A.  Yes.  That's correct.
8  Q.  Okay.  Are you familiar with the 1998
9  National Toxicology Program Study on which the 2010
10 toxicological review developed the IUR?
11 A.  I am generally familiar with it.
12 Q.  And I think we described a minute ago
13 that that studied the rat, male and female, of the
14 F344/N rat, and the male and female of the B6 C3 F1
15 mouse; is that right?
16 A.  That is my understanding, yes.
17 Q.  How are the species selected; do you
18 know?
19 A.  I don't know.  The National Toxicology
20 Program would have decided that.
21 Q.  And I think this probably will be a
22 question for Dr. Cote, but I just want to confirm.
23 You don't know whether there was any determination
24 that either the rat or the mouse would be
25 representative of human response, in performing

Page 41

1  those studies?
2  A.  That would be -- no.
3  Q.  Do you know, is there a scientific
4  device that is available for use, come up with a
5  best estimate of true human risk, true human dose
6  response?
7      BY MR. SHERMER:
8          Objection.  Form.
9      BY THE WITNESS:
10         Say that again, please.
11 EXAMINATION BY MR. HOLDEN:
12 Q.  Is there a scientific technique
13 available to estimate human dose response to
14 chemicals like chloroprene, based on toxicological
15 data, such as the NTP data on the B6 mouse?
16 A.  The use of animal studies to estimate
17 human risk has been used for many years.  It's
18 supported by the National Research Council, the
19 National Academy of Sciences, if you will, both
20 nationally and internationally.
21 Q.  Isn't the physiologically based
22 pharmacokinetic model, the PBPK model, a scientific
23 device that is expressly designed to relate animal
24 toxicology dose response to human dose response?
25 A.  Generally, that's the goal of those

Page 142
1  evaluation; isn't that right?
2      A.   That's correct.
3      Q.   And trying to evaluate dosage over 70
4  year period; isn't that right?
5      A.   Well, we're trying to estimate risk over
6  a 70 year period.
7      Q.   And in order to estimate risk, you have
8  to estimate dosage over 70 years; isn't that right?
9      A.   That's correct.
10     Q.   So if people move away from the area,
11 they no longer have an increase in the dose,
12 correct?
13     A.   It, that's, could be.  They could be
14 moving away.  But they may have already accrued the
15 risk earlier in their, while they were there.
16     Q.   Well, if you -- my question was, if
17 somebody moves away from the area around the Denka
18 facility, the dosage that they receive from exposure
19 to chloroprene is not going to increase after they
20 move.  Would you agree with that?
21     A.   That's correct.  If it's outside of the
22 concentration area.
23     Q.   And in terms of doing a 70 year dose
24 response evaluation, we still need to average the
25 period with no exposure, along with the period of

Page 143
1  some exposure, to get the excess risk calculation
2  for the individual involved, correct?
3      A.   Yes.
4      Q.   And if the individual spends half of his
5  or her time at work outside the area, that, too,
6  affects the dosage for a dose response calculation;
7  isn't that right?
8      A.   That is correct.
9      Q.   And in fact, there would be a reduction
10 in the maximum risk for people who work or go to
11 school away from the area around the facility; isn't
12 that right?
13     A.   There would be a reduction in that
14 individual's risk.  It doesn't necessarily mean that
15 there's a reduction in the maximum individual risk.
16     Q.   Okay.  And how many individuals are
17 exposed to the maximum individual risk that you're
18 talking about?
19     A.   I would point to the figures we
20 discussed earlier that showed concentrations well
21 above the 1 in 10,000 risk level.  Demonstrating
22 that throughout the entire area, there are high --
23 I'll call it high concentrations being above .2
24 micrograms per cubic meter, that occur all around
25 the facility, in every direction.

Page 144
1          And so the maximum is variable from
2  point to point as to where the monitors are.  So
3  when you say the maximum, you may be referring to
4  one place, or all of them.  I don't know.
5      Q.   How many individuals within the area
6  that will be exposed to a concentration above 0.2,
7  do you estimate never leave their homes, never have
8  a reduction in dosage because they're outside of the
9  area?
10     A.   I, I would have to look to the
11 demographic information from Dr. Black for that.
12 And again, her analysis indicates that there are a
13 number of, quite a large number of individuals in
14 the census track just to the west of the facility
15 that reside there for decades.  So I have no
16 information about people moving or working somewhere
17 else.  I don't have any information about that, that
18 I'm aware of.
19     Q.   Okay.  So you don't have any information
20 about the day-to-day mobility of the residents near
21 the Denka facility, which would reduce emissions; is
22 that your testimony?
23     A.   Reduce emissions?  What?
24     Q.   You have no information about the
25 mobility of the people who live near the Denka

