IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:23-cv-735 |
| | ) | |
| v. | ) | Judge Barbier (Section: "J" (5)) |
| | ) | |
| DENKA PERFORMANCE ELASTOMER, | ) | Magistrate Judge North |
| LLC and DUPONT SPECIALTY | ) | |
| PRODUCTS USA, LLC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**UNITED STATES' REPLY IN SUPPORT OF ITS
MOTION FOR A PRELIMINARY INJUNCTION
AGAINST DENKA PERFORMANCE ELASTOMER, LLC**

# TABLE OF CONTENTS

TABLE OF CONTENTS......................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... iii

TABLE OF EXHIBITS ........................................................................................................ vi

INTRODUCTION ................................................................................................................. 1

STANDARD OF REVIEW .................................................................................................. 3

ARGUMENT ......................................................................................................................... 4

    I.    Denka's scant legal analysis ignores the plain text of 42 U.S.C. § 7603, consistent caselaw, and clear legislative history................................................... 4

        A.    Congress understood that "notwithstanding any other provision" of the Clean Air Act includes the Section 112 rulemaking authorities. ......... 5

        B.    Congress has not set any numerical risk threshold in the Clean Air Act to define what is or is not an imminent and substantial endangerment. ..................................................................................................... 6

        C.    The Court should reject Denka's effort to limit the EPA's options for responding to cancer risk from industrial air pollution. ....................... 8

    II.    The United States' Substantial Likelihood of Success on the Merits.................... 8

        A.    "Real-world" evidence shows an ongoing endangerment to public health.................................................................................................................. 8

        B.    This case alleges an imminent and substantial endangerment; EPA made no contrary finding under 42 U.S.C. § 7412(f)(4). ......................... 10

        C.    The Court should not reject the EPA's reasoned scientific judgments regarding the best available science to assess risk to human health. ...................................................................................................... 11

            1.    The 2010 IRIS Assessment's IUR is a plausible estimate for the lifetime cancer risk from breathing chloroprene. .................................................................................... 12

            2.    Denka's PBPK model is not reliable enough to allow increased public exposure to chloroprene.............. 15

         D.    "Is Presenting" – Denka's emission reduction efforts do not erase decades of accumulating cancer risk....................................................... 17

1.     A four-month sliver of air monitoring data does not provide a reliable or representative picture of the risks Denka "is presenting."................................. 17

2.     Air monitoring is better for assessing exposure to Denka's chloroprene emissions than modeling. ............... 19

3.     The Louisiana Tumor Registry warns against using its cancer data to draw the causal conclusions Denka's epidemiologist makes. ......................................... 20

E.     The Proposed Order requires valid preliminary injunctive relief that will reduce the Facility's chloroprene emissions.............................. 22

1.     Preliminary injunctive relief need not be the permanent relief. ............................................................. 22

2.     The preliminary injunctive relief is not impossible. ......... 23

3.     The Court has authority to tailor the proposed relief and deadlines.................................................................. 24

III.     Chloroprene Concentrations in the Parish Still Present a Substantial Likelihood of Irreparable Harm ........................................................... 25

A.     There is no unreasonable, inexplicable delay for this case. ...................... 25

1.     The 2010 IRIS Assessment alone did not prove that Denka's Facility was a "pollution source" presenting an endangerment. ............................................. 27

2.     Denka suggests it was an unreasonable delay for the EPA to consider the company's four Information Quality Act requests.......................................................... 28

3.     The United States has taken steady action to reduce Denka's chloroprene emissions. ..................................... 28

B.     The Proposed Rule will not come into effect for two-and-a-half years,  and perhaps never if Denka has its way. ....................... 29

IV.     The Balance of the Equities Weighs in Favor of Protecting Public Health.......... 29

V.     The Public Interest Is Best Served By Reducing People's Exposure to Denka's Carcinogenic Air Pollution................................................................... 32

CONCLUSION................................................................................................... 32

## TABLE OF AUTHORITIES

**Cases**                                                                                                    Page(s)

*Adair v. Troy State Univ. of Montgomery*,
  892 F. Supp. 1401 (M.D. Ala. 1995) ................................................................ 5
*Almendarez-Torres v. United States*,
  523 U.S. 224 (1998) ......................................................................................... 4
*Amoco Production Co. v. Village of Gambell,*
  480 U.S. 531 (1987) ......................................................................................... 3
*Andritz Sundwig GmbH v. United States*,
  No. CV 4:18-2061, 2018 WL 3218006 (S.D. Tex. July 2, 2018) ................... 31
*Apalachicola Riverkeeper v. Taylor Energy Co., LLC*,
  954 F. Supp. 2d 448 (E.D. La. 2013) ............................................................. 9
*Ass'n of Irritated Residents v. E.P.A.*,
  494 F.3d 1027 (D.C. Cir. 2007) ................................................................. 7, 28
*Benisek v. Lamone*,
  138 S. Ct. 1942 (2018) (per curiam) ............................................................ 27
*Bragdon v. Abbott*,
  524 U.S. 624 (1998) ......................................................................................... 5
*Brogan v. United States*,
  522 U.S. 398 (1998) ......................................................................................... 8
*Butler v. Denka Performance Elastomer, LLC*,
  No. CV 18-6685, 2020 WL 2747276 (E.D. La. May 27, 2020) ................... 13
*Butler v. Denka Performance Elastomer, LLC*,
  16 F.4th 427 (5th Cir. 2021). ........................................................................ 13
*Cannon v. University of Chicago*,
  441 U.S. 677 (1979) ......................................................................................... 5
*Citibank, N.A. v. Citytrust*,
  756 F.2d 273 (2d Cir. 1985) .......................................................................... 27
*Cox v. City of Dallas, Tex.*,
  256 F.3d 281 (5th Cir. 2001) .......................................................................... 4
*Daily Instruments Corp. v. Heidt*,
  998 F. Supp. 2d 553 (S.D. Tex. 2014) ......................................................... 26
*Dallas Safari Club v. Bernhardt*,
  453 F.3d 391 (D.D.C. 2020) .................................................................... 26, 27
*Doe v. Tex. Christian Univ.*,
  601 F. Supp. 3d 78 (N.D. Tex. 2022), *appeal dismissed*,
  No. 22-10505, 2023 WL 3568171 (5th Cir. Jan. 10, 2023) ......................... 31
*Gamble v. Zoellick*,
  No. 01CV0018, 2001 WL 1823812 (D.D.C. May 8, 2001) ......................... 32
*In re: G-1 Holdings, et al.*,
  Nos. 01-30135 and 01-38790 (Bkrptcy. D. N.J.) ......................................... 28
*Monumental Task Comm., Inc. v. Chao*,
  678 F. App'x 250 (5th Cir. 2017) .................................................................... 3
*Monumental Task Comm., Inc. v. Foxx*,
  157 F. Supp. 3d 573 (E.D. La. 2016) .............................................................. 3

*Navistar, Inc. v. U.S. E.P.A.*,
  No. 11-CV-449 (RLW), 2011 WL 3743732 (D.D.C. Aug. 25, 2011).......................... 27, 30, 31
*North Star Steel Co. v. Thomas*,
  515 U.S. 29 (1995)........................................................................................................... 5
*NRDC, Inc. v. U.S. E.P.A.*,
  824 F.2d 1146 (D.C. Chir. 1987)................................................................................ 12, 13
*Optimus Steel, LLC v. U.S. Army Corps of Eng'rs*
  492 F. Supp. 3d 701 (E.D. Tex. 2020).............................................................................. 26
*Pennsylvania Dep't of Corr. v. Yeskey*,
  524 U.S. 206 (1998)........................................................................................................... 4
*Reiter v. Sonotone Corp.*,
  442 U.S. 330 (1979)........................................................................................................... 5
*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*,
  279 F. Supp. 3d 846 (D. Minn. 2017)............................................................................... 32
*Sierra Club v. Whitman*,
  268 F.3d 898 (9th Cir. 2001) ........................................................................................ 7, 28
*Texas Marine & Brokerage, Inc. v. Bennington Marine, LLC*,
  No. 1:12-CV-397, 2012 WL 12888827 (E.D. Tex. Oct. 17, 2012) ................................. 31
*Texas v. United States*,
  328 F. Supp. 3d 662 (S.D. Tex. 2018)............................................................................. 29
*Trainmen v. Baltimore & Ohio R. Co.*,
  331 U.S. 519 (1947)........................................................................................................... 4
*United States v. Apex Oil Co.*,
  579 F.3d 734 (7th Cir. 2009) ............................................................................................. 9
*United States v. Apex Oil Co.*,
  No. 05-CV-242-DRH, 2008 WL 2945402, (S.D. Ill. July 28, 2008) ........................... 9, 13
*United States v. Dell'Aquilla*,
  150 F.3d 329 (3d Cir.1998)................................................................................................ 4
*United States v. Gear Box Z Inc.*,
  526 F. Supp. 3d 522 (D. Ariz. 2021) ............................................................................... 26
*United States v. Marine Shale Processors*,
  81 F.3d 1329 (5th Cir. 1996) ............................................................................................. 3
*United States v. Menasche*,
  348 U.S. 528 (1955)........................................................................................................... 5
*United States v. Price*,
  688 F.2d 204 (3d Cir. 1982)............................................................................................. 23
*United States v. S.H. Bell Co.*,
  Case No. 4:17-cv-0131 (S.D. Ohio)................................................................................. 28
*United States v. Waste Indus., Inc.*,
  734 F.2d 159 (4th Cir. 1984) ............................................................................................. 5
*Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*,
  16 F.4th 1130 (5th Cir. 2021) .......................................................................................... 30
*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982)...................................................................................................... 3, 4

