IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

————————————————————

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:23-cv-735 |
| | ) | |
| v. | ) | Judge Barbier (Section: "J" (5)) |
| | ) | |
| DENKA PERFORMANCE ELASTOMER, | ) | Magistrate Judge North |
| LLC and DUPONT SPECIALTY | ) | |
| PRODUCTS USA, LLC. | ) | |
| | ) | |
| Defendants. | ) | |

————————————————————

**UNITED STATES' OPPOSITION TO
DENKA PERFORMANCE ELASTOMER, LLC'S
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... iii

TABLE OF EXHIBITS ................................................................................................... v

INTRODUCTION ............................................................................................................ 1

STANDARD OF REVIEW ............................................................................................. 3

ARGUMENT .................................................................................................................... 4

I.      This case alleges an imminent and substantial endangerment; EPA's
Proposed Rule made no contrary finding under 42 U.S.C. § 7412(f)(4). .............. 5

II.     Denka's scant legal analysis ignores that 42 U.S.C. § 7603, consistent
caselaw, and clear legislative history all support this endangerment case
based on excess cancer risks. .................................................................................... 6

     A.    Congress understood that "notwithstanding any other provision" of
the Clean Air Act includes the Section 112 rulemaking authorities. .......... 8

     B.    Overexposure to carcinogenic agents, like Denka's chloroprene
emissions, is an actionable endangerment. ................................................. 9

     C.    Congress has not excluded any numerical risk threshold from
defining what is or is not an imminent and substantial
endangerment in the Clean Air Act ........................................................... 10

     D.    1-in-10,000 is a common benchmark for defining unacceptable
lifetime excess cancer risk. ....................................................................... 13

     E.    The Court should reject Denka's effort to limit the EPA's options
for responding to cancer risk from industrial air pollution. ...................... 13

     F.    The EPA's decision-making under different Clean Air Act
regulatory authorities is irrelevant; so is whether the EPA has
brought other endangerment actions. ......................................................... 14

III.    There is no unreasonable or inexplicable delay for this case............................... 16

     A.    *Any* evidence is not necessarily *enough* evidence.................................... 17

     B.    Denka suggests it was an unreasonable delay for the EPA to
consider the company's four Information Quality Act requests. ............... 18

C.     The United States has taken steady action to reduce Denka's chloroprene emissions......................................................................... 19

IV.    The United States' allegations about the cancer risk from breathing chloroprene are based on substantial scientific evidence...................................... 19

CONCLUSION .................................................................................................... 23

## TABLE OF AUTHORITIES

**Cases**                                                                                            Page(s)

*Adair v. Troy State Univ. of Montgomery*,
   892 F. Supp. 1401 (M.D. Ala. 1995) ................................................................. 9

*Ass'n of Irritated Residents v. EPA*,
   494 F.3d 1027 (D.C. Cir. 2007) ................................................................. 7, 15

*Brogan v. United States*,
   522 U.S. 398 (1998) ................................................................................. 13

*Butler v. Denka Performance Elastomer, LLC*,
   No. CV 18-6685, 2020 WL 2747276 (E.D. La. May 27, 2020) ........................... 18

*Butler v. Denka Performance Elastomer, LLC*,
   16 F.4th 427 (5th Cir. 2021) ....................................................................... 18

*City of Arlington, Tex. v. FCC*,
   668 F.3d 229 (5th Cir. 2012) ................................................................... 7, 15

*City of Arlington, Tex. v. FCC*,
   569 U.S. 290 (2013) .................................................................................. 7

*Daily Instruments Corp. v. Heidt*,
   998 F. Supp. 2d 553 (S.D. Tex. 2014) ........................................................... 17

*Davis v. Sun Oil Co.*,
   148 F.3d 606 (6th Cir. 1998) ...................................................................... 19

*In re: G-1 Holdings, et al.*,
   No. 01-30135 (Bkrptcy. D. N.J.) ................................................................. 14

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*,
   263 F. Supp. 2d 796 (D.N.J. 2003) .............................................................. 19

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*,
   399 F.3d 248 (3d Cir. 2005) ...................................................................... 19

*Int'l Shortstop, Inc. v. Rally's, Inc.*,
   939 F.2d 1257 (5th Cir. 1991) .................................................................... 14

*Maine People's All. and Nat. Res. Def. Council v. Mallinckrodt, Inc.*,
   471 F.3d 277 (1st Cir. 2006) ...................................................................... 10

*Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
   70 F.4th 582 (D.C. Cir. 2023) ..................................................................... 9

*NRDC, Inc. v. U.S. EPA*,
   824 F.2d 1146 (D.C. Cir. 1987) ............................................................. 21, 22

*Optimus Steel, LLC v. U.S. Army Corps of Eng'rs*,
   492 F. Supp. 3d 701 (E.D. Tex. 2020) .......................................................... 17

*Reiter v. Sonotone Corp.*,
   442 U.S. 330 (1979) .................................................................................. 9

*Sec. & Exch. Comm'n v. Chenery Corp.*,
   332 U.S. 194 (1947) ............................................................................ 2, 7, 15

*Sec. Indus. & Fin. Markets Ass'n v. United States Commodity Futures Trading Comm'n*,
   67 F. Supp. 3d 373 (D.D.C. 2014) .............................................................. 2, 7

*Sierra Club v. Whitman*,
   268 F.3d 898 (9th Cir. 2001) .................................................................. 7, 15

*Simsbury-Avon Preservation Society, LLC v. Metacon Gun Club, Inc.*,
   575 F.3d 199, 211 (2d Cir. 2009).................................................................... 22
*Texas v. United States*,
   328 F. Supp. 3d 662 (S.D. Tex. 2018) ........................................................... 19
*Trinity Am. Corp. v. U.S. EPA*,
   150 F.3d 389 (4th Cir. 1998)...................................................................... 8, 9
*United States v. Apex Oil Co.*,
   No. 05-CV-242-DRH, 2008 WL 2945402 (S.D. Ill. July 28, 2008).................... 9, 22
*United States v. Apex Oil Co.*,
   579 F.3d 734 (7th Cir. 2009).......................................................................... 9
*United States v. Gear Box Z Inc.*,
   526 F. Supp. 3d 522 (D. Ariz. 2021)........................................................ 16, 17
*United States v. Menasche*,
   348 U.S. 528 (1955)...................................................................................... 9
*United States v. Reilly Tar & Chem. Corp.*,
   546 F. Supp. 1100 (D. Minn. 1982).............................................................. 8, 9
*United States v. Waste Indus., Inc.*,
   734 F.2d 159 (4th Cir. 1984).......................................................................... 9
*Zuber v. Allen*,
   396 U.S. 168 (1969).................................................................................... 12

## Statutes

42 U.S.C. § 7412 ...............................................................................passim
42 U.S.C. § 7412(d) ................................................................................. 11
42 U.S.C. § 7412(f)...........................................................................passim
42 U.S.C. § 7412(f)(2)................................................................... 11, 12, 13
42 U.S.C. § 7412(f)(4).................................................................................. 4
42 U.S.C. § 7603 ..............................................................................passim
42 U.S.C. § 7607(b)(1)................................................................................. 5
42 U.S.C. § 7607(d)(6)(B)............................................................................ 5
Pub. L. No. 101-549, 104 Stat 2399 (Nov. 15, 1990)................................... 16

