**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| v. | Civ. No. 2:23-cv-735 |
| | Judge Barbier (Section: "J" (5)) |
| DENKA PERFORMANCE ELASTOMER, LLC, and DUPONT SPECIALTY PRODUCTS USA, LLC, | Magistrate Judge North |
| *Defendants*. | |

**UNITED STATES' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I.    INTRODUCTION**

1.      Pursuant to Fed. R. Civ. P. 52(a), the Court enters these Findings of Fact and Conclusions of Law.  If any finding is in truth a conclusion of law or any conclusion stated is in truth a finding of fact, it shall be deemed so, labels notwithstanding.

2.      The United States of America filed the Complaint in this action against Denka Performance Elastomer, LLC ("Denka") and DuPont Specialty Products USA, LLC ("DuPont Specialty Products"). *See* ECF No. 1. The United States alleges that DuPont Specialty Products owns property called the Pontchartrain Works Site ("Site") in LaPlace, Louisiana, and that Denka operates a Neoprene manufacturing plant at the Site, which emits the carcinogenic hazardous air pollutant chloroprene from its processes (the "Facility").  *See id.*

3.      The United States alleges that the chloroprene emitted by Denka's Neoprene manufacturing operations at the Site are presenting an imminent and substantial endangerment to public health or welfare in the surrounding communities and seeks an injunction abating that endangerment, under Section 303 of the Clean Air Act. 42 U.S.C. § 7603.  *See* ECF No. 1.

1

4.      The United States seeks relief from DuPont Specialty Products based on Fed. R. Civ. P. 19(a) and the All Writs Act, 28 U.S.C. § 1651, requiring DuPont Specialty Products to not interfere or impede with any Court-ordered actions that Denka must take at the Site.

5.      This matter was tried before the Court, sitting without a jury, beginning on March 11, 2024.

## II.   FINDINGS OF FACT

### A. Denka's Neoprene Manufacturing Operations.

6.      Denka is the current owner and operator, as defined by 42 U.S.C. § 7412(a)(9), of the Neoprene manufacturing operations at the Facility. *See* Denka's Ans. to Compl. ("Denka's Ans.") ¶¶ 1, 22 (ECF No. 22).

7.      Neoprene (*a.k.a.* "chloroprene rubber" or "polychloroprene") is a flexible, synthetic rubber used to produce common goods like wetsuits, beverage cozies, orthopedic braces, and automotive belts and hoses. *See* Denka's Ans. ¶ 27.

8.      Since about 2008, Neoprene has been manufactured at only one place in the United States: the Facility.

- Anticipated trial testimony of Jorge Lavastida.

9.      Denka's Neoprene manufacturing operations at the Facility are the sole source of chloroprene emissions in St. John the Baptist Parish, Louisiana.

- Anticipated trial testimony of Dr. John Vandenberg.

10.     Denka began manufacturing Neoprene at the Facility on approximately November 1, 2015. *See* Denka's Ans. ¶ 27. Denka purchased the Facility in 2015 from E. I. du Pont de Nemours and Company ("E. I. du Pont"), but Denka did not purchase the land underlying the Facility. *See* Order and Reasons at 1 (ECF No. 89).

11. DuPont Specialty Products now owns the land at the Pontchartrain Works Site on which Denka's Neoprene manufacturing operations are located. DuPont Specialty Products' Ans. to Compl. ("DuPont's Ans.") ¶¶ 2, 24 (ECF No. 93). DuPont Specialty Products is Denka's landlord and leases the land on which the Neoprene manufacturing operations are located to Denka pursuant to a "Ground Lease." *See id.*; Order and Reasons at 1 (ECF No. 89).

12. The Ground Lease between Denka and DuPont Specialty Products empowers DuPont Specialty Products to withhold its consent for certain types of construction and other activities involving Denka's Neoprene manufacturing operations, such as changes to the Neoprene manufacturing process. *See* Order and Reasons at 2, 13 (ECF No. 89).  Under the Ground Lease, DuPont Specialty Products has discretion to ratify, to decline, or to stall activities which Denka may be required to carry out as a part of the resolution to this case. *See id.* at 13.

- Anticipated trial testimony of DuPont Specialty Products representative.

13. As part of their Ground Lease, Denka and E.I. du Pont also entered into a "Site Services Agreement" pursuant to which now-DuPont Specialty Products provides certain services, such as utilities and chemicals to Denka, such as nitrogen, natural gas, electricity, river water, potable water, steam, as well as the use of certain DuPont facilities at the Pontchartrain Works Site, such as rail lines and barge docks.  Denka shares the costs of these services with DuPont Specialty Products.

- Anticipated trial testimony of DuPont Specialty Products representative, Chris Meyers, and Jorge Lavastida.

## B. Denka's Neoprene Manufacturing Operations Emit Chloroprene.

14. Chloroprene is a liquid raw material that is used to produce Neoprene. *See* Denka's Ans. ¶ 3. It is colorless, flammable, and readily evaporates at room temperature. *See id.* Chloroprene is produced using toxic substances, including 1,3-butadiene and chlorine. *See id.*

- Anticipated trial testimony of Jeffrey Harrington.

15.     Denka's Neoprene manufacturing operations consist primarily of three chemical manufacturing process units: the Chloroprene Unit, the Neoprene Unit, and the HCl Recovery Unit. *See* Denka's Ans. ¶ 29. Each of these three units emits chloroprene as well as other hazardous air pollutants. *See id.*

16.     In addition, each of the Facility's three process units has its own Clean Air Act Title V operating permit because each unit is regulated as a "major" stationary source of air pollution. 42 U.S.C. § 7603.

- Anticipated trial testimony of Jeffrey Harrington.

17.     Chloroprene is routinely emitted into the air at various stages of Denka's Neoprene manufacturing operations. It is emitted through vents from the manufacturing equipment that discharge directly to the atmosphere. It is also emitted through more diffuse ("fugitive") sources, like equipment leaks and evaporative emissions from wastewater generated during Neoprene manufacturing. It is also emitted when tanks and other process vessels are opened, during normal operations and maintenance work.

- Anticipated trial testimony of Jeffrey Harrington; Denka's Ans. ¶ 31.

18.     Denka's Facility emits more than one hundred tons of air pollution each year.

- Anticipated trial testimony of Jeffrey Harrington

**C.     Thousands of People Live Near Denka's Facility and Breathe its Chloroprene Emissions.**

19.     Thousands of people, including young children, live near Denka's Facility. Approximately 15,000 to 17,000 people live within 2.5 miles of the Facility's center. Over 20% of that population (roughly 3,000- 4,000) is under the age of 18. Of those 3,000-4,000 young people, approximately 800-1,000 are young children under the age of 5.

- Anticipated trial testimony of Dr. Nyesha Black.

20.    Parish residents living as far as 2.5 miles away from Denka's Facility are consistently exposed to Denka's chloroprene emissions.

- Anticipated trial testimony of Dr. John Vandenberg, Jiayang Chen, and Richard Wayland.

21.    Many people have lived near the Facility for decades, including within 2.5 miles of the Facility.

- Anticipated trial testimony of Dr. Nyesha Black.

22.    Roughly 300 kindergarteners through fourth graders attend the Fifth Ward Elementary School, which is only about 450 feet away from the Facility's western fenceline. East St. John High School, where about 1,200 students go to school, is roughly a mile-and-a-half north of Denka's Facility. Some of these students live in the communities surrounding Denka's Facility and continue to be exposed to its chloroprene emissions even after they go home.

- Anticipated trial testimony of Dr. Nyesha Black; Dr. John Vandenberg.

23.    Parish residents have few viable alternatives to reduce the cancer risks they are exposed to because of Denka's chloroprene emissions. Affected residents may have to choose between continuing to suffer these risks or fleeing their homes in order to escape them.

- Anticipated trial testimony of Dr. Nyesha Black; Dr. John Vandenberg.

**D.  Chloroprene Is a Likely Human Carcinogen**

24.    Chloroprene is a potent, likely human carcinogen. Breathing chloroprene increases the risk of developing potentially fatal cancers, such as lung and liver cancer. Chloroprene creates this risk because of its mutagenic mode of action. Mutagenic carcinogens, like chloroprene, cause DNA mutations in the body's cells. That genetic damage increases the risk of developing cancers.

- Anticipated trial testimony of Dr. Ila Cote and Dr. John Vandenberg.

25.     Infants and children younger than 16 are likely to be especially susceptible to the cancer-causing effects of mutagens like chloroprene. This is because human cells divide and replicate more rapidly when we are younger, leaving less time for the body to repair DNA mutations before the damaged cells replicate. The more rapid replication of mutated cells increases the risk of developing cancer.

- Anticipated trial testimony of Dr. Ila Cote and Dr. John Vandenberg.

26.     The DNA-damaging effects of breathing chloroprene are particularly grave for the still-developing bodies of infants and children. Young people accumulate cancer risks more rapidly than adults, their bodies are less able to repair the genetic damage breathing chloroprene causes, and exposure-related tumors often have shorter latency periods in children than adults, meaning exposure-related tumors are expected to appear sooner than in comparably exposed adults.

- Anticipated trial testimony of Dr. Ila Cote and Dr. John Vandenberg.

27.     Infants and children are also more susceptible to chloroprene's cancer-causing risks for physiological reasons. Because of their smaller, still-developing bodies, they will likely have higher and more persistent blood concentrations of chloroprene or its metabolites than adults exposed to the same air concentrations of chloroprene. Chloroprene exposure during a person's early years is therefore particularly harmful.

- Anticipated trial testimony of Dr. Ila Cote and Dr. John Vandenberg.

28.     Cancers generally have years-long "incubation" periods. The risk of developing cancer is evaluated against numerical values, like 1-in-10,000 or 1-in-1 million.

- Anticipated trial testimony of Dr. Ila Cote; Dr. John Vandenberg.

6

i.  The EPA's "2010 IRIS Assessment."

29.  The EPA determined that chloroprene is a likely human carcinogen, and that it acts through a mutagenic mode of action, in its peer-reviewed 2010 Integrated Risk Information System assessment of chloroprene (the "2010 IRIS Assessment"). IRIS assessments identify the types of human health hazards – such as the risk of developing cancer – that exposure to a particular chemical may cause. The EPA then quantifies the correlation between exposure to the chemical and the related health hazards to arrive at a numerical estimate of its carcinogenic potency.

- Anticipated trial testimony of Dr. Ila Cote and Dr. John Vandenberg.

30.  Here, the relevant health effect and route of exposure is cancer risk from breathing chloroprene, and the relevant numerical risk estimate is called an Inhalation Unit Risk ("IUR"). An IUR is an estimate of the carcinogenic risk of breathing one microgram per cubic meter ($\mu g/m^3$) of chloroprene continuously for an assumed 70-year lifetime. Based on chloroprene's IUR from the 2010 IRIS Assessment, the average concentration of chloroprene a person may regularly breathe over a 70-year lifetime without being expected to exceed a 1-in-10,000 risk of contracting chloroprene-linked cancers is 0.2 $\mu g/m^3$. The higher the average concentration of chloroprene people living near Denka's facility are exposed to, the faster their associated cancer risk will accrue.

- Anticipated trial testimony of Dr. John Vandenberg and Dr. Ila Cote.

31.  In 1991, the State of Louisiana published an 857 $\mu g/m^3$ eight-hour ambient air standard for chloroprene under the state's Toxic Air Pollutants Program pursuant Title 33, Chapter 51 of the Louisiana Administrative Code. That standard has not been revised since 1991 to reflect the updated toxicological information about chloroprene's carcinogenic potency in the EPA's 2010 IRIS Assessment.

- Anticipated trial testimony of Donald "Deever" Bradley.

32.     IRIS assessments are extensively peer-reviewed by experts inside and outside of the United States government and are recognized as the gold standard for chemical assessments for cancer risks. *See Nat'l Oilseed Processors Ass'n v. Browner*, 924 F. Supp. 1193, 1199-1200 n.9 (D.D.C. 1996) (IRIS assessments offer "comprehensive hazard assessments conducted by panels of senior EPA scientists"). Although IRIS assessments and their conclusions are not law, courts recognize that IRIS assessments, because of the rigorous vetting process, are "generally accepted as a reliable source of information on the potential hazardous effects of those chemicals that are included in IRIS." *See id*. at 1200; *see also Leese v. Martin*, Civ. No. 11-5091, 2012 WL 1224573, at *1 n.2 (D.N.J. 2012) (taking judicial notice of the trichloroethylene IRIS assessment and suggesting, by reference to Fed. R. Evid. 201(b), that it is a source whose accuracy cannot reasonably be questioned). The EPA and other agencies rely on IRIS assessments as a thoroughly vetted scientific foundation for chemical regulations and other health risk-based decisions.

- Anticipated trial testimony of Dr. Ila Cote and Dr. John Vandenberg.

33.     The 2010 IRIS Assessment was based on a comprehensive review of the available evidence on chloroprene toxicity, including animal toxicology data, evidence of chloroprene's mutagenic properties, and human epidemiological data. The EPA's sound, health-protective judgments about the cancer risk from breathing chloroprene are well supported and documented.

- Anticipated trial testimony of Dr. Ila Cote, Dr. Helen Suh, and Dr. Dustin Kapraun.

34.     Before it was finalized, the 2010 IRIS Assessment was first subject to a rigorous review process within the EPA, by other federal agencies and White House offices, and the public. The conclusions of the 2010 IRIS Assessment were then vetted and confirmed by an independent external six-expert peer review panel.

- Anticipated trial testimony of Dr. Ila Cote.

35.    This peer review panel supported the EPA's conclusion that "chloroprene is likely to be carcinogenic to humans by all routes of exposure."  The majority of peer reviewers also agreed that the EPA's reliance on the B6C3F1 female mouse appropriately supported the derivation of chloroprene's IUR estimate.

- Anticipated trial testimony of Dr. Ila Cote.

ii.    The EPA properly rejected Denka's four Information Quality Act petitions challenging the 2010 IRIS Assessment.

36.    No post-2010 science undermines the 2010 IRIS Assessment's conclusions about chloroprene's carcinogenic effects.

- Anticipated trial testimony of Dr. Ila Cote, Dr. Dustin Kapraun, and Dr. Helen Suh.

37.    After Denka raised objections, starting in 2016, to the then-published 2010 IRIS Assessment, the EPA again convened an independent external peer-review panel of experts to assess Denka's concerns. After thoroughly reviewing Denka's concerns, members of this second peer review panel found flaws in Denka's submission and its potential application in chloroprene risk assessment. The EPA consequently concluded that Denka's submission did not provide a valid basis to change the 2010 IRIS Assessment's findings about chloroprene's cancer-causing potential.

- Anticipated trial testimony of Dr. Ila Cote, Dr. Dustin Kapraun, and Dr. Kris Thayer.

a. *The 2010 IRIS Assessment's IUR is a plausible estimate for the lifetime cancer risk from breathing chloroprene.*

38.    An IUR is designed to be a health-protective estimate of the excess cancer risk caused by breathing a given chemical substance for an assumed 70-year lifetime. IURs account for the inherent uncertainties of estimating cancer risk, including the variability in how people's bodies respond to carcinogens.

9

- Anticipated trial testimony of Dr. Ila Cote, Dr. John Vandenberg, Dr. Michael Lumpkin, and Dr. Kris Thayer.

39. Cancer risk – both in terms of the carcinogenic potential of a chemical and the actual risks from environmental exposure to it – is estimated. And estimates necessarily include and tolerate uncertainty. *See NRDC, Inc. v. U.S. EPA*, 824 F.2d 1146, 1165 (D.C. Cir. 1987) and *United States v. Apex Oil Co.*, No. 05-CV-242-DRH, 2008 WL 2945402, at *79 (S.D. Ill. July 28, 2008), *aff'd*, 579 F.3d 734 (7th Cir. 2009).

- Anticipated trial testimony of Dr. Ila Cote, Dr. John Vandenberg, Dr. Kris Thayer, and Dr. Dustin Kapraun.

40. To account for uncertainties in estimating the carcinogenic potential of a chemical, such as people's varying susceptibility to carcinogens, the EPA follows its consistent practice, based on the National Research Council's recommendation to use an upper bound estimate for inhalation unit risks. This recommendation is intended to ensure that IURs do not leave substantial portions of the public unnecessarily exposed to cancer risks. Chloroprene's IUR is thus designed to ensure, with a 95% degree of statistical confidence, that it will not miss chloroprene's "true" carcinogenic potential.

- Anticipated trial testimony of Dr. Ila Cote, Dr. John Vandenberg, and Dr. Kris Thayer.

41. EPA's adherence to established policy includes relying on data from the most sensitive lab animal tested – here, the commonly used B6C3F1 female lab mouse – to establish chloroprene's IUR. The EPA did not ignore data about other lab animals tested.  And the EPA correctly made cross-species adjustments for inhaled chemicals in the 2010 IRIS Assessment.

- Anticipated trial testimony of Dr. Ila Cote, Dr. Kris Thayer, and Dr. Dustin Kapraun.

10

>  b. *Denka's PBPK model is not reliable enough to allow increased public exposure to chloroprene.*

42. A physiologically based pharmacokinetic ("PBPK") model is a mathematical description of absorption, distribution, metabolism, and excretion ("ADME") processes for a given chemical substance in a human or laboratory animal. In other words, a PBPK model describes how the human's or animal's body processes the chemical substance during and following exposure. Like all models, PBPK models provide approximate descriptions of reality.

- Anticipated trial testimony of Dr. Dustin Kapraun.

43. The EPA has used PBPK models in past IRIS assessments to evaluate potential differences in the toxicological effects of a chemical from one species to another, like a human to a lab mouse. But the EPA has only used PBPK models when they are sufficiently validated. Denka's proposed PBPK modeling does not meet the EPA's exacting standards for proving that these types of models are accurate enough to use in public health decisions. Too many uncertainties remain about how well Denka's PBPK models predict human cancer response to chloroprene exposure. And Denka's PBPK models may not account for cancer risk in all the types of tissues and organs where tumors were observed in animal testing.

- Anticipated trial testimony of Dr. Dustin Kapraun and Dr. Kris Thayer.

44. A lingering, fundamental defect in Denka's PBPK models is the lack of human "*in vivo*" data. This type of data is vital to proving that a PBPK model accurately replicates – and can therefore make accurate predictions about – what happens to a chemical once inside the human body. The absence of this data also distinguishes Denka's PBPK models from others that the EPA has adopted, which were all supported by human *in vivo* data.

- Anticipated trial testimony of Dr. Dustin Kapraun and Dr. Kris Thayer.

11

45.    The EPA developed a robust record supporting its careful judgment declining to incorporate a PBPK model in the 2010 IRIS Assessment, as well as for denying Denka's four similar Information Quality Act requests (called "Requests for Correction" and "Requests for Reconsideration"). This record includes years of collaboration, including additional testing and data gathering. The EPA also convened additional external peer-review panels of experts that support the EPA's ultimate conclusions that Denka's proposed PBPK models were not sufficiently validated to relax the IUR for chloroprene.

- Anticipated trial testimony of Dr. Dustin Kapraun and Dr. Kris Thayer.

**E.    1-in-10,000 Is A Commonly Used Numerical Benchmark For Identifying Unacceptable Lifetime Excess Cancer Risk.**

46.    A 1-in-10,000 risk is a generally accepted upper threshold for acceptable lifetime excess cancer risk associated with exposure to a single pollutant. EPA programs to combat the health risks from air and non-air pollution rely on this benchmark.[1] Denka has not identified an alternative numerical threshold that it believes should be used to determine unacceptably high lifetime excess cancer risk or an imminent and substantial endangerment.

- Anticipated trial testimony of Dr. John Vandenberg, Dr. Ila Cote, and Dr. Michael Lumpkin.

47.    Under the Clean Air Act, for example, the EPA follows a policy that sets a presumptive 1-in-10,000 upper threshold for acceptable excess lifetime cancer risk when the agency reviews national emission standards for hazardous air pollutants ("NESHAPs") governing source categories under Clean Air Act Section 112(f), 42 U.S.C. § 7412(f). Congress

---

[1] For example, the EPA's "Superfund" program for cleaning up hazardous waste sites uses a 1-in-10,000 risk as a generally accepted upper threshold for acceptable lifetime excess cancer risk. *See* 40 C.F.R. § 300.430(e)(2)(i)(A)(2). So do other federal agencies that regulate human health risks from carcinogens, such as the Department of Defense and National Institute of Occupational Safety and Health.

subsequently endorsed this policy in the Clean Air Act's 1990 amendments. *See* 54 Fed. Reg. 38,044, 38,045 (Sept. 14, 1989) (EPA's "1989 Residual Risk Policy"); *see also* 42 U.S.C. § 7412(f)(2)(B).

48.    A handful of Clean Air Act NESHAPs, out of dozens, have tolerated greater than 1-in-10,000 cancer risks presented by individual source categories. But these rare exceptions were for narrow, case-specific reasons that are not relevant to Denka's Facility. Moreover, in no instance did the allowable estimated risks exceed 2.7-in-10,000, and only about 120 people *in total* were expected to be exposed to such risks. Far more people are exposed to greater than 1-in-10,000 lifetime excess cancer risks from Denka's chloroprene emissions.

- Anticipated trial testimony of Dr. Ila Cote, Dr. Nyesha Black, and Dr. John Vandenberg.

49.    The EPA has issued a "Proposed Rule"[2] regarding chloroprene and other hazardous air pollutants. A final rule will be signed on or before March 29, 2024, as required by consent decree. *See Envt'l Integrity Project et al. v. Michael Regan, Case 1:20-cv-03119; Concerned Citizens of St. John et al. v. Michael Regan*, Case 1:21-cv-03063, Joint Consent Decree Regarding Group I Polymers and Resins Claims (Aug. 24, 2022). In the Proposed Rule, the EPA made no finding under 42 U.S.C. § 7412(f)(4) that Denka's chloroprene emissions do not constitute an imminent endangerment. *See* 88 Fed. Reg. 25,080 (containing no proposed determination whether imminent endangerment exists). Denka can point to no language in the proposed rule that constitutes a contrary finding because the proposed rule contains no such

---

[2] *See New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*, 88 Fed. Reg. 25,080 (Apr. 25, 2023) (the "Proposed Rule").

finding, and has admitted that EPA did not include an explicit finding" that there was no endangerment.

50.     The EPA determined that Denka's chloroprene emissions are causing an imminent and substantial endangerment to public health and welfare, and made this determination public when it filed this action under 42 U.S.C. § 7603 on February 28, 2023, two months before the Proposed Rule was published in the Federal Register. *See* Compl. at 1 (Rec. Doc. 1) (explaining that the United States filed this case "acting at the request of the Administrator of the United States Environmental Protection Agency"). That is the only determination the EPA reached regarding whether Denka's chloroprene emissions are presenting an imminent and substantial endangerment.

**F.  Air Monitoring Shows Average Chloroprene Levels Consistently Much Greater than 0.2 μg/m³.**

51.     Denka's chloroprene is in St. John the Baptist Parish's air. People need to breathe that air. Chloroprene emissions drift across the Facility's fenceline and into LaPlace, Reserve, and Edgard, Louisiana. These emissions reach the nearby residential neighborhoods, schools, and a hospital. People inevitably breathe these emissions, allowing chloroprene to enter their bodies.

- Anticipated trial testimony of Dr. Nyesha Black, Dr John Vandenberg, and Dr. Ila Cote.

- Denka's Ans. ¶ 33.

52.     Chloroprene metabolites have been detected in urine samples given by Parish residents, confirming internal exposure the Denka's chloroprene emissions.

- Anticipated trial testimony of Dr. Ila Cote.

53.     A substantial, multi-year set of air monitoring data shows that thousands of people, including infants, young children, and adults, living in communities surrounding Denka's Facility are being exposed to long-term average airborne chloroprene levels that are between two

14

and approximately thirteen times greater than 0.2 μg/m³. Chloroprene concentrations greater than 0.2 μg/m³ extend about two-and-a-half miles from Denka's Facility.

- Denka's Ans. to Compl. ¶¶ 9, 10, 45, 48, 51 (ECF No. 22).
- Anticipated trial testimony of Dr. John Vandenberg, Jiayang Chen, and Richard Wayland.

54.    In mid-to-late 2016, the EPA and Denka both began monitoring chloroprene concentrations in the air around Denka's Facility. *See* Denka's Ans. ¶¶ 9, 44, 46. Two monitoring networks (one operated by Denka, the other by the EPA) were installed. *See id*. These monitors used steel canisters to take 24-hour samples, using an EPA monitoring method called "Method TO-15."  This TO-15 monitoring was intended to better understand the amount of chloroprene in the air near Denka's Facility and to better characterize the associated health risks to the surrounding communities. Air monitors were installed in residential neighborhoods near the Facility and near schools close to the Facility, including the Fifth Ward Elementary School and East St. John High School. *See id*.

- Anticipated trial testimony of Dr. John Vandenberg.

55.    Until the EPA stopped using its original TO-15 monitors in mid-2020, both the EPA's and Denka's TO-15 monitors gathered 24-hour air samples to measure for chloroprene every few days. The EPA's six TO-15 monitors were located in a rough ring outside the Facility's property line. Denka's six TO-15 monitors, which continue to collect samples, are located at points on the Facility's property line that are close to, but not exactly the same as, the EPA's monitors.

- Anticipated trial testimony of Dr. John Vandenberg.

56.    TO-15 monitors provide high-quality direct air concentration measurement for 24-hour collection periods, now every five days. Denka's existing TO-15 monitors are capable of

reliably and accurately measuring high concentration events sampled during collection periods. High concentrations are important to estimating cancer risk to the exposed population near Denka's Facility because a few high or very high concentrations (*a.k.a.*, "spikes"), such as have been measured at TO-15 monitors deployed near the Denka Facility, can lead to the accrual of lifetime cancer risk that is similar to the lifetime cancer risk from many instances of lower concentrations.

- Anticipated trial testimony of Dr. John Vandenberg.

57.     In January 2022, Denka also deployed 18 diffusion tube air monitors – a different type of monitor than the six 24-hour canisters – around the Facility's fenceline. *See* Denka's Ans. ¶ 49. Three additional diffusion tube monitors were installed later that year (for a total of 21 diffusion tube monitors). *See id*. These new "passive" monitors measure the ambient air concentration of chloroprene over a two-week sampling period, using an EPA monitoring method called "Method 325." *See id*. Consistent with the results of the EPA's and Denka's 24-hour TO-15 air sampling, through late December 2023, many diffusion tube sampling locations are measuring average chloroprene concentrations greater than 0.2 $\mu$g/m$^3$. Two-week average concentrations of chloroprene greater than 0.2 $\mu$g/m$^3$ continue to occur near residential areas. *See id*.

- Anticipated trial testimony of Dr. John Vandenberg.

58.     Method 325 monitors provide a calculated concentration for a two-week collection period at the 21 locations along the Facility's fenceline.[3] The large array of Method

---

[3] The Method 325 monitoring method is an indirect monitoring method, meaning, the target air pollutant – here, chloroprene – is diffused into what is called a "passive sampler tube." Inside the tube, the chloroprene is adsorbed (or sticks) to a sorbent material. Denka's Method 325 monitors use a sorbent called "Carbopack X." The sorbent is then later thermally desorbed (*i.e.*, heated) in a laboratory to extract the target air pollutant (the "analyte") for chemical analysis. An uptake

325 monitors provides information on chloroprene concentrations at more locations than measured by the TO-15 monitors – essentially 360 degrees around the Facility. However, intermittent high concentration events ("spikes") may be underestimated by Method 325 during collection periods because the currently employed uptake rate does not accurately reflect the monitoring tube sorbent's collection efficiency when highly variable chloroprene concentrations occur over the two-week sampling period. In other words, Method 325 may miss the full magnitude of an emission spike.

- Anticipated trial testimony of Dr. John Vandenberg.

59. The TO-15 air monitors generated a robust and reliable set of data to assess human exposure and the associated public health risks from Denka's chloroprene emissions. Denka's TO-15 monitoring continue to do so. The available ambient air monitoring data is one of the best sources of exposure data for estimating inhalation cancer risks from Denka's chloroprene emissions.

- Anticipated trial testimony of Dr. John Vandenberg.

60. The results from both Denka's and the EPA's air monitoring networks closely align and consistently show average airborne chloroprene concentrations in the communities surrounding Denka's Facility that are multiples greater than 0.2 $\mu g/m^3$. These high concentrations of chloroprene persist even though Denka has substantially cut the Facility's chloroprene emissions after purchasing it.

- Anticipated trial testimony of Dr. John Vandenberg.

---

rate, which is the chemical-specific rate at which a chemical is adsorbed to the sorbent, is required to calculate the concentration using Method 325. The uptake rate is a source of inaccuracy in Method 325 monitoring.

61.     Some of the highest chloroprene concentrations detected by ongoing air monitoring have been near homes and a local elementary school. The hundreds of people living within one mile of the Pontchartrain Works Site (primarily near the EPA's former "Chad Baker" and Denka's "Western" TO-15 monitors) have been exposed to the highest average levels of chloroprene – approximately thirteen times greater than 0.2 μg/m$^3$ since April of 2018.[4]

- Anticipated trial testimony of Dr. John Vandenberg and Dr. Nyesha Black.
- Denka's Ans. ¶¶ 10, 51.

62.     One of the highest chloroprene concentrations (almost 600 times greater than 0.2 ug/m$^3$) was measured on Monday, October 10, 2022 – a school day – at Denka's Western Site, just a few hundred feet from the Fifth Ward Elementary School. Even the lowest measured average value for Denka's five closest monitors (out of the six total) is about four times greater than 0.2 μg/m$^3$.

- Anticipated trial testimony of Dr. John Vandenberg.

63.     Current emissions of chloroprene from Denka's Facility continue to expose thousands of people, including vulnerable subpopulations, near Denka's Facility to unacceptably high lifetime excess cancer risks. TO-15 air monitoring data through December of 2023 demonstrate that the current long-term (since April 2018) and the most recent annual average concentrations at locations near the Denka Facility, remain greater than 0.2 μg/m$^3$. Method 325

---

[4] Although both TO-15 monitoring networks began sampling by late 2016, Denka completed a series of air pollution control projects required by a 2017 Administrative Order on Consent with the Louisiana Department of Environmental Quality ("Louisiana DEQ"). In particular, Denka commenced stable operations of a Regenerative Thermal Oxidizer ("RTO") – a large piece of air pollution control equipment – which substantially reduced Denka's chloroprene emissions in April 2018. Examining post-April 2018 air monitoring data therefore provides a more accurate picture of current chloroprene emissions and the resulting exposure to the surrounding community. Including pre-April 2018 air monitoring data would substantially increase the average concentrations listed (and the associated estimated cancer risks from exposure to those concentrations).

air monitoring data through December of 2023 demonstrate that the most recent annual average concentrations for some of the monitor sites are greater than 0.3 μg/m$^3$.

- Anticipated trial testimony of Dr. John Vandenberg.

**G. Parish Residents Are Being Exposed To Unacceptably High Cancer Risks From Denka's Chloroprene Emissions.**

64.     The EPA analyzed many factors and reliable "real-world" evidence to determine that the lifetime excess cancer risks that Parish residents suffer from Denka's chloroprene emissions are unacceptably high. For example, the EPA considered:

- The years-long duration of greater-than-0.2 μg/m$^3$ long-term average air concentrations measured at multiple monitoring sites encircling the Facility.

- The magnitude and frequency of high concentration chloroprene "spikes" and their consequent risks, particularly to children.

- How greatly lifetime excess cancer risks exceed 1-in-10,000 in the communities near the Facility, including from historical, "pre-Denka" emissions.

- The alarmingly fast rate at which the surrounding population, and particularly children, will reach and exceed a 1-in-10,000 lifetime excess cancer risk.

- The multiple sets of high-quality air monitoring data that confirm real-world exposure conditions in the communities.

- The consistency of results between the EPA's and Denka's air monitoring networks.

- Urinalysis testing results from Parish residents showing actual internal bodily exposure to Denka's chloroprene.

- The size and demographics of the actual population living near Denka's Facility, including the number of young children and other vulnerable sub-populations, and residential occupancy tenures.

- The proximity of the population exposed to Denka's emissions, including homes and schools.

- Anticipated trial testimony of Dr. John Vandenberg, Dr. Nyesha Black, and Dr. Ila Cote.

65.     At the long-term average chloroprene concentrations that many people living in the Parish are currently being exposed to, they will exceed (if they have not already exceeded) a 1-in-10,000 lifetime excess cancer risk far sooner than over an assumed 70-year lifetime.[5]

- Anticipated trial testimony of Dr. John Vandenberg, Jiayang Chen, Richard Wayland, and Dr. Ila Cote.

66.     The speed at which chloroprene-related cancer risks accrue in infants and young children is particularly alarming. Infants who are born today in LaPlace and Reserve, Louisiana and consistently breathe the current average levels of chloroprene detected by the "Western Monitor" (by the neighborhood just west of Denka's Facility) will suffer double their lifetime acceptable excess cancer risk from chloroprene exposure by approximately their second birthday – approximately 68 years sooner than they should amass half as much. A two-year old who moves into that neighborhood and attends the Fifth Ward Elementary School will amass their lifetime acceptable excess cancer risk before they can legally drive a car. And a teenager living there who begins breathing Denka's chloroprene emissions at age 16 will surpass their lifetime acceptable excess cancer risk decades before the end of their assumed 70-year lifetime.

- Anticipated trial testimony of Dr. John Vandenberg.

67.     TO-15 monitor data demonstrate that the most recent twelve-month ("rolling annual") average concentrations at locations near the Denka Facility are more than 2 to 5 times greater than 0.2 $\mu g/m^3$, the 1-in-10,000 lifetime cancer risk target concentration. However, Denka's chloroprene emissions are variable year-to-year. Therefore, only looking at the previous

---

[5] Chloroprene emissions and the consequent cancer risks to the public were even higher before Denka substantially cut its emissions pursuant to the 2017 Administrative Order on Consent with the Louisiana DEQ. The cumulative health impacts from the Facility's decades of higher historical emissions do not disappear because Denka's current emissions are now lower.

year of air monitoring data does not necessarily predict the Facility's future chloroprene emissions or resulting ambient air concentrations.

- Anticipated trial testimony of Dr. John Vandenberg.

68.    More than ten thousand Parish residents, including as many as one thousand that are younger than five years old, are being exposed to a serious risk of harm from Denka's carcinogenic chloroprene emissions.

- Anticipated trial testimony of Dr. Nyesha Black, Dr. Ila Cote, and Dr. John Vandenberg.

**H.  The United States Has Taken Steady Action To Evaluate And Reduce The Cancer Risks Parish Residents Suffer From Denka's Chloroprene Emissions.**

69.    The EPA's invested substantial time to develop robust, representative monitoring data to support evaluating the lifetime excess cancer risks from the Facility's chloroprene emissions. Air monitoring sufficient to determine long-term average chloroprene concentrations in the communities surrounding the Facility did not start until May 2016.

- Anticipated trial testimony of Dr. John Vandenberg.

70.    It was appropriate to focus on post-April 2018 air monitoring data. At that time, the Facility's RTO started stable operations. And it takes about a year of air monitoring data to develop a representative picture of longer-term exposure concentrations.

- Anticipated trial testimony of Dr. John Vandenberg.

71.    The EPA diligently considered Denka's four petitions challenging chloroprene's carcinogenic potency. Between 2016 and 2022, Denka asked the EPA to thoroughly consider revising the 2010 IRIS Assessment in four requests under the Information Quality Act. The EPA and Denka collaborated to try to develop a valid, reliable PBPK model for chloroprene and the EPA committed substantial resources to provide quality assurance guidance on the development

21

of a PBPK model for chloroprene. That process took roughly three years, only finishing in October of 2022.

- Anticipated trial testimony of Dr. Dustin Kapraun and Dr. Kris Thayer.

72.     On January 6, 2017, Denka entered into the 2017 Administrative Order on Consent with the Louisiana DEQ, with EPA's guidance and support. *See* Denka's Ans. ¶ 34. Under the 2017 Administrative Order on Consent Denka reduced chloroprene emissions from the Facility by an estimated 85 percent (from approximately 118 tons per year ("tpy") to 18 tpy). *See id.*

## I.   The United States' Requested Injunction.

73.     The United States requests that the Court abate the unacceptably high lifetime excess high cancer risks to Parish residents living near Denka's Facility by requiring that Denka take the following actions (the "Injunction"):

a.   <u>Annual average chloroprene concentrations</u>: Denka must immediately cease chloroprene and Neoprene production at the Facility until Denka can demonstrate that it is able to maintain annual average chloroprene concentrations:

- At or below 0.3 µg/m$^3$ at each of Denka's existing set of 21 passive diffusion tube monitors using EPA Method 325B; and

- At or below 0.2 µg/m$^3$ in the areas surrounding the Facility at each of Denka's six 24-hour Method TO-15 canister monitor locations.

b.   <u>Initial showing</u>: After the Facility restarts operations or, if Denka demonstrates that it can meet the required ambient air concentrations without a Facility shutdown, Denka must calculate a 3-month rolling average chloroprene concentration once 3-months of monitoring data are available, and a rolling annual average chloroprene

concentration, once 12 months of data are available after restarting operations, at each

monitor (in both monitoring systems) after each monitoring event.

   c.   <u>Corrective action</u>: based on the calculated average concentrations, Denka must

take the following actions:

- If any 3-month average is above 0.3 ug/m$^3$ for any Method 325B passive diffusion tube or above 0.2 ug/m$^3$ for any Method TO-15 cannister samples, Denka must within one day of receiving the monitoring results undertake root cause analysis and complete corrective actions as soon as is feasible in order to demonstrate to the Court and the EPA that the Facility will achieve the required annual average chloroprene concentrations.

- If any 12-month average is above 0.3 ug/m$^3$ for any Method 325B passive diffusion tube or above 0.2 ug/m$^3$ for any Method TO-15 cannister samples, Denka must shut the Facility down or reduce chloroprene and Neoprene production until it makes the necessary physical changes to the Facility or necessary changes in process operations in order to demonstrate to the Court and the EPA that that the Facility will achieve the required annual average chloroprene concentrations.

   d.   <u>Monitoring methods</u>: Denka must follow its existing monitoring frequency and

protocols for both monitoring networks except that, if the EPA establishes a two-week

chloroprene uptake rate for EPA Method 325B monitoring, Denka must comply with that

uptake rate uptake instead of the existing 24-hour 0.55 ml/min uptake rate.

   e.   <u>Access</u>: Denka must provide the United States and its employees, representatives,

and contractors, with immediate, unimpeded access to Denka's Neoprene manufacturing

operations at the Site, and to areas with any ancillary operations and facilities related to

the Facility that are under Denka's control, to monitor compliance with the Injunction,

including by conducting inspections, monitoring, and sampling to evaluate the

generation, storage, handling, and emission of chloroprene at and from the Facility.

f.   <u>Landlord consent</u>: Denka must make all necessary efforts to secure DuPont Specialty Products' consent under the terms of their Ground Lease for all construction and other necessary actions for Denka to comply with the Injunction and any subsequent order issued by the Court in this matter.

g.   <u>Reporting</u>: On or before the first day of each month following the entry of the Injunction, Denka must file with the EPA a "Monthly Report" regarding Denka's progress in complying with the Injunction.  The Monthly Report must include:

- A detailed description of Denka's progress in complying with each of the Injunction's requirements, including a narrative description of the specific steps Denka has taken to meet each requirement;

- A detailed description of any non-compliance with the Injunction, including a description of the dates, times, and locations of the non-compliance, an explanation of the non-compliance and its underlying causes, and the proposed measures and implementation schedule Denka is taking to correct the non-compliance; and

- All monitoring data collected by Denka or its contractors in the prior month from its 21 diffusion tube monitors located on the Facility's perimeter, its six 24-hour canisters, and any other monitoring data collected to assess or quantify the Facility's chloroprene emissions or Denka's compliance with the Injunction.

74.   The United States also requests that the Court require DuPont Specialty Products to grant its consent, authorize, and otherwise not delay or impede Denka from its efforts in performing any action required by the Court's Injunction. This prohibition includes any delays in approving activities under the Ground Lease, including on-site construction.

75.   The Injunction is narrowly focused on reducing the Facility's chloroprene emissions and their associated unacceptably high cancer risks to Parish residents living near Denka's Facility. The 0.2 ug/m$^3$ average concentration target is consistent with a 1-in-10,000 lifetime excess cancer risk level. The 0.3 ug/m$^3$ average concentration target is an appropriate

24

methodology-based target for reducing the excess cancer risks associated with inhalation exposure to Denka's chloroprene emissions.[6]

- Anticipated trial testimony of Dr. John Vandenberg.

76.     The Access requirements of the injunction impose little burden on Denka, other than allowing EPA and other personnel to visit the Site.

- Anticipated trial testimony of Chris Meyers.

77.     The requirement to consult with DuPont Specialty Products is already a requirement of the Ground Lease. Requiring DuPont Specialty Products to grants its consent under the Ground Lease for work Denka must perform to comply with the Injunction places only a minimal burden on DuPont Specialty Products. So does refraining from impeding or delaying Denka. DuPont Specialty Products has presented no evidence that it would suffer any dire financial or other business consequences from complying with its requirements under the Injunction.

- Anticipated trial testimony of Jorge Lavastida and DuPont Specialty Products representative.

78.     DuPont Specialty Products has suggested to this Court that "[t]here is no prior actual history of EID or Specialty not giving consent to Denka to perform any construction activities necessary to comply with any orders to reduce emissions or take any other action." DuPont Specialty Products' Mem. In Supp. of Mot. to Dismiss at 3 (ECF No. 49-1); *see also id*. at 6 and 8-9.

- Anticipated trial testimony of DuPont Specialty Products representative.

---

[6] Although the EPA will soon publish final amendments to several Clean Air Act rules, which include requirements that apply to Denka's chloroprene emission sources, it is uncertain when those requirements will ultimately come into effect. Denka has indicated it plans to challenge the final rule once it is published, pursuant to 42 U.S.C. § 7607(b).

78.    The Reporting requirements will impose only a limited burden on Denka to prepare and submit reports. Given that the TO-15 and Method 325 monitoring networks required by the Injunction are already operating, and Denka currently submits reports of this air monitoring data reports to the EPA, the required information is already available to be used for submitting the required reports and there is little additional burden.

- Anticipated trial testimony of Dr. John Vandenberg and Chris Meyers.

i.    There are a number of technically feasible emissions control options that Denka can use to decrease its chloroprene emissions and comply with the Injunction.

79.    There are a number of technically feasible emissions control options that Denka can use to decrease its chloroprene emissions and comply with the Injunction. Options for capturing chloroprene emissions include technologies such as ventilation hoods and enclosures. Controlling the captured emissions can be accomplished with devices such as a regenerative thermal oxidizer ("RTO"), additional wastewater aeration tanks, the use of enhanced Leak Detection and Repair ("LDAR") techniques, and improved maintenance practices, such as during tank cleanings.

- Anticipated trial testimony of Jeffrey Harrington and Chris Meyers.

80.    Denka has not evaluated whether reducing chloroprene or Neoprene production would enable it to reduce its chloroprene emissions or achieve the ambient air concentrations required by the Injunction. Continuing to produce Neoprene at a reduced rate could serve to limit potential losses in revenue, employees, suppliers, and customers that Denka claims may result from the need to shut down the Facility to install additional air pollution control equipment.

- Anticipated trial testimony of Jeffrey Harrington and Chris Meyers.

81.     Based on air dispersion modeling, there are different emissions control scenarios that Denka could deploy to achieve the average chloroprene concentrations required by the Injunction.[7]

- Anticipated trial testimony of Jeffrey Harrington and Chris Meyers.

82.     Volatile organic compounds ("VOCs") and volatile organic hazardous air pollutants ("VOHAPs") are broad pollutant categories that include many individual hydrocarbon compounds that can be controlled and monitored using the same methods. Chloroprene is both a VOC and VOHAP. For that reason, air pollution control technologies (such as thermal oxidizers) and work practices (such as LDAR procedures) that reduce or eliminate emissions of other types of VOCs and VOHAPs are also effective at reducing or eliminating chloroprene emissions.

- Anticipated trial testimony of Jeffrey Harrington and Paul Casarez.

83.     Denka can make the demonstration required by the Injunction using known air modeling tools.

- Anticipated trial testimony of Jeffrey Harrington.

84.     With sufficient time and planning, Denka can safely manage the workload and process safety considerations associated with complying with the Injunction, including any necessary shutdowns, mothballing, and restarting of the Facility.

- Anticipated trial testimony of Paul Casarez and Jim Moore.

85.     Denka influences the duration of any shutdown by choosing how much time and resources it or Denka's parent company, Denka Co. Ltd., dedicates to complying with the

---

[7] Air quality dispersion modeling uses computerized mathematical formulations to simulate the atmospheric processes that disperse a pollutant emitted by a source. A dispersion model predicts ambient air quality concentrations at user-selected downwind receptor locations based on inputs that characterize the emissions source and meteorology.

Injunction. Under the 2017 Administrative Order on Consent with the Louisiana DEQ, Denka successfully managed and completed at least four parallel significant air pollution control projects within approximately two years, demonstrating that Denka is capable of such project management on expedited schedules when it chooses to do so.

- Anticipated trial testimony of Jeff Harrington, Paul Casarez, Jorge Lavastida, and Chris Meyers.

86.    Denka has already spent many months evaluating available candidate control technologies to reduce its chloroprene emissions. This planning will shorten the amount of time Denka would potentially need to remain shut down in order to install new control technologies and demonstrate that it can comply with the Injunction. A shortened period of shutdown, in turn, may help to limit potential losses in revenue, employees, suppliers, and customers that Denka claims may result from the need to shut down the Facility to install additional air pollution control equipment.

- Anticipated trial testimony of Jeffrey Harrington and Chris Meyers.

87.    Substantial portions of the planning, design, and procurement work necessary to comply with the Injunction does not require that the Facility be operational. In fact, portions of the necessary construction and installation work would require that the Facility not be operational.

- Anticipated trial testimony of Jeffrey Harrington, Chris Meyers, Paul Casarez, and Jim Moore.

88.    Denka can use its twice-a-year, several week-long turnaround periods to install the types of large air pollution control equipment that Denka may need to comply with the Injunction. For example, in 2017, Denka completed final installation of the Regenerative Thermal Oxidizer under the 2017 Administrative Order on Consent during a turnaround period.

Denka personnel, along with resident and non-resident contractors hired by Denka, perform maintenance or other assignments during turnaround periods.

- Anticipated trial testimony of Jeff Harrington, Jorge Lavastida, Chris Meyers, and Paul Casarez.

89.     Installing air pollution control equipment and implementing new maintenance procedures costs money, as would temporarily shutting down Denka's Facility, if that is needed. Denka's parent corporation, Denka Co. Ltd., provides Denka's annual capital expenditure budget, and can provide additional monetary resources, as well as technical support personnel to assist Denka comply with the Injunction.

- Anticipated trial testimony of Jorge Lavastida.

90.     The decision whether to permanently shut down the Facility would involve Denka's parent company, Denka Co. Ltd., Denka has only speculated that its alleged financial losses from complying with the Injunction would be ruinous.

- Anticipated trial testimony of Jorge Lavastida.

91.     Denka currently sells all its Neoprene product to its parent company, Denka Co. Ltd. pursuant to a manufacturing and distribution agreement. Denka might be able to increase prices of some of its products to offset some of the additional costs of complying with the Injunction if Denka engaged directly in arms-length transactions with its customers.

- Anticipated trial testimony of Ken Stern.

92.     Denka has not substantiated its alleged reputational harms or the expected fallout to its finances, customer base, suppliers, or staffing levels. The number of Denka's employees and onsite contractor staff has remained steady, if not slightly grown, since Denka purchased the Facility in 2015. Mr. Lavastida's testimony about expected impacts to the Facility's workforce is based on hearsay, and thus unfounded.

- Anticipated trial testimony of Jorge Lavastida and Michelle Helfrich.

93.    Denka offers nothing sufficiently pervasive or concrete to substantiate its alleged reputational harms or the expected financial fallout. For example, Denka's current plant manager, Michelle Helfrich, was unaware of any negative reputation about the Facility before starting to work for Denka until her recruiter directed her to investigate available press about the Facility and the efforts to reduce its chloroprene emissions. Ms. Helfrich still believed that leaving her job at a nearby chemical manufacturing plant and coming to work for Denka presented a better employment opportunity.

- Anticipated trial testimony of Michelle Helfrich.

94.    Denka does not suspend or fire its employees during turnarounds. Denka personnel, along with resident and non-resident contractors hired by Denka, perform maintenance or other assignments during turnaround periods, often working double-shifts. The capital projects work required to comply with the Injunction would represent employment opportunities for Denka's personnel.

- Anticipated trial testimony of Jorge Lavastida.

95.    To comply with the injunction against it, Denka might need to perform onsite construction or other work that requires DuPont Specialty Products' consent under the Ground Lease.  Accordingly, Denka may need DuPont Specialty Products' permission or cooperation to comply with the Court's orders in this matter.

- Anticipated trial testimony of Jorge Lavastida and DuPont Specialty Products representative.

ii.      The two monitoring networks are necessary to reliably monitor Denka's <u>compliance with the Injunction</u>.

96.     Achieving and maintaining a target rolling annual average 0.3 μg/m$^3$ chloroprene concentration at each of Denka's 21 fenceline (passive) Method 325 two-week monitors and a rolling annual (12-month) average 0.2 μg/m$^3$ chloroprene concentration at each of Denka's 24-hour (active) community TO-15 monitors is necessary to reliably reduce the unacceptably high long-term excess cancer risks from ongoing public inhalation exposure to Denka's chloroprene emissions. Both monitoring networks provide necessary information for estimating lifetime cancer risks from Denka's chloroprene emissions.

- Anticipated trial testimony of Dr. John Vandenberg.

97.     Both sets of monitoring networks (TO-15 and Method 325) are necessary to confirm that ambient air concentrations of chloroprene in the community surrounding the Denka Facility are reliably meeting the required average chloroprene concentration levels. Given the relative strengths and limitations of the TO-15 active air monitors and Method 325 passive air monitors, as well as given the monitoring networks' respective geographic coverages (and proximities to human receptors, *i.e.*, the people living near Denka's Facility), each monitoring network is independently necessary for generating reliable and representative data from which to estimate the lifetime excess cancer risks that the public is exposed to on an ongoing basis from Denka's chloroprene emissions.

- Anticipated trial testimony of Dr. John Vandenberg.

98.     Because TO-15 monitors more reliably capture high concentration events, it is important that the TO-15 monitors be employed at the commencement of the near-term three-month rolling averaging period required by the Injunction to accurately measure chloroprene emission "spikes" from Denka's Facility that the Method 325 passive monitors may

31

underestimate because of limitations with the "uptake rate" of the passive monitors sorbent material.

- Anticipated trial testimony of Dr. John Vandenberg.

99.    The Injunction uses existing monitors, which have several advantages. They have already been installed and are operational. Denka is accustomed to using them. Laboratory capability to analyze the air monitoring samples is available, and the monitors give sufficient geographic coverage for the Court to conclude that the required 0.2/0.3 μg/m$^3$ rolling averages are being reliably achieved and maintained within the population that has historically been exposed to long-term chloroprene concentrations that are greater than 0.2 μg/m$^3$.

- Anticipated trial testimony of Dr. John Vandenberg.

iii.    It is reasonable to use 0.3 μg/m$^3$ as a methodology-based target for the Method 325 monitors and to use 0.2 μg/m$^3$ as both a methodology- and risk-based target for the TO-15 monitors.

100.    The rationale for a 0.3 μg/m$^3$ target for the Method 325 monitors based on the capabilities of that measurement methodology is appropriate and well-described by the EPA. A "fenceline" action level of 0.3 μg/m$^3$ is appropriate because it is equal to three times the representative detection limit (RDL).

- Anticipated trial testimony of Dr. John Vandenberg.

101.    The rationale for a target chloroprene concentration of 0.2 μg/m$^3$ for the TO-15 monitors is appropriate based on both the consideration of an acceptable lifetime excess cancer risk level – 1-in-10,000 – and on methodological considerations. It is reasonable to use 0.2 μg/m$^3$ as a rolling annual average chloroprene concentration target as measured by the TO-15 monitors deployed around the Denka Facility, in order to ensure that the population near Denka's Facility is not exposed to greater than 1-in-10,000 lifetime excess cancer risks.

32

- Anticipated trial testimony of Dr. John Vandenberg.

102.     It is reasonable to use a rolling annual average concentration to determine an accurate and representative assessment of exposure to Denka's ongoing chloroprene emissions. It is consistent with EPA guidance to use an annual period of data gathering for a chronic exposure assessment in order to account for meteorological patterns and facility operating cycles.

- Anticipated trial testimony of Dr. John Vandenberg.

103.     Commencing a rolling three-month average monitoring period after three months of monitoring data are available is a reasonable near-term duration of time for Denka to demonstrate compliance with these target chloroprene concentrations in advance of having a full year of monitoring data to generate a complete annual average.

- Anticipated trial testimony of Dr. John Vandenberg.

### III.    CONCLUSIONS OF LAW

**A.     Legal Background: The *eBay* Standard Governs The Requested Injunction.**

104.     When considering injunctive relief, a court evaluates whether: (1) [the plaintiff] has suffered irreparable injury; (2) . . . remedies available at law, such as monetary damages, are inadequate to compensate for the injury; (3) . . . considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) . . . the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange*, L.L.C., 547 U.S. 388, 391 (2006).

105.     The standards for a permanent injunction and a preliminary injunction are "'essentially the same.'" *4 Aces Enterprises, LLC v. Edwards*, 479 F. Supp.3d 311, 322 (E.D. La. 2020) (quoting *Winter v. Natural Resources Def. Council*, 555 U.S. 7, 32 (2008)).

106. In addition to the *eBay* factors, several principles guide the crafting of remedies in a case like this. "The Supreme Court emphasize[s] that when a court is called upon to enforce a federal statutory injunction, its reliance upon the traditional practices of equity must be 'conditioned by the necessities of the public interest which Congress has sought to protect.'" *United States v. City of Painesville, Ohio*, 644 F.2d 1186, 1193 (6th Cir. 1981) (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 330 (1944)); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 319 (1982).

107. The Court's traditionally broad discretion in deciding whether to grant injunctive relief is consequently shaped by the "'judgment of Congress, deliberately expressed in [the] legislation.'" *See United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001) (quoting *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 551 (1937)).

108. Here, the Court's discretionary injunctive powers are "tempered by its obligation to carry out the congressional mandate contained in the Clean Air Act." *City of Painesville*, 644 F.2d at 1193. Congress has "deliberately expressed" in 42 U.S.C. § 7603 that enjoining endangerments to public health and welfare should be given paramount importance "[n]othwithstanding" any other part of the Clean Air Act. *See* 42 U.S.C. § 7603.

109. The Court is guided by the principle that, when addressing a statutory mandate, "enforcement is preferable to no enforcement at all." *Oakland Cannabis Buyers' Co-op.*, 532 U.S. at 497 ("Courts of equity cannot, in their discretion, reject the balance that Congress struck in a statute" or "override Congress' policy choice, articulated in a statute, as to what behavior should be prohibited"). The Court must use 42 U.S.C. § 7603's authority to abate the endangerment. *See id*. at 497-98; *see also City of Painesville*, 644 F.2d at 1194 (Congress placed "high priority" on controlling air pollution when it enacted the Clean Air Act).

34

110.   A remedy should grant "complete" relief to fulfill the statute's purposes. *Mitchell v. Robert De Mario Jewelry, Inc.*, 361 U.S. 288, 296 (1960) (noting "little room for . . . discretion not to order" equitable reimbursement and that a court either proceeding under general equity powers or the Fair Labor Standards Act has authority to order "legal relief[ ] necessary to do complete justice between the parties.").

111.   The Court must also analyze the individual factors for determining whether to award injunctive relief in a light more favorable to the United States because the requested injunction seeks to protect a statutory public interest. *See, e.g.*, *Maine People's All. and Nat. Res. Def. Council v. Mallinckrodt, Inc.*, 471 F.3d 277, 296 (1st Cir. 2006) (explaining that the factors for an injunction are "inevitably colored by the nature of the case and the purposes of the underlying environmental statute"); s*ee also United States v. Marine Shale Processors*, 81 F.3d 1329, 1358-59 (5th Cir. 1996) (emphasizing the "the extraordinary weight courts of equity place upon the public interests in a suit involving more than a mere private dispute") (citing *Virginian Ry.*, 300 U.S. at 552).

112.   Still, "[a]n injunction must be tailored to remedy specific harm shown." *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982). The injunction should be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

**B.   42 U.S.C. § 7603 – Clean Air Act Section 303.**

113.   Section 303 of the Clean Air Act, 42 U.S.C. § 7603, authorizes a civil action in the appropriate United States district court to abate an imminent and substantial endangerment to public health or welfare:

> Notwithstanding any other provision of this chapter, the Administrator [of the EPA], upon receipt of evidence that a **pollution source** or combination of sources . . . is presenting an **imminent and substantial endangerment** to public health or

welfare . . . may bring suit on behalf of the United States in the appropriate United States district court to immediately restrain any **person causing or contributing to the alleged pollution** to stop the emission of air pollutants causing or contributing to such pollution or to take such other action as may be necessary.

42 U.S.C. § 7603 (emphasis added).

114.    42 U.S.C. § 7603 is an endangerment provision that, like its counterparts in several other environmental statutes, broadly grants "appropriate government officials the right to seek judicial relief or take other appropriate actions to avert imminent and substantial threats to the environment or public health." *United States v. Reilly Tar & Chem. Corp.*, 546 F. Supp. 1100, 1107 (D. Minn. 1982). The statute's key portion authorizes a civil action to abate such threats from air pollution. *See* 42 U.S.C. § 7603 (authorizing "district court to immediately restrain any person causing or contributing to the alleged pollution to stop the emission of air pollutants…or to take such other action as may be necessary").

115.    The current version of 42 U.S.C. § 7603 was enacted in 1990, after the Benzene NESHAP policy was issued. *See* Pub. L. No. 101-549, § 704(1)-(5), 104 Stat 2399 (Nov. 15, 1990). The 1990 Clean Air Act Amendments "greatly increased the utility of § 303." *See* EPA's 303 Guidance at 2 (explaining that the 1990 Clean Air Act Amendments "eliminated the requirement for state or local inaction as a prerequisite to EPA initiating action under § 303."); *see also id.* at 2 and 3 n.6 (citing legislative history explaining that "one reason for amending § 303 was to make it similar to other endangerment authorities.").

i.    The text of 42 U.S.C. § 7603 empowers this Court to immediately enjoin endangerments to public health and welfare caused by air pollution.

116.    The text of 42 U.S.C. § 7603 empowers this Court to act when presented with compelling evidence that a pollution source, like Denka's Facility, is presenting an imminent and substantial endangerment to public health or welfare. *See United States v. New-Indy Catawba, LLC*, No. 0:21-CV-02053-SAL, 2022 WL 18357257, at *10 (D.S.C. Sept. 15, 2022), *appeal*

36

*docketed sub nom., Enrique Lizano v. New-Indy Catawba, LLC*, No. 23-1052 (4th Cir. Jan. 17, 2023).

117.    Unlike the Clean Air Act's other enforcement authorities (42 U.S.C. § 7413(a)-(d)), the United States need not prove that an underlying statutory or regulatory requirement was violated in order to invoke 42 U.S.C. § 7603. *See, e.g., New-Indy Catawba*, 2022 WL 18357257, at *10; EPA, *Guidance on Section 303 of the Clean Air Act* at 1 (April 1999) ("EPA 303 Guidance") (noting that 42 U.S.C. § 7603 "is a 'gap-filling' authority, providing a basis for injunctive relief… regardless of a pollution source's compliance or noncompliance with the [Clean Air] Act").

118.    42 U.S.C. § 7603 empowers this Court to immediately enjoin endangerments to public health and welfare caused by air pollution "[n]otwithstanding any other provision of [the Clean Air Act]." Because of its unmistakable clarity, as well as because of Congress' clearly expressed intent in the legislative history for comparable statutes, courts have correctly found that analogous statutory language is "'intended to override *any* limitations upon the Administrator's authority found elsewhere' in the Act." *Trinity Am. Corp. v. U.S. EPA*, 150 F.3d 389, 394-95 (4th Cir. 1998) (citing Safe Drinking Water Act legislative history) (emphasis in original).

119.    The plain language of 42 U.S.C. § 7603, as well as the related legislative history, instructs the Court to "giv[e] paramount importance to the sole objective of the public health" and "to overlook technological and economic feasibility" in the name of achieving this objective. *Trinity Am. Corp.*, 150 F.3d at 399 (citing *United States v. Hooker Chem. & Plastics Corp.*, 749 F.2d 968, 988 (2d Cir. 1984)); *see also Apex Oil*, 2008 WL 2945402, at *79 (protecting human

health and the environment is the "primary intent" of the Resource Conservation and Recovery

Act's ("RCRA's") endangerment statute); *Reilly Tar*, 546 F. Supp. at 1110.

120.    The authority that 42 U.S.C. § 7603 grants to the EPA to act to abate an imminent

and substantial endangerment to public health and welfare from air pollution takes precedence

over any other Clean Air Act regulatory authority that the EPA has, including under 42 U.S.C.

§ 7412. Congress amended 42 U.S.C. §§ 7412 and 7603 at the same time. *See* Pub. L. No. 101-

549, 104 Stat. 2681 (Section 704 amending Section 303 of the Clean Air Act); *see also id*. 104

Stat. 2531. Congress wrote no exception into 42 U.S.C. § 7603 for the regulatory authority it

contemporaneously gave the EPA in 42 U.S.C. § 7412.

121.    Denka's proposed interpretation – that 42 U.S.C. § 7603 is subservient to 42

U.S.C. § 7412 – violates the "cardinal principle of statutory construction" that "the language

used by the legislature is intended to have an effect." *Adair v. Troy State Univ. of Montgomery*,

892 F. Supp. 1401, 1407-08 (M.D. Ala. 1995) (citing *Reiter v. Sonotone Corp.*, 442 U.S. 330,

339 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word

Congress used.") and *United States v. Menasche*, 348 U.S. 528, 538-39 (1955)).

122.    Denka's interpretation has also been rejected by at least one court construing a

similar environmental endangerment statute. *See United States v. Waste Indus., Inc.*, 734 F.2d

159, 164 (4th Cir. 1984) (noting RCRA's similar "notwithstanding" language in its endangerment

section, and explaining that the section provides "a remedy . . . whether or not those engaging in

the endangering acts are subject to any other provision of the Act").

123.    42 U.S.C. § 7603 gives the Court jurisdiction to craft "complete relief" in light of

its statutory purposes and the Clean Air Act's broader purposes. There is no limitation in 42

U.S.C. § 7603 suggesting otherwise. *See Mitchell*, 361 U.S. at 291-92; *see also* 42 U.S.C.

38

§ 7401(b)(1); *cf. Mitchell*, 361 U.S. at 291-92 (jurisdiction is "not to be denied or limited in the absence of a clear and valid legislative command"); *see also United States v. ATP Oil & Gas Corp.*, 955 F. Supp. 2d 616, 636 (E.D. La. 2013) (courts' equitable powers are "at their apex when the public interest is involved").

124.    Although few cases discuss 42 U.S.C. § 7603, the Clean Air Act's legislative history is clear that 42 U.S.C. § 7603 is intended "to conform the [EPA's] emergency authority under the [Clean Air Act] to emergency authorities under other environmental laws." S. Rep. No. 101-228 (1989), 1990 U.S.C.C.A.N. 3385, 3753 (citing the imminent and substantial endangerment authorities under RCRA, 42 U.S.C. § 6973(a), the Clean Water Act, 33 U.S.C. § 1364(a), and the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9606(a)).

125.    The legislative history behind these analogous environmental statutes, as well as the caselaw interpreting them, would be the proper tools to understand 42 U.S.C. § 7603 if its plain text was not clear.

ii.      Overexposure to carcinogenic agents, like Denka's chloroprene emissions, is an <u>actionable endangerment</u>.

126.    Congress intended the endangerment statutes to protect against excessive cancer risk despite the inherent uncertainty of whether exposure will materialize into diagnosable cancer. *See, e.g., Reilly Tar*, 546 F. Supp. at 1110 (citing examples of substantial endangerments in the Safe Drinking Water Act's legislative history). Even a latent threat of developing cancer suffices. *See, e.g., Mallinckrodt*, 471 F.3d at 279 n.1 (even if there is "a reasonable prospect that a carcinogen released into the environment today may cause cancer twenty years hence, the threat is near-term even though the perceived harm will only occur in the distant future") (emphasis added).

39

127. Thousands of infants, children, and adults living in St. John the Baptist Parish face the exact types of endangerments that motivated Congress to enact the environmental endangerment statutes, like 42 U.S.C. § 7603.

    iii.      Congress has not excluded any numerical risk threshold from being used to identify what is or is not an imminent and substantial endangerment under the Clean Air Act.

128. Congress has made no finding – explicit or implied – that long-term cancer risks higher than 1-in-10,000 cannot constitute an imminent and substantial endangerment. 42 U.S.C. § 7603 includes no such exemption. Nor do 42 U.S.C. § 7412(d) and (f).[8]

129. The fact that Congress established a nationwide regulatory program under 42 U.S.C. § 7412(f)(2) that includes an examination of whether residual cancer risks are "***less*** than one in ***one million***," in no way means that Congress excluded lifetime excess cancer risks higher than 1-in-***10,000*** from being considered an imminent and substantial endangerment. 42 U.S.C. § 7412(f)(2) (emphasis added).

130. 42 U.S.C. § 7412(f)(2) requires – and sets timelines for – the EPA to assess a variety of public health risks, not just cancer, from almost two hundred hazardous air pollutants emitted by thousands of facilities that comprise dozens of industrial categories. The broad guidelines and years-long timelines Congress provided in 42 U.S.C. § 7412(f)(2) that govern how "residual risk" emission standards should be developed are not prerequisites for bringing an endangerment action under 42 U.S.C. § 7603.

---

[8] Indeed, 42 U.S.C. § 7412(f)(2) directs the EPA to promulgate standards if an existing emission requirement does not reduce estimated lifetime excess cancer risks to the most exposed individual to "less than one in *one million*." (emphasis added).

iv.      Clean Air Act Section 112, 42 U.S.C. § 7412, is not the exclusive authority the EPA has under the Clean Air Act to reduce excess lifetime cancer risk from <u>hazardous air pollution like Denka's chloroprene emissions</u>.

131.    42 U.S.C. § 7603's plain text, consistent caselaw, and the clear legislative history behind the environmental endangerment statutes all support the EPA's approach in this case. And "bedrock administrative law" gives the EPA discretion to use whichever Clean Air Act authority (or authorities) the agency deems best suited to addressing the public health risks from hazardous air pollution in a given situation. *See, e.g., Sec. Indus. & Fin. Mkts. Ass'n v. United States Commodity Futures Trading Comm'n*, 67 F. Supp. 3d 373, 426 (D.D.C. 2014); *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 203 (1947).

132.    Nothing in the EPA's previous or proposed rulemakings under Section 112 of the Clean Air Act, 42 U.S.C. § 7412, resolves the relevant factual issues in Denka's favor. Nor do the EPA's discretionary decisions about whether to bring an endangerment case to address health risks from other air pollution sources. Nor does the time the EPA steadfastly invested in trying to sufficiently reduce Denka's carcinogenic chloroprene emissions without the need to bring this action. These irrelevant factual arguments fail to refute the clear statutory authority that the EPA has pursuant to Section 303 of the Clean Air Act, 42 U.S.C. § 7603, to bring this action.

133.    The Supreme Court has long held that "the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency." *Chenery*, 332 U.S. at 203; *see also City of Arlington, Tex. v. FCC*, 668 F.3d 229, 236 (5th Cir. 2012), aff'd, 569 U.S. 290, 133 (2013) (recognizing that agencies "typically enjoy 'very broad discretion [in deciding] whether to proceed by way of adjudication or rulemaking.'") (citations omitted). The EPA's discretion to choose how best to address public health risks from hazardous air pollution is "bedrock administrative law." *Sec. Indus. & Fin. Mkts. Ass'n*, 67 F. Supp. 3d at 426 (citations omitted).

41

134.    The EPA may therefore issue a regulation under 42 U.S.C. § 7412 to address hazardous air pollution from large or small industrial categories that may include hundreds of facilities or just one. *See, e.g.*, 88 Fed. Reg. at 25,106 (Table 1) (proposing to regulate 195 synthetic organic chemical manufacturing facilities). The EPA may also choose to bring an endangerment action under 42 U.S.C. § 7603 focusing on an individual source (or combination of sources) of air pollution based on appropriate evidence. *See, e.g., Sierra Club v. Whitman*, 268 F.3d 898, 902-03 (9th Cir. 2001) (noting the "traditional presumption" that a decision whether to bring an enforcement case is committed to an agency's discretion); *see also Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1031-33 (D.C. Cir. 2007) (federal environmental statutes' enforcement provisions do not give "any indication that violators must be pursued in every case, or that one particular enforcement strategy must be chosen over another"). Or the EPA may choose to do both, even when—as here—both actions implicate a single source.

135.    The EPA has the legal authority and discretion to bring this action under 42 U.S.C. § 7603 even as the agency continues to promulgate a revised regulation under 42 U.S.C. § 7412(f) that also addresses public health risks from chloroprene emissions.

136.    "Courts may not create their own limitations on legislation, no matter how alluring the policy arguments for doing so." *Brogan v. United States*, 522 U.S. 398, 408 (1998). Denka's interpretation of the "residual risk" requirements in 42 U.S.C. § 7412(f)(2) and the EPA's 1989 Benzene NESHAP policy would wrongly preempt an imminent and substantial endangerment action stemming from regulated health risks. The existence of a regulation under 42 U.S.C. § 7412(f)(2) – whether proposed or final – does not remove 42 U.S.C. § 7603 from the EPA's options for responding to a public health endangerment caused by regulated hazardous air pollutants. The opposite interpretation, espoused by Denka, would mean the EPA could not bring

a case under 42 U.S.C. § 7603 even if a company were flagrantly violating a residual risk regulation. That interpretation cannot be the correct result or one that Congress wanted.

v.    The EPA's decision-making under different Clean Air Act regulatory authorities is irrelevant; so is whether the EPA has brought other endangerment actions.

137.    The reasons for why the EPA found greater than 1-in-10,000 lifetime excess cancer risks to be tolerable in four previous residual risk rulemakings under 42 U.S.C. § 7412(f) – among the dozens it has conducted – are irrelevant to whether the cancer risks from Denka's chloroprene emissions are causing an imminent and substantial endangerment under 42 U.S.C. § 7603.

138.    It is also irrelevant whether the EPA has not yet taken action under 42 U.S.C. § 7603 against other sources of different air pollutants. *See, e.g., Whitman*, 268 F.3d at 902-03; *Ass'n of Irritated Residents*, 494 F.3d at 1031-33. The EPA's choices about how best to allocate finite agency resources in selecting which time- and resource-intensive judicial actions to bring, and which regulatory tools will best achieve public health and environmental objectives are fact-intensive decisions that are within the EPA's discretion to make. *See Chenery*, 332 U.S. at 203; *see also City of Arlington*, 668 F.3d at 236.

**C.    Denka Is Liable For An Injunction Under 42 U.S.C. § 7603.**

139.    The facts set out above show that the elements of 42 U.S.C. § 7603 are met here and that, therefore, the Court is authorized to immediately restrain Denka from continuing to cause or contribute to an imminent and substantial endangerment to public health and welfare in St. John the Baptist Parish. The Court is also authorized to take such other action as may be necessary, including ordering that DuPont Specialty Products authorize, and not impede, under the terms of its Ground Lease with Denka, all construction and other necessary measures for Denka to comply with this Court's injunction.

i.    <u>Denka's Facility is a "pollution source" that is "causing or contributing" to pollution</u>.

140.    Denka's Facility is a "source" or "combination of sources" of air pollution within the meaning of 42 U.S.C. § 7603. A plain English reading suggests that the Facility fits these statutory terms, and a closer inspection of the statutory text confirms this conclusion.

141.    The chloroprene that Denka's Facility emits into the air constitutes "pollution."

142.    Chloroprene is a chemical substance and statutorily designated hazardous air pollutant. *See* 42 U.S.C. § 7412(b)(1) (listing chemicals designated as hazardous air pollutants); *see also* Denka's Ans. ¶ 3. Congress listed the air pollutants in 42 U.S.C. § 7412(b)(1) because of their "potential for adverse health effects to occur in exposed populations." 42 U.S.C. § 7412(b)(1); H. Rep. No. 101-490 (Part I), at 325 (1990).

143.    Chloroprene is therefore an "air pollution agent" and an "air pollutant." 42 U.S.C. § 7603; 42 U.S.C. § 7602(g) (defining "air pollutant" as "any air pollution agent or combination of such agents, including any…chemical substance…which is emitted into or otherwise enters ambient air").

144.    For the same reasons, the Facility's chloroprene emissions are "causing" or "contributing" to pollution within the meaning of 42 U.S.C. § 7603.

ii.    <u>Denka and DuPont Specialty Products are "persons"</u>.

145.    Denka is a "person" within the meaning of 42 U.S.C. § 7603. 42 U.S.C. § 7602(e). Denka is a privately owned limited liability company formed under the laws of the State of Delaware, headquartered in LaPlace, Louisiana, and authorized to do business in the State of Louisiana. Denka's Ans. ¶ 17. Denka is a joint venture between majority owner Denka Company Ltd. and minority owner Mitsui & Co. Ltd., both of which are Japanese companies. *See id*. ¶ 22.

44

146.    DuPont Specialty Products is a "person" within the meaning of 42 U.S.C. § 7603 because it is a privately owned limited liability company. 42 U.S.C. § 7602(e). DuPont Specialty Products is a privately owned limited liability company that is headquartered in Delaware and maintains its principal place of business in Delaware. DuPont's Ans. ¶ 23.

147.    Limited liability companies fit within the Clean Air Act's definition of "person" in 42 U.S.C. § 7602(e). The statutory definition uses the term "includes" to preface a non-exhaustive array of private, public, and not-for-profit entities that fall within the broad scope of "person." 42 U.S.C. § 7602(e); *Cox v. City of Dallas, Tex.*, 256 F.3d 281, 293 (5th Cir. 2001) (explaining that "includes" indicates a non-exhaustive list).

   iii.    The increased cancer risk from Denka's chloroprene emissions is presenting an <u>"imminent and substantial endangerment"</u>.

148.    Distilled to its judicially interpreted essence, 42 U.S.C. § 7603 requires the United States to prove that Denka's chloroprene emissions are presenting a "threatened harm" to public health or welfare that is "serious" or "gives reasonable cause for concern." That straightforward burden of proof is met here. *Cox*, 256 F.3d at 299-300; *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1021 (10th Cir. 2007).

149.    The Fifth Circuit, consistent with other courts, makes clear that the statutory terminology "imminent and substantial endangerment" should be broadly interpreted. These broad interpretations are warranted, courts recognize, because Congress chose to give "paramount importance" to the objective of protecting public health when it enacted the current set of environmental endangerment statutes. *See Reilly Tar*, 546 F. Supp. at 1110; *see also Trinity Am. Corp.*, 150 F.3d at 399 (Safe Drinking Water Act case); *Apex Oil*, 2008 WL 2945402, at *79; *Cox*, 256 F.3d at 299-300; S. Rep. No. 101-228 (1989), 1990 U.S.C.C.A.N. 3385, 3753

(confirming that 42 U.S.C. § 7603's authority is intended to match the other environmental endangerment statutes).

150.    Unacceptably high cancer risks are an actionable endangerment under 42 U.S.C. § 7603.

*a. "Imminence."*

151.    To prove imminence, the United States does not need to show an increased number of deaths or an increased cancer rate among Parish residents, *i.e.*, that actual harm has occurred or will necessarily ever occur. *See Cox*, 256 F.3d at 299-300 ("imminence" requires that the harm pose a near-term threat, but there is no requirement for proof or certainty that actual harm will necessarily occur); *Apalachicola Riverkeeper v. Taylor Energy Co., LLC*, 954 F. Supp. 2d 448, 459 (E.D. La. 2013) (serious threat of harm suffices).

152.    Endangerments are "imminent" so long as the threat of harm is present now, even though actual resulting harms may not immediately materialize. *See Cox*, 256 F.3d at 299; *United States v. Conserv. Chem. Co.*, 619 F. Supp. 162, 193-94 (W.D. Mo. 1985), *overruled on other grounds*, *United States v. Ne. Pharm. & Chem. Co.*, 810 F.2d 726 (8th Cir. 1986)) ("an endangerment is 'imminent' if factors giving rise to it are present, even though the harm may not be realized for years").

153.    That broad interpretation of imminence makes sense because Congress enacted statutes like 42 U.S.C. § 7603 to stop endangerments *before* they result in actual harm. *Schmucker v. Johnson Controls, Inc.*, No. 3:14-CV-1593 JD, 2019 WL 718553, at *26 (N.D. Ind. Feb. 19, 2019) (emphasizing that the purpose of RCRA's endangerment statute "is preventative, and allows courts to order relief to keep those risks from coming to pass"); *Apalachicola Riverkeeper*, 954 F. Supp. 2d at 459 (oil spill that was 11 miles offshore and to which no plaintiff

had yet been directly exposed sufficiently alleged an imminent and substantial endangerment to overcome a motion to dismiss); *Interfaith Cmty. Org. v. Honeywell Int'l*, 399 F.3d 248 (3d Cir. 2005) (affirming injunction under RCRA to abate the endangerment posed simply by current exposure pathways to carcinogenic hexavalent chromium-containing contamination).

154.    The EPA's statements in its Proposed Rule regarding chloroprene and other hazardous air pollutants do not bar finding an imminent endangerment here. The preamble to the Proposed Rule's silence on the question of endangerment does not support Denka's claim that the EPA determined that the Facility's chloroprene emissions are not causing an imminent endangerment.

>    b.    *"Substantial."*

155.    The excess lifetime cancer risks that Denka's chloroprene emissions are causing are serious. And an endangerment is "substantial" if it is serious. *See Cox*, 256 F.3d at 300. In this case, lifetime excess cancer risks that are as much as approximately 13 times greater than the EPA's presumptive ceiling constitute a substantial endangerment.

156.    Proving that a risk or threat is serious "'does not require quantification of the endangerment (*e.g.*, proof that a certain number of persons will be exposed…or that a [resource] will be contaminated to a specific degree).'" *Interfaith Cmty. Org.*, 399 F.3d at 259 (quoting *Conserv. Chem. Co.*, 619 F. Supp. at 194); *Burlington N. & Santa Fe Ry. Co.*, 505 F.3d at 1021 (same).

157.    Rather, an endangerment is substantial if there is "reasonable cause for concern that someone or something may be exposed to risk of harm by release, or threatened release, of hazardous substances in the event remedial action is not taken." *Burlington N. & Santa Fe Ry.*

*Co.*, 505 F.3d at 1021; *Apalachicola Riverkeeper*, 954 F. Supp. 2d at 459 (visible sheen from offshore oil spill sufficiently alleged substantial endangerment to overcome a motion to dismiss).

158.    It is not necessary to prove that actual harm – meaning, in this case, proof of a measurable increase in cancer incidence or resulting deaths – is afflicting Parish residents in order to establish that Denka's chloroprene emissions are causing a substantial endangerment under 42 U.S.C. § 7603. The unacceptably high lifetime excess cancer risks caused by breathing Denka's chloroprene emissions are the type of serious or potential harm that Congress intended endangerment statutes like 42 U.S.C. § 7603 to cover. *See Cox*, 256 F.3d at 299.

159.    No actual injury need ever occur. *See Cox*, 256 F.3d at 299; *Ethyl Corp. v. Env't Prot. Agency*, 541 F.2d 1, 13 (D.C. Cir. 1976). Serious threatened or potential harm suffices. *See Apalachicola Riverkeeper*, 954 F. Supp. 2d at 459; *Dague v. City of Burlington*, 935 F.2d 1343, 1356 (2d Cir. 1991) (affirming finding that landfill presented imminent and substantial endangerment under RCRA).

160.    It also does not matter that estimating cancer risk necessarily tolerates some scientific uncertainty. *NRDC, Inc*., 824 F.2d at 1165 (recognizing "the inherent limitations of risk assessment and the limited scientific knowledge of the effect of exposure to carcinogens at various levels"); *Apex Oil*, 2008 WL 2945402, at *79 (explaining that the United States need not meet a standard of "exactitude" to prove up an endangerment).

161.    The point of 42 U.S.C. § 7603 and its statutory brethren is to authorize courts to intervene and prevent the worst public health outcomes from ever happening. Therefore, "'if an error is to be made in applying the endangerment standard, the error must be made in favor of protecting public health, welfare and the environment.'" *Interfaith Cmty. Org*., 399 F.3d at 259

(quoting *Conserv. Chem. Co.*, 619 F. Supp. at 194); *see also Burlington N. & Santa Fe Ry. Co.*, 505 F.3d at 1021 (same).

  iv.  <u>The Facility "is presenting" an imminent and substantial endangerment</u>.

162. Air monitoring data through December 2023 and the associated estimated excess cancer risks from exposure to such measured chloroprene concentrations show that Denka's Facility "is presenting" an imminent and substantial endangerment to public health and welfare. 42 U.S.C. § 7603.

163. Even if the Facility's chloroprene emissions, the resulting air concentrations, and the rate at which the associated cancer risks accumulate are all now lower than Denka's first years of owning the Facility or lower than when E.I. du Pont owned the Facility, Denka's current emissions still present an imminent and substantial endangerment to Parish residents.

164. Any difference in statutory language between 42 U.S.C. § 7603 – which includes the phrase "is presenting" – and other endangerment statutes like RCRA – that include the phrase "may present" – is immaterial here. The legislative history of 42 U.S.C. § 7603 makes clear that Congress did not intend that section to result in less protection for public health or the environment than other environmental endangerment statutes. To the contrary, the statute's legislative history explains that 42 U.S.C. § 7603 was intended to match the other endangerment statutes, including the Clean Water Act's analogue, which also uses the phrase "is presenting." S. Rep. No. 101-228 (1989), 1990 U.S.C.C.A.N. 3385, 3753; *see also* 33 U.S.C. § 1364(a).

165. Even assuming 42 U.S.C. § 7603 requires a higher standard than the other endangerment statutes, the cancer risks caused by Denka's chloroprene emissions meet that standard.

166. The "is presenting" element under 42 U.S.C. § 7603 does not require a re-analysis of whether an imminent and substantial endangerment continues to exist, as Denka proposes,

whenever there is *any* additional emission reduction – no matter the extent, the cause, or whether the reduction is expected to continue. Denka's "standard" for this element would allow it to evade 42 U.S.C. § 7603 whenever it can point to even a small estimated reduction in emissions.

## D.  DuPont Specialty Products Is Liable For An Injunction Under 42 U.S.C. § 7603.

167.  Any delay or refusal by DuPont Specialty Products to authorize Denka under the Ground Lease to comply with the requirements the order of this Court will "cause or contribute to" the emission of chloroprene due to the delays within the meaning of 42 U.S.C. §§ 7602(g) and 7603. DuPont Specialty Products is a necessary party pursuant to Fed. R. Civ. P. 19(a) based on its ability as Denka's landlord under the Ground Lease to frustrate the Injunction or other necessary orders of this Court.

## E.  The *eBay* Standard Is Met Here For An Injunction As To Denka.

168.  Based on the *eBay* factors, the EPA's requested remedy is narrowly tailored to the harm suffered, addresses irreparable injury that cannot be compensated through legal remedies, serves the public interest, and is warranted when considering the balance of hardships in this case.

   i.  <u>Public health in St. John the Baptist Parish will suffer irreparable harm without the requested Injunction</u>.

169.  The rapidly accumulating excess cancer risks caused by exposure to unacceptably high levels of chloroprene – a mutagenic carcinogen – demonstrate that Parish residents will continue to suffer irreparable harm without the requested injunctive relief. It is the irreparability of the threatened harm, not the magnitude of it, that drives the Court's conclusion. *See Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 575 (5th Cir. 1974).

170.  Breathing chloroprene causes irreparable harm by damaging DNA. No amount of money can reverse this harm – the lingering and latent biological mechanism by which breathing

chloroprene increases cancer risk. *See Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 582, 585 (5th Cir. 2013) (defining irreparable harm as "harm for which there is no adequate remedy at law," such as monetary damages); *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011).

171.    Like environmental damage, harm to public health and welfare can "is often permanent or at least of long duration, i.e. irreparable." *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 545 (1987); *Shell Offshore Inc. v. Greenpeace, Inc.*, 864 F. Supp. 2d 839, 851 (D. Alaska 2012) ("demonstrated risks to health and safety constitute the type of irreparable harm for which there is no adequate remedy at law.").

172.    The Court can presume that irreparable harm exists if the United States proves 42 U.S.C. § 7603's statutory elements: that Denka's chloroprene emissions are presenting an imminent and substantial endangerment to public health. *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) ("irreparable harm need not be proven if (1) the injunctive relief is sought pursuant to statute by the appropriate government officer or agency and (2) all of the statutory prerequisites are met"); *United States v. Hayes Int'l Corp.*, 415 F.2d 1038, 1045 (5th Cir. 1969); *see also Marine Shale Processors*, 81 F.3d at 1358-59 ("when the United States or a sovereign state sues in its capacity as protector of the public interest, a court may rest an injunction entirely upon a determination that the activity at issue constitutes a risk of danger to the public").

173.    This presumption of irreparable harm logically flows from the predicate finding that an imminent and substantial endangerment to public health or welfare exists. *See Amoco*, 480 U.S. at 545 ("[e]nvironmental injury, by its nature, can seldom be adequately remedied by monetary damages); *City of Painesville, Ohio*, 644 F.2d at 1194 (finding it "unnecessary" to hold a hearing to determine the presence of irreparable injury).

51

174. This presumption of irreparable harm also serves Congress' intent that the environmental endangerment statutes, like 42 U.S.C. § 7603, should enhance courts' traditional equitable powers. *Waste Indus.*, 734 F.2d at 165.

175. This more lenient standard for irreparable harm under 42 U.S.C. § 7603 – *i.e.*, needing to show only threatened or potential harm – is met here because the unacceptably high lifetime excess cancer risks caused by breathing Denka's chloroprene emissions are an imminent and substantial endangerment to public health and welfare.

176. Without the requested injunction, Denka will continue to emit mutagenic chloroprene emissions and Parish residents will continue to be exposed to the associated cancer risks. The Injunction is called for here.

ii.     There is no adequate remedy at law.

177. For similar reasons as to why Denka's chloroprene emissions are causing irreparable harm, monetary damages are inadequate to address the harm to public health and welfare that Parish residents are suffering because of the excess cancer risks that Denka's chloroprene emissions create. *See Amoco*, 480 U.S. at 545 (explaining that environmental harm "can seldom be adequately remedied by money damages"). Legal remedies alone cannot address the harm.

iii.     Congress' statutory priority to protect public health and welfare tips the balance of hardships in favor of protecting public health.

178. If environmental injury is sufficiently likely, "the balance of harms will usually favor the issuance of an injunction." *Amoco*, 480 U.S. at 545.

179. Congress chose unambiguous text in 42 U.S.C. § 7603 to express the "extraordinary weight" it places on the public interest at stake here – protecting public health and

welfare from endangerments caused by air pollution like Denka's carcinogenic chloroprene emissions. *Marine Shale Processors*, 81 F.3d at 1358-59.

180.     42 U.S.C. § 7603 authorizes action "[n]otwithstanding" any other part of the Clean Air Act. The statutory text thus puts a heavy "'congressional thumb on the scale'" in favor of protecting the public health and welfare of Parish residents. *Mallinckrodt*, 471 F.3d at 296-97; *Amoco*, 480 U.S. at 545. That thumb definitively tips the balance of hardships in the United States' favor.

181.     Even without any presumption, the equities favor granting the United States' requested Injunction and protecting public health and welfare in the Parish.

182.     Protecting thousands of Parish residents from the ongoing public health threats from Denka's chloroprene emissions outweighs any financial costs or inconvenience to Denka contemplated by the Injunction. *See Andritz Sundwig GmbH v. United States*, Civ. No. 4:18-2061, 2018 WL 3218006, at *11 (S.D. Tex. 2018) (government interest in protecting pine forests "heavily outweighs" any financial harm to company); *United States v. Gear Box Z Inc.*, 526 F. Supp. 3d 522, 529 (D. Ariz. 2021) (financial loss to company from government injunction does not outweigh the harm to human health and the environment at issue); *League of Wilderness Def. v. Forsgren*, 184 F. Supp. 2d 1058, 1070-71 (D. Or. 2002) (potential harm to environment outweighs even a certain financial loss).

183.     Denka has not demonstrated that its alleged financial losses would be ruinous. *See Navistar, Inc. v. U.S. EPA*, No. 11-CV-449 (RLW), 2011 WL 3743732, at *3 (D.D.C. Aug. 25, 2011) (recoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business).

184. Courts are, furthermore, often and rightfully reluctant to accept claims of reputational damage, agreeing that such harm is sufficiently irreparable only when it is "pervasive and certain to occur." *Texas Marine & Brokerage, Inc. v. Bennington Marine, LLC*, No. 1:12-CV-397, 2012 WL 12888827, at \*5 (E.D. Tex. Oct. 17, 2012); *Andritz*, 2018 WL 3218006, at \*11 (finding speculation about reputational injury insufficient to prove irreparable harm); *Navistar*, 2011 WL 3743732, at \*2 (rejecting that affidavit's conclusory allegations of lost sales, loss of market share, and competitive disadvantage substantiated finding reputational harm).

185. There is also no unreasonable delay in bringing this action. Courts may consider delay as part of weighing the factors for whether to grant injunctive relief. *See, e.g., United States v. Gear Box Z Inc.*, 526 F. Supp. 3d 522, 528 (D. Ariz. 2021) (explaining that delay in seeking relief to address harm "goes more to a balancing of the equities").

186. But "[h]arm to human health and the environment is what it is," *i.e.*, obvious irreparable harm. *Gear Box Z*, 526 F. Supp. 3d at 528. Even as a balancing factor, delay should militate against issuing an injunction "only 'absent a good explanation.'" *Optimus Steel, LLC v. U.S. Army Corps of Eng'rs*, 492 F. Supp. 3d 701, 719 (E.D. Tex. 2020) (quoting *Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553, 570 (S.D. Tex. 2014).

187. Denka was given meaningful chances to avoid this lawsuit. *Cf. Texas v. United States*, 328 F. Supp. 3d 662, 739 (S.D. Tex. 2018) (explaining that delays have been found reasonable "if the parties have been trying to reach an amicable resolution short of litigation").

188. The United States' steady efforts to reduce cancer risks in the Parish without litigation do not constitute unreasonable delay. *See Davis v. Sun Oil Co.*, 148 F.3d 606, 610 (6th Cir. 1998) ("An 'imminent hazard' may be declared at any point in a chain of events which may

54

ultimately result in harm to the public"); *see also Interfaith Cmty. Org.*, 263 F. Supp. 2d at 837 ("[i]mminence refers 'to the nature of the threat rather than identification of the time when the endangerment initially arose'").

189. The balance of hardships tips in the United States' favor.

    iv.      <u>The Injunction is in the public interest</u>.

190. "Enforcement of the environmental laws is in the public interest." *Matter of Commonwealth Oil Ref. Co., Inc.*, 805 F.2d 1175, 1190 (5th Cir. 1986).

191. Issuing the preliminary injunction serves both the specific interest expressed in 42 U.S.C. § 7603 and the Clean Air Act's overarching purpose as expressed in 42 U.S.C. § 7401(b)(1). Reducing unacceptably high cancer risks to infants, children, and adults in St. John the Baptist Parish fully aligns with "protect[ing] and enhance[ing] the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." The Court's action is needed here to guard that public interest. 42 U.S.C. § 7401(b)(1).

192. Here, the requested injunctive relief is the best means to vindicate 42 U.S.C. § 7603's objectives. *See Weinberger*, 456 U.S. at 314 (analyzing *Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978)). The proposed injunction serves the public interest.

**F.**      **The *eBay* Standard Is Met For An Injunction As To DuPont Specialty Products.**

193. The Injunction against DuPont Specialty Products meets the *eBay* factors. First, the "irreparable injury" prong is met for the same reasons described as to Denka regarding human health threats.

194. Second, there are no adequate remedies at law if DuPont Specialty Products refuses to grant its consent under the Ground Lease or delays or otherwise impedes Denka's ability to comply with the Injunction.

195. As to the fourth *eBay* prong, the public interest would not be disserved by a permanent injunction for the same reasons as for Denka.

196. As to the third prong – the balance of hardships – the equities in favor of the Injunction are largely the same as discussed above regarding Denka. However, DuPont Specialty Products is not identically situated to Denka, so the equities with respect to DuPont Specialty Products must be analyzed separately.

197. There is minimal hardship on DuPont Specialty Products in complying with the limited requirements of the Injunction that apply to it. The onus of the Injunction against Denka far exceeds that against DuPont Specialty Products. The balance of hardships tips in favor of issuing the Injunction as to DuPont Specialty Products.

198. Any delay or refusal by DuPont Specialty Products to authorize Denka under the Ground Lease to comply with the requirements the order of this Court may contribute to the emission of chloroprene due to the delays in Denka's ability to comply with the Injunction, such as correcting exceedances of the required average chloroprene concentrations.

## IV.   CONCLUSION

199. Residents of St. John the Baptist Parish living next to Denka's Facility suffer an unacceptably high lifetime excess risk of cancer from inhalation exposure to the Facility's chloroprene emissions. That risk constitutes an imminent and substantial endangerment to public health and welfare.

200. Because DuPont Specialty Products' rights as Denka's landlord under the Ground Lease place the company in a position to frustrate the Court's order of injunctive relief against Denka, DuPont Specialty Products is a necessary party to the ordered Injunction.

201. The Court agrees that the Injunction's chloroprene emission reduction requirements are narrowly tailored to reduce the endangerment caused by Denka's chloroprene

56

emissions. The Court further agrees that the public interest in abating the endangerment to public health and welfare caused by Denka's chloroprene emissions outweighs any hardships to Denka or DuPont Specialty Products. Therefore, the Court will sign and enter the requested Injunction. For purposes of Fed. R. Civ. P. 65, these Findings of Fact and Conclusions of Law are incorporated by reference into the Injunction.

New Orleans, Louisiana, this _____ day of _____, 2024.

_____
THE HONORABLE JUDGE CARL J. BARBIER
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF LOUISIANA