# **EXHIBIT 1**



# Transcript of John J. Vandenberg, Ph.D.

**Date:** February 2, 2024
**Case:** United States of America -v- Denka Performance Elastomer, LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

109

1  it's five paragraphs down, where it says "next
2  steps."
3      A   Yes.
4      Q   And I think you're talking about
5  organizing a public meeting in a month or so?
6      A   Uh-huh.
7      Q   And then, in the middle there, the
8  middle of that paragraph says "I indicated to Sam
9  Coleman that we would support this public meeting,
10 as needed, but that I was not anxious, at all, to
11 return to LaPlace," and you added an exclamation
12 point?
13     A   Uh-huh.
14     Q   Do you recall why you were not anxious
15 to return to LaPlace, with an exclamation point?
16     A   You know, my experience with public
17 meetings is limited and they're stressful.  So,
18 that's what that was about.  It's, like, given my
19 personal preference, I'd rather not be in a public
20 meeting than in a meeting.  That's what I was
21 talking about there.
22         (Exhibit 407 marked for identification
23 and attached to the transcript.)
24     Q   I've handed you what we've marked as
25 Deposition Exhibit 407.

110

1      A   Okay.
2      Q   This is a report of the expert
3  report -- I'm sorry, the report of the expert
4  panel on chloroprene emission -- chloroprene
5  exposure in air in St. John the Baptist Parish,
6  and it's dated September 6th, 2017.
7          Do you see that?
8      A   Yes, I do.
9      Q   Do you recognize this document?
10     A   I've seen it before.
11     Q   Okay.  Now, this was released
12 two months after the July 2017 meeting that we
13 were just discussing in Exhibit 406, right?
14     A   That's correct.
15     Q   If you look on page 4, the very top,
16 after the heading "Louisiana Department of Health
17 Expert Panel on Chloroprene Exposure in Air at
18 St. John the Baptist Parish," it says "Dr. Jimmy
19 Guidry, Louisiana Department of Health, LDH, state
20 health officer of Louisiana, convened an expert
21 panel to provide advice and recommendations on the
22 public health implications associated with
23 chloroprene releases in St. John the Baptist
24 Parish."
25         Do you see that?

111

1      A   Yes.
2      Q   Were you aware that Dr. Guidry had
3  convened this expert panel to assess health
4  implications associated with chloroprene releases
5  in St. John the Baptist Parish?
6      A   As I recall, he mentioned that he was
7  either planning that or that was underway.  I
8  don't know any -- did not have any details about
9  it.
10     Q   Okay.  Go to the next page.  Right in
11 the middle, there's a heading, "Expert Panel on
12 Chloroprene."
13     A   Yes.
14     Q   And you can see that there are ten
15 names listed beneath that.
16     A   Uh-huh.
17     Q   Do you recognize any of those names?
18     A   I do.
19     Q   And did you know any of the individuals
20 on the panel?
21     A   The only person that I interacted with,
22 that I recognize here, is June Sutherlin.
23     Q   And who is June Sutherlin?
24     A   He's a toxicologist with the Louisiana
25 Department of Environmental Quality.

112

1      Q   Would you describe this expert panel as
2  an accomplished panel of experts?
3          MR. SMITH:  Objection.  Form.
4      A   I have no information.  I see that
5  there's MDs, Ph.D.s, DVMs.  I don't have any
6  information about their CVs or anything like that,
7  of any of them.  I would need to judge that.
8      Q   Can you go back to page 4.
9      A   Okay.
10     Q   We're going to look at the heading
11 "Background and Rationale for Expert Panel."
12     A   Uh-huh.
13     Q   If you go three paragraphs down, I'll
14 read the first couple of sentences.
15     A   The third paragraph?
16     Q   Yeah.
17     A   It says --
18     Q   It being EPA?
19     A   EPA Louisiana Department of --
20     Q   I'll read it.
21     A   Oh, you'll read it.
22     Q   Yeah, save your voice.
23         "EPA and the Louisiana Department of
24 Environmental Quality, LDEQ, initiated air
25 monitoring for chloroprene to assess the actual

---

Page 113

1  ambient air concentrations of chloroprene at six
2  sites in LaPlace, Louisiana. While no standards
3  have been officially set for cancer risk for
4  chloroprene, EPA has non-cancer guidance for
5  long-term exposure screening to chloroprene in air
6  at 20 micrograms per cubic meter."
7      Do you see that?
8   A  Yes.
9   Q  Were you aware that the Louisiana
10 Department of Environmental Quality had initiated
11 air monitoring in the vicinity of the Denka
12 facility at this time?
13  A  I think that they had presented some
14 data, so I was aware they had done, at least, some
15 grab samples.
16  Q  Now, this refers to a long-term
17 exposure screening level of 20.0 micrograms per
18 cubic meter.
19     Do you see that?
20  A  Yes.
21  Q  And you'd agree that's a hundred times
22 higher than the 0.2 level that the United States
23 is asking Denka to be required to meet in this
24 case, right?
25  A  The 20 micrograms per cubic meter is

Page 114

1  the reference concentration for non-cancer health
2  outcomes, yes.
3   Q  That concentration level is 100 times
4  higher than 0.2?
5   A  Yes.
6   Q  And you can see, right below there, I
7  think what you were just referring to, that the
8  report talks about grab samples taken in 2016 and
9  2017?
10  A  Right.
11  Q  Now, in the next paragraph, there's a
12 reference to the administrative order on consent
13 between LDEQ and Denka, that you had mentioned in
14 your July 2017 email, that we looked at just a
15 minute ago, right?
16  A  Did I mention that?
17  Q  I think you mentioned it in your -- I
18 could be wrong.
19  A  In this (indicating)?
20  Q  Yeah, yeah, yeah.
21  A  I don't see that, but maybe you can
22 point me to it.
23  Q  I could be wrong. Oh, I see.
24     In the second-to-last paragraph on the
25 first page.

Page 115

1   A  On the first page, okay.
2   Q  You wrote "A couple of major additional
3  control technologies are being installed by
4  December 2017."
5      And I think I asked you if that was in
6  connection with the administrative order on
7  consent between the LDEQ and Denka?
8   A  Oh, I don't know.
9   Q  You don't know that?
10  A  I don't know about that.
11  Q  That's fine.
12  A  No.
13  Q  Now, if we go to page 7 of the expert
14 panel report, the heading, at the top, is "Air
15 Monitoring for Chloroprene Exposure by
16 Inhalation."
17     And if you look at the first sentence,
18 it says, "A summary of the air monitoring
19 conducted for May 2016 through August 2017 was
20 provided to the expert panel."
21     Do you see that?
22  A  Yes.
23  Q  And the second sentence says "Air
24 monitoring from the 24-hour canister samples from
25 the six locations, from May 2016 to September 2017

Page 116

1  (1,084 measurements), detected chloroprene in 79.7
2  (864) of the air samples and did not detect
3  chloroprene in 20.3 percent (220)."
4      Do you see that?
5   A  Yes.
6   Q  So just -- well, let's go on to the
7  remainder of that sentence, after the semicolon.
8      It says, 'Of those with detectable
9  levels of chloroprene (879), 93.2 percent (805)
10 were below the EPA 20 micrograms per cubic meter
11 guidance value for non-cancer endpoints, and
12 6.8 percent (59) exceeded the 20 micrograms per
13 cubic meter guidance value."
14     Do you see that?
15  A  Yes.
16  Q  So, do you read that to mean that 59 of
17 the samples that were taken were more than 100
18 times higher than the 0.2 concentration value that
19 the United States seeks to apply in this lawsuit?
20  A  What this says is 59 of the samples, of
21 the 1,084 measurements, exceeded 20 micrograms per
22 cubic meter, which is the non-cancer guidance --
23 or reference concentration, yes.
24  Q  Which is 100 times higher than the 0.2
25 applicable to this case?

**117**

1  A  Is that a question?
2  Q  Yes.
3  A  Yes.
4  Q  The next sentence says, "The mean
5  concentration from the EPA 24-hour canister
6  samples was 0.62 micrograms per cubic meter."
7      Do you see that?
8  A  Yes.
9  Q  So, do you agree that that means that
10  the mean concentration of the sampling, in 2016,
11  2017, was more than three times higher than the
12  0.2 value that the United States seeks to apply in
13  this lawsuit?
14  A  Yes.
15  Q  Let's go to page 9. At the bottom, you
16  see conclusions and public health recommendations
17  at the bottom there. The introductory sentence
18  says "The expert panel provided the following
19  conclusions and recommendations: 1, the detection
20  of chloroprene in air constitutes an exposure to
21  the surrounding population. The levels measured
22  as of August 2017 do not present a public health
23  emergency."
24      Do you see that?
25  A  I see that.

**118**

1  Q  So, you'd agree that means the panel
2  concluded that chloroprene concentrations with a
3  mean of .62 micrograms per cubic meter, and at
4  least 59 samples above the 20 micrograms per cubic
5  meter, did not present a public health emergency?
6  A  That seems to be their view.
7  Q  Were you aware that the expert panel
8  reached that conclusion in and around this time?
9  A  I received a copy of this sometime
10  after that report was made, so I do recall seeing
11  that.
12  Q  Did you agree with the panel's
13  conclusion?
14  A  You know, I had a number of questions
15  about who these people were and what their basis
16  for their decisions were. So, I didn't
17  necessarily agree.
18  Q  You didn't necessarily agree?
19  A  That's right.
20  Q  Specifically to the statement, "the
21  levels measured as of August 27 do not present a
22  public health emergency," did you agree or
23  disagree with that statement?
24  A  I don't recall, at that time, having an
25  opinion one way or another.

**119**

1  Q  But you did disagree with Dr. Guidry's
2  statement that there was not an imminent hazard
3  when he made that statement in the July 27 team
4  meeting, right?
5      MR. SMITH: Objection. Form.
6  Q  I think that's what you testified to.
7  Tell me if I'm wrong.
8  A  If I might. It says "He summarized his
9  opinion that there was not an imminent hazard to
10  children, that he would send his own children and
11  grandchildren to the schools."
12      I didn't agree that I would send my
13  child to that school.
14  Q  Well, part of his summary of opinion is
15  that there was not an imminent hazard to children.
16      Did you agree with that opinion?
17  A  I don't recall having any opinion, one
18  way or another, about that.
19  Q  So you might have agreed that as of
20  2017, there was no imminent hazard to children?
21      MR. SMITH: Objection. Form. Form.
22  A  No, I -- again, it's along the lines of
23  the comment at the bottom of the page, that some
24  of the critics were not trusting of the opinion of
25  the state officials. In my own view, his approach

**120**

1  was to minimize the concern about the risk to the
2  population. That seemed to be the approach he was
3  taking.
4  Q  And did you disagree with that
5  approach?
6  A  I did and I do.
7  Q  Well, in 2017, July of 2017, then, did
8  you disagree that there was not an imminent hazard
9  to children due to the then-present chloroprene
10  emissions?
11  A  Did I disagree there was not? I'm
12  trying to get the negatives here.
13  Q  Well, did you agree or did you not
14  agree whether there was an imminent endangerment
15  to children as of July 2017, as stated by
16  Dr. Guidry?
17  A  In my view, there certainly was a
18  potential for an imminent hazard to children than
19  there is now.
20      He has his opinion, I have my opinion.
21  I'm sorry, I didn't mean to interrupt.
22  Q  No, no. And you disagreed with his
23  opinion at the time?
24  A  Yeah.
25  Q  And I'll ask you again, I mean, did you

**121**

1  agree or disagree with the opinion of the expert
2  panel, that the levels of chloroprene, measured as
3  of August 2017, do not present a public health
4  emergency?
5     A  So my reading of that was, really, in
6  part, regards to the non-cancer concerns, whether
7  there was an immediate, you know, respiratory
8  health or neurological health problem. Because
9  they're medical doctors who are -- most of them
10 were medical doctors who are looking at a patient
11 today, they're not necessarily coming from a
12 public health point of view, in my opinion. So I
13 didn't react to the statement "public health
14 emergency," because an emergency implies that the,
15 you know, that it is, literally, an emergency,
16 like there's a fire, you know.
17     So I guess I was not taken one way.
18    Q  Do you have a view on whether an
19 imminent and substantial endangerment is also an
20 emergency?
21     MR. SMITH: Objection. Form.
22    A  I think it's different than an
23 emergency in that an emergency sounds like you
24 must act within minutes or hours to have a, you
25 know, an ambulance show up. That's what I think

**122**

1  of as an emergency.
2     Q  Do the chloroprene emission
3  concentrations at the Denka facility, today,
4  constitute an emergency, in your view?
5     A  I think it's an imminent and
6  substantial hazard or endangerment, yes, but --
7     Q  Do you think that the chloroprene
8  levels at issue in -- strike that.
9      Did you think that the chloroprene
10 concentration levels in the vicinity of the
11 facility in July of 2017 constituted an imminent
12 and substantial endangerment?
13     MR. SMITH: Objection. Form.
14    A  You know, I didn't have those words in
15 mind, necessarily, but I certainly viewed that
16 they exceeded, substantially, the 1 in
17 10,000 cancer risk level for a lifetime. Yeah.
18    Q  Well, as we saw from the expert panel's
19 report, the emission levels were up to a hundred
20 times higher than the levels that EPA is seeking
21 to apply in this litigation, right?
22    A  And even higher still.
23    Q  Do you think that's actually more of an
24 imminent and substantial endangerment, as of the
25 summer of 2017, than exists today at the facility?

**123**

1      MR. SMITH: Objection. Form.
2     A  I'm sorry, say it again, please.
3     Q  Yeah. Wouldn't you agree that
4  concentrations of chloroprene as high or higher
5  than 20 micrograms per cubic meter, as were
6  reported in 2017, presents even more of an
7  imminent and substantial endangerment than does
8  the levels of chloroprene at the facility today?
9      MR. SMITH: Objection. Form.
10    A  Well, the levels were even higher then.
11    Q  100 times higher?
12    A  No. Not a hundred times higher. The
13 concentrations in the environment around there are
14 not a hundred times higher in 2017 than now.
15     What do you mean by a hundred times
16 higher?
17    Q  Didn't they find samples that showed
18 concentrations of 20 micrograms per cubic meter?
19    A  Yes, they did.
20    Q  And didn't we agree that that's 100
21 times higher than the 0.2 level that the United
22 States is seeking to enforce in this case?
23    A  Right. As you said in the beginning, I
24 want to be clear what you're asking about.
25 Because you made the statement a minute ago as

**124**

1  though the levels, now, were a hundred times lower
2  than they were then, they're not. We're not
3  communicating well as to what hundred times you're
4  talking about.
5      Now you're saying 20 is a hundred times
6  greater than .2, yes.
7     Q  Right. And what I'm asking is, in your
8  view, do the concentrations in 2017, as high as
9  20 micrograms per cubic meter, constitute an
10 imminent and substantial endangerment --
11     MR. SMITH: Objection. Form.
12    Q  -- in your view?
13    A  Yes.
14    Q  And is that more of an imminent and
15 substantial endangerment than exists today, when
16 the chloroprene concentrations are lower than they
17 were in 2017?
18     MR. SMITH: Objection. Form.
19    A  So, they're -- the average
20 concentrations are lower. There are still high
21 concentrations that occur around the facility.
22    Q  Okay.
23    A  Yep.
24    Q  So, what's your answer?
25    A  So, is there less exposure or less risk

125

now than there was then? Is that the question?
2  Q  Sure.
3  A  What's the question?
4  Q  That's the question.
5  A  The risk has come down and it's still unacceptably high.
7  Q  So my question is, was there more of an imminent and substantial endangerment in 2017, when the chloroprene concentrations were demonstratively higher than they are today?
11     MR. SMITH: Objection. Form.
12  A  It would appear from the -- if I might turn to a graphic to kind of make my point here.
14  Q  Sure.
15  A  If you look at the supplement from January. Let's see, that's --
17  Q  So we're looking at Exhibit 405?
18  A  Yeah.
19     And I'm going to turn your attention to updated Figure 2. And this -- if I might describe that. Is that --
22  Q  Sure.
23  A  Okay. So it's titled "Average Annual Chloroprene Concentration Measured by TO-15 Monitors in the Denka Facility Monitor Locations

126

from April 2018 through December 2023."
2     This does not include 2017. As part of -- you're asking about 2017. I don't have that here in my analysis.
5  Q  Okay.
6  A  So I don't want to talk about 2017 versus now because I don't have 2017.
8  Q  Yeah. I'm just referring to the concentration levels that are reported in the expert panel report, where they commented that 59 samples showed a concentration greater than 20 micrograms -- 20 --
13  A  Micrograms.
14  Q  I was going to say greater than 20.0, how's that?
16  A  Okay. So what you can see here is on a -- in Figure 2, from my January 15th supplemental declaration, is that the average concentrations go up and they go down, okay? So, the most current year, 2023, which is the green bar here, is lower than it was in the year before, but the year before was much higher than the year before that. So the concentrations go up and down a lot.
25     So you're asking me about 2017, and I

127

don't know if that would have been higher or lower than these. I don't know. Maybe it's somewhere. I can't recall off the top of my head.
4  Q  So, are you aware that -- you know what the regenerative thermal oxidizer is --
6  A  Yes, I do.
7  Q  -- the RTO?
8     Are you aware the emissions were reduced by 85 percent after the RTO was installed?
10  A  My understanding is, that's what has been reported by the facility. Although, the concentrations around the facilities have not gone down by 85 percent.
14  Q  Are you aware that the LDEQ confirmed that the emissions had been reduced by 85 percent?
16  A  No.
17  Q  And do you know when the RTO was installed?
19  A  I think it was in January of 2017, if I recall.
21  Q  2018?
22  A  2018. I'm sorry, 2018.
23  Q  So the numbers being reported by the expert panel are before the RTO was placed?
25  A  That's correct.

128

1  Q  Just to be really clear, is it your testimony that concentrations in 2017 do not present a higher degree of an imminent and substantial endangerment than concentrations in the vicinity of the facility presently?
6     MR. SMITH: Objection. Form.
7  A  Again, the analysis that I've provided here, and if I might go back to my March -- my original -- let's see here. I just want to look at something, if you can --
11  Q  Sure.
12  A  -- give me a minute here.
13     My analysis started from the beginning in March -- I'm sorry, in my March initial declaration, in the attachment 12, and in the subsequent declarations, my analysis begins after the installation of the regenerative thermal oxidizer. I used April 2018 as the starting point because it normally takes a little while, it's my understanding, for equipment to really get going and have it be tuned as it's needed.
22     So I don't have anything in here about 2017 to refer to.
24  Q  But it's fair to assume, is it not, that the concentrations for chloroprene would have

**129**

1 been higher in 2017 than 2018, after the RTO was
2 implemented?
3     MR. SMITH: Objection. Form.
4  A  As an assumption, yes.
5  Q  That's a fair assumption, isn't it?
6  A  I think that's a fair assumption.
7  Q  We're talking about emission control
8 equipment that reduces emissions by 85 percent,
9 and, of course, the concentrations prior to that
10 RTO being installed and operating are going to be
11 lower or higher, aren't they?
12  A  I think that's an assumption.
13     MR. SMITH: Objection. Form.
14  A  A fair assumption.
15  Q  That's a fair assumption.
16     Take a look at the executive summary of
17 the expert panel report.
18  A  Okay.
19  Q  Exhibit 407.
20  A  Okay. I'm there.
21  Q  In the first paragraph, under executive
22 summary, the report states "The chloroprene levels
23 detected in St. John the Baptist Parish over the
24 last two years are well below the levels that
25 could constitute an immediate public health

**130**

1 emergency. There is not an imminent threat of
2 illness or health condition associated with
3 exposure to chloroprene at the current levels."
4     Do you see that?
5  A  I do.
6  Q  So, there, the panel is concluding that
7 chloroprene concentrations with a mean of
8 0.62 micrograms per cubic meter and 59 samples
9 above 20 micrograms per cubic meter are "well
10 below the levels that could constitute an
11 immediate public health emergency."
12     Do you see that?
13  A  I see what they're saying here. I
14 think what they are referring to is, are children
15 getting sick today? Sick today versus a lifetime
16 risk, which is what I am focused on.
17  Q  But you would agree, would you not,
18 that that lifetime risk applied as of the time
19 that this report was written, right?
20  A  Yes.
21  Q  Okay. Were you aware that the expert
22 panel had reached this conclusion?
23  A  Again, I read this around that time.
24  Q  Did you agree with the panel's
25 conclusion that there was not an imminent threat

**131**

1 of illness or health condition associated with
2 exposure to chloroprene at the current levels?
3  A  In my view, there was, and there has
4 been, and continues to be, an imminent threat.
5 And that was their view. That's not my view.
6  Q  So you disagree with the conclusion
7 they're reaching?
8  A  Yes. I mean, I -- in terms of imminent
9 threat, as it applies to an immediate illness in
10 children, that they would be immediately ill, I
11 think that's correct because the referenced
12 concentration is the metric which you would look
13 at for that. Versus cancer, you'd look at the
14 current exposures yielding a long-term, lifetime
15 concern from cancer.
16  Q  If you look at page 4 of the report,
17 you can see, in the second paragraph, that the
18 panel there is discussing EPA having put forth a
19 preliminary risk base concentration of 0.2
20 micrograms per cubic meter or 100 in 1 million
21 cancer risk base comparison level.
22     Do you see?
23  A  Yes, I do.
24  Q  So, you would agree that the expert
25 panel was aware of the cancer risk that had been

**132**

1 propounded by EPA at the time, right?
2  A  Seems to be, yes.
3  Q  All right. How do you interpret the
4 phrase -- well, strike that.
5     (Exhibit 408 marked for identification
6 and attached to the transcript.)
7  Q  I've handed you what we've marked as
8 Exhibit 408.
9     This is an email from you to four
10 people, dated February 27, 2018.
11     Do you see that?
12  A  Yes.
13  Q  And if you look at the left-hand side,
14 at the top there, got from, to, cc, subject, date,
15 importance, and attachments. I want to focus on
16 the attachments.
17  A  Okay.
18  Q  If you look at the ones listed, the
19 second one says "Denka chloroprene LDOH expert
20 panel on chloroprene in air."
21     Do you see that?
22  A  Yes.
23  Q  Okay. Let's turn to the second
24 attachment of your February 27, 2018 email. It's
25 actually Bates number -- it ends with 4553. That

133

1  might help you find it.  There's two Bates
2  numbers.  Look at the one at the top.
3     A   4553?  So it's back a ways.
4     Q   4553.  The last four numbers.
5     A   Yes, I'm here.
6     Q   Okay.  Now, that's the document that we
7  were just looking at, Exhibit 407; is it not?
8     A   That's correct.
9     Q   The expert panel report on chloroprene
10 exposure?
11    A   That's right.
12    Q   And that's an attachment to your email,
13 dated February 27, 2018, right?
14    A   Yes.
15    Q   Okay.  So in this email, you're
16 forwarding the expert report to your colleagues,
17 right?
18    A   That's correct.
19    Q   Look at your email.  If you go down to
20 the third line, it says "The attachment from LDEQ
21 concludes there is not a public health emergency
22 (which I agree with)."
23        Do you see that?
24    A   Yes.
25    Q   So you told your colleagues you agreed

134

1  with the conclusions of the expert panel convened
2  by Dr. Guidry, right?
3        MR. SMITH:  Objection.  Form.
4     A   Well, what I was agreeing with was
5  regarding the words public health emergency, which
6  means, again, do you need to call in an ambulance
7  and evacuate people immediately?  And my reaction
8  is it is not a -- you know, not an emergency, in
9  terms of those kind of actions.
10       Do you need to evacuate people?  No, I
11 don't think so.
12    Q   Do you agree that chloroprene
13 concentrations of 20 micrograms per cubic meter
14 constitute a public health emergency?
15    A   No.
16    Q   You don't believe?
17    A   In terms of -- the 20 is a reference
18 concentration for non-cancer effects.  So I'm
19 referring specifically to that.  In my mind, if
20 you are at or exceeding the non-cancer reference
21 concentration here, that exceedance doesn't
22 necessarily represent a public health emergency,
23 for non-cancer effects.
24    Q   But it's your opinion, is it not, that
25 a concentration of 20 micrograms per cubic meter,

135

1  which is 100 times higher than the 0.2 level that
2  the United States seeks to apply in this case,
3  does constitute a substantial endangerment to
4  public health, right?
5        MR. SMITH:  Objection.  Form.
6     A   It does for cancer outcomes, most
7  certainly, yes.
8     Q   And you're not stating anything in this
9  email to your colleagues, attaching the expert
10 panel report, that there's a problem with the
11 concentration levels that were reported in the
12 2017 report, are you?
13    A   Not in this report.  We were all very
14 aware of the concerns from a cancer point of view,
15 not from the non-cancer point of view.
16    Q   And you describe that as a public
17 health emergency that you agree with?
18    A   For --
19       MR. SMITH:  Objection.  Form.
20    A   I didn't say that.
21    Q   Can a cancer risk ever constitute a
22 public health emergency?
23    A   Again, in my mind, a public health
24 emergency is from an immediate risk, such as from
25 a chemical plant explosion, where there's toxic

136

1  chemicals that are going to cause immediate
2  respiratory effect or death.  That, to me, is a
3  public health emergency.
4     Q   One of your opinions in this case is
5  that newborns, ages birth to 2 --
6     A   Yes.
7     Q   -- will incur a substantial portion of
8  their lifetime risk before their second birthday,
9  right?
10    A   That's correct.
11    Q   Would a child born, say, in July of
12 2017 be incurring that level of risk for the next
13 two years?
14    A   Potentially.
15    Q   Why potentially when the concentrations
16 that were measured were 100 times higher than the
17 level that EPA is seeking to enforce in this case?
18    A   So you're comparing -- or you're
19 commingling cancer and non-cancer.  I'm trying to
20 delineate between cancer and non-cancer.  The 20
21 is for non-cancer outcomes.  It occasionally
22 happened, not at average.  The average was much
23 lower than that.
24    Q   .6, right?
25    A   Yeah.  But you were making the

137

comparison to 20.
Q I was. Some of the measurements were as high as 20 micrograms per cubic meter.
A That's right.
Q And regardless of whether you're thinking about if that causes an immediate health effect, someone having to go to the hospital, it also causes a tremendous cancer risk, doesn't it?
A The cancer risk comes from long-term average concentrations. The non-cancer risk is from short-term, like the 20 micrograms per cubic meter, and the comparator for the 20 is the reference concentration. The comparator for the cancer is the .2.
So I'm trying to, again, not commingle those things.
Q Take a look at paragraph 67 of your PI declaration. That's Exhibit 401.
A All right. Paragraph 67?
Q Yeah.
A Okay.
Q That -- the last sentence on that page, it begins in the second line, "These cancer risks pose an immediate and serious threat to public health."

138

Do you see that?
A Yes.
Q By "these cancer risks," you're referring to the risks above 1 in 10,000, right?
A That's correct.
Q Is your reference to an immediate threat there, is that different from the immediate threat you associated with a public health emergency?
A Two points. First off, these cancer risks also exceed 1 in a thousand, in the sentence you see above that, okay?
And, so, please repeat your question.
Q No, I'm saying, is your reference to an immediate --
A Yeah.
Q -- threat to public health there, is that different than the immediate threat to public health that you associated with a public health emergency, when you are trying to explain what you meant by agreeing with the expert report?
A I see. And it's the term "emergency" is what I'm coming off of there. Emergency, to me, means that you have to have, again, perhaps, evacuation of people because there's been some

139

upset condition, or something like that.
So, that there's not a public health emergency means that you don't have the chemicals on fire and you've got direct immediate, immediate, like, today, in the next hour; that's what I think of as a public health emergency.
Q Don't you think that is what is addressed by an imminent and substantial endangerment?
MR. SMITH: Objection. Form.
A Again, I think that the immediate exposures, meaning now, and subsequently, mean that you do have a public health serious threat. It's not necessarily the word "emergency" I associate with that.
Q Let's talk about a hypothetical child, born in July of 2017, around the same time as that meeting.
A Yep.
Q That child, today, would be approaching seven years old, right?
A About, yeah.
Q And according to your opinions in this case, that child would have incurred just about all of its lifetime cancer risks due to inhaling

140

chloroprene, wouldn't it?
A Well, it would very much depend on where they lived.
Q Okay. That's fair.
A Okay.
Q But if they lived in an area that they were subject to chloroprene emissions of the levels that you're alleging in this case, that child would have incurred just about all of their lifetime cancer risk at that point, wouldn't they?
MR. SMITH: Objection. Form.
A I mean, they're going to continue to accrue risk over the rest of their life.
Q Okay. And as of the time that you forwarded this expert report to your colleagues in February of 2018, that hypothetical child would have been inhaling levels of chloroprene, a mean concentration of 6.2 micrograms [sic] per cubic meter, right?
MR. SMITH: Objection. Form.
A 0.62?
Q Yes.
A Yes.
Q Is that an emergency, in your view?
A Again, my use of the word "emergency"

141

1 is different than immediate or serious. So --
2   Q  So --
3   A  -- emergency, to me, to be clear, why
4 I'm agreeing with this, is that I didn't view it
5 as a public health emergency that required
6 immediate movement of the people away from that
7 facility. Because there wasn't, like, they're
8 going to be dying in the next days. That doesn't
9 mean that there's not serious public health
10 concern for a lifetime, potentially, for cancer.
11 Emergency, to me, relates to non-cancer outcomes.
12   Q  So that's something different from an
13 immediate and serious threat to public health that
14 you referred to paragraph 7 --
15   A  Yeah.
16   Q  -- 67 --
17   A  Well, I think that's what they were
18 referring to in their document. It's what I'm
19 referring to here in this email, is the word
20 "emergency" means evacuation, now.
21   Q  Just to --
22   A  Non-cancer being the driver. You're
23 not going to get, you know, an -- emergency means
24 just that, it's an emergency.
25   Q  Okay.

142

1   A  The documentation they have, they were
2 looking at that. Is there an emergency? No.
3   Q  Are you familiar with the language of
4 Section 303 of the Clean Air Act --
5     MR. SMITH: Objection. Form.
6   Q  -- that's being enforced in this
7 action?
8   A  I have read it.
9   Q  Are you aware that it says, it asks
10 whether a source is presenting imminent and
11 substantial endangerment?
12   A  Yes.
13     MR. SMITH: Object to form.
14   Q  How do you view the term "is"? Does
15 that mean current, to you?
16     MR. SMITH: Objection. Form.
17   A  How do I view the word is?
18   Q  Yeah. Is presenting.
19   A  "Is presenting" means exposure now. It
20 may have either near-term consequences or
21 long-term consequences. So in the near-term
22 consequences, you would be looking at, again,
23 immediate, like, people could die today or be
24 injured today. Long-term, also, is part of that
25 "is," which is the longer-term consequences of

143

1 exposure to a chemical that causes cancer.
2   Q  What is your time window? What is the
3 time window that you associate with what you
4 define as a public health emergency?
5   A  You know, emergency, to me, means, oh,
6 in the next hours to days, perhaps weeks. I would
7 use, for an example of that, the cases where you
8 had earlier this -- I guess it was last year, that
9 East Palestine train derailment. That, to me, was
10 a public health emergency because those train cars
11 could blow up. That's an emergency. That's how I
12 think about it. That occurred over a number of
13 days, not just in hours.
14   Q  Who is -- do you remember who Wilma
15 Subra is?
16   A  As I recall, she is a, sort of a
17 community organizer type of person. I've seen her
18 on TV, I think, in different types of settings.
19   Q  And in your email to your colleagues,
20 dated February 27, 2018, you write that Wilma is
21 pushing for the facility to be shut down until
22 they install emission reductions to get to 0.2
23 micrograms per cubic meter.
24     Do you see that?
25   A  Yes.

144

1   Q  In this email, you're asking whether
2 the recipients had any issue with you
3 participating in a meeting with Ms. Subra; is that
4 right?
5   A  That's right.
6   Q  Did you know how EPA ultimately
7 responded to Ms. Subra's request to shut down the
8 facility until emission reductions reached 0.2
9 micrograms per cubic meter?
10   A  I don't know that there was a formal
11 response back to her. I don't recall.
12   Q  Are you aware that EPA did not take any
13 action to require the facility to reduce its
14 emissions to 0.2 micrograms per cubic meter --
15     MR. SMITH: Objection. Form.
16   Q  -- in response to Ms. Subra?
17   A  I can't say. I don't know.
18   Q  Do you consider, you raised it, the
19 East Palestine derailment --
20   A  Yeah.
21   Q  -- do you consider that to be an
22 imminent and substantial endangerment?
23   A  I did at the time, yes.
24   Q  So do you think that all emergencies
25 are imminent and substantial endangerment?

---

**Page 145**

1  MR. SMITH: Objection. Form.
2  A  That all emergencies are imminent and
3  substantial endangerment?
4  Q  Yeah.
5  A  Certainly, yeah, they can be. They can
6  be.
7  Q  But you don't think that all imminent
8  and substantial endangerments constitute an
9  emergency.
10  MR. SMITH: Objection. Form.
11  A  That's -- yes. In the way I've been
12  thinking about it, the emergency comes from, you
13  know, again, like East Palestine, or other
14  chemical plants that have exploded, or things like
15  that, that's the emergency, in my mind.
16  Q  Okay. So in your email, just to be
17  clear, Exhibit 408, you are agreeing with the
18  expert panel that the levels of chloroprene,
19  measured in 2016 and 2017, did not constitute a
20  public health emergency?
21  A  For non-cancer health outcomes, as I've
22  said, yes.
23  Q  Okay.
24  A  What I was focused on.
25  Q  And is it your testimony that the

**Page 146**

1  chloroprene concentrations existing in the
2  vicinity of the facility today do not constitute
3  an emergency?
4  A  I would say they don't constitute an
5  emergency in the fashion of causing direct
6  immediate death or illness in the population right
7  there. Yes, it's not an emergency. For
8  non-cancer type of outcomes, no, I don't think it
9  is. I think it's an imminent and serious or
10  substantial, whatever term, threat to public
11  health. Public health, looking at the longer-term
12  exposure consequences, so it is --
13  Q  Do you think --
14  A  -- it's not inconsistent, in my mind.
15  I might not be very clear, and I'm sorry, I'm not.
16  Q  When the emissions, chloroprene
17  emissions in the vicinity of the facility were
18  measured as high as 20 micrograms per cubic meter
19  in 2017, should the EPA have immediately
20  instituted an action, alleging an imminent and
21  substantial endangerment, to shut down the
22  facility --
23  MR. SMITH: Objection. Form.
24  Q  -- in your opinion?
25  A  In my opinion, the 20 micrograms per

**Page 147**

1  cubic meter exceedance of a reference
2  concentration does not constitute an emergency.
3  Q  That wasn't my question. My question
4  was --
5  A  Okay.
6  Q  -- when we saw that concentrations as
7  high as 20 micrograms per cubic meter were being
8  measured as of 2017, should the EPA have
9  instituted an action, alleging an imminent and
10  substantial endangerment, to abate the risk
11  attributable to those concentrations as high as 20
12  micrograms per cubic meter?
13  MR. SMITH: Objection. Form.
14  A  Again, for long-term cancer concerns,
15  the 20 micrograms per cubic meter is just an event
16  that occurs. It contributes substantially to the
17  average, but it's the average that is what is
18  important for a cancer outcome. And the cancer
19  averages here are very high. So those do
20  represent an imminent and substantial
21  endangerment. Not an emergency that is, again, as
22  I'm defining emergency, is really related to
23  non-cancer outcomes. Imminent and substantial
24  endangerment could be immediate or it could be
25  longer term.

**Page 148**

1  Q  Do you have a view of why EPA didn't
2  rush in, alleging an imminent and substantial
3  endangerment, to abate the harm from
4  concentrations as high as 20 micrograms per cubic
5  meter?
6  A  I don't know --
7  MR. SMITH: Objection. Form.
8  A  -- what EPA was thinking. No, I don't
9  know.
10  Q  Do you think they should have done it
11  back then?
12  MR. SMITH: Objection. Form.
13  A  Do I think that they should have
14  done --
15  Q  Rushed in, alleging an action, alleging
16  an imminent and substantial endangerment based on
17  concentrations measured 20 times higher than the
18  0.2 that EPA is trying to enforce in this case?
19  MR. SMITH: Objection. Form.
20  A  My experience has been largely with the
21  NESHAP program, not with the imminent and
22  substantial endangerment. So I, at that time,
23  would have had no, really, knowledge that that was
24  an option. I was not aware of that, really, at
25  least at any level of detail.

149

1 Q And do you think there is an imminent
2 and substantial endangerment today, based on the
3 concentration of chloroprene being measured in the
4 vicinity of the facility?
5 A Yes.
6 MR. SMITH: Objection. Form.
7 Q But you don't think there was one in
8 2017, when concentrations were measured as high as
9 20.0 micrograms per cubic meter, 100 times higher
10 than the level that the United States is seeking
11 to enforce in this lawsuit?
12 MR. SMITH: Objection. Form.
13 A At that -- what is my opinion now about
14 that point in time?
15 Q Yeah.
16 A Yeah, there was an imminent and
17 substantial endangerment. Most definitely.
18 Q Then why didn't EPA do something about
19 it?
20 MR. SMITH: Objection. Form.
21 A I have no idea why EPA would or would
22 not do something about it.
23 Q But you were part of the EPA at the
24 time?
25 A Yes, that's true.

150

1 Q Why didn't you ask someone to do it?
2 MR. SMITH: Objection. Form.
3 A That was not my role.
4 Q Whose role was it?
5 MR. SMITH: Objection. Form.
6 A We have other offices in EPA -- EPA has
7 other offices, Office of Enforcement, Emergency
8 Response. You know, that's not within my
9 experience of working with them.
10 Q I mean, not only did you suggest that
11 there was an imminent and substantial endangerment
12 to your colleagues in this email, you said you
13 agreed that there was no public health emergency
14 in connection with concentrations as high as 20
15 micrograms per cubic meter --
16 MR. SMITH: Objection. Form.
17 Q -- isn't that right?
18 A No, I didn't say here there was an
19 imminent and substantial endangerment in my email.
20 Q I'm wondering why you didn't?
21 A I didn't think of it.
22 Q Okay.
23 MR. SUPER: Let's take a break for
24 lunch.
25 THE VIDEOGRAPHER: We are going off the

151

1 record. The time is 12:13 p.m.
2 (Recess taken.)
3 THE VIDEOGRAPHER: We are back on the
4 record. The time is 1:12 p.m.
5 BY MR. SUPER:
6 Q Good afternoon.
7 A Good afternoon.
8 Q I'm handing you what we've marked as
9 Deposition Exhibit 409.
10 (Exhibit 409 marked for identification
11 and attached to the transcript.)
12 A Okay.
13 Q This is an Office of Inspector General
14 EPA document, it's entitled "Management Alert:
15 Prompt Action Needed to Inform Residents Living
16 Near Ethylene Oxide-Emitting Facilities About
17 Health Concerns and Actions to Address Those
18 Concerns," and it's dated March 31st, 2020.
19 Are you familiar, at all, with this
20 document?
21 A I don't recall seeing this, no.
22 Q Well, I'm going to represent to you
23 that it's a report that I downloaded from EPA's
24 website. And I want to ask you a couple of
25 questions about it.

152

1 If you go to page 4, there's a bold
2 heading that reads "EPA's Approach for Addressing
3 Risks from Ethylene Oxide."
4 A Okay. I see that.
5 Q Okay. I'm just going to go ahead and
6 read some language there.
7 "As the EPA was finalizing the 2014
8 NATA, the Agency identified 22 ethylene
9 oxide-emitting facilities that contribute to
10 elevated estimated cancer risks equal to or
11 greater than 100 in one million at the census
12 tract level. According to the EPA, the Agency has
13 prioritized taking actions to assess and address
14 the health risks from these 22 facilities as well
15 as three additional facilities that were estimated
16 to contribute to elevated estimated cancer risks
17 equal to or greater than 1,000 in one million at
18 the census block level."
19 Do you see that?
20 A Yes.
21 Q Are you familiar with the risk levels
22 at ethylene oxide facilities that the EPA OIG
23 describes in this paragraph?
24 A Beyond what I'm reading here? What do
25 you mean?