Page 145
1  facility, who are in areas, live in areas above the
2  0.2 concentration area, you have no information
3  about what percentage of those people work or go to
4  school for a substantial period of each day outside
5  of the area where the Denka facility?
6      A.   I'm sorry.  I don't recall if that's in
7  Dr. Black's assessment.  But I don't have any
8  information.  She may be able to speak to that.
9      Q.   And even with Dr. Black's number, you
10 made no adjustment in your risk evaluation for that
11 fact that even if people lives for decades near the
12 Denka facility, but they do, in large numbers, move
13 away from the area, sell their house, move, et
14 cetera?
15     A.   Again, some portion of them do in
16 aggregate.  Specifically, in the neighborhood by,
17 for example, the western monitor, to the southwest
18 of the center of the facility, I have no, no
19 knowledge as to whether those individuals are
20 staying there for their entire lifetime.  I don't
21 know.
22     Q.   Okay.  And you say your assumption is,
23 as the worst case, none of the people who are
24 exposed to the numbers you are talking about move
25 away; none of those people work outside of the area,

Page 146

1  go to school outside of the area.  That's your
2  maximum type of risk analysis, right?
3      A.   Yeah.  The assumption is that the main
4  concentrations from the monitors represent people
5  being there for, you know, essentially they're not
6  moving outside of the area.  That's right.  That's
7  correct.
8      Q.   And the most susceptible of all, you
9  say, would be those who are between two, zero to
10  two, the infants who are exposed to those
11  concentrations, right?
12      A.   As Dr. Cote can refer to, the biological
13  reasons that young children beneath the age of two,
14  from birth to two, or even prenatally, are at higher
15  risk because of their immune system development, and
16  their rapid growth.  They are at the highest, I'll
17  call it, potency as represented in the IUR, in age
18  dependent adjustment factor applied there to be 10
19  fold more than for those over 16.
20      Q.   Okay.  Now, presumably, a large number
21  of residents who, in your assumptions, are born and
22  live in the area for 70 years, their entire lives,
23  were children in the '80s, '90 and 2000s, were
24  infants in the '80s, '90s, and 2000s, correct.  Now
25  adults?

Page 147

1  BY MR. SHERMER:
2          Objection.  Form.
3  BY THE WITNESS:
4          Can you restate that please?
5  EXAMINATION BY MR. HOLDEN:
6      Q.   What, so would a child who was born in
7  that area, say 1986, the first year that we have TRI
8  data, live there for two years, was exposed to those
9  concentrations, meaning the emissions of the
10  facility were about 450 to 500 tons a year, that
11  would be what?  The current emissions are about 16
12  tons a year.  Help me.  How many multipliers is
13  that?  Much, much larger than today's numbers,
14  right?
15      A.   Yes.  Yes.
16      Q.   Now what is the latency period that you
17  would expect to see for an infant exposed to
18  chloroprene concentrations, between zero and two
19  years old?
20      A.   Dr. Cote's declaration, she refers to
21  latency as being from two to several decades.  I
22  don't have the details on that.  Could be several
23  decades.
24      Q.   And so, for those who were born in 1986
25  and lived there two years, they would be well past

Page 148

1  the latency period for development of cancer, right?
2  BY MR. SHERMER:
3          Objection.  Form.
4  BY THE WITNESS:
5          I'm actually, I'm not sure.  I
6       don't know the latency for chloroprene
7       specifically.
8  EXAMINATION BY MR. HOLDEN:
9      Q.   And the point is, there are no data to
10  reflect increased cancers for people, for young
11  infants or children who were born in or grew up in
12  that area; is that correct?
13  BY MR. SHERMER:
14          Objection to form.
15  BY THE WITNESS:
16          Again, I, I have not looked at such
17       data.  I don't know if Dr. Cote or
18       Dr. Suh would have that either.  I'm
19       not, I'm not aware of any data.  I
20       don't know.
21  EXAMINATION BY MR. HOLDEN:
22      Q.   What data would EPA accept to determine
23  that the 2010 IUR overestimates your risk?
24      A.   I can't speculate about what EPA would
25  say.

Page 149

1      Q.   Are you aware of any other data, other
2  than the IUR in the 2010 toxicological review, to
3  suggest that there is an increased risk of cancer of
4  the order of magnitude that EPA estimates around the
5  Denka facility?  Any evidence other than the 2010
6  IUR?
7      A.   Dr. Suh, I think, looked into the
8  available data, including the data that was
9  developed by the Louisiana Tumor Registry, which
10  would look at the population in the area.  And she
11  would be better positioned to, to answer that
12  question.
13      Q.   Were you limited in your review for
14  doing risk calculations based on anything other than
15  the 2010 IUR, the slope factor of the 2010 IUR?
16      A.   Was I limited?
17      Q.   Yes.
18      A.   No, I wasn't limited.  No.
19      Q.   Could you have used the Ramboll 2021
20  PBPK model to double check your calculations and
21  your estimations?
22      A.   No.  I could not have.
23      Q.   Why not?
24      A.   As Dr. Cote, in her declaration
25  indicates, that a review of that model indicated

Page 154

1  reviewing the available literature on the, on the
2  health effects of chloroprene, on the development of
3  a draft that goes through extensive review, both
4  internal to the agency, with other federal agencies,
5  with an external peer review panel.
6         So I guess you could say it's that
7  excessive review, including external independent
8  peer review of experts that merits its application
9  in risk assessment, as the basis for the chloroprene
10  risk assessment.
11     Q.   And if there's subsequent scientific
12  information that's developed, how do you apply that
13  or not apply that?  What decisions do you make in
14  that evaluation process?
15     A.   Until -- you know, I wouldn't apply it,
16  actually.  I would use the IRIS assessment until
17  such a well developed and reviewed document is
18  available as the basis for the assessment.  So I
19  wouldn't, any individual study would have to be
20  incorporated into the process of an IRIS assessment
21  for it to be applied in a new assessment like this.
22     Q.   So when the EPA denied Denka's request
23  for correction, Number 210005, EPA said that under
24  the Information Quality Act guidelines, they have no
25  obligation to update IRIS values to reflect new

Page 155

1  scientific information.  Did you read that?  Do you
2  recall seeing that?
3      A.   I recall seeing that memo, yes.  That
4  was after I retired.
5      Q.   So the IRIS group has not made any
6  decision as to whether the PBPK model should or
7  should not be used to update the science?
8      A.   I, I can't say that.  I don't know.
9      Q.   Okay.
10     BY MR. HOLDEN:
11          Can you, would you get me the
12          decision on -- don't we have that?  Or
13          is that in the copy materials?
14       (Off the record.)
15     BY MR. HOLDEN:
16          We'll get you that.  We are going
17          to go over that over the lunch break.
18          Let's see.
19     EXAMINATION BY MR. HOLDEN:
20     Q.   Just assuming, though, that the PBPK
21  model is available, your, your position is that
22  until that receives the imprimatur of the IRIS
23  group, and incorporating it into the IRIS review,
24  you would not use it in that risk assessment?
25     A.   That's correct.

Page 156

1      Q.   But you're not aware of any scientific
2  limitation on your ability to use more current
3  information in the risk assessment then was
4  available in 2010?
5      A.   More scientific?  Can you restate that,
6  please.
7      Q.   Well, sir, what I'm trying, to
8  differentiate your opinion as an scientist from your
9  opinion as a person reflecting the policy.
10     A.   Okay.  Okay.
11     Q.   And as I appreciate it, as a scientist,
12  you should be saying, well, what's the available
13  information for me to calculate those response.  But
14  I've just heard you, if I understood your answer, to
15  say, "I wouldn't use new information to calculate a
16  response, until it's reflected in IRIS document."
17  Am I stating, am I overstating what you said?
18     A.   I think that's, that's correct, to what
19  I was saying, yes.  For chloroprene.
20     Q.   Right.  And you wouldn't even apply the
21  IRIS statement, in the denial of RFCs, that would
22  result in a factor of 2 adjustment, unless that was
23  actually reflected in the, in the revision of the
24  IRIS number by EPA, right?
25     BY MR. SHERMER:

Page 157

1          Objection.  Form.
2      BY THE WITNESS:
3          Sorry.  Could you say that again,
4          please.
5      EXAMINATION BY MR. HOLDEN:
6      Q.   So in the denial of RFC 210005, EPA said
7  taken at face value, PBPK model would result in a 50
8  percent downward adjustment of the IUR, or a factor
9  of 2?
10     A.   Okay.
11     Q.   But you would not take it upon yourself
12  to independently review, for example, the peer
13  review comments on that PBPK model; instead, you
14  would not take, you would not take that into account
15  in your calculations unless the IRIS program said,
16  "Yes, we adopt it."  Is that right?
17     A.   Essentially, that's correct.  I would
18  not independently apply someone's model like that
19  without having had it go through the type of review
20  process that occurs with the IRIS program.
21     Q.   Okay.  So if we pointed out in court
22  what the peer reviewers said in 2021 about the PBPK
23  model, and said, well, three of them have said yes,
24  it's ready for use.  You have another two who say
25  really, the PBPK model is not their area, and it's a

Page 158

1  peer review that's not calling for a consensus
2  judgment.  At a matter of science, isn't that fully
3  verifiable?  Isn't that, isn't that -- is there any
4  problem with doing that as a matter of science?
5      BY MR. SHERMER:
6          Objection.  Form.
7      BY THE WITNESS:
8          Well, I think that there was one of
9      the peer reviewers that felt that the
10     model was not suitable for
11     application, and raised some questions
12     about that.  I, I have to say that
13     Dr. Cote would be better positioned to
14     review that science review of the PBPK
15     model than I am.
16     EXAMINATION BY MR. HOLDEN:
17  Q.  Right.  But IRIS has not taken an
18  official position on the PBPK model.  Do you agree
19  with that?
20     BY MR. SHERMER:
21         Objection.  Form.
22     BY THE WITNESS:
23         Again, I'm not aware of that.
24     BY MR. HOLDEN:
25         Okay.  I'm trying to see where we

Page 159

1      are.  I'm beating a dead horse.
2          Steve, I think this would be a good
3      opportunity to take a lunch break.
4      BY MR. SHERMER:
5          That sounds great.
6      BY THE WITNESS:
7          That's fine with me.
8      BY THE VIDEOGRAPHER:
9          We're going off the record at
10     12:42.
11     (At this time a short break was taken.)
12     BY THE VIDEOGRAPHER:
13         We are back on the record at 2:04.
14     BY MR. HOLDEN:
15         Dr. Vandenberg, I would like to
16     show you what's been labeled as
17     Exhibit 10.
18     (Whereupon, at this time, Exhibit 10 was
19     identified to be attached to the record.)
20     EXAMINATION BY MR. HOLDER:
21  Q.  Do you recognize this document?
22  A.  Yes, I do.
23  Q.  What is it?
24  A.  It's titled A Toxicological Review of
25  Chloroprene and Supportive Summary Information on

Page 160

1  the Integrated Risk Information System.
2  Q.  This is the document we've been
3  referring to so often today; is that correct?
4  A.  That's correct.
5  Q.  Okay.  Could you turn to Page 139, Table
6  58.  And I'm going to ask you, Table 58 concerns
7  uncertainties in the development of the IUR.  And I
8  would like you to focus in particular on the lower
9  right hand side of that, the lower right hand matrix
10 of box.  If you could just read the first three or
11 four lines out of that?
12 A.  Yes.  It says:
13     (Reading)  Unit risk is based on the
14 most sensitive end point, parentheses, risk of any
15 tumor type, close parentheses, in the most sensitive
16 species and sex, open parentheses, female and male,
17 close parentheses, based on POD, lower case, hec.
18 It was assumed that humans are as sensitive as the
19 most sensitive rodents sex slash species tested.
20 True correspondence is unknown.  Site concordance
21 for liver tumors for humans and female mice was
22 observed, but human data not sufficient to rule out
23 other types seen in mice.
24 Q.  Could you help us understand what true
25 concordance is unknown means?

Page 161

1  A.  In this context, true concordance means
2  that you may have observed in the tested animals,
3  we'll just say a lung tumor.  It doesn't necessarily
4  mean that there would be lung tumors in humans.
5  That's what site concordance means.  If this says
6  true correspondence is unknown means that again,
7  there's not necessarily site concordance.
8  Q.  Right.  So we don't even know what --
9      (Overlapping speech.)
10 A.  The sentence --
11 Q.  -- the, as I appreciate it, what the
12 2010 toxicological review is saying, is that they
13 really don't know whether the female B6 mouse is
14 going to give an accurate projection of human
15 response.  Is that a fair way of rephrasing that?
16 A.  Well, actually it's not.
17 Q.  Okay.  How would you phrase it?
18 A.  So what this means is that the risk, or
19 the tumors that are observed in the animal studies
20 may not be the same tumors found in humans.  So you
21 might have a liver tumor, just to make an example,
22 liver tumor in the mice that turns out to not be
23 found.  But rather, you've got brain tumors in the
24 humans, but you didn't have brain tumors in the
25 mice.  But you still have tumors.

Page 174

1  this correctly, Doreen, Dorian Spence, Director of
2  Special Litigation Advocacy, and Maryum Jordan,
3  counsel, Lawyers Committee For Civil Rights Under
4  Law.
5    Q.  Did you have a meeting --
6    A.  Oh, there's a bunch of names actually.
7    Q.  Did you have a meeting with Earth
8  Justice in response to this letter?
9    A.  I do not recall having a meeting.  No.
10 I don't recall.
11   Q.  Do you recall how this letter was
12 handled?
13   A.  I'm actually not recalling.  I'm sorry.
14 I don't recall.  There are other names.  Does
15 that --
16   Q.  Have you, have you met with any of
17 these, have you met with any of the nongovernmental
18 organizations, the NGOs, about chloroprene
19 toxicological review of the IUR?
20     BY MR. SHERMER:
21        Objection.  Form.
22     BY THE WITNESS:
23        I don't, I don't recall actually
24        meeting with them, no.
25     BY MR. HOLDEN:

Page 175

1        Okay.  I'm showing you another
2        letter.  This from 2017.
3     BY THE WITNESS:
4        Okay.
5        (Whereupon, at this time, Exhibit 13 was
6        identified to be attached to the record.)
7     EXAMINATION BY MR. HOLDEN:
8    Q.  Have you seen this before?  What is this
9  letter?
10   A.  So this is a letter dated 13th November,
11 2017, to Samuel Coleman, Acting Regional
12 Administrator, Region 6, in Dallas, Texas.  Subject
13 is request for emergency action under Section 303 of
14 the Clean Air Act.  It's a, looks like close to
15 three page letter.  Signed by Mark Squillace, who is
16 with, I guess, the Professor of Law, university of
17 Colorado Boulder.
18   Q.  Do you know how the EPA responded to
19 this, if at all?
20   A.  I have no recollection of this letter.
21   Q.  Okay.  But you would agree that at least
22 as of 2017, at least one party was asking the EPA to
23 treat the emissions at that time as an emergency
24 condition?
25     BY MR. SHERMER:

Page 176

1        Objection.  Form.
2     BY THE WITNESS:
3        I haven't read the letter, but that
4        is the subject of it.
5     EXAMINATION BY MR. HOLDEN:
6    Q.  Let me ask you.  Turn back now to what's
7  been labeled --
8     BY MR. HOLDER:
9        What exhibit is this?
10    BY MR. RAUSCHENBERGER:
11       P-4.
12    EXAMINATION BY MR. HOLDEN:
13   Q.  Turn back to Exhibit 4.  And I'm going
14 to ask you to review with us the Table 107, 25107.
15 I'd like to --
16   A.  I have it.
17   Q.  And my, my question to you is have you
18 tried to calculate, or have you calculated the
19 expected incidence, the number of incidence of
20 cancer, based on your methodology, around the Denka
21 facility as a result of current emissions?
22   A.  That was not within the scope of work
23 that I performed.  No, I did not.
24   Q.  If you were going to do that, how would
25 you do it?  Do you have the data you need to make

Page 177

1  that calculation?
2    A.  That type of calculation, as you can see
3  here, is based on the use of the human exposure
4  model, in terms of dispersion modeling, coupling it
5  with census data, to estimate the risk of people
6  living that's within, within 50 kilometers, as it
7  says here on this page.  So the question is would I
8  have the date?  I, I don't have the data to do that,
9  no.  I have not done that.
10   Q.  So you don't have the data to go out 50
11 kilometers?
12   A.  I don't have the data to model.
13   Q.  Would you have the data based on the
14 ambient monitoring data that you summarized in your
15 report, in your declaration, to calculate the
16 expected incidence of cancer?
17   A.  No.
18   Q.  When -- okay.  When we say, when EPA
19 refers, in this table, in The Federal Register, on
20 the incidence of cancer, they're not talking about
21 cancer mortalities, are they?
22   A.  Actually incidence typically at EPA,
23 incidence is assumed to include consequence of
24 mortality.
25   Q.  Yes.  But incident would be larger than