Statutes

33 U.S.C. § 1364(a) ................................................................................................ 4

42 U.S.C. § 7401(b)(1) .......................................................................................... 12

42 U.S.C. § 7412 ................................................................................................. 5, 8

42 U.S.C. § 7412(f)................................................................................................ 7, 8

42 U.S.C. § 7412(f)(2) ............................................................................... 6, 7, 8, 20

42 U.S.C. § 7412(f)(4) ............................................................................................ 10

42 U.S.C. § 7603 ........................................................................................... passim

42 U.S.C. § 7607(b)(1) ........................................................................................... 11

42 U.S.C. § 7607(d)(6)(B) ...................................................................................... 11

Regulations

88 Fed. Reg. 25,080 (Apr. 25, 2023) .............................................................. passim

## TABLE OF EXHIBITS

| Exhibit A: | Excerpt of EPA, *Guidelines for Carcinogen Risk Assessment* (March 2005) |
| --- | --- |
| Exhibit B: | Excerpts of August 15, 2023 deposition of Dr. Michael Lumpkin |
| Exhibit C: | Rebuttal Declaration of Dr. John J. Vandenberg |
| Exhibit D: | Excerpt of August 3, 2023 deposition of David Blye |
| Exhibit E: | Summary table of residential tenure and supporting excerpts of Plaintiffs' Responses to Defendant Denka Performance Elastomer LLC's First Set of Interrogatories, *Robert Taylor, Jr. et al. v. Denka Performance Elastomer LLC et al.*, Civil Action No. 2:17-cv-07668 (E.D. La.) (portions redacted pursuant to Fed. R. Civ. P. 5.2) |
| Exhibit F: | Photo of air monitoring at Fifth Ward Elementary School |
| Exhibit G: | Rebuttal Declaration of Dr. Ila L. Cote |
| Exhibit H: | Rebuttal Declaration of Dr. Dustin F. Kapraun |
| Exhibit I: | August 8, 2021 email from Dr. Michael G. Morton to Dr. Kris Thayer |
| Exhibit J: | Excerpts of August 16, 2023 deposition of Dr. P. Robinan Gentry |
| Exhibit K: | June 26, 2017 Letter from Bob Holden to Information Quality Guidelines Staff |
| Exhibit L: | Excerpts of Versar, Inc., *Comment Report: Follow up - External Peer Review of a Report on Physiologically Based Pharmacokinetic (PBPK) Modeling for Chloroprene and a Supplemental Analysis of Metabolite Clearance* (December 6, 2021) |
| Exhibit M: | Excerpts of August 11, 2023 deposition of Chris Meyers |
| Exhibit N: | Rebuttal Declaration of Dr. Helen Suh |
| Exhibit O: | EPA, Method 204 – Criteria For And Verification Of A Permanent or Temporary Total Enclosure (2019) |
| Exhibit P: | Rebuttal Declaration of Jeffrey R. Harrington |
| Exhibit Q: | Complaint, *United States v. S.H. Bell Co.*, Case No. 4:17-cv-0131 (S.D. Ohio) |
| Exhibit R: | Complaint, *In re: G-1 Holdings, et al.*, Cases Nos. 01-30135 and 01-38790 (Bkrptcy. D. N.J.); |

| Exhibit S: | In the Matter of Shallow Water Refinery, Docket No. VII-97-CAA-120 (EPA Region 7) |
|---|---|
| Exhibit T: | Denka's 2016 air modeling of projected chloroprene concentrations after implementation of 2017 State AOC |
| Exhibit U: | Excerpts of August 18, 2023 deposition of Jorge Lavastida (portions redacted and filed under seal pursuant to Paragraph 4 of the Stipulated Protective Order (Rec. Doc. 53)) |

## INTRODUCTION

For the thousands of St. John the Baptist Parish residents who breathe Denka's chloroprene emissions every day, being diagnosed with cancer is a worst-case scenario. There is no way to predict who among them may have to face the irreparable consequences of a potentially fatal cancer diagnosis. Even if ultimately survivable, the looming, ever-present, ever-increasing risk of developing that disease simply from breathing the air where they live is an imminent and substantial endangerment to their health and welfare. The United States' preliminary injunction motion provides ample "real-world" evidence showing the unacceptably high cancer risks that Parish residents are exposed to from breathing Denka's chloroprene emissions, as well as how quickly those risks accumulate, especially for infants and children.

Denka does not dispute that thousands of people, including young children, regularly breathe the chloroprene emitted from its LaPlace, Louisiana Neoprene manufacturing operations (the "Facility"). Nor does Denka meaningfully dispute that chloroprene is a likely carcinogen. Instead, Denka coldly points to a "deficit in deaths"[1] and continues to push its now thrice-rejected mathematical "PBPK" model as reasons to avoid undertaking projects – some of which Denka has already begun or knows can be done – to further reduce the Facility's chloroprene emissions. But Denka's models offer little reassurance to the Parish parents who send their very real children to an elementary school located in the shadow of Denka's Facility. And Denka's "show me the bodies" argument conflicts with 42 U.S.C. § 7603's health protective goal of ensuring that there *continues to be* a deficit of deaths. That objective is at the heart of the EPA's 2010 IRIS Assessment and its inhalation unit risk ("IUR") estimate, both of which were

---

[1] *See, e.g.*, Denka Performance Elastomer LLC's Opp. to Mot. for Prelim. Inj. ("Denka's Opp.") (Rec. Doc. 73), Ex. 3 at 3 (first bullet) (Decl. of Dr. Gary Marsh) (Rec. Doc. 73-3).

developed in accordance with the EPA's long-standing cancer risk management policies that

affirm "the primary goal of EPA actions is protection of human health."  *See* Ex. A at 1-7

(excerpt of EPA, *Guidelines for Carcinogen Risk Assessment* (March 2005)).

Denka asks the Court to ignore 42 U.S.C. § 7603, the clear legislative history of the

environmental endangerment statutes, and consistent case law, and to look instead at a proposed

regulation promulgated under another provision of the Clean Air Act that will not become

effective for over two years.[2]  A regulation that, if finalized, Denka plans to challenge.  In doing

so, Denka tries to turn this case into a policy dispute about how best and how extensively the

cancer risks from the Facility's chloroprene emissions should be reduced.

Much of Denka's opposition also stems from disagreements with the EPA's sound

health-protective judgments about the complicated scientific fields at issue here, such as

toxicology, epidemiology, and pharmacokinetic modeling.  But the EPA thoughtfully considered

Denka's scientific arguments and rejected them.  Indeed, what Denka mischaracterizes as

"inexplicable" delay in bringing this action actually reflects, among other things, the EPA's

considerable investment of time (through October of last year) to thoroughly consider Denka's

arguments about its PBPK models and chloroprene's carcinogenic potency.  Denka essentially

suggests that the EPA was unreasonable for taking the time to consider the company's multiple

petitions under the Information Quality Act asking to revise the 2010 IRIS Assessment.

Despite Denka's repeated insinuations, there is no conspiracy here to artificially inflate

the health risks of breathing chloroprene.  There is, however, a group of dedicated EPA scientists

and technical specialists who have spent years working with Denka to ensure that the agency's

scientific judgments – in an incredibly consequential area – are based on the best available

---

[2] *See* 88 Fed. Reg. 25,080 (Apr. 25, 2023) (the "Proposed Rule").

science so as to best protect public health and welfare.  They did just that.  Denka mistakes the collaborative effort to determine *whether* a valid and reliable PBPK model *might* be developed as a foregone conclusion that its model would be accepted.  But a robust scientific process sometimes does not yield the hoped-for results.

Denka was given ample opportunity to avoid this litigation.  Denka instead chose to fight, and it foreshadows that there is more to come, here and in other forums.  We are before this Court now for that reason.  The Court should grant the requested preliminary injunction.

## STANDARD OF REVIEW

There is no major disagreement about the basic standard of review for preliminary injunction motions.[3]  *See United States' Mem. In Supp. of Mot. for Prelim. Inj.* at 18 and 21-22 (Rec. Doc. 9-2) (the "U.S. PI Mot."); *cf.* Denka's Opp. at 6-7.

The United States also correctly explained the standard of review for motions for preliminary injunctions in cases, like this one, to protect a statutory public interest.  *See* U.S. PI Mot. at 18-20; *see also United States v. Marine Shale Processors*, 81 F.3d 1329, 1358-59 (5th Cir. 1996) (disagreeing that "*Amoco* and *Weinberger* require a court to balance the equities and make findings regarding irreparable harm and adequacy of legal remedies in all cases arising under the environmental statutes"); *cf.* Denka's Opp. at 46.  Denka's scant explanation of the law ignores *Marine Shale*'s clear finding.  *See* Denka's Opp. at 7 and n.4.  Denka also ignores that the language Congress chose for endangerment statutes like 42 U.S.C. § 7603 shapes how courts exercise their "traditional equitable discretion," and that the Supreme Court's discussion in *Weinberger v. Romero-Barcelo* explains how that exercise differs when courts consider the more

---

[3] The United States' motion could have more clearly recited that it must prove a "substantial" likelihood of success on the merits.  *See Monumental Task Comm., Inc. v. Foxx*, 157 F. Supp. 3d 573, 582 (E.D. La. 2016), *aff'd sub nom. Monumental Task Comm., Inc. v. Chao*, 678 F. App'x 250 (5th Cir. 2017) (same).

typical compliance violations that Denka mistakenly emphasizes.  *See id.*; *cf. Weinberger v. Romero-Barcelo*, 456 U.S. 305, 317 (1982) (the rule of immediate cessation, is "limited to the indicated class of violations" in 33 U.S.C. § 1364(a)).

## ARGUMENT

I.   **Denka's scant legal analysis ignores the plain text of 42 U.S.C. § 7603, consistent caselaw, and clear legislative history**

Courts have not done what Denka asks this Court to do.  No court has ignored the consistent caselaw and clear legislative history interpreting the environmental endangerment statutes in favor of relying exclusively on dictionary definitions.  Moreover, Denka simply ignores how the *Cox* case defined "substantial."  *See Cox v. City of Dallas, Tex.*, 256 F.3d 281, 299 (5th Cir. 2001) (defining "substantial" as serious); *cf.* Denka's Opp. at 7.  The Court should decline Denka's invitation to ignore clear and consistent precedent.[4]

It is true that the *Cox* case *started* its analysis of 42 U.S.C. § 7603's terms by referring to dictionary definitions.  *See Cox*, 256 F.3d at 294 and 299.  But the Fifth Circuit (like most others) then looked beyond the dictionary.  *See id.*  It is appropriate for this Court, too, to examine legislative history and caselaw about similar statutes for guidance in applying 42 U.S.C. § 7603.  *See United States v. Dell'Aquila*, 150 F.3d 329, 338 n.9 (3d Cir. 1998) ("[T]he Clean Water Act and the Clean Air Act are in *pari materia*, and courts often rely upon interpretations of the Clean Water Act to assist with an analysis under the Clean Air Act.") (citations omitted); U.S. PI Mot.

---

[4] References to 42 U.S.C. § 7603's title should not supplant the plain, unambiguous statutory text which defines our claim using the broader term "endangerment," rather than a narrower term like "emergency."  It is true that "'the title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute."  *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (quoting *Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519, 528-29 (1947).  But "the title of a statute . . . cannot limit the plain meaning of the text."  *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998).

at 18 n.17; *see also Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) ("repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well").[5]

A. Congress understood that "notwithstanding any other provision" of the Clean Air Act includes the Section 112 rulemaking authorities.

The first seven words of 42 U.S.C. § 7603 prove that Denka's argument – that the EPA's regulatory authority under 42 U.S.C. § 7412 should, in fact, *supplant 42 U.S.C. § 7603* – is backwards, and therefore, wrong. *See* Denka's Opp. at 7-10, 30-38, and 50. Denka has little response to this plain text. As Denka notes, Congress amended 42 U.S.C. §§ 7412 and 7603 at the same time. *See* Denka's Opp. at 43 n.38. And Congress wrote no exception into 42 U.S.C. § 7603 for the regulatory authority it contemporaneously gave the EPA in 42 U.S.C. § 7412.

Denka's proposed interpretation – that 42 U.S.C. § 7603 should be subservient to 42 U.S.C. § 7412 – thus violates the "cardinal principle of statutory construction" that "the language used by the legislature is intended to have an effect." *Adair v. Troy State Univ. of Montgomery*, 892 F. Supp. 1401, 1407-08 (M.D. Ala. 1995) (citing *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used.") and *United States v. Menasche*, 348 U.S. 528, 538-39 (1955). Denka's position has also been rejected by at least one court. *See United States v. Waste Indus., Inc.*, 734 F.2d 159, 164 (4th Cir. 1984) (noting the Resource Conservation and Recovery Act's similar "notwithstanding" language in its endangerment section, and explaining that the section provides

---

[5] With endangerment cases reaching back to at least 1982, it is reasonable to presume that Congress was aware of precedent defining the elements of other environmental endangerment statutes when it passed the 1990 Clean Air Act amendments that revised 42 U.S.C. § 7603. *See, e.g.*, *North Star Steel Co. v. Thomas*, 515 U.S. 29, 34 (1995) ("it is not only appropriate but also realistic to presume that Congress…expect[s] its enactment[s] to be interpreted in conformity with [our precedents].") (quoting *Cannon v. University of Chicago*, 441 U.S. 677, 699 (1979)).

"a remedy…whether or not those engaging in the endangering acts are subject to any other provision of the Act").  This Court should reject Denka's similar argument.

B.  Congress has not set any numerical risk threshold in the Clean Air Act to define what is or is not an imminent and substantial endangerment.

Congress made no finding – explicit or implied – that long-term cancer risks higher than 1-in-10,000 do not constitute an imminent and substantial endangerment.  *Cf*. Denka's Opp. at 30.  42 U.S.C. § 7603 certainly includes no such exemption.[6]  Denka incorrectly argues that 42 U.S.C. § 7603 cannot be used to address lifetime excess cancer risks if a 42 U.S.C. § 7412(f)(2) rulemaking is in progress, no matter how high the cancer risks are from an air pollution source or how much time an EPA rulemaking may take to complete.[7]  Congress broadly authorized the EPA to act in 42 U.S.C. § 7603 without reference to any numerical cancer risk threshold.[8]

The fact that Congress established a nationwide regulatory program under 42 U.S.C. § 7412(f)(2) that includes an examination of whether residual cancer risks are "***less*** than one in ***one million***," in no way means that Congress excluded lifetime excess cancer risks ***higher*** than 1-in-***10,000*** (or multiples higher as is the case here) from being considered an imminent and substantial endangerment.  42 U.S.C. § 7412(f)(2) (emphasis added).  42 U.S.C. § 7412(f)(2) requires – and sets timelines for – the EPA to assess a variety of public health risks, not just cancer, from almost two hundred hazardous air pollutants emitted by thousands of facilities that

---

[6] Denka also makes an unsupported leap when it claims that "Congress never intended an [IUR] to constitute an imminent endangerment."  Denka's Opp. at 9.

[7]  The eight-year timeline that Congress allowed for completing residual risk rulemakings under 42 U.S.C. § 7412(f)(2) underscores that imminent and substantial endangerment claims also serve an important gap-filling role while that process happens.  *See* U.S. PI Mot. at 16 (citing EPA's *Guidance on Section 303 of the Clean Air Act* (April 1999)); *cf.* Denka's Opp. at 2.

[8] A 1-in-10,000 is a common benchmark for defining unacceptable lifetime excess cancer risk. *See* U.S. PI Mot. at 8-9.  Denka's toxicologist, Dr. Michael Lumpkin, agrees.  *See* Depo. Tr. of Dr. Michael Lumpkin, Ex. B at 91 and 97-98.  Denka offers no alternative threshold.

comprise dozens of industrial categories.  The broad guidelines and years-long timelines

Congress provided in 42 U.S.C. § 7412(f)(2) for how "residual risk" emission standards should

be developed are not prerequisites for actions under 42 U.S.C. § 7603.

Whether the EPA allowed greater than 1-in-10,000 lifetime excess cancer risks in four

residual risk rulemakings – among the dozens it has conducted – is irrelevant to the inquiry here

about the cancer risks from Denka's chloroprene emissions.[9]  *See* U.S. PI Mot. at 8-9.  As is the

fact that the EPA has not yet taken enforcement action under 42 U.S.C. § 7603 against other

sources of different air pollutants.  *See, e.g.*, *Sierra Club v. Whitman*, 268 F.3d 898, 902-03 (9th

Cir. 2001) (noting "traditional presumption" that decision whether to bring an enforcement case

is committed to an agency's discretion); *see also Ass'n of Irritated Residents v. E.P.A.*, 494 F.3d

1027, 1031-33 (D.C. Cir. 2007) (federal environmental statutes' enforcement provisions do not

give "any indication that violators must be pursued in every case, or that one particular

enforcement strategy must be chosen over another"); *cf.* Denka's Opp. at 36-37.

Furthermore, the EPA's decade-old response to a single public comment about a different

regulation for a different hazardous air pollutant with different, non-cancer health effects does

not support Denka's sweeping conclusion that Congress forbade the EPA from estimating cancer

risks using an upper bound value, like the IUR, or a 1-in-10,000 benchmark.  *Cf.* Denka's Opp.

at 9-10.  The EPA correctly explained in its comment response that Congress did not determine

that "*any*" risk being addressed by regulation under 42 U.S.C. § 7412(f) automatically constitutes

an imminent endangerment.  *See id.* at 10 (last sentence of indented quotation).  And here, the

EPA concluded that the risks from Denka's chloroprene emissions – relying on a different

methodology and site-specific air monitoring data – constitute an endangerment to a specific

---

[9] The Proposed Rule is not one of these four residual risk rulemakings.

population for a host of site-specific reasons.  Unlike the commenter, the EPA is not "merely

making general allegations" about the same risks that prompted the Proposed Rule.  *See id*.

  C.  The Court should reject Denka's effort to limit the EPA's options for
      <u>responding to cancer risk from industrial air pollution</u>.

  "Courts may not create their own limitations on legislation, no matter how alluring the

policy arguments for doing so."  *Brogan v. United States*, 522 U.S. 398, 408 (1998).  Denka's

interpretation of the "residual risk" requirements in 42 U.S.C. § 7412(f)(2) would wrongly

preempt an endangerment action stemming from regulated health risks.  In Denka's view, the

existence of a regulation under 42 U.S.C. § 7412(f)(2) – whether proposed or final – would

remove 42 U.S.C. § 7603 from the EPA's options for responding to a public health

endangerment caused by regulated hazardous air pollutants.  Indeed, Denka's interpretation

would mean the EPA could not bring a case under 42 U.S.C. § 7603 even if a company were

flagrantly violating a residual risk regulation.  *See* Denka's Opp. at 30 (taking action under 42

U.S.C. § 7603 would "run counter to the separate, rulemaking regime under Section 112 that

Congress created").  That interpretation cannot be the correct result or one that Congress wanted.

## II.  **The United States' Substantial Likelihood of Success on the Merits**

  A.  <u>"Real-world" evidence shows an ongoing endangerment to public health</u>.

  The EPA carefully analyzed many factors to conclude that the unacceptably high lifetime

excess cancer risks that Parish residents suffer from Denka's chloroprene emissions constitute an

imminent and substantial public health endangerment.  Denka incorrectly suggests that the EPA

engaged in a monochromatic analysis focused solely on whether long-term average chloroprene

concentrations exceed 0.2 μg/m$^3$.  *See* Denka's Opp. at 16-17.  That metric is certainly one key

factor.  But the EPA also thoroughly considered:

- The years-long duration of greater-than-0.2 µg/m$^3$ long-term average air concentrations measured at multiple monitoring sites encircling the Facility.[10]  *See* U.S. PI Mot. at 9-11;

- The magnitude and frequency of high concentration chloroprene "spikes" and their consequent risks, particularly to children.[11]  *See id*. at 11 and 27-28; *see also* Denka's Opp. at n.9 (noting pre-2018 spikes);

- How greatly lifetime excess cancer risks exceed 1-in-10,000 in the communities near the Facility, including from historical, "pre-Denka" emissions.[12]  *See* U.S. PI Mot. at 3-4, 9-11, and 27-28; *see also* Ex. B at 102-103 (1-in-1,000 excess cancer risks would be of "serious concern");

- The alarmingly fast rate at which the surrounding population, and particularly children, will reach and exceed a 1-in-10,000 lifetime excess cancer risk.[13]  *See* U.S. PI Mot. at 4 and 24-25;

- The multiple sets of high-quality air monitoring data that confirm real-world exposure conditions in the communities.[14]  *See id*. at 9-10;

---

[10] Although Denka now claims that the TO-15 air monitoring data the United States relies on "artificially inflate[s] the numbers" (*see* Denka's Opp. at 30), Denka has long used the same data – and continues to do so *in its brief* – to showcase its emission reductions.  *See id*. at 3 and 43.

[11] These spikes help drive the rate at which Parish residents reach and exceed a 1-in-10,000 lifetime excess cancer risk.  *See, e.g.*, Rebuttal Decl. of Dr. John Vandenberg, Ex. C ¶¶ 46, 69, and Att. 11A.  The "active" TO-15 air monitors that the United States relies on are better suited to measuring emission spikes.  *See id*. ¶¶ 9 and 13-14.

[12] Parish residents face threats even more dire than the circumstances in the *Apalachicola Riverkeeper* and *Apex Oil* cases.  *See* Denka's Opp. at 17 n.18 (citing *Apalachicola Riverkeeper v. Taylor Energy Co., LLC*, 954 F. Supp. 2d 448 (E.D. La. 2013) and *United States v. Apex Oil Co.*, No. 05-CV-242-DRH, 2008 WL 2945402, (S.D. Ill. July 28, 2008), *aff'd*, 579 F.3d 734 (7th Cir. 2009)).  Unlike potential exposure to contaminated groundwater (*Apex Oil*) or a Gulf of Mexico oil spill (*Apalachicola*), people in LaPlace, Reserve, and Edgard have to breathe the air there.  Every day.  These cases support the proposition they were cited for – that potential harms can constitute an imminent and substantial endangerment.  *See* U.S. PI Mot. at 26-27.

[13] The United States' risk assessment expert, Dr. John Vandenberg, correctly used age dependent adjustment factors in his risk calculations.  *See* Ex. C ¶¶ 64-69; Ex. B at 108:11-111:18 and 243:20-247:20 (agreeing with Dr. Vandenberg's method of calculating lifetime cancer risk).

[14] Denka's air monitoring expert agress that the TO-15 air monitoring method provides reliable, accurate measurements of ambient air chloroprene concentrations.  *See* Depo. Tr. of David Blye, Ex. D at 45-46 and 72; *see also* Ex. B at 252.  The quality of this data is important because it is essentially impossible to directly measure the physiological effects from a person's, let alone a

- The consistency of results between the EPA's and Denka's air monitoring networks.[15]  *See id.* at 10-11 and 27;

- Urinalysis testing results from Parish residents showing actual internal bodily exposure to Denka's chloroprene.  *See id.* at 4 and 24;

- The size and demographics of the actual population living near Denka's Facility, including the number of young children.[16]  *See id.* at 3-4; *see also* Ex. E at 1-2 (table of tort plaintiff residential occupancy tenures); and

- The proximity of the population exposed to Denka's emissions, including homes and schools.  *See* U.S. PI Mot. at 3-4; *see also* Ex. F.

Despite this compelling evidence, Denka suggests that the United States "offers *not a single word* on alleged *actual real-world risk* due to chloroprene emissions."  Denka's Opp. at 17 (emphasis added and in original) (claiming EPA's "utter silence").  We respectfully disagree.

B.  This case alleges an imminent and substantial endangerment; EPA made no contrary finding under 42 U.S.C. § 7412(f)(4).

The United States alleges, based on detailed evidence, that Denka's chloroprene emissions are causing an imminent and substantial endangerment to public health and welfare.  The EPA made this determination when it filed this action under 42 U.S.C. § 7603 on February 28, 2023, two months before the Proposed Rule was published in the *Federal Register*.  *See* Compl. at 1 (Rec. Doc. 1) (explaining that the United States filed this case "acting at the request of the Administrator of the United States Environmental Protection Agency").  That is the *only*

---

group of people's, exposure to a specific carcinogen for an extended timespan.  *See* U.S. PI Mot., Ex. D ¶¶s 34-35; *see also* Ex. B at 221-222 (explaining that personalized exposure data is rare).

[15] Denka's arguments about realistic exposure assumptions ignore that Parish residents need far less than 70 years of exposure to exceed their lifetime excess cancer risk.  And some residents have lived in their homes for decades longer than Denka's default residential occupancy periods.  *See* U.S. PI Mot. at 24-25 and Ex. D, Att. 9-11; *see also* Ex. E at 1-2.

[16] Denka wrongly claims that the United States' expert demographer provides no evidence of residential occupancy.  *Cf.* Denka's Opp. at 20 n.23.  Dr. Black specifically relied on census data to opine about residential tenure.  *See* U.S. PI Mot., Ex. C at 31.  Denka offers no alternative.

determination the EPA reached regarding whether Denka's chloroprene emissions are presenting an imminent and substantial endangerment.

When the EPA proposed amendments to several Clean Air Act rules on April 25, 2023, it did not propose to make a contradictory finding. *See* 88 Fed. Reg. 25,080 (containing no proposed determination whether imminent endangerment exists). Denka admits as much. *See* Denka's Opp. at 9 ("EPA did not include an explicit finding"). The preamble to the Proposed Rule's silence on the question of endangerment simply does not support Denka's claim that the EPA "determined that the Facility's chloroprene emissions are not causing an 'imminent endangerment.'" *Id*. at 8. Denka can point to no language in the proposed rule that constitutes a contrary finding because the proposed rule contains no such finding.[17]

    C.  The Court should not reject the EPA's reasoned scientific judgments
          regarding the best available science to assess risk to human health.

Denka's fight with the EPA is not really about the thoroughness or transparency of the agency's process for developing the 2010 IRIS Assessment or reviewing Denka's multiple requests under the Information Quality Act. *See, e.g.*, Ex. B at 71-73, 131-32, and 321-23 (agreeing that qualified experts comprised the EPA's peer review panels). Denka itself acknowledges the "years of cooperation" it spent working with the EPA trying to develop a valid PBPK model. *See* Counterclaim at ¶¶s 42-44 and 70 (Rec. Doc. 22). And although Denka disagrees with which data the EPA emphasized in its decision-making or how much data the EPA is requiring to validate Denka's PBPK modeling, Denka does not claim that the EPA failed to examine key scientific information. The EPA and Denka considered the same evidence.

---

[17] The Proposed Rule is a proposal. It is not final. When the EPA promulgates the final rule, after considering the public comments received, it will include further explanation supporting the appropriate compliance schedules selected for the emissions standards applicable to the affected emission sources. *See* 42 U.S.C. § 7607(d)(6)(B); *see also id*. § 7607(b)(1) (exclusive review of the final rule is in the United States Court of Appeals for the District of Columbia Circuit).

Rather, Denka disagrees with the EPA's scientific judgments on complex topics.  *See, e.g.*, Ex. B at 73:5-18.  Those disagreements, in turn, are rooted in policies and practices that are drawn from the Clean Air Act's purpose and that the EPA has followed for decades to guide its decision-making about protecting public health from cancer-causing air pollutants like chloroprene.  *See, e.g.*, 42 U.S.C. § 7401(b)(1).  The EPA's legitimate policy-based decisions are the product of a reliable and thorough scientific process.  *See* U.S. PI Mot. at 7-8 (describing the robust IRIS development process); *see also* Ex. B at 319-321.[18]

      1.     The 2010 IRIS Assessment's IUR is a plausible estimate for the lifetime cancer risk from breathing chloroprene.

Denka is correct that IURs are designed to be health-protective estimates of the excess cancer risk caused by breathing a given chemical substance for an assumed 70-year lifetime.  *See* U.S. PI Mot., Ex. D ¶ 21; *see also* https://www.epa.gov/iris/iris-glossary#i (definition of "Inhalation Unit Risk").  IURs account for the inherent uncertainties of estimating cancer risk, including the variability in how people's bodies respond to carcinogens.  And rightfully so.

      *a.   "True" cancer risk cannot be measured.*

Cancer risk – both in terms of the carcinogenic potential of a chemical and the actual risks from environmental exposure to it – is estimated.  *See* Ex. G ¶ 10.  And estimates necessarily include and tolerate uncertainty.  *See* U.S. PI Mot. at 29 (citing *NRDC, Inc. v. U.S. E.P.A.*, 824 F.2d 1146 (D.C. Cir. 1987) and *Apex Oil Co.*, 2008 WL 2945402)); *see also* Denka's Opp., Ex. 4 at ¶ 21 (acknowledging the "uncertainty in the range of human susceptibility" to carcinogens) and Ex. B at 51-52, 181-83, and 270-272.  Even if valid, Denka's proffered PBPK models, at best, only *reduce* the inherent uncertainties in estimating the cancer risk that

---

[18] The six experts on the external peer-review panel for the 2010 IRIS Assessment unanimously agreed that chloroprene is a mutagen (and thus particularly harmful to young children).  *See* Rebuttal Decl. of Dr. Ila Cote, Ex. G ¶ 25; *see also* Ex. B at 171:5-11; *cf.* Denka's Opp. at 41.

chloroprene exposure causes.  *See, e.g.*, Denka's Opp. at 39; Ex. B at 278:9-14; *see also* Rebuttal Decl. of Dr. Dustin Kapraun, Ex. H ¶ 13.  For these reasons, Denka's repeated accusation that the IUR for chloroprene does not measure "true risk" is accurate, but misleading.  *See, e.g.*, Denka's Opp. at 14-17 (twelve references to "true" risk).

To account for uncertainties in estimating the carcinogenic potential of a chemical, such as people's varying susceptibility to carcinogens, the EPA follows the National Research Council's recommendation to use an upper bound estimate for inhalation unit risks.  *See* U.S. PI Mot., Ex. F. ¶ 39; Ex. G ¶¶ 5 and 8-13.  This recommendation is intended to ensure that IURs do not leave substantial portions of the public unnecessarily exposed to cancer risks, as Denka's proposed alternatives would.[19]  *See* Ex. G ¶¶ 10-12, and 14.  Chloroprene's IUR is thus designed to ensure, with a 95% degree of statistical confidence, that it will not miss chloroprene's "true" carcinogenic potential.[20]  *See* Decl. of Dr. Michael Lumpkin, Denka's Opp., Ex. 4 at ¶ 3(1) and ¶ 38 (Rec. Doc. 73-4) (recognizing that "[w]hen EPA uses an 'upper bound' estimate for IURs, it means the EPA has confidence that the excess cancer risk will not be *greater* than that estimate") (emphasis in original).  The IUR is not a "meaningless number."  *Cf.* Denka's Opp. at 13-14.

Denka incorrectly suggests that using a lower-bound risk level to set the IUR is the same as the upper-bound.[21]  *See* Denka's Opp. at 14-15.  From a statistical standpoint, it is true that the

---

[19] The late Judge Feldman did not agree with Denka's challenges to the scientific underpinnings of the IUR.  *Cf.* Denka's Opp. at 15 n.16.  Judge Feldman was quoting *from the EPA's* explicit disclaimers against using the 2015 National Air Toxics Assessment (or "NATA") as an absolute measure of a risk from air toxins.  *See Butler v. Denka Performance Elastomer, LLC*, No. CV 18-6685, 2020 WL 2747276, at *11 (E.D. La. May 27, 2020), *aff'd in part, rev'd in part, Butler v. Denka Performance Elastomer, L.L.C.*, 16 F.4th 427 (5th Cir. 2021).

[20] The designated confidence level also means that there is a 5% chance the IUR value will *not* account for the "true" cancer risk.  *See* U.S. PI Mot., Ex. F at ¶ 50 n.52.

[21] Average airborne chloroprene concentrations at five of six monitoring locations surrounding the Facility still exceed the lower-bound estimate of 0.4 μg/m$^3$.  *See* Ex. C, Att. 4A and 6A.

bounds are equivalent – both are based on 95% confidence levels.  From the more relevant risk

prevention standpoint, however, the lower-bound and upper-bound risk levels reflect completely

different risk tolerances.  Picking the lower bound value represents the point at which there is

high confidence that the "true" value *is greater than* that point.  It therefore provides far less

certainty about whether the IUR captures the "true" estimate of chloroprene's cancer risk.  The

EPA does not take that chance with protecting public health.  *See* Ex. B at 267:13-269:1.

> b.  *The EPA followed its consistent practice for developing IURs.*

Denka does not challenge the EPA's fidelity to its long-standing practices and guidelines

for vigorously vetting IRIS assessments and developing IURs.  There is no "sleight-of-hand"

here.[22]  *Cf.* Denka's Opp. at 15.  To the contrary, IURs are not developed as Denka proposes to

do, using adjustments for assumed residential occupancy patterns.  *See* Ex. B at 57:10-14; *cf.*

Denka's Opp. at 18-19 (incorrectly claiming that Denka's adjustment is "called for by [EPA's]

own guidance").  IURs are standardized measures of lifetime cancer risk. They are not

recalculated for each change in location-specific demographic information.

EPA's adherence to established policy includes relying on data from the most sensitive

lab animal tested – here, the commonly used B6C3F1 female lab mouse.  *See* Ex. G ¶¶ 15-16; *cf.*

Denka's Opp. at 20-22 and 38.  The EPA did not ignore data about other lab animals tested.

Indeed, Denka points to data tables presented in the 2010 IRIS Assessment that show the results

---

[22] Despite Denka's innuendo, the nomination from the EPA's Region 6 office that the EPA's
Office of Research and Development ("ORD") review the 2010 IRIS Assessment did not stem
from any concern or question about the validity, quality, or scientific rigor of the 2010 IRIS
Assessment or the IUR.  *Cf.* Denka's Opp. at 39 n.46.  The EPA was anticipating Denka's then-
third request under the Information Quality Act.  EPA's Region 6 office wanted to ensure that
the EPA's ORD would continue to prioritize reviewing another of Denka's requests.  *See* Ex. I,
August 8, 2021 email from Dr. Michael G. Morton to Dr. Kris Thayer.

from the other lab animals.[23]  *See, e.g.*, Denka's Opp., Ex. 21 at 129-130 (.pdf pages 26-27)

(Rec. Doc. 73-21).  The EPA considered the evidence.  It simply exercised its scientific

judgment differently than Denka would have, based on policies designed to safeguard public

health and welfare.  That reasoned scientific judgment is not a "fundamental error" or a refusal to

consider the best available science.  *Cf.* Denka's Opp. at 38.

> 2. Denka's PBPK model is not reliable enough to allow increased
> public exposure to chloroprene.

There is no real dispute here about what PBPK modeling is intended to do.  *See* Ex. H

¶¶ 13-15.  And it is true that the EPA has used PBPK models in past IRIS assessments *when they*

*are sufficiently validated*.  *See* U.S. PI Mot., Ex. F ¶ 56; *see also* Ex. H ¶¶ 14 and 35.  But

Denka's proposed PBPK modeling does not meet the EPA's exacting standards for proving that

these types of models are accurate enough to use in public health decisions.  *See, e.g.*, Ex. H

¶¶ 13-15, 38, 43-45, 48, and 50.  Too many uncertainties remain about how well Denka's PBPK

models predict human cancer response to chloroprene exposure.  *See id*.  And Denka's PBPK

models may not account for cancer risk in all the types of tissues and organs where tumors were

observed in animal testing.  *See id*. ¶¶ 41 and 46.

A lingering, fundamental defect in Denka's PBPK models is the lack of human "*in vivo*"

data.  *See* Ex. H ¶¶ 23, 25, 27-28, and 51; *see also* Ex. B at 287; Depo. Tr. of Dr. P. Robinan

Gentry, Ex. J at 155:7-10.  This type of data is vital to proving that a PBPK model accurately

replicates – and can therefore make accurate predictions about – what happens to a chemical

once inside the human body.  *See* Ex. H ¶¶ at 23, 25-26, and 51.  The absence of this data also

---

[23] The United States' toxicologist, Dr. Ila Cote, did not say that she lacks the experience to consider the general issue of differing sensitivities between lab animals and humans.  *Cf.* Denka's Opp. at 38, n.45 (citing Dr. Cote's deposition testimony).  Dr. Cote was explaining that she is not an expert in PBPK modeling – a sub-specialty in toxicology.

distinguishes Denka's PBPK models from others that the EPA has adopted, which were all supported by human *in vivo* data.  *See* Ex. H ¶¶ 25, 27, and 33-38; Ex. B at 289-290; Ex. J at 169:21-170:6; *cf*. Denka's Opp. at 41 (citing Lumpkin Decl., Ex. 4 ¶ 89).

Furthermore, the progressively smaller adjustments to the chloroprene IUR that Denka's proposed PBPK models recommended show why the EPA insists on exacting standards before adopting a PBPK model in chemical risk assessments.  *See* Ex. H ¶ 49.  Denka's first PBPK models called for loosening the chloroprene IUR by a factor of 156.  *See* Ex. K at 2, ¶ 1 (June 26, 2017 Letter from Bob Holden to Information Quality Guidelines Staff).  Following four years of further study and analysis, Denka's most recent model now calls for a reduced 35-fold loosening of the IUR.  *See* Ex. H ¶¶ 49-50; *see* Ex. B at 291-92.  Had the EPA accepted those PBPK models, the IUR would have allowed for over four times more cancer risk from breathing chloroprene than even Denka now says is appropriate.  Fortunately, the EPA rejected them.

The EPA developed a robust record supporting its careful judgment declining to incorporate a PBPK model in the 2010 IRIS Assessment, as well as for denying Denka's four similar Information Quality Act requests.  This record includes, as Denka acknowledges, years of collaboration, including additional testing and data gathering.  *See* Denka's Opp. at 39-40 and Ex. B at 319-320 (agreeing that the additional work the EPA required improved the model).  The EPA also convened additional external peer-review panels of experts that support the EPA's ultimate conclusions that Denka's proposed PBPK models were not sufficiently validated to relax the IUR for chloroprene.  *See* Ex. H ¶¶ 32, 37, and 43.

It is true that some of the peer reviewers that Denka references believed that a PBPK model *might* be appropriate.  But not a single peer reviewer unequivocally endorsed the Ramboll model, and one peer reviewer was adamant that Denka's PBPK model should *not* be used to

adjust the chloroprene IUR.  *See, e.g.*, Ex. L at 48 (Versar, Inc., *Comment Report: Follow up - External Peer Review of a Report on Physiologically Based Pharmacokinetic (PBPK) Modeling for Chloroprene and a Supplemental Analysis of Metabolite Clearance* (Dec. 6, 2021)).[24]  The lingering difference of opinions about when mathematical modeling of the human body's physiological response to a carcinogenic air pollutant is valid for use in a chemical risk assessment underscores the fact that this complex scientific question has no simple, clear answer. It is a matter of expert scientific judgment.  And the EPA is charged with making that judgment in accordance with its health protective policies and standards for validating tools used to assess the human health hazards from chemical exposure.  "Close enough" is not the standard.  *Cf.* Denka's Opp. at 40 (explaining that Denka's consultants "addressed all the *meaningful* critiques of the model") (emphasis added).  The 2010 IRIS Assessment's IUR still is the best available scientific foundation for estimating the cancer risks from Denka's chloroprene emissions.

     D.  "Is Presenting" – Denka's emission reduction efforts do not erase decades of <u>accumulating cancer risk</u>.

       Even if the Facility's chloroprene emissions, the resulting air concentrations, and the rate at which the associated cancer risks accumulate are all now lower, Denka's current emissions still present an imminent and substantial endangerment to Parish residents for several reasons.

       1.    A four-month sliver of air monitoring data does not provide a reliable or representative picture of the risks Denka "is presenting."

       Denka's reading of 42 U.S.C. § 7603's "is presenting" element ignores that cancer risk accumulates.  *See, e.g.*, U.S. PI Mot., Ex. D ¶ 69 and Att. 10 and 11; Ex. G ¶ 37 ("[c]ancer is driven by a "cumulative and lifelong action of mutational processes, which each incrementally

---

[24] One 2021 peer reviewer, Dr. Portier, explained that he did not have the expertise to comment on "the appropriateness of the Ramboll PBPK model for estimation of inhalation dosimetry in an EPA toxicological review of chloroprene."  Ex. L at 19.  He also used the wrong standard for judging the reliability of the Ramboll PBPK.  *See* Ex. J at 193:19-199:3.

adds to cancer risk"); Ex. B at 203-204.  Some Parish residents have lived there for decades, and they have already been exposed to multiples greater than a 1-in-10,000 lifetime excess cancer risk from the Facility's chloroprene emissions.  *See* Ex. E at 1-2; *see also* U.S. PI Mot. at 27-28, Ex. C at 31-32 (residential tenure).  Denka's roughly one-to-three ton per year estimated reduction in annual chloroprene emissions since 2019 makes only a nominal difference to the still rapidly accumulating and unacceptably high lifetime excess cancer risks.  *See* Ex. C at 14 n.19 and Att. 4A, 6A, 7A, 9A, and 11A; *see also* Ex. G ¶ 37 ("small numbers of mutations can cause cancer and have a significant impact on risks").

Furthermore, Denka's self-serving four-month window of air monitoring data does not prove that their emissions no longer present an imminent and substantial endangerment.  Denka's air monitoring expert selected that window of time for one reason: Denka's attorneys told him to. *See* Ex. D at 90-93 and 96.  Mr. Blye simply compared the chosen subset of monitoring data to previous monitoring data and concluded that one set of numbers is lower than the other.  He has no opinion about whether the arbitrary four-month window of time starting in February of this year is representative of Denka's current operations or its longer-term average chloroprene concentrations.[25]  *See id.* at 91-92.  Nor does he challenge that the United States is relying on a longer, more robust timespan of air monitoring measurements for evaluating human exposure to Denka's chloroprene emissions.  *See id.* at 77 and 91-92; *see also* Ex. B at 39; *cf.* Denka's Opp. at 27 (accusing the EPA of "intentionally relying upon unrepresentative emissions monitoring data").  Mr. Blye also has no independent opinion about the cause of the nominal chloroprene

---

[25] Denka's four-month window does not align with the starting or completion dates of its recent emission control projects.  Projects started in May 2022, much earlier than February of this year. *See* Denka's Opp., Ex. 10 ¶ 21 (Rec. Doc. 73-10); *see also id.* ¶ 24 (emission reduction projects started in September 2022).  And these projects were complete by approximately November 2022.  *See* Depo. Tr. of Chris Meyers, Ex. M at 105:3-19.

emission reductions he sees.  *See* Ex. D at 99.  And so he does not offer any opinion that the reductions will continue.  *See id*. at 96-98; *cf*. Ex. M at 116:21-117:1-20 (meteorological conditions are a "a major contributing factor" to fenceline monitoring results) and 125:20-126:1-7 (decreasing production volumes likely affects chloroprene emissions).

In addition, Denka's standardless view of the "is presenting" element under 42 U.S.C. § 7603 would require a re-analysis whenever there is any additional emission reduction – no matter the extent, the cause, or whether the reduction is expected to continue.  Here, Denka only offers that its current *estimate* of annual chloroprene emissions is *lower* than earlier years.  *See* Denka's Opp., Ex. 10 ¶ 21 (summarily estimating 16.9 tons per year) and Ex. 6 ¶ 14 (Decl. of Eric Farstad) (noting emission estimates for 2019 and 2021); Ex. M at 74:4-11 (no methodology or calculations for Mr. Meyers' 16.9 tons per year estimate provided in his declaration).  The reductions are a good thing.  But Denka offers no guarantee that this year's estimated chloroprene reductions will continue.[26]  *See* Denka's Opp., Ex. 10 ¶ 9 (proposed terms and conditions of draft permits "are not yet enforceable") and ¶ 73 (changes made "were not required by the Clean Air Act or any permit issued thereunder").  Denka's "standard" allows it to evade 42 U.S.C. § 7603 whenever it can point to even a small estimated reduction in emissions.

2. Air monitoring is better for assessing exposure to Denka's chloroprene emissions than modeling.

The air monitoring data that the United States relies on are superior for evaluating the public's cumulative cancer risk exposure than Denka's modeling.  *See* Ex. C ¶¶ 37-39 and 43; *see also id*. at ¶ 8-33 (explaining strengths of TO-15 active air monitors).  Air monitors around the Facility provide more proximate and accurate measurements of actual exposure to Denka's

---

[26] The government's concern that Denka may not continue its emission reduction efforts is borne out by the fact that Denka stopped working on certain emission control projects when the United States filed this case.  *See* Denka's Opp., Ex. 10 ¶¶ 64 and 68.

chloroprene emissions within the exposed Parish population, including by more accurately measuring high concentration "spikes."[27]  *See* U.S. PI Mot. at 9-11 and Ex. D, Att. 3; *see also* Ex. D at 77 (acknowledging that the location of air monitors affects their ability to accurately reflect public exposure); Ex. C ¶¶ 13-14.

Modeling can be a useful tool to predict exposure to *future* chloroprene emissions, depending on the accuracy of the chosen inputs, such as the quantity of emissions.  Indeed, Denka's own air modeling shows that thousands of Parish residents near Denka's Facility may still exceed a 1-in-10,000 lifetime excess risk level.  *See* Ex. C ¶¶ 40-43; *see also* Denka's Opp., Ex. 4, Decl. of Dr. Michael Lumpkin ¶ 101 (explaining that 3,776 people will exceed a 1-in-10,000 lifetime excess cancer risk using an "adjusted" IUR).  But monitoring data still provides an important reality check on modeling.[28]

3.     The Louisiana Tumor Registry warns against using its cancer data to draw the causal conclusions Denka's epidemiologist makes.

The same Louisiana Tumor Registry (LTR) that Denka's epidemiologist, Dr. Gary Marsh, relies on starkly cautions that its data *should not* be used to draw the causal conclusions he makes here.  Denka claims that LTR data shows "no increase in cancer incidence rates in the community surrounding the Facility."[29]  Denka's Opp. at 22.  But the registry explains that using its data to draw such a causal conclusion is "a common misperception that we feel very strongly

---

[27] The Proposed Rule's projected cancer incidence is based on modeling of Denka's 2019 annual emissions.  *See* 88 Fed. Reg. at 25,097-98.  This forward-looking modeling – the EPA's usual method for developing proposed rules under 42 U.S.C. § 7412(f)(2) – is not intended to consider the cumulative risk from exposure over many years.  *See id*. at 25,095; *cf.* Denka's Opp. at 22.

[28] In developing the Proposed Rule, the EPA noted that the monitoring data it collected at various facilities often detected concentrations higher than modeling of reported emissions inventories, indicating that its modeling underestimated exposure.  *See* 88 Fed. Reg. at 25,142.

[29] Dr. Vandenberg is not an epidemiologist, which is why he did not perform calculations about expected cancer incidence.  *Cf.* Denka's Opp. at 19 n.22.

is important to correct." Denka's Opp., Ex. 3, Decl. of Dr. Gary Marsh, Att. C (Cancer in Louisiana, 2015-2019) at 17. In a section titled "Cautions in Interpretation: Misperceptions, Misinterpretation and Misapplication of Cancer Registry Data," the LTR warns that "[t]he lack of significantly higher cancer rates in census tracts, parishes, regions, etc., *does not indicate no problem* associated with environmental exposures in smaller geographic areas, like fenceline communities." *See id.* (emphasis added). The United States' expert epidemiologist, Dr. Helen Suh, explains that the LTR's strong caution is well taken because its data is aggregated and anonymized by design and does not provide the necessary individual exposure and residence history data for drawing meaningful conclusions about the *causes* of higher or lower cancer rates across census tracts or parishes.[30] *See* Rebuttal Decl. of Dr. Helen Suh, Ex. N ¶¶ 50-59.

For his part, Dr. Marsh admits that his "examination of cancer rates in the Parish is not an epidemiological study." Denka's Opp., Ex. 3, Decl. of Dr. Gary Marsh ¶ 87. Yet he proceeds to compare cancer rates between the Parish and the State and concludes on that basis that "EPA is overstating the risks of chloroprene."[31] *Id.* ¶ 87. In direct contradiction of the LTR cautions, Dr. Marsh thus improperly uses Parish-wide cancer data to conclude that chloroprene poses no risk to the smaller fenceline communities surrounding the Facility.[32] Denka therefore overreaches

---

[30] Denka mischaracterizes Dr. Suh's testimony as disregarding the epidemiological evidence and Dr. Marsh's opinions. Denka's Opp. at 25 n.29. Dr. Suh fully considered the available information, including Dr. Marsh's analysis. *See* Ex. N ¶¶ 3-34. She simply disagrees with him.

[31] Dr. Marsh's stated goal in assessing the LTR data was to "examine[] current cancer rates in St. John the Baptist Parish . . . to draw conclusions on the possible impact of past levels of chloroprene exposure." Denka's Opp., Ex. 3, Decl. of Dr. Gary Marsh ¶ 62.

[32] Dr. Marsh's attempt to compare census tract level lung cancer rates (Marsh Decl. ¶¶ 80-84), is flawed for similar reasons – it uses LTR data to test a hypothesis rather than form one, and fails to consider possible confounding factors among the census tracts (*e.g.*, smoking rates, employment rates, and other socioeconomic factors). *See* Ex. N ¶¶ 60-61. Dr. Marsh's "exploratory analysis" of estimated lifetime exposures at fenceline monitors with epidemiological studies of chloroprene workers does not rely on LTR data. *See* Marsh Decl.

when it presents this flawed analysis as "affirmative evidence rebutting the risk of harm [from chloroprene]." Denka's Opp. at 26.

E. **The Proposed Order requires valid preliminary injunctive relief that will reduce the Facility's chloroprene emissions.**

There is a self-evident connection between reducing the Facility's chloroprene emissions and reducing the associated cancer risks from exposure to those emissions. No expert testimony is needed on that point. *Cf.* Denka's Opp. at 45. Denka itself recognizes this link. *See id.* at 26 (emphasizing the results of its emission control projects). Moreover, the EPA provided Denka with air modeling late last year that connects expected reductions in ambient chloroprene concentrations to the proposed preliminary injunctive relief. Denka's air modeling expert references this modeling. *Compare* Denka's Opp., Ex. 6, Decl. of Eric Farstad ¶ 25 (discussing the EPA's 2022 modeling analysis) (Rec. Doc. 73-6) *with* Denka's Opp. at 42 (claiming the EPA "offers no evidence as to why or how the Proposed Measures would achieve 0.2 μg/m$^3$").

1. Preliminary injunctive relief need not be the permanent relief.

The United States made clear that its proposed preliminary injunctive relief will "*begin* to abate" the unacceptably high cancer risks from Denka's chloroprene emissions. U.S. PI Mot. at 2-3. That is a suitable objective for *preliminary* injunctive relief.[33] *Cf.* Denka's Opp. at 48 (criticizing the proposed order because it would "fail to abate the alleged harm"). Preliminary injunctive relief need not be the same as the final relief sought after a trial on the merits. *See, e.g.*, *United States v. Price*, 688 F.2d 204, 212-13 (3d Cir. 1982) (the Resource Conservation and

---

¶¶ 88-94. But that analysis is also flawed. By comparing cancer rates among working and non-working populations it suffers from a "Healthy Worker Effect" bias. *See* Ex. N ¶¶ 62-64.

[33] The possibility that the proposed preliminary injunction will not, by itself, achieve long-term ambient chloroprene levels of 0.2 ug/m$^3$ or lower is also not a reason to doubt that Denka's emissions are causing ongoing irreparable harm. *Cf.* Denka's Opp. at 48.

Recovery Act's endangerment provision authorizes "both short- and long-term injunctive relief," and funding a diagnostic study as a "first step in the remedial process" would be appropriate).

Unlike its view about a Facility shutdown, Denka does not claim that the preliminary injunctive relief "overcorrects" the Facility's chloroprene emissions. Denka's complaint that Jeffery Harrington – the United States' air pollution control expert – was "given no stopping point in identifying emission reduction opportunities" is therefore irrelevant. *See* Denka's Opp. at 45. The United States examined whether there were feasible options – both immediate and longer-term – to reduce chloroprene emissions from the Facility's major uncontrolled sources. *See, e.g.*, U.S. PI Mot. at 12-15. That is a logical approach for determining what preliminary injunctive relief is needed to begin to abate the risks from the Facility's chloroprene emissions.[34]

2.    The preliminary injunctive relief is not impossible.

Denka's complaints about the feasibility of the proposed preliminary injunctive relief are almost exclusively about timing. Indeed, Denka "has already *completed* several of the Proposed Measures," and is well underway in planning for the rest.[35] *See* Denka's Opp. at 45 (emphasis added). The tasks Denka completed must have been feasible, and Denka must have performed the required process safety analyses. *Cf.* Denka's Opp. at 43-44. The more than 5,000 hours that Denka's emission control project task force has spent offered ample opportunity to address the timing and technical challenges Denka now claims prevent it from completing the rest of the

---

[34] It is also odd to criticize that Mr. Harrington determined the feasibility of emission control projects by examining "whether anyone else had completed a similar task." Denka's Opp. at 42.

[35] For example, Denka is already controlling chloroprene emitted from the "Polymerization Kettle Strainers." *Compare* Decl. of Chris Meyers ¶ 22, Denka's Opp., Ex. 10 (Rec. Doc. 73-10) (explaining that all Poly Kettle Strainer Waste has been controlled since January 31, 2023) *with* U.S. PI Mot, Ex. A at ¶ 3 (requiring "Capture and Control of Chloroprene Emissions from Coagulated Polymer Waste Generated by the Polymerization Kettle Strainers").

proposed preliminary injunctive relief.  *See* Denka's Opp. at 43.[36]  And to the extent that Denka

says it does not have the human resources needed to complete required tasks, it can hire

additional staff and contractors, as other companies do, or accelerate project timelines.  Denka

has done so in the past.  *See* Ex. M at 55:7-58:15.  The decision not to is just that – a *decision* by

Denka's management not to.  It is not an issue of technical feasibility or "doability."

Denka's few challenges directly about the technical feasibility of some injunctive relief

elements are unsupported strawman arguments.  *Cf.* Denka's Opp. at 42 (providing no support

for what Denka claims is "not possible" or "completely infeasible").  For example, the United

States is not requiring Denka to capture and control "every molecule of chloroprene."  *See, e.g.*,

Denka's Opp., Ex. 10, Decl. of Chris Meyers at ¶ 64.  "Method 204" – the standard the proposed

order requires for capturing chloroprene emissions – explains that if the method's criteria for

designing enclosures are met, capture efficiency "is assumed to be 100 percent."  *See* Ex. O at 1

("Summary of Method"); *see also* Rebuttal Decl. of Jeffrey Harrington, Ex. P ¶¶ 10-12.

       3.       The Court has authority to tailor the proposed relief and deadlines.

If the absence of a "stopping point" in identifying emission reduction opportunities is

truly a barrier for Denka, or if Denka's position is that a preliminary injunction must completely

abate the endangerment, 42 U.S.C. § 7603 authorizes the Court to shut down the Facility.  *See*

Denka's Opp. at 42-43 (acknowledging that a shutdown would be effective to reduce

chloroprene emissions below 0.2 $\mu g/m^3$).  Or, the Court could avoid any supposed ambiguity

about "where to stop" by ordering Denka to immediately reduce its emissions to meet a 0.2

$\mu g/m^3$ ambient air concentration target for chloroprene, which can be verified using air

---

[36]  It is no coincidence that Denka's task force has been working on similar, if not identical,
emission control projects as the proposed preliminary injunction requires.  Denka received a
roadmap of these actions during discussions with the EPA that spanned much of last year.  *See*
Denka's Opp. at 26 (noting May 2022 start of sustained efforts to reduce chloroprene emissions).

monitoring.  *Cf. id.* at 45.  The United States has provided Denka with a framework for this alternative approach.[37]  *See id.*, Ex. 41 at 10-12 (Rec. Doc. 73-41).

The Court similarly has the discretion to consider and order more appropriate timelines if it believes that the preliminary injunctive relief's proposed timelines are unrealistic.

## III.   Chloroprene Concentrations in the Parish Still Present a Substantial Likelihood of Irreparable Harm

Until Denka reduces long-term average chloroprene concentrations in the ambient air surrounding the Facility to approximately 0.2 ug/m$^3$, there remains a substantial likelihood of irreparable harm.  *Cf.* U.S. PI Mot. at 18 (under *Marine Shale*, courts may issue an injunction without making findings of irreparable harm).  Even assuming Denka's narrow set of recent air monitoring data accurately represents its current emissions, average chloroprene concentrations in the communities surrounding the Facility remain above this mark.

A.   There is no unreasonable, inexplicable delay for this case.

The United States has good reason for the timeline leading up to its motion.  And delay or not, "[h]arm to human health and the environment is what it is," *i.e.*, obvious irreparable harm. *United States v. Gear Box Z Inc.*, 526 F. Supp. 3d 522, 528 (D. Ariz. 2021) (explaining that delay in seeking relief to address such harm "does not change the irreparable harm" but "goes more to a balancing of the equities").  Even as a balancing factor, delay should militate against the issuance of a preliminary injunction "only 'absent a good explanation.'"  *Optimus Steel, LLC v. U.S. Army Corps of Eng'rs*, 492 F. Supp. 3d 701, 719 (E.D. Tex. 2020) (quoting *Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553, 570 (S.D. Tex. 2014).

---

[37] One benefit of the chosen preliminary injunctive relief, however, is that Denka's compliance is more readily verifiable.  Either the required actions – for example, installing air pollution control equipment – have been completed or not.

The ongoing harm to public health and welfare alleged in this case is different from the economic and other harms in the cases Denka cites about unwarranted delays. *See* Denka's Opp. at 47 and n.56. The delays in Denka's cases simply do not involve the same investment of time needed here to develop robust, representative monitoring data, as well as to consider Denka's own petitions challenging chloroprene's carcinogenic potency. *Cf. Dallas Safari Club v. Bernhardt*, 453 F.3d 391, 403 (D.D.C. 2020) (plaintiffs delayed seeking preliminary injunction over emotional anguish and alleged economic harms caused by agency delays in processing permits to import sport-hunted elephant trophies for more than two years); *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (per curiam) (plaintiff sought preliminary injunction for six-year-old publicly available election district map that had already been used in three elections); *Citibank, N.A. v. Citytrust*, 756 F.2d 273 (2d Cir. 1985) (plaintiff proved only "minimal likelihood of increased harm" and delayed filing a trademark infringement suit against a known banking competitor that had publicly advertised its plan to open competing office for months).

Denka's reliance on the *Navistar* Freedom of Information Act case is also misplaced. *See* Denka's Opp. at 45 n.57. There, the court denied the requested preliminary injunction, in part, because it did not believe the company's conclusory affidavit substantiated its predictions of lost sales and alleged competitive disadvantage supposedly caused by slow responses to Freedom of Information Act requests. *See Navistar, Inc. v. U.S. E.P.A.*, No. 11-CV-449 (RLW), 2011 WL 3743732, at *3 (D.D.C. Aug. 25, 2011) (finding the company's alleged economic losses "do not constitute the type of irreparable economic injury typically found by courts to support the entry of a preliminary injunction"). *Navistar's* circumstances are quite different from the thousands of Parish residents who face daily exposure to Denka's carcinogenic air pollution.

1.  The 2010 IRIS Assessment alone did not prove that Denka's
    Facility was a "pollution source" presenting an endangerment.

Without more – such as facility- or community-specific air monitoring data – the 2010

IRIS Assessment does not provide sufficient evidence to conclude that "a pollution source" like

Denka's Facility is causing or contributing to an imminent and substantial endangerment.  *See* 42

U.S.C. § 7603; *cf.* Denka's Opp. at 3 (criticizing the EPA for being aware of the 2010 IRIS

Assessment for 13 years).  The more generally applicable information in an IRIS assessment –

here, the IUR for chloroprene – is used to develop site-specific risk estimates that consider actual

exposure to the particular chemical based on additional information like air monitoring data.

Air monitoring sufficient to determine long-term average chloroprene concentrations in

the communities surrounding the Facility did not *start* until May 2016.  *See* Denka's Opp., Ex.

11 at 8 (first bullet point) (Rec. Doc. 73-11).[38]  As explained in the United States' motion, it was

appropriate to focus on post-April 2018 monitoring data.  *See* U.S. PI Mot., Ex. E.  And it takes

about a year of air monitoring data to develop a representative picture of longer-term exposure

concentrations.  *See* Ex. C ¶ 25 (explaining that amount of time is needed to account for

variations in facility operations and seasonal weather patterns).  It certainly takes more than four

months.  *See id.* ¶¶ 25-27 and Ex. D at 91; *cf.* Denka's Opp. at 26.  Gathering sufficient air

monitoring data is clearly vital, as Denka shows by continuing to argue that the United States

*still* is not presenting the Court with a representative picture of Denka's chloroprene emissions.

---

[38] Denka incorrectly claims that the EPA "concedes" there was sufficient monitoring data starting in January 2016.  *See* Denka's Opp. at 10 n.8 (citing Compl. ¶ 45 (Rec. Doc. 1)).  Denka seems to be referencing air *modeling* performed in January 2016.  *See id.*, Ex. 11 at 7 (second bullet).

42 U.S.C. § 7603 does not require action *as soon as any* evidence is received.  Denka

adds "any" into the statute's first sentence.  *Some* evidence is not necessarily *enough* evidence.[39]

*See Whitman*, 268 F.3d at 902-903; *Ass'n of Irritated Residents*, 494 F.3d at 1031-33.

    2.      Denka suggests it was an unreasonable delay for the EPA to
              consider the company's four Information Quality Act requests.

Denka overlooks that, between 2016 and 2022, *it* asked the EPA to thoroughly consider

revising the 2010 IRIS Assessment in *four* requests under the Information Quality Act.  Denka's

counterclaim explains this history.  *See, e.g.*, Counterclaim ¶¶s 38-59 and 95 (Rec. Doc. 22)

(explaining that the EPA and Denka "actively collaborated" to *try to* develop a valid, reliable

PBPK model for chloroprene and that the EPA "committed substantial resources to provide

Ramboll [Denka's consultant] with quality assurance guidance on the development of the PBPK

model").  That process, as Denka acknowledges, took roughly three years, only finishing in

October of last year.  *See id.* ¶ 59.  And the United States was far from idle during that time.

    3.      The United States has taken steady action to reduce Denka's
              chloroprene emissions.

The EPA has been engaged in a focused, deliberate effort to reduce Denka's chloroprene

emissions.[40]  Indeed, Denka defends itself in part by highlighting that the EPA "dealt with

---

[39] Flammable oil droplets raining down on homes (a "flare rainout") are an obvious, immediate problem.  *Cf.* Denka's Opp. n.11.  Identifying and characterizing longer-term, latent health risks from breathing carcinogens like chloroprene necessarily takes more time.  42 U.S.C. § 7603 applies in both situations.  Using 42 U.S.C. § 7603 to respond to chronic health risks from long-term chemical exposure is not "unprecedented" (*see, e.g.*, Ex. Q, Compl., *United States v. S.H. Bell Co.*, Case No. 4:17-cv-0131 (S.D. Ohio)), including for carcinogenic hazardous air pollutants.  *See* Ex. R, Compl., *In re: G-1 Holdings, et al.*, No. 01-30135 (Bkrptcy. D. N.J.) and Ex. S (Shallow Water Refinery EPA Administrative Order); *cf.* Denka's Opp. at 2.

[40] Parish residents and the EPA are, in fact, still waiting for Denka to make good on the chloroprene emission reductions the company projected would result from the 2017 State AOC.  *Compare* Ex. T at 3 (2016 air modeling showing Denka's expected chloroprene concentrations after complying with the 2017 State AOC) *with* U.S. PI Mot., Ex. E (Table of air monitoring results showing higher average chloroprene concentrations than the projections in Ex. T at 3).

[Denka] through permitting, regulatory enforcement, and rulemaking." *Cf.* Denka's Opp. at 11. And even though Denka now weaponizes the time the United States invested in those efforts, Denka was given meaningful chances to avoid this lawsuit. *Cf. Texas v. United States*, 328 F.Supp.3d 662, 739 (S.D. Tex. 2018) (explaining that delays have been found reasonable "if the parties have been trying to reach an amicable resolution short of litigation").[41] Denka therefore wrongly argues that the EPA did "not take *any* action to abate the alleged harm[s]" from Denka's chloroprene emissions). *See* Denka's Opp. at 46-47.

> B. The Proposed Rule will not come into effect for two-and-a-half years, <u>and perhaps never if Denka has its way</u>.

The harm from Denka's chloroprene emissions is not "already addressed" by the Proposed Rule. *Cf.* Denka's Opp. at 32 n.36. The Proposed Rule's current compliance deadline is not until March 2026 – two years after the yet-to-be finalized rule's effective date. *See* 88 Fed. Reg. at 25,176. Denka also omits that it asked to add a third year to that timeline. *See* Denka's Opp., Ex. 1 at 107 (Rec. Doc. 73-1). And Denka is sharpening its knives to entirely dismantle the Proposed Rule. *See id.*; *see also* Denka's Opp. at 27 ("DPE is vigorously challenging the Proposed Rule"). There is an important ongoing need for the requested preliminary injunction.

## IV. The Balance of the Equities Weighs in Favor of Protecting Public Health

Denka's carcinogenic chloroprene emissions are causing irreparable harm to public health and welfare. The economic costs that Denka faces from the proposed preliminary injunction, in contrast, can be lessened or offset. The balance of equities favors protecting the health and welfare of the communities surrounding Denka's Facility.

---

[41] After filing this case, the United States worked cooperatively with Denka on necessary procedural matters, such as service of process, briefing schedules, and page limits. *Cf.* Denka's Opp. at 13 (criticizing the United States for an "inexplicable" delay in filing this motion).

It is true that installing air pollution control equipment and implementing new maintenance procedures costs money.  As would temporarily shutting down Denka's Facility, if that is needed.  But Denka has not claimed that its alleged financial losses would be ruinous.  *See, e.g.*, *Navistar*, 2011 WL 3743732, at *3 (recoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business).  Denka has options to recoup at least some costs it expends.[42]  Denka also influences its own fate – *i.e.*, what is "doable" – by choosing how much time and resources it dedicates to planning for and complying with any preliminary injunction (including how long it might remain shut down).  *Cf.* Denka's Opp. at 44 (citing declaration of Paul Casarez).  These facts set Denka apart from the e-cigarette company that had no say in whether and when the Food and Drug Administration might allow it to restart selling e-cigarettes.  *Cf.* Denka's Opp. at 49 (citing *Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1142 (5th Cir. 2021)) (noting that the FDA's order "threatens the very existence" of the manufacturer's business).

With planning, Denka can accommodate the work needed under the proposed order.  Planning will also help further reduce Denka's potential financial losses.  Twice a year (once in the Spring and once in the Fall), Denka shuts down for a "turnaround" – an extended period of planned maintenance work.  *See* Denka's Opp., Ex. 10, Decl. of Chris Meyers at ¶ 20, Ex. 10, Denka's Opp. (Rec. Doc. 73-10).  These turnaround periods, which last for roughly four-weeks, provide reasonable, already scheduled opportunities for completing at least some of the preliminary injunctive relief.[43]  *See id.*; *see also* Ex. M at 143-144.  The schedules for turnaround

---

[42] Denka has indemnification rights against E. I. du Pont de Nemours and Company.  *See* Ground Lease at 1-2 (referencing the "Environmental Indemnity Agreement") (Rec. Doc. 76-2).

[43] The Facility increases production ahead of turnaround periods in anticipation of revenue losses during the downtime.  *See* Ex. U at 138:5-19.  Denka could do the same to offset at least some of the financial costs associated with the preliminary injunctive relief.

periods can be shifted, and they can be extended. *See* Ex. M at 145-46 (explaining that Denka "could voluntarily shut down the plant at any point in time as needed") and 149:2-7 ("If we were to shut the plant down and we had projects fully developed, then it's possible that you could shut the plant down outside of the scheduled turnaround periods to implement emission reduction projects"). Denka can use turnarounds to install large equipment, like in 2017 when it installed the Regenerative Thermal Oxidizer. *See* Depo. Tr. of Jorge Lavastida, Ex. U at 106-107.[44]

Denka offers only unsupported guesses about potential losses to its workforce. *See* Denka's Opp. at 49. Denka does not suspend or fire its employees during turnarounds. *See* Ex. U at 138:1-4. Denka personnel, along with resident and non-resident contractors hired by Denka, perform maintenance or other assignments during turnaround periods. *See id.* at 57:14-58:12 and 62-63. Mr. Lavastida's testimony about expected impacts to the Facility's workforce is based on hearsay, and thus unfounded. *See id.* at 146-149.

Denka furthermore offers nothing sufficiently pervasive or concrete to substantiate its alleged reputational harms or the expected financial fallout. *See* Denka's Opp. at 49-50; Ex. S at 133-134 and 151-155. Courts are often and rightfully reluctant to accept claims of reputational damage, agreeing that such harm is sufficiently irreparable only when it is "pervasive and certain to occur." *Texas Marine & Brokerage, Inc. v. Bennington Marine, LLC*, No. 1:12-CV-397, 2012 WL 12888827, at *5 (E.D. Tex. Oct. 17, 2012); *see also Andritz Sundwig GmbH v. United States*, No. CV 4:18-2061, 2018 WL 3218006, at *11 (S.D. Tex. July 2, 2018) (finding speculation about reputational injury insufficient to prove irreparable harm); *Navistar*, 2011 WL

---

[44] Exhibit U includes redactions based on Denka's claim, pursuant to the Court's Stipulated Protective Order (Rec. Doc. 53) that portions of the deposition contain confidential information. The United States will file an unredacted copy under seal in accordance with Paragraph 6 of the Stipulated Protective Order and Local Rule 5.6(E).

3743732, at *2 (rejecting that affidavit's conclusory allegations of lost sales, loss of market share, and competitive disadvantage substantiated finding reputational harm).

Denka has been in an undoubtedly unwelcome spotlight since it purchased the Facility in late 2015, and its business has survived.  Denka offers no evidence to support that the proposed preliminary injunction would create different, unmanageable consequences.  Denka's speculative predictions about reputational harm are simply different than the lifelong consequences associated with being suspended from college because of rape allegations.  *See Doe v. Tex. Christian Univ.*, 601 F. Supp. 3d 78, 93–94 (N.D. Tex. 2022), *appeal dismissed*, No. 22-10505, 2023 WL 3568171 (5th Cir. Jan. 10, 2023) (noting that because of student's suspension, he will be unable to take exams, will not receive credit for courses this semester, will have to repeat the semester, and will effectively be permanently labeled as a sex offender); *cf.* Denka's Opp. at 49.

## V.   The Public Interest Is Best Served By Reducing People's Exposure to Denka's Carcinogenic Air Pollution

Denka's neighbors should not have to accept more cancer risk—beyond what Americans already face—just because they happen to live next to the country's only Neoprene factory.  42 U.S.C. § 7603 enshrines Congress' expression that preventing endangerments to public health and welfare is in the public interest notwithstanding any other provision in the Clean Air Act.[45] *Cf.* Denka's Opp. at 50.  The proposed preliminary injunction serves that public interest.

## CONCLUSION

For these reasons, the United States asks this Court to grant its motion.

---

[45] Denka's cases are not on point.  *See* Denka's Opp. at 50 n.60.  *Gamble v. Zoellick* turned on inapplicable prudential grounds.  *See Gamble v. Zoellick*, No. 01-CV-0018, 2001 WL 1823812, at *4-5 (D.D.C. May 8, 2001) (finding that plaintiffs did not allege justiciable claim and had no standing).  And Denka's other cited case involved the protection of state interests that are also not at issue.  *See Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 279 F. Supp. 3d 846, 880–81 (D. Minn. 2017) (analyzing whether Congress intended to circumvent Minnesota state law in order to expedite flood control construction projects).

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA**

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice


<u>      s/Steven D. Shermer      </u>
Trial Attorney:      STEVEN D. SHERMER
Senior Attorney
District of Columbia Bar No. 486394
DAVIS H. FORSYTHE
DANIEL S. SMITH
Senior Counsel
HANNAH L. FRAZIER
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, DC  20044-7611
(202) 514-1134
Steven.Shermer@usdoj.gov

OF COUNSEL:

ROBERT PARRISH
Attorney-Advisor
U.S. Environmental Protection Agency
Office of Civil Enforcement, Air Enforcement Division
1200 Pennsylvania Avenue, NW (2242A)
Washington, D.C. 20460

JUSTIN LANNEN
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 6
1201 Elm Street, Suite 500 (ORCEA)
Dallas, TX 75270

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 6, 2023, a true and correct copy of the foregoing United States' Reply in Support of its Motion for a Preliminary Injunction was filed with the U.S. District Court for the Eastern District of Louisiana using the Court's CM/ECF system. Notice of this Electronic Filing will be sent to all parties by operation of the Court's Electronic Filing System.

s/Steven Shermer
Steven D. Shermer

34