## Rules

Fed. R. Civ. P. 12(b)(6)............................................................................. 18
Fed. R. Civ. P. 56(a)...................................................................... 1, 14, 16
L. R. 56.2 ................................................................................................. 3

## Regulations

54 Fed. Reg. 38,044 (Sept. 14, 1989))................................................... 15, 16
76 Fed. Reg. 70,834 (Nov. 15, 2011)........................................................ 12
88 Fed. Reg. 25,080 (Apr. 25, 2023) ...................................................... 5, 7

# TABLE OF EXHIBITS[1]

| Exhibit A: | Printout from Reginfo.gov, Office of Information and Regulatory Affairs, Office of Management and Budget (Regulatory ID number "2060-AV7l") |
|---|---|
| Exhibit B: | Denka's June 7, 2023 Responses to the United States' First Set of Interrogatories |
| Exhibit C: | EPA's *Guidance on Section 303 of the Clean Air Act* at 2 (April 1999) |
| Exhibit D: | Excerpt of Denka's Mot. to Dismiss for Failure to State a Claim Under Fed. R. Civ. P. 12(b)(6), Civil Action No. 18-cv-06685 (Section: "F" (4)) (E.D. La.) |
| Exhibit E: | Excerpt of August 15, 2023 deposition of Dr. Michael Lumpkin |
| Exhibit F: | Versar, Inc., *Final Reviewer Comments - External Peer Review Meeting on the Toxicological Review of Chloroprene (CAS No. 126-99-8)* (Jan. 26, 2010) |
| Exhibit G: | January 15, 2024 Decl. of Dr. John Vandenberg Decl. (cited in the United States' Statement of Material Facts Which Present a Genuine Issue) |
| Exhibit H: | Excerpts of EPA's September 2010 Toxicological Assessment of Chloroprene (cited in the United States' Statement of Material Facts Which Present a Genuine Issue) |

---

[1] The documents (or excerpts thereof) referenced in this table and attached to this Memorandum as exhibits are true and correct copies of those documents as attested to in the Declaration of Stephen D'Alessio, which is filed concurrently with this Memorandum.

## INTRODUCTION

When Denka previously wanted this Court to act in its favor, the company repeatedly highlighted a "mass of material facts, nearly all of which are hotly disputed." ECF No. 25-3 at 1 (Denka's request for more time to respond to the United States' preliminary injunction motion); *see also* ECF No. 28-3 at 1 (Denka's request for expedited discovery); ECF No. 29 at 2, ¶ 7 (Denka's request for expedited consideration); and ECF No. 92 ¶¶ 2-4 (Denka's request for a five-day preliminary injunction hearing). Now, seeking a different result from the Court, Denka takes a fundamentally incompatible position, arguing that there is not even so much as a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a); *see* Denka's Mem. In Supp. of Mot. for Summ. J. at 4 ("Denka's Mot.") (ECF No. 131-2). Denka's newly minted position is not true, and its motion for summary judgment should be denied.

Since this case was filed, there have been no developments in the complex, "hotly disputed" scientific questions at issue here that warrant Denka's untenable shift. And these scientific questions are at the heart of this dispute about whether Denka's carcinogenic chloroprene emissions are exposing people living in St. John the Baptist Parish to an imminent and substantial endangerment. Denka does not dispute that thousands of people, including young children, regularly breathe the chloroprene emitted from its LaPlace, Louisiana Neoprene manufacturing operations (the "Facility"). But this Court will still need to conduct fact-finding before it can conclude that the Facility's chloroprene emissions are endangering public health and welfare.

Contrary to Denka's arguments, nothing in the EPA's previous or proposed rulemakings under Section 112 of the Clean Air Act, 42 U.S.C. § 7412, resolves the relevant factual issues in Denka's favor. Nor do the EPA's discretionary decisions about whether to bring an

1

endangerment case to address health risks from other air pollution sources.  Nor does the time the EPA steadfastly invested in trying to sufficiently reduce Denka's carcinogenic chloroprene emissions without the need to bring this action.

These irrelevant factual arguments fail to refute the clear statutory authority that the EPA has pursuant to Section 303 of the Clean Air Act, 42 U.S.C. § 7603, to bring this action. Contrary to Denka's assertion, Clean Air Act Section 112, 42 U.S.C. § 7412 is not the exclusive authority the EPA has under the Clean Air Act to reduce excess lifetime cancer risk from hazardous air pollution like Denka's chloroprene emissions.  Denka ignores 42 U.S.C. § 7603's plain text, consistent caselaw, and the clear legislative history behind the environmental endangerment statutes, all of which support the EPA's approach in this case.  And "bedrock administrative law" gives the EPA discretion to use whichever Clean Air Act authority (or authorities) the agency deems best suited to addressing the public health risks from hazardous air pollution in a given situation.  *See, e.g.*, *Sec. Indus. & Fin. Mkts. Ass'n v. United States Commodity Futures Trading Comm'n*, 67 F. Supp. 3d 373, 426 (D.D.C. 2014); *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 203 (1947).

The EPA's sound, health-protective judgments about the cancer risk from breathing chloroprene are well supported and documented.  *See, e.g.*, United States' Reply in Supp. of Mot. for Prelim. Inj. at 11-17 (ECF No. 94) ("U.S. PI Reply Br.").  These judgments involve complicated scientific fields, such as toxicology, epidemiology, and pharmacokinetic modeling. Denka recognizes that challenging the EPA's determinations about chloroprene's health risks requires weighing of scientific evidence in these fields.  *See* Denka's Mot. at 25 (observing that comparing the EPA's and Denka's evidence about the representativeness of the Inhalation Unit Risk estimate for chloroprene is "not a matter for summary judgment").  Though it tries to

suggest otherwise, Denka's arguments about, for example, whether a common type of laboratory mouse was suitable for the EPA's 2010 Toxicological Assessment of Chloroprene ("2010 IRIS Assessment") raise just such disputed questions of material fact.

The tragic reality that Denka points to – that an "average" American has a 1-in-3 chance of developing cancer – does not provide Denka with an excuse to expose Parish residents to still higher risks. The EPA has determined that Denka's chloroprene emissions are exposing thousands of Parish residents to unacceptably high lifetime excess cancer risks. That determination was made by referring to the EPA's presumptive 1-in-10,000 threshold, which Denka's own toxicologist says is "the value that I would choose." *See* U.S. PI Reply Br., Ex. B, Depo. Tr. of Dr. Michael Lumpkin at 91:3-16 (ECF No. 94-2). The EPA has the authority to bring this endangerment action, and it is well supported both in fact and law.

The Court should deny Denka's motion, and this case should proceed to trial.[2]

## STANDARD OF REVIEW

There is no major disagreement about the basic standard of review under Rule 56. Denka must prove that there is no "genuine issue as to any material fact."[3] *See* Denka's Mot. at 4.

---

[2] The factual issues in this case require a trial. Contrary to Denka's suggestion (*see* Denka's Mot. at 2 (asking why the Court should "bother" holding a trial "only days before the final rule is issued")), issuance of a final rule promulgated under a separate statutory provision of the Clean Air Act does not change this. Denka's singular focus on the rule, however, leads the United States to conclude that a short continuance might be appropriate. The United States has sent a draft of the final Section 112 "Proposed Rule" to the Office of Management of Budget, Office of Information and Regulatory Affairs, Reginfo.gov (Jan. 25, 2024), https://www.reginfo.gov/public/Forward?SearchTarget=RegReview&textfield=2060-AV71 (*see* Ex. A), making it more certain that the final rule will be signed on or before March 29, 2024, as required by consent decree. *See Envt'l Integrity Project et al. v. Michael Regan*, Case 1:20-cv-03119; *Concerned Citizens of St. John et al. v. Michael Regan*, Case 1:21-cv-03063, Joint Consent Decree Regarding Group I Polymers and Resins Claims (Aug. 24, 2022). In the interest of judicial economy, the United States will therefore confer with Denka on this point.

[3] Pursuant to L.R. 56.2, the United States submits the attached Statement of Material Facts Which Present a Genuine Issue in support of this opposition brief.

Denka, however, omits any meaningful discussion about the environmental endangerment statutes, like 42 U.S.C. § 7603, or how courts have interpreted those statutes. *Cf.* United States' Mem. In Supp. of Mot. for a Prelim. Inj. ("U.S. PI Mot.") (ECF No. 9-2) at 16-18 and 23-29 (explaining how the elements for proving an imminent and substantial endangerment are interpreted in legislative history and caselaw). Understanding these statutes and their legislative history is important because they show why Denka's arguments – such as that the EPA's rulemaking authority under 42 U.S.C. § 7412 should supplant the EPA's emergency powers under 42 U.S.C. § 7603 – are wrong.

## ARGUMENT

Denka's summary judgment motion largely ignores the law in favor of recharacterizing its previously proclaimed hotly disputed scientific questions, such as the appropriate benchmark for determining acceptable lifetime excess cancer risk; the accuracy, significance, and extent of the evidence showing Parish residents' exposure to Denka's carcinogenic chloroprene emissions; and the suitability of particular laboratory animals for evaluating chloroprene's carcinogenic potential.[4] As the Court has already recognized, these scientific issues necessarily raise key factual questions about whether Denka's chloroprene emissions are causing an imminent and substantial endangerment to public health and welfare. *See* Order at 18. Tacking on the phrase "as a matter of law" at the end of an argument does not transform the underlying factual disputes into issues that can be resolved on summary judgment. *Cf.* Denka's Mot. at 8.

---

[4] The Court previously noted that Denka's arguments about whether the EPA should have adopted Denka's alternative scientific evidence about chloroprene's carcinogenic potential involve scientific inquiries that are "central" to this case. *See* Order at 18 (ECF No. 90).

I.    **This case alleges an imminent and substantial endangerment; EPA's Proposed Rule made no contrary finding under 42 U.S.C. § 7412(f)(4).**

The United States alleges, based on detailed evidence, that Denka's chloroprene emissions are causing an imminent and substantial endangerment to public health and welfare. The EPA made this allegation when it filed this action under 42 U.S.C. § 7603, two months before the "Proposed Rule" was published in the *Federal Register*.[5] *See* Compl. at 1 (ECF. No. 1) (explaining that the United States filed this case "acting at the request of the Administrator of the United States Environmental Protection Agency"). The allegations in this case represent the *only* determinations the EPA has ever reached regarding whether Denka's chloroprene emissions are presenting an imminent and substantial endangerment.

When the EPA proposed amendments to several Clean Air Act rules on April 25, 2023, it neither made nor proposed to make a contradictory finding. *See* 88 Fed. Reg. 25,080 (containing no proposed determination whether imminent endangerment exists at Denka). First, the EPA certainly did not *actually make* a determination in a *proposed* rule. Denka admitted as much in its opposition to the United States' preliminary injunction motion, but is now shifting its story by repeatedly and wrongly suggesting to the Court that there already is a finalized "grant of a 2-year waiver in the Proposed Rule." *Compare* Denka's Opp. to Mot. for Prelim. Inj. at 9 (ECF No. 73) ("Denka's PI Opp.") ("EPA did not include an explicit finding") *with* Denka's Mot. at 7, 6 (the "EPA's grant"), and n.4 ("the 2-year waiver (*which EPA granted*)") (emphasis added). Second, the Proposed Rule is silent on the question of endangerment, lending no support to Denka's assertion that EPA has "already determined that the Facility's chloroprene emissions are not causing an 'imminent endangerment.'" Denka's Mot. at 5. Denka can point to no language in the Proposed Rule that constitutes a contrary finding because the Proposed Rule contains no

_____

[5] *See* 88 Fed. Reg. 25,080 (Apr. 25, 2023) (the "Proposed Rule").

contrary finding.[6]  And that fact is more than just "the absence of 'magic words.'"  *Cf.* Denka's

Mot. at 6, n.4.  Denka's argument hinges on this supposed contrary finding, and its absence is

one of many reasons that Denka's motion fails.

Moreover, Denka overstates the significance of the EPA's response to the Office of

Management and Budget's comment on a draft version of the Proposed Rule.  *See* Denka's Mot.

at 7.  The EPA's response to OMB's comment considers only whether a two-year compliance

period is necessary for multiple emission sources in several industrial emission source categories

covered by the Proposed Rule to install the necessary air pollution controls.  *See* Denka's Mot. at

7.  Neither the comment nor EPA's response addresses whether carcinogenic emissions from

Denka or any other covered emission source under the Proposed Rule present an imminent

endangerment to public health.

## II.    Denka's scant legal analysis ignores that 42 U.S.C. § 7603, consistent caselaw, and clear legislative history all support this endangerment case based on excess cancer risks.

The plain text of 42 U.S.C. § 7603, consistent caselaw, and the clear legislative history

behind the environmental endangerment statutes all support the EPA's approach in this case.  *See*

U.S. PI Mot. at 16-18 (discussing the broad scope of the environmental endangerment statutes'

authorities) and 25-26 (ECF No. 9-2).  Denka's incorrect interpretation that Congress allowed

the EPA only one tool for addressing excess lifetime cancer risk – issuing regulations under 42

U.S.C. § 7412 – ignores the law.  Denka likewise cannot refute the EPA's authority under 42

---

[6] The Proposed Rule is a proposal.  It is not final.  When the EPA promulgates the final rule, which is expected by the end of March, after considering the public comments received, it will include appropriate compliance schedules selected for the final emission standards applicable to the affected emission sources.  *See* 42 U.S.C. § 7607(d)(6)(B); *see also id.* § 7607(b)(1) (exclusive review of the final rule is in the United States Court of Appeals for the District of Columbia Circuit).

U.S.C. § 7603 by drawing factual distinctions with other Clean Air Act regulations or with the health risks that other air pollution sources are creating. *Cf.* Denka's Mot. at 13-15.

Denka makes no mention of the Supreme Court's long-standing holding that "the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency." *Chenery*, 332 U.S. at 203; *see also City of Arlington, Tex. v. FCC*, 668 F.3d 229, 236 (5th Cir. 2012), *aff'd*, 569 U.S. 290, 133 (2013) (recognizing that agencies "typically enjoy 'very broad discretion [in deciding] whether to proceed by way of adjudication or rulemaking.'") (citations omitted). The EPA's discretion to choose how best to address public health risks from hazardous air pollution is "bedrock administrative law." *Sec. Indus. & Fin. Mkts. Ass'n*, 67 F. Supp. 3d at 426 (citations omitted).

The EPA may therefore issue a regulation under 42 U.S.C. § 7412 to address hazardous air pollution from large or small industrial categories that may include hundreds of facilities or just one. *See, e.g.*, 88 Fed. Reg. at 25,106 (Table 1) (proposing to regulate 195 synthetic organic chemical manufacturing facilities). The EPA may also choose to bring an endangerment action under 42 U.S.C. § 7603 focusing on an individual source (or combination of sources) of air pollution based on appropriate evidence. *See, e.g.*, *Sierra Club v. Whitman*, 268 F.3d 898, 902-03 (9th Cir. 2001) (noting the "traditional presumption" that a decision whether to bring an enforcement case is committed to an agency's discretion); *see also Ass'n of Irritated Residents v. E.P.A.*, 494 F.3d 1027, 1031-33 (D.C. Cir. 2007) (federal environmental statutes' enforcement provisions do not give "any indication that violators must be pursued in every case, or that one particular enforcement strategy must be chosen over another"). Or the EPA may choose to do both, even when—as here—both actions implicate a single source. Denka may not like being

singled out, but that is irrelevant.  So is the fact that Denka posits its Facility used to pose a *far greater* danger to the surrounding community.  The EPA has the legal authority and discretion to bring this action under 42 U.S.C. § 7603 even as the agency continues to promulgate a revised regulation under 42 U.S.C. § 7412(f) that also addresses public health risks from chloroprene emissions.  *Cf.* Denka's Mot. at 13-15.  Denka offers no meaningful response to the bedrock law.

A.  Congress understood that "notwithstanding any other provision" of the Clean Air Act includes the Section 112 rulemaking authorities.

The first seven words of 42 U.S.C. § 7603 prove that Denka's argument – that the EPA's regulatory authority under 42 U.S.C. § 7412 supplants its authority under 42 U.S.C. § 7603 – is backward and, therefore, wrong.  *Cf.* Denka's Mot. at 9-13 and 15.  The opposite is true: the Clean Air Act grants the EPA authority to bring endangerment actions under 42 U.S.C. § 7603 "notwithstanding" the EPA's separate regulatory authority under other portions of the Clean Air Act.  *See* 42 U.S.C. § 7603.  Denka has little response to this plain text, and Denka is wrong to look to 42 U.S.C. § 7412 for answers.[7]  As Denka notes, Congress amended 42 U.S.C. §§ 7412 and 7603 at the same time.  *See* Denka's Mot. at 11 n.8.  Congress wrote no exception into 42 U.S.C. § 7603 for the regulatory authority it contemporaneously gave the EPA in 42 U.S.C. § 7412.  Because of its unmistakable clarity, as well as because of Congress' clearly expressed intent in the legislative history for comparable statutes, courts have correctly found that analogous statutory language in the Safe Drinking Water Act is "'intended to override *any*

---

[7] Denka's distinction that its arguments are about "statutory interpretation" and "not EPA's authority under Section 303" is meaningless.  *See* Denka's Mot. at 12-13.  The basic premise of Denka's motion is that 42 U.S.C. § 7603 does not give the EPA authority to address lifetime excess cancer risks, using a 1-in-10,000 risk benchmark, in light of 42 U.S.C. § 7412(f).  *See, e.g.*, Denka's Mot. at 1 (this action runs "counter to the statutory program" under Clean Air Act Section 112) and 13 (the EPA "may not use Section 303" in light of Section 112).

limitations upon the Administrator's authority found elsewhere' in the Act."[8] *Trinity Am. Corp. v. U.S. EPA*, 150 F.3d 389, 394-95 (4th Cir. 1998) (emphasis in original).

Denka's proposed interpretation – that 42 U.S.C. § 7603 is subservient to 42 U.S.C. § 7412 – thus violates the "cardinal principle of statutory construction" that "the language used by the legislature is intended to have an effect." *Adair v. Troy State Univ. of Montgomery*, 892 F. Supp. 1401, 1407-08 (M.D. Ala. 1995) (citing *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used.") and *United States v. Menasche*, 348 U.S. 528, 538-39 (1955)).  Denka's interpretation has also been rejected by at least one court construing a similar environmental endangerment statute. *See United States v. Waste Indus., Inc.*, 734 F.2d 159, 164 (4th Cir. 1984) (noting the Resource Conservation and Recovery Act's similar "notwithstanding" language in its endangerment section, and explaining that the section provides "a remedy . . . whether or not those engaging in the endangering acts are subject to any other provision of the Act").  Denka's similar effort to read an implied limitation into 42 U.S.C. § 7603 based on the separate rulemaking authority in 42 U.S.C. § 7412(f) should likewise be rejected.

B.  Overexposure to carcinogenic agents, like Denka's chloroprene emissions, is an actionable endangerment.

Congress clearly intended the endangerment statutes to protect against excessive cancer risk despite the inherent uncertainty of whether exposure will materialize into diagnosable

---

[8] Denka ignores that Congress chose to give "paramount importance" to protecting public health when it enacted the current set of environmental endangerment statutes, including 42 U.S.C. § 7603.  *See United States v. Reilly Tar & Chem. Corp.*, 546 F. Supp. 1100, 1110 (D. Minn. 1982); *see also Trinity Am. Corp.*, 150 F.3d at 399; *United States v. Apex Oil Co.*, No. 05-CV-242-DRH, 2008 WL 2945402, at *79 (S.D. Ill. July 28, 2008), *aff'd*, 579 F.3d 734 (7th Cir. 2009) (protecting human health and the environment is the "primary intent" of RCRA's endangerment statute).  In doing so, Congress enshrined the statutory "precautionary principle" for the EPA to follow that Denka wrongly claims is lacking here.  *Cf.* Denka's Mot. at 12 (citing *Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 599 (D.C. Cir. 2023)).

cancer. *See, e.g.*, *Reilly Tar*, 546 F. Supp. at 1110 (citing examples of substantial endangerments in the Safe Drinking Water Act's legislative history).[9] Even a latent threat of developing cancer suffices.[10] *See id.* That conclusion makes sense given the insidious reality of cancer's furtive, slow-moving development – cancers generally have years-long "incubation" periods. *See* U.S. PI Mot., Ex. F, Decl. of Dr. Ila Cote ¶ 41 (ECF No. 9-8). At least one court has noted, in dicta, that even a twenty-year latency period should not disqualify Denka's emissions as a near-term, imminent endangerment. *See, e.g.*, *Maine People's All. and Nat. Res. Def. Council v. Mallinckrodt, Inc.*, 471 F.3d 277, 279 n.1 (1st Cir. 2006) (even if there is "a reasonable prospect that a carcinogen released into the environment today may cause cancer *twenty years hence*, the threat is near-term even though the perceived harm will only occur in the distant future") (emphasis added). Congress may have been aware that people were being exposed to long-term cancer risks greater than 1-in-10,000 from air pollution. *See* Denka's Mot. at 9. But it is untenable to suggest that Congress categorically barred the EPA from addressing such cancer risks under the Clean Air Act except via regulation under 42 U.S.C. § 7412. *Cf.* Denka's Mot. at 9.

C. Congress has not excluded any numerical risk threshold from defining what is or is not an imminent and substantial endangerment in the Clean Air Act.

Congress made no finding – explicit or implied – that long-term cancer risks higher than 1-in-10,000 cannot constitute an imminent and substantial endangerment. *Cf.* Denka's Mot. at 9-13 and 15 (wrongly claiming that Congress "determined" greater than 1-in-10,000 risk levels should only be addressed through Section 112 rulemaking). 42 U.S.C. § 7603 certainly includes

---

[9] No meaningful difference exists between ingesting cancer-causing pollutants through drinking water, which the Safe Drinking Water Act focuses on, or breathing harmful air pollution, which is the Clean Air Act's focus. *See* U.S. PI Mot. at 17-18 (ECF No. 9-2).

[10] That threat is evaluated against numerical values, like 1-in-10,000 or 1-in-1 million.

no such exemption.  Nor do 42 U.S.C. § 7412(d) and (f).[11]  It is therefore not credible for Denka to argue that, as a matter of law, 42 U.S.C. § 7603 cannot be used to reduce unacceptably high lifetime excess cancer risks if a 42 U.S.C. § 7412(f)(2) rulemaking is in progress, *no matter how high the cancer risks are* from an air pollution source or how much time an EPA rulemaking may take to complete.  Yet Denka makes that very argument.[12]  *See* Denka's Mot. at 9 (arguing that the EPA's only tool for limiting public exposure to cancer risks under the Clean Air Act is issuing a regulation under 42 U.S.C. § 7412 "through an 18-year regulatory process").[13]

The fact that Congress established a nationwide regulatory program under 42 U.S.C. § 7412(f)(2) that includes an examination of whether residual cancer risks are "***less*** than one in ***one million***," in no way means that Congress excluded lifetime excess cancer risks ***higher*** than 1-in-***10,000*** (or multiples higher as is the case here) from being considered an imminent and substantial endangerment.  42 U.S.C. § 7412(f)(2) (emphasis added).  The statute therefore shows that Denka is wrong about a 1-in-10,000 lifetime excess cancer risk standard being inappropriate as a matter of law.[14]  *Cf.* Denka's Mot. at 9.  42 U.S.C. § 7412(f)(2) requires – and

---

[11] Indeed, 42 U.S.C. § 7412(f)(2) directs the EPA to promulgate standards if an existing emission requirement does not reduce estimated lifetime excess cancer risks to the most exposed individual to "less than one in *one million*."  (Emphasis added.)

[12] In dismissing Denka's counterclaims regarding the EPA's reliance on a 1-in-10,000 cancer risk benchmark, the Court noted that "Denka does not state why or what law supports a claim that applying this standard in a bright-line fashion would be problematic."  *See* Aug. 30, 2023 Order at 15 (ECF No. 90).

[13]  The eight-year timeline that Congress allowed for completing residual risk rulemakings under 42 U.S.C. § 7412(f)(2) underscores that imminent and substantial endangerment claims serve an important gap-filling role while that process happens.  *See* U.S. PI Mot. at 16 (citing EPA's *Guidance on Section 303 of the Clean Air Act* (April 1999)); *cf.* Denka's Mot. at 9.

[14] Denka supposes that "Congress easily could have included" a statutory directive deeming certain numerical cancer risks to be an emergency.  *See* Denka's Mot. at 11.  Maybe so.  But

sets timelines for – the EPA to assess a variety of public health risks, not just cancer, from almost two hundred hazardous air pollutants emitted by thousands of facilities that comprise dozens of industrial categories. The broad guidelines and years-long timelines Congress provided in 42 U.S.C. § 7412(f)(2) that govern how "residual risk" emission standards should be developed are not prerequisites for bringing an endangerment action under 42 U.S.C. § 7603.

Furthermore, the EPA's decade-old response to a single public comment about a different regulation for a different hazardous air pollutant with different, non-cancer health effects does not support Denka's sweeping conclusion that Congress forbade the EPA from estimating cancer risks using an upper bound value, like the Inhalation Unit Risk, or a 1-in-10,000 benchmark.[15] *Cf*. Denka's Mot. at 7-8. The comment response is likewise certainly not an EPA pronouncement prohibiting itself from taking action under 42 U.S.C. § 7603 to reduce excess cancer risks multiples higher than a 1-in-10,000 benchmark, as is the case here. The comment response simply and correctly explained that Congress did not determine that "*any*" risk being addressed by regulation under 42 U.S.C. § 7412(f) automatically constitutes an imminent endangerment. *See id*. at 8 (last sentence of indented quotation). And here, the EPA concluded that the risks from Denka's chloroprene emissions – relying on a different methodology and site-specific air monitoring data – constitute an imminent and substantial endangerment to a specific population for a host of site-specific reasons. Unlike the commenter, the EPA is not "merely making general allegations" about the same risks that prompted the Proposed Rule. *See id*.

---

"[l]egislative silence is a poor beacon to follow in discerning the proper statutory route." *Zuber v. Allen*, 396 U.S. 168, 185 (1969).

[15] Indeed, the risk calculation for that regulation showed a maximum individual risk of 20-in-1,000,000, well below 1-in-10,000. *See* 76 Fed. Reg. 70,834, 70,839 (Nov. 15, 2011).

D. 1-in-10,000 is a common benchmark for defining unacceptable lifetime excess cancer risk.

Contrary to Denka's claim, Congress broadly authorized the EPA to act in 42 U.S.C. § 7603 without reference to any numerical cancer risk threshold.  And a 1-in-10,000 risk is a common benchmark for defining unacceptable lifetime excess cancer risk.  *See* U.S. PI Mot. at 8-9 (ECF No. 9-2).  Denka's toxicologist, Dr. Michael Lumpkin, agrees.  *See* U.S. PI Reply Br., Ex. B (ECF No. 94-2), Depo. Tr. of Dr. Michael Lumpkin at 91:3-16 and 97:12-98:9.

Despite the admission of its toxicologist, Denka dodged answering interrogatories that specifically asked it to identify a numerical threshold that should be used to determine unacceptably high lifetime excess cancer risk or an imminent and substantial endangerment.  *See* Ex. B at 6-8, Denka's Responses to the United States' First Set of Interrogatories, Response to Interrogatories One and Two.  Without an answer from Denka about what numerical threshold *should be used* for determining unacceptably high cancer risk or an imminent and substantial endangerment, its argument that the EPA is using the *wrong* benchmark necessarily raises a genuine issue of disputed material fact, which renders summary judgment improper.

E. The Court should reject Denka's effort to limit the EPA's options for responding to cancer risk from industrial air pollution.

"Courts may not create their own limitations on legislation, no matter how alluring the policy arguments for doing so."  *Brogan v. United States*, 522 U.S. 398, 408 (1998).  Denka's interpretation of the "residual risk" requirements in 42 U.S.C. § 7412(f)(2) and the EPA's 1989 Benzene NESHAP policy would wrongly preempt an imminent and substantial endangerment action stemming from regulated health risks.  In Denka's view, the existence of a regulation under 42 U.S.C. § 7412(f)(2) – whether proposed or final – would remove 42 U.S.C. § 7603 from the EPA's options for responding to a public health endangerment caused by regulated hazardous air pollutants.  Indeed, Denka's interpretation would mean the EPA could not bring a

13

case under 42 U.S.C. § 7603 even if a company were flagrantly violating a residual risk regulation. *See* Denka's Mot. at 13 (using 42 U.S.C. § 7603 to reduce cancer risks from hazardous air pollution would "undermine the carefully calibrated process Congress created in Section 112"). That interpretation cannot be the correct result or one that Congress wanted.[16]

F. The EPA's decision-making under different Clean Air Act regulatory authorities is irrelevant; so is whether the EPA has brought other endangerment actions.

The reasons for why the EPA allowed greater than 1-in-10,000 lifetime excess cancer risks in four previous residual risk rulemakings under 42 U.S.C. § 7412(f) – among the dozens it has conducted – are irrelevant to the central factual question in this case: whether the cancer risks from *Denka's* chloroprene emissions are causing an imminent and substantial endangerment under 42 U.S.C. § 7603.[17]

Moreover, comparing the EPA's choices in one regulation but not another is ultimately a matter of discerning the EPA's intent, typically a factual question. *See, e.g., Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991) (a party's "state of mind is a question of fact"); *cf.* Fed. R. Civ. P. 56(a). Denka makes no effort to address the United States' explanation of the numerous factors – that *Denka* elsewhere highlights as necessary to consider – governing why the EPA tolerated the specific excess risk levels in four regulations. *Cf.* Denka's Mot., Ex.

---

[16] Denka is wrong that the EPA has not pursued imminent and substantial endangerment claims to abate excess cancer risks. *Cf.* Denka's Mot. at 15 (claiming that the EPA has "always accepted risk levels over 1-in-10,000 without declaring an endangerment"). For example, the United States filed an imminent and substantial endangerment claim under 42 U.S.C. § 7603 regarding the cancer risks from asbestos exposure. *See* U.S. PI Reply Br., Ex. R (ECF No. 94-18), Compl. ¶¶ 12-20 and 27-34, *In re: G-1 Holdings, et al.*, No. 01-30135 (Bkrptcy. D. N.J.). The EPA also issued an administrative order under Section 303 for similar asbestos related cancer risks. *See id.* Ex. S ¶¶ 2-4 and 16-18 (ECF No. 94-19) (Shallow Water Refinery EPA Administrative Order).

[17] The Proposed Rule is not one of these four residual risk rulemakings.

14

9 at 9-13 (U.S. interrogatory response which provides a four-page *summary* of the EPA's reasons for the four Clean Air Act regulations); *see also* U.S. PI Mot., Ex. F § IV, ¶¶ 58-66 (ECF No. 9-8). Instead, Denka simply looks at the numerical risk level tolerated by these other regulations and concludes that they were greater than 1-in-10,000. But that incomplete analysis is the exact "reflexive reliance on a bare number" Denka wrongly suggests was the EPA's sole basis for bringing this imminent and substantial endangerment action. Denka's Mot. at 10.[18] Comparing only the numerical cancer risk tolerated by four other Clean Air Act regulations does not explain the EPA's intent about the general acceptability of lifetime excess cancer risk from hazardous industrial air pollution.

Separately, it is also irrelevant whether the EPA has not yet taken enforcement action under 42 U.S.C. § 7603 against other sources of different air pollutants. *See, e.g.*, *Whitman*, 268 F.3d at 902-03; *Ass'n of Irritated Residents*, 494 F.3d at 1031-33; *cf.* Denka's Mot. at 13-18. The EPA's choices about how best to allocate finite agency resources in selecting which time- and resource-intensive judicial actions to bring, and which regulatory tools will best achieve public health and environmental objectives are fact-intensive decisions that are within the EPA's discretion to make. *See Chenery*, 332 U.S. at 203; *see also City of Arlington*, 668 F.3d at 236. They are not issues that can lead to a conclusion as a matter of law.

Furthermore, Denka's entire discussion questioning why the EPA never brought an endangerment action about the pre-1990 cancer risks in the "Benzene Rule" (54 Fed. Reg.

---

[18] In contrast, the EPA evaluated ample real-world evidence regarding multiple factors to determine that exposure to Denka's chloroprene emissions are causing an imminent and substantial endangerment. *See* U.S. PI Reply Br. at 8-10 (ECF No. 94). Whether long-term average chloroprene concentrations exceed 0.2 μg/m³ is certainly one key factor. But the EPA also thoroughly considered many others. *See id.*; *cf.* Denka's Mot. at 10-11 (incorrectly suggesting that the EPA's analysis "begin[s] and end[s]" solely on whether chloroprene concentrations exceed 0.2 μg/m³).

38,044 (Sept. 14, 1989)) ignores that *the current version of 42 U.S.C. § 7603 had not yet been enacted in 1989*. Congress amended 42 U.S.C. § 7603 in 1990, *i.e.*, after the Benzene Rule was issued.[19] *See* Pub. L. No. 101-549, § 704(1)-(5), 104 Stat 2399 (Nov. 15, 1990). And the 1990 Clean Air Act Amendments "greatly increased the utility of § 303." *See* Ex. C, EPA's *Guidance on Section 303 of the Clean Air Act* at 2 (April 1999). As the EPA explains, the 1990 Clean Air Act Amendments "eliminated the requirement for state or local inaction as a prerequisite to EPA initiating action under § 303." *See id*. at 2 and 3 n.6 (citing legislative history explaining that "one reason for amending § 303 was to make it similar to other endangerment authorities."). Because that former prerequisite is no longer present, Denka's reliance on the pre-1990 version of 42 U.S.C. § 7603 is inapt. *Cf*. Denka's Mot. at 13-15.

## III. There is no unreasonable or inexplicable delay for this case.

Courts may consider delay as part of weighing the factors for whether to grant injunctive relief. *See, e.g.*, *United States v. Gear Box Z Inc.*, 526 F. Supp. 3d 522, 528 (D. Ariz. 2021) (explaining that delay in seeking relief to address harm "goes more to a balancing of the equities"). Denka wrongly suggests that this balancing should be decided as a matter of law. *Cf*. Denka's Mot. at 19-22. Indeed, just a few months ago when seeking a multi-day evidentiary hearing on the United States' preliminary injunction motion – which would include the same arguments about delay – Denka underscored the "numerous disputed factual issues." *See* Denka's Mot. for Evidentiary Hearing ¶ 2 (ECF No. 92); *see also id*. ¶ 3. Denka presumably wanted the Court to believe that those were "genuine" factual disputes. *See* Fed. R. Civ. P. 56(a).

---

[19] Denka is aware of this legislation because it cites to it elsewhere. *See* Denka's Mot. at 15 (noting the legislation adopting "the current section 303").

Here, the facts show that the United States has good reason for the timeline leading up to filing this action. And regardless of Denka's exaggerated claims, "[h]arm to human health and the environment is what it is," *i.e.*, obvious irreparable harm. *Gear Box Z*, 526 F. Supp. 3d at 528. Even as a balancing factor, delay should militate against issuing an injunction "only 'absent a good explanation.'" *Optimus Steel, LLC v. U.S. Army Corps of Eng'rs*, 492 F. Supp. 3d 701, 719 (E.D. Tex. 2020) (quoting *Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553, 570 (S.D. Tex. 2014).

A. *Any* evidence is not necessarily *enough* evidence.

Denka ignores the EPA's investment of time needed to develop robust, representative monitoring data to properly evaluate lifetime excess cancer risks from the Facility's chloroprene emissions. Air monitoring sufficient to determine long-term average chloroprene concentrations in the communities surrounding the Facility did not *start* until May 2016. *See* Denka's Mot. at 19 (third bullet). As explained in the United States' preliminary injunction motion, it was appropriate to focus on post-April 2018 air monitoring data. At that time, the Facility's Regenerative Thermal Oxidizer – a large piece of air pollution control technology – started stable operations. *See* U.S. PI Mot., Ex. E (ECF No. 9-7) (*see* narrative below table). And it takes about a year of air monitoring data to develop a representative picture of longer-term exposure concentrations. *See* U.S. PI Reply Br., Ex. C ¶ 25 (ECF No. 94-3) (explaining that amount of time is needed to account for variations in facility operations and seasonal weather patterns). Denka says nothing about this. Instead, Denka mischaracterizes EPA witness testimony and discovery responses as an admission that there was *sufficient* air monitoring data starting as early as January 2016 to declare an imminent and substantial endangerment. *See* Denka's Mot. at 19.

Although Denka now stresses to this Court that the EPA should have filed this case sooner based on other preliminary information, like the screening-level 2011 National Air Toxics

17

Assessment ("NATA"), Denka told a very different story about that information when defending itself from private tort claims.  *See, e.g.*, Ex. D at 9-10 and 12, excerpt of Denka's Mot. to Dismiss for Failure to State a Claim Under Fed. R. Civ. P. 12(b)(6), Civil Action No. 18-cv-06685 (Section: "F" (4)) (E.D. La.) (warning *that* court against relying on the NATA because "the EPA—without equivocation—has repeatedly cautioned that 'NATA wasn't designed as a final means to pinpoint specific risk values at local levels.'"); *see also Butler v. Denka Performance Elastomer, LLC*, No. CV 18-6685, 2020 WL 2747276, at *11 (E.D. La. May 27, 2020), *aff'd in part, rev'd in part*, 16 F.4th 427 (5th Cir. 2021) (agreeing with Denka's arguments about the NATA).  Now, however, Denka lists the same NATA in its very first bullet point about evidence it disingenuously claims should have spurred the EPA to bring this case sooner.  *See* Denka's Mot. at 19.

### B.  Denka suggests it was an unreasonable delay for the EPA to consider the company's four Information Quality Act requests.

Denka ignores the time the EPA spent diligently considering *Denka's own petitions* challenging chloroprene's carcinogenic potency – time that Denka presumably wanted the EPA to take.  Between 2016 and 2022, Denka asked the EPA to thoroughly consider revising the 2010 IRIS Assessment in *four* requests under the Information Quality Act.  *See, e.g.*, Counterclaim ¶¶s 38-59 and 95 (ECF No. 22) (explaining that the EPA and Denka "actively collaborated" to *try to* develop a valid, reliable PBPK model for chloroprene and that the EPA "committed substantial resources to provide Ramboll [Denka's consultant] with quality assurance guidance on the development of the PBPK model"); *cf.* Denka's Mot. at 21-22.  That process, as Denka acknowledges, took roughly three years, only finishing in October of 2022.  *See* Counterclaim ¶ 59.

C.  The United States has taken steady action to reduce Denka's chloroprene emissions.

The EPA has been engaged in a focused, deliberate effort to reduce Denka's chloroprene emissions.  Denka's amended counterclaim is, in fact, premised on those efforts.  *See generally* Amd. Counterclaim (ECF No. 104).  Although Denka now mischaracterizes the EPA's involvement in the 2017 Administrative Order on Consent between Denka and the Louisiana DEQ as unreasonable delay, the time the EPA spent in that worthwhile effort substantially reduced the Facility's chloroprene emissions, as Denka frequently touts.  *See* Denka's Mot. at 20 (last bullet).  And even though Denka now weaponizes the time the United States invested in settlement efforts, Denka was given meaningful chances to avoid this lawsuit.  *Cf. Texas v. United States*, 328 F. Supp. 3d 662, 739 (S.D. Tex. 2018) (explaining that delays have been found reasonable "if the parties have been trying to reach an amicable resolution short of litigation").  Denka wrongly argues that this action was sudden.  *See* Denka's Mot. at 22.

This case was initiated after years of ultimately unsuccessful efforts by the EPA to try to convince Denka to reduce its chloroprene emissions.  Those steady efforts to reduce cancer risks in the Parish without litigation do not constitute unreasonable delay.  *See Davis v. Sun Oil Co.*, 148 F.3d 606, 610 (6th Cir. 1998) ("An 'imminent hazard' may be declared at any point in a chain of events which may ultimately result in harm to the public"); *see also Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 263 F. Supp. 2d 796, 837 (D.N.J. 2003), *aff'd*, 399 F.3d 248 (3d Cir. 2005) ("[i]mminence refers 'to the nature of the threat rather than identification of the time when the endangerment initially arose'").

## IV.  The United States' allegations about the cancer risk from breathing chloroprene are based on substantial scientific evidence.

Denka is wrong that there is no scientific evidence to substantiate the EPA's reliance on the B6C3F1 female mouse in developing a human Inhalation Unit Risk estimate for chloroprene

19

in the 2010 IRIS Assessment.[20]  *Cf.* Denka's Mot. at 22-25.  However, the fundamental question

that Denka's argument raises – who's right on the science? – illustrates that this case cannot be

resolved at summary judgment.  Answering this question requires the Court to weigh the quality

and sufficiency of detailed scientific data, an exercise Denka all but admits is "not a matter for

summary judgment."  *See id.* at 25.

The conclusions of the 2010 IRIS Assessment were vetted and confirmed by an

independent external six-expert peer review panel charged with considering the argument Denka

is (once again) raising.  *See* U.S. PI Mot. at 7 (ECF No. 9-2); *see also* Ex. F, Versar, Inc., *Final*

*Reviewer Comments - External Peer Review Meeting on the Toxicological Review of*

*Chloroprene (CAS No. 126-99-8)* (Jan. 26, 2010).  This peer review panel supported the EPA's

conclusion that "chloroprene is likely to be carcinogenic ***to humans*** by all routes of exposure."

*See* Ex. F at 25 (emphasis added); *see also id.* 25-29 (describing the "weight of evidence"

analysis that EPA performed to determine chloroprene's carcinogenic classification as a likely

human carcinogen).  And although there was some disagreement, but the majority of peer

reviewers also agreed that the EPA's reliance on the B6C3F1 female mouse appropriately

supported the derivation of chloroprene's IUR estimate.  *See id.* 30-31; *see also* Ex. E, Excerpt of

August 15, 2023 deposition of Dr. Michael Lumpkin at 193:20-194:2 (finding no reason to

disagree that "a majority of the peer reviewers thought that the NTP bioassay study of the B6

mouse was appropriate to use in deriving the IUR for chloroprene.").

---

[20] IURs are designed to be health-protective estimates of the excess cancer risk caused by breathing a given chemical substance for an assumed 70-year lifetime.  *See* U.S. PI Mot., Ex. D ¶ 21.  IURs account for the inherent uncertainties of estimating cancer risk, including the variability in how people's bodies respond to carcinogens.  Because of these uncertainties, "[t]he human IUR for chloroprene may actually *underestimate* the risk of cancer from chloroprene, despite being based on the most sensitive sex and species."  U.S. PI Reply Br., Ex. G ¶ 9, Cote Rebuttal Decl. (ECF No. 94-7) (emphasis added).

The analysis and opinions of the United States' expert toxicologist, Dr. Ila Cote, provide further supporting evidence for the EPA's decision to calculate the IUR using the B6C3F1 mouse. *See* U.S. PI Mot., Ex. F, Decl. of Dr. Ila Cote ¶ 53 (ECF No. 9-8) ("I also agree with the EPA estimate of the IUR…."); *cf.* Denka's Mot. at 24. Dr. Cote concluded, to a reasonable degree of scientific certainty based on her expertise, that the original National Toxicology Program studies, on which the IUR is based, "are of the highest quality and provide sound, reliable experimental data." U.S. PI Mot., Ex. F, Decl. of Dr. Ila Cote ¶ 32; *see also id.* ¶ 21 (explaining the National Toxicology Program). Dr. Cote noted that the EPA "correctly made cross-species adjustments for inhaled chemicals in the 2010 IRIS Assessment." *See* U.S. PI Reply Br., Ex. G ¶ 17 Rebuttal Decl. of Dr. Ila Cote (ECF 94-7) (referencing the EPA's Guidelines for Inhalation Dosimetry and citing to relevant portion of 2010 IRIS Assessment). Dr. Cote also "conducted an independent review of all available chloroprene health information, starting with a new literature search that included post-2010 information." *See* U.S. PI Mot., Ex. F, Decl. of Dr. Ila Cote ¶ 20 (ECF No. 9-8). Ultimately, Dr. Cote confirmed the EPA's conclusion that relying on the B6C3F1 female mouse is appropriate to estimate the human IUR for chloroprene because doing so meets criteria generally accepted by scientists. *See* U.S. PI Reply Br., Ex. G ¶ 16, Table 1 (ECF No. 94-7) (discussing criteria published by the National Academy of Sciences).

Denka may disagree, but expert testimony like Dr. Cote's, as well as the rigorous peer review of the data underlying the 2010 IRIS Assessment, constitute robust scientific evidence for the EPA's decision to rely on the B6C3F1 mouse.[21] *Cf.* Denka's Mot. at 22-25. This is one

---

[21] Denka also ignores the reality that cancer risk – both in terms of the carcinogenic potential of a chemical and the actual risks from environmental exposure to it – is estimated. *See* Ex. G ¶ 10,

reason, among many, that the *Simsbury-Avon Preservation Society* case that Denka cites is readily distinguishable. *See id.* at 25. The *Simsbury-Avon* court affirmed a summary judgment because two key types of evidence – both of which have been amply documented here – were absent. *See Simsbury-Avon Preservation Society, LLC v. Metacon Gun Club, Inc.*, 575 F.3d 199, 211 (2d Cir. 2009). Unlike the robust air monitoring data used to estimate Parish residents' exposure to Denka's chloroprene emissions, the degree of potential exposure to humans and wildlife in *Simsbury-Avon* "was not assessed." *Id.* (finding that this lack of evidence rendered the record "insufficient to permit a factfinder to assess the magnitude of the possible risk," and therefore, insufficient to determine whether there was a "reasonable prospect of future harm"); *see also id.* at 204. This same lack of evidence about the lead contamination at issue in *Simsbury-Avon* prevented a factfinder from determining the seriousness of the alleged risks, and therefore, whether the risks involved potentially serious harm. *Id.* at 212; *see also id.* at 213 (noting that the plaintiff "provided no evidence that anyone is subject to long-term exposure to lead contamination…or that there are realistic pathways of exposure"). Here, in stark contrast, the United States has presented ample real-world evidence of how residents living in St. John the Baptist Parish are routinely exposed to Denka's carcinogenic chloroprene emissions, as well as evidence assessing the seriousness of the risks to their public health. *See* U.S. PI Reply Br. at 8-10 (ECF No. 94) (noting, for example, the urinalysis testing that confirms chloroprene has been metabolized in the bodies of Parish residents).

---

Rebuttal Decl. of Dr. Ila Cote (ECF 94-7). And estimates necessarily include and tolerate uncertainty. *See* U.S. PI Mot. at 29 (citing *NRDC, Inc. v. U.S. EPA*, 824 F.2d 1146 (D.C. Cir. 1987) and *Apex Oil Co.*, 2008 WL 2945402)). Estimates of unknowns that are made to a reasonable degree of scientific certainty are often accepted by courts.

As Denka acknowledges, the EPA's established policy includes relying on data from the most sensitive lab animal tested – here, the commonly used B6C3F1 female lab mouse. *See* Ex. G ¶¶ 15-16, Rebuttal Decl. of Dr. Ila Cote (ECF 94-7). The EPA did so properly. Denka believes a different scientific judgment is appropriate here. But that is a disputed issue of material fact that should not be decided as a matter of law. *See* Denka's Mot. at 25.

## CONCLUSION

For these reasons, the United States asks this Court to deny Denka's summary judgment motion.

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA**

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice


_____s/Steven D. Shermer_____
Trial Attorney:           STEVEN D. SHERMER
                          Senior Attorney
                          District of Columbia Bar No. 486394
                          DAVIS H. FORSYTHE
                          DANIEL S. SMITH
                          Senior Counsel
                          HANNAH L. FRAZIER
                          Trial Attorney
                          Environmental Enforcement Section
                          Environment and Natural Resources Division
                          United States Department of Justice
                          P.O. Box 7611
                          Washington, DC  20044-7611
                          (202) 514-1134
                          Steven.Shermer@usdoj.gov

OF COUNSEL:

ROBERT PARRISH
Attorney-Advisor
U.S. Environmental Protection Agency

23

Office of Civil Enforcement, Air Enforcement Division
1200 Pennsylvania Avenue, NW (2242A)
Washington, D.C. 20460

JUSTIN LANNEN
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 6
1201 Elm Street, Suite 500 (ORCEA)
Dallas, TX 75270

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on January 26, 2024, a true and correct copy of the foregoing United States' Opposition to Denka Performance Elastomer LLC's Motion for Summary Judgment and Response to Denka's Statement of Undisputed Facts, including attached exhibits, were filed with the U.S. District Court for the Eastern District of Louisiana using the Court's CM/ECF system. Notice of this Electronic Filing will be sent to all parties by operation of the Court's Electronic Filing System.

s/Steven Shermer
Steven D. Shermer