```
                 UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF LOUISIANA

**************************************************************
UNITED STATES OF AMERICA,

                  Plaintiff,

                            Civil Action No. 23-735
VS.                         Section "J"(3)
                            New Orleans, Louisiana
                            July 18, 2024

DENKA PERFORMANCE ELASTOMER, LLC
AND DUPONT SPECIALTY PRODUCTS USA, LLC,

                  Defendants.
**************************************************************

              TRANSCRIPT OF STATUS CONFERENCE
       HEARD BEFORE THE HONORABLE CARL J. BARBIER
                UNITED STATES DISTRICT JUDGE
```

APPEARANCES:

FOR THE GOVERNMENT:          Steven David Shermer
                             U.S. Department of Justice
                             Environmental
                             601 D Street NW
                             Washington, DC 20004

                             Heather E. Gange
                             U.S. Department of Justice
                             P.O. Box 23926
                             Washington, DC 20026

                             Davis Hoskins Forsythe
                             DOJ-Enrd
                             150 M Street NE
                             Room 2.1130
                             Washington, DC 20002

                             Hannah Lee Frazier
                             DOJ-Enrd
                             Enrd-Ees
                             150 M Street NE
                             Washington, DC 20002

APPEARANCES CONTINUED


FOR THE GOVERNMENT:           Daniel Stephen Smith
                              DOJ-Enrd
                              Environmental Enforcement
                              Section
                              P.O. Box 7611
                              Ben Frankling Station
                              Washington, DC 20044

                              Jonah M Seligman
                              DOJ-Enrd
                              Environment and Natural
                              Resources Division
                              150 M St. NE
                              Rm 5.130
                              Washington, DC 20002




FOR DENKA PERFORMANCE ELASTOMER, LLC:

                              David A. Super
                              Jason B. Hutt
                              Jeffrey Holmstead
                              Kevin Voelkel
                              Bracewell LLP
                              2001 M Street, NW
                              Suite 900
                              Washington D.C., DC 20036

                              Robert E. Holden
                              Jones Walker
                              Place St. Charles
                              201 St. Charles Avenue
                              Suite 5100
                              New Orleans, LA 70170

FOR DUPONT SPECIALTY PRODUCTS USA, LLC:

                              Eric Earl Jarrell
                              King & Jurgens, LLC
                              201 St. Charles Avenue
                              Suite 4500
                              New Orleans, LA 70170

                              Marie Olga Luis
                              King & Jurgens, LLC
                              201 St. Charles Ave
                              45th Floor
                              New Orleans, LA 70170

Official Court Reporter:    Nichelle N. Wheeler, RMR, CRR
                              500 Poydras Street, B-275
                              New Orleans, Louisiana 70130
                              (504) 589-7775

     Proceedings recorded by mechanical stenography,
transcript produced via computer.

1        **P R O C E E D I N G S**

2             (Call to order of the court.)

3        THE DEPUTY CLERK:  The Court calls Civil Action

4    23-735, *United States of America v. Denka Performance*

5    *Elastomer, LLC, et al.*

6        THE COURT:  All right.  The Court has this -- we

7    have this as -- scheduled as a status conference to see

8    where we are in this whole litigation.  I've got to say

9    this has all been somewhat confusing.  There's so much

10   going on and I'm not sure exactly where we are or where

11   we're headed with all of this.  So that's what I hope to

12   talk about this morning.

13        Who plans to speak here today, first of all, I

14   guess on behalf of the United States?

15        MR. SHERMER:  Good morning, Your Honor, I'm Steve

16   Shermer.  I'm lead counsel for the United States.  I plan

17   to speak, as well as Heather Gange, who is counsel for

18   the United States in its capacity as a counterclaim

19   defendant.

20        THE COURT:  Okay.  Very well.  Thank you.

21        And on behalf of DPE, who plans to speak?

22        MR. SUPER:  Good morning, Your Honor, Dan Super.

23   It's nice to meet you in person.  I'll be speaking on

24   behalf of Denka Performance Elastomer.

25        THE COURT:  Okay.  Is there someone here from

1    DuPont?

2        MR. JARRELL:  Eric Jarrell, Your Honor, for DuPont

3    Specialty Products USA, LLC.

4        THE COURT:  Okay.  Other than the persons who just

5    identified themselves, I have a list of everyone who is

6    here, but does anyone plan to need to speak here this

7    morning?

8        Okay.  All right.  I don't know who wants to

9    start.

10        The suit that we have here in this court, of

11    course, was brought by the EPA, by the United States, as

12    an enforcement action against Denka under Section 303 of

13    the Clean Air Act, arguing that Denka's emissions are

14    imminent, constituting imminent and substantial

15    endangerment to the surrounding community, and as I

16    understand, they argued that any emissions above that 0.2

17    microgram level was unsafe and presents an unacceptable

18    high risk of cancer for individuals living near Denka.

19        Denka is located in St. John Parish?

20        MR. SHERMER:  Yes.

21        THE COURT:  So this is in LaPlace, right?

22        MR. SUPER:  LaPlace.

23        THE COURT:  Is that where you're located?

24        Okay.  In the meantime, the EPA has promulgated

25    the so-called final rule, and initially, as I recall, the

1    proposed rule would impose that same standard, 0.2, but

2    with a two-year window to apply -- to comply, right?  The

3    proposed rule?

4          MR. SUPER:  That's not -- may I approach the

5    podium?

6          THE COURT:  Sure.  Go ahead.

7          MR. SUPER:  That's not correct, Your Honor, and

8    that's actually a fundamental point.

9          The proposed rule and now the final rule actually,

10    if all of the control requirements were implemented under

11    the final rule, EPA has said that the concentration that

12    would result is 0.8 micrograms per cubic meter.  And in

13    the rule, the United States says that that would be

14    protective of human health.  So in our view, the rule

15    with a 0.8 result is fundamentally inconsistent with the

16    Section 303 action where they're saying that a level of

17    0.2 constitutes an imminent and substantial endangerment.

18          THE COURT:  Well, you just managed to confuse me

19    even further, Mr. Super.

20          MR. SUPER:  It's confusing.  I'm sorry.

21          THE COURT:  Wait.  You can sit down, ma'am.

22          Wait.  No, stay where you are.  Stay where you

23    are.  I got a couple questions for you.

24          MR. SUPER:  Sure.

25          THE COURT:  So this is the first time I've heard

1    the 0.8.  I thought we were talking about 0.2 that was in

2    the proposed rule, but it provided for a proposed

3    two-year window to comply, but when the final rule came

4    out, they said, no, it's 90 days to comply.

5              MR. SUPER:  That is one of the --

6              THE COURT:  As I understand, the 90 days, I don't

7    want to call it the standard or the statutory

8    requirement, right, the 90 days -- the two-year would be

9    an extension, correct?

10             MR. SUPER:  That is correct.

11             THE COURT:  And that's what was originally

12   proposed.  Now it is 90 days.  So I didn't know there was

13   some argument about 0.2 versus 0.8.  Tell me about that.

14             MR. SUPER:  Yes.

15             THE COURT:  It's the first I heard about that.

16             MR. SUPER:  No, it's a really important point for

17   our motion for summary judgment, but, again -- because,

18   again, the risk assessment in the final rule points out,

19   the estimate is that once all the control requirements

20   are in place, the concentrations then would apply.  The

21   maximum average annual concentration would be 0.8.  And,

22   again, that is four times higher than the level that

23   we're --

24             THE COURT:  Meaning --

25             MR. SUPER:  -- trying to meet --

1          THE COURT:  -- meaning all the controls that Denka

2     would be required to implement.

3          MR. SUPER:  Under the rule.  That's exactly --

4     it's a post -- a post-control concentration of 0.8, that

5     under the statute as a matter of law, the agency in

6     promulgating this rule has said that is protective of

7     human health.

8          THE COURT:  What's the current emission from there

9     now?

10         MR. SUPER:  They've gone down considerably over

11    the past several years including during the pendency of

12    this lawsuit.  I can't tell you exactly what they are at

13    the moment, but 0.8 is within the realm of possibility as

14    we've consistently represented to the Court.  0.2 is not.

15    That would require a shutdown.  It's impossible to meet.

16         So, again, the rule, the final rule, will have in

17    our view an enormous impact on this case and it will be

18    part of the summary -- the supplemental summary judgment

19    briefing that --

20         THE COURT:  But --

21         MR. SUPER:  -- both sides proposed.

22         THE COURT:  -- but -- okay.

23         Let me hear from the government --

24         MR. SUPER:  Sure.

25         THE COURT:  -- on their point.  Okay?

1          MR. SHERMER:  Good morning --

2          THE COURT:  Good morning.

3          MR. SHERMER:  -- Your Honor, Steve Shermer for the

4    United States.

5          Your Honor, the reason you're hearing about this

6    0.8 concentration for the first time is because Mr. Super

7    is incorrect.  That is not the end-all be-all of this

8    final rule.  The final rule in addition to the technology

9    requirements, emission standards that it also requires,

10   it also requires a 0.3 concentration that Denka would

11   have to meet after installing all of its control

12   technologies as a backstop.  That is the end goal of the

13   rule.  So that's why you're not -- you haven't

14   heard about 0.3 --

15         THE COURT:  So now we're talking about 0.8, 0.3

16   and 0.2.

17         MR. SHERMER:  Correct.

18         THE COURT:  So what --

19         MR. SHERMER:  I can try and square that a bit for

20   you.

21         THE COURT:  Yeah, please.

22         MR. SHERMER:  So that 0.3 standard is measured at

23   the fence line, the perimeter of the facility.  The EPA

24   has modeled that that -- achieving that concentration

25   will result in acceptable below or at 0.2 levels in the

1  community, outside the perimeter.  So that's how you

2  reconcile the different numbers that you're hearing.  0.8

3  is a technology based standard, 0.3 is an air

4  concentration based standard at the perimeter of the

5  fence line, and 0.2 is the ultimate end goal in the

6  community amongst the people who are being exposed to

7  Denka's emissions.

8       THE COURT:  So what is the goal -- what is the

9  EPA -- what is your final goal here in terms of -- other

10  than shutting down the plant?  What is your goal here in

11  terms of emissions?

12       MR. SHERMER:  So our goal is not to shut down the

13  plant, Your Honor.  Our goal is to have Denka meet -- the

14  relief that we've asked for in this case is that Denka

15  achieve a 0.3 concentration at the perimeter at its fence

16  line using one type of monitoring system, and at the same

17  time, achieve a 0.2 microgram per cubic meter

18  concentration outside the fence line using a different

19  type of monitoring system, hand-in-hand monitoring

20  systems to give --

21       THE COURT:  So you're saying it would be 0.3 at

22  the fence line, so the farther away you got, the

23  concentration would logically be lower, right?

24       MR. SHERMER:  That's correct, in the affected

25  communities who have been exposed --

1      THE COURT:  So from your perspective, what's the

2  significance of the 0.8 that Mr. Super was talking about?

3      MR. SHERMER:  It's part of the rule, Your Honor.

4  It's EPA's calculation of how far they project Denka will

5  be able to get implementing all of the sort of known

6  control technologies that the rule talks about.  0.3 is

7  another target that EPA doesn't dictate how Denka needs

8  to get there, but it needs to get there.

9      THE COURT:  That doesn't make a lot of sense to

10  me, I got to tell you.

11      So you're saying if they install every bit of

12  technology that's available now they would only get to

13  0.8?

14      MR. SHERMER:  Of the categories of emissions.

15      THE COURT:  But they need to get to 0.3, but you

16  don't care how they get there.  Is that what you just

17  said?

18      MR. SHERMER:  The last part is correct, Your

19  Honor.  They have the flexibility to meet that 0.3

20  requirement.

21      THE COURT:  How would they get there if there's no

22  technology other than shutting down?  I'm not -- I'm just

23  having trouble understanding your argument here.

24      MR. SHERMER:  So the 0.8 number is based on a

25  fixed set of different emission sources.  It doesn't

1    represent the whole universe of sources of chloroprene

2    emissions at the facility.

3         So, for example, the rule talks about how to

4    control tanks, how to control different, essentially,

5    smokestacks, process fence (phonetic), how to control

6    emissions from wastewater.  The rule talks about a set of

7    different emission sources that the EPA -- the rule

8    dictates the control requirements for those different

9    sources.  But beyond that, there are other sources of

10   chloroprene emissions that Denka can control.

11        It can control those same sources like tanks below

12   the standards to achieve a 0.3 standard, but the point --

13   the 0.8 standard is based on a fixed set of different

14   manufacturing equipment that the EPA focused on.

15        THE COURT:  Okay.  So tell me -- and I'll let Mr.

16   Super respond, but tell me where things stand

17   procedurally in all of this litigation.  Because you have

18   this case here where you want -- your goal here is to --

19   your goal here would be to shut them down, right, at

20   least temporarily?

21        MR. SHERMER:  The goal would be for them -- would

22   be for them to achieve those two concentrations --

23        THE COURT:  Well, is it even feasible for them to

24   do this -- like, if you say this is an immediate danger,

25   it needs to be shut down or they need to reduce it to

1    that level, it doesn't sound like that's even feasible,

2    would it be?

3        MR. SHERMER:  Within the time that's left between

4    now and October 15th, I don't know.  We don't know if it

5    is feasible.  Denka has had years of time to plan for

6    this, to understand the government's objectives in this

7    case, and with the time that it's been aware of what the

8    government has asked for, it certainly could have

9    achieved those numbers without the need for a shutdown.

10       THE COURT:  And you have the rule up -- the rule

11   in DC.  What's the status of that?

12       MR. SHERMER:  So Ms. Gange's section of the

13   Justice Department is handling that litigation.  If I

14   may, Your Honor, she might be best suited to speak to

15   that.

16       THE COURT:  Okay.  Sure.

17       MS. GANGE:  Good morning, Your Honor.

18       THE COURT:  Hi.

19       MS. GANGE:  The litigation in the DC Circuit of

20   the window for additional petitioners challenging that

21   rule just closed this Monday.  EPA recently designated

22   the administrative record, and so that litigation is in

23   its early stages.  We're estimating that that may take up

24   to a year, give or take a few months, possibly more to

25   resolve and have a decision issued from the DC Circuit,

1   but in the meantime, because Denka's request for a stay

2   of that rule pending review is denied, the rule is valid,

3   and on October 15th will become effective.  And so that

4   will from that date forward be effective and potentially

5   enforceable.

6        All of it is provisions.  There are many, many

7   categories of sources; many, many pollutants regulated by

8   that rule.  So that is very --

9        THE COURT:  This is much -- this is much broader

10  than just the Denka Plant in LaPlace.

11       MS. GANGE:  Much; much, much broader; many more

12  pollutants, many more categories of potential sources all

13  across the country.

14       THE COURT:  But Denka is the only place where

15  chloroprene is manufactured, correct, only place in the

16  United States?

17       MS. GANGE:  I might need to stand corrected, but I

18  believe that there is one other source of chloroprene in

19  this country or one other facility that uses it and

20  therefore might be regulated.  But Denka -- I mean,

21  Denka's focus is chloroprene because that is so central

22  to their manufacturing, but the rule is so much more

23  broader.  There are many more petitioners.  And so

24  Denka's brief may be very focused, but the other issues

25  raised by other petitioners all will be litigated

1    simultaneously in the DC Circuit.

2         THE COURT:  But all the other petitioners -- their

3    argument, one of their arguments for the stay, as I

4    appreciate it, has been that, for whatever reason, the

5    EPA decided to -- in the rule to give every other

6    facility two years to comply as opposed to 90 days for

7    Denka.  Is that -- is that accurate?

8         MS. GANGE:  That is an issue that the DC Circuit

9    will need to grapple with, yes.

10        With respect to -- because that is an issue in the

11   final rule that jurisdiction to entertain that lies

12   exclusively in the DC Circuit.

13        I think Your Honor was accurate earlier today

14   though when you pointed out that under the statute it

15   requires a 90-day compliance with an emissions standard

16   issued under Section 112 unless the EPA grants an

17   extension, and the EPA determined not to do that due to

18   the imminent and substantial endangerment presented by

19   chloroprene.

20        THE COURT:  So in the EPA's view, chloroprene is

21   more imminently dangerous than any of these other

22   chemicals anywhere?

23        MS. GANGE:  My understanding -- and I apologize.

24   I might, again, need to stand corrected, but my

25   understanding of the chemicals regulated in the rule,

1   chloroprene happens to be the only one for which an

2   actual determination of an imminent and substantial

3   endangerment has been made.  For the other chemicals that

4   are regulated, there has not been a formal EPA

5   determination that there is an imminent and substantial

6   endangerment presented.

7           THE COURT:  How was -- who determined that?  How

8   is that determined by the EPA, the imminent danger part

9   of it?

10          MS. GANGE:  Imminent and substantial endangerment?

11          THE COURT:  Yes.

12          MS. GANGE:  In the preparation for this lawsuit

13  and in this lawsuit, there have been positions and

14  statements made.  There is no formal rulemaking, per se,

15  that there is -- there's no document I can point you to

16  from the EPA that has, say, been published in the Federal

17  Register making that determination, but the gravamen of

18  this lawsuit is that EPA scientists in the agency have

19  analyzed the data and information available and

20  determined that there is, in fact, an imminent and

21  substantial endangerment presented that -- that that

22  actually is the issue before Your Honor in this case.

23          THE COURT:  Right.  I understand that, but I was

24  trying to figure out how is that determined.  Do you

25  know?

1          As I recall -- as I recall, there was some --

2     Denka has filed a request for reconsideration or

3     rehearing or something up in the DC Circuit on their

4     request for a stay?

5          MS. GANGE:  They did.  That was recently filed.

6     That has not yet been decided.

7          THE COURT:  Okay.  Now, has -- I know the State of

8     Louisiana, the Attorney General and so forth, have filed

9     something in the Fifth Circuit.  Has Louisiana or anyone

10    filed something intervening or somehow in the DC Circuit,

11    too?

12         MS. GANGE:  I am not aware of whether or not

13    Louisiana has intervened in the DC Circuit.  I know that

14    Denka did file a request with the Fifth Circuit for a

15    finding that an extension, a two-year extension that

16    Louisiana tried to grant them, is valid.  They're asking

17    for declaratory judgment that that two-year extension is

18    valid.

19         EPA does not believe that that is valid.  By

20    Friday, I believe an intervention motion from Louisiana

21    will have to be responded to.  Louisiana has tried to

22    intervene in that Fifth Circuit action, and by Monday,

23    the EPA is required to file a response on the merits --

24         THE COURT:  So are you --

25         MS. GANGE:  -- to the request.

1      THE COURT:  -- are you involved in that?  Who is

2  involved in that?  Same lawyers who are here in this

3  courtroom this morning?

4      MS. GANGE:  No, Your Honor.  My section of DOJ --

5  I'm in the environmental defense section, and so we are

6  handling the DC Circuit and the Fifth Circuit litigation.

7  I am not personally writing the briefs, but members of my

8  section are and I work with them --

9      THE COURT:  In the Fifth Circuit, too?

10      MS. GANGE:  That's correct.

11      THE COURT:  Okay.  And I'll, of course, ask the

12  other side, but I'm trying to understand the procedural

13  avenue by which Denka and/or Louisiana went from -- went

14  directly to the Fifth Circuit.  Or is that an issue?

15      MS. GANGE:  That is an issue.  It is a bit of a

16  puzzlement.

17      THE COURT:  Yeah.

18      MS. GANGE:  So I -- at this point, the

19  government's position hasn't been articulated formally in

20  a brief and I'm not allowed to present issues until I

21  know that they've been approved by officials at an

22  appropriate level to make them.

23      But I can say and it has been said in other

24  filings that the government does not believe that the

25  two-year extension that was granted by the State of

1    Louisiana is --

2          THE COURT:  Well, I know -- I know that.  I

3    understand the government's position on that.  But I was

4    just thinking about the procedural machinations, if I

5    want to call it, in this whole case that is going on.

6          MS. GANGE:  Whether or not all proceedings should

7    go in the DC Circuit or not, that's certainly a question

8    and an issue that is being grappled with.  But in the

9    meantime, for this case, there is no inconsistency

10   between the endangerment that's being litigated here in

11   the 0.2 figure and the figures in the final rule.

12         I think the way perhaps to drop to the bottom line

13   might be that it is our belief that on October 15th that

14   emissions standard or all of these figures you have been

15   hearing about will become effective.  But if --

16         THE COURT:  And what's the -- if that occurs,

17   what's the practical effect or implication?  Does that

18   shut down the plant?  Because they say they can't comply,

19   it's impossible.

20         MS. GANGE:  And I think we -- I would have to

21   reiterate what Mr. Shermer said earlier, which is Denka

22   has been aware of this for years.

23         THE COURT:  Well, that's fine.  But we are where

24   we are now.  We're not -- we're not two years in the

25   past.

1           So if that happens, do you envision that Denka

2   would be shut down if they can't get a stay from either

3   the Fifth Circuit or the DC Circuit?

4           MS. GANGE:  Whether Denka is shut down or not in

5   light of that emissions standard, I'm afraid that's

6   something only Denka could answer.  I think in the

7   meantime our concern is Denka has been trying every --

8   trying to follow every possible pathway to try to ensure

9   that the standards in the final rule would not become

10  effective against them and our concern is that in the

11  meantime the public is being endangered by these

12  emissions.  And so we would like for this case to go

13  forward so that the public can be protected while these

14  other machinations are playing out.

15          THE COURT:  All right.  Thank you.

16          Mr. Super, you want to --

17          MR. SUPER:  Yes.  Thank you, Your Honor.

18          THE COURT:  Why don't you start by telling me, are

19  you involved in the Fifth Circuit --

20          MR. SUPER:  I'm involved in all of them, Your

21  Honor.

22          THE COURT:  I figured you were.

23          MR. SUPER:  Yeah.  Okay.

24          THE COURT:  So tell me, how is it that you go

25  directly to the circuit on that issue.

1          MR. SUPER:  Certainly.

2          THE COURT:  Okay.

3          MR. SUPER:  If I might --

4          THE COURT:  Procedurally.  I'm just trying to

5     understand --

6          MR. SUPER:  Can I just spend a few minutes just

7     telling you what's going on in the DC Circuit and the

8     Fifth Circuit?

9          THE COURT:  Sure.  Yeah.  I'd love --

10          MR. SUPER:  That may help.

11          THE COURT:  -- for you to do that.

12          MR. SUPER:  But the one thing I really do need to

13     just say immediately is, the notion that we're doing

14     everything we can to nullify this unlawful rule is

15     exactly right, because we're trying to protect a plant

16     that they're ordering to be closed.  We're trying to

17     protect the jobs of 250 employees and their families.  So

18     it does matter a lot to us.

19          And so in the DC Circuit, we are challenging the

20     rule in its entirety, but we filed an emergency stay just

21     to stop the 90-day implementation period.  And there

22     really can be no mistake in this court that that

23     implementation period is impossible to comply with.

24          And I'm not sure what Mr. Shermer was referring

25     to, but, I mean, their own experts in this litigation in

1    front of you opined that it would take 90 days just to

2    plan one of the control projects, just one, and now we

3    would have to plan and implement all of the projects in a

4    90-day period and no one believes that's possible,

5    including the EPA.

6        Now -- so we filed a motion for stay of the rule

7    in the DC Circuit and we got sort of the standard

8    one-sentence denial from the court that we had met the

9    stringent standards for a stay.  The next day, the

10   Supreme Court issued the *Ohio v. EPA* case which pretty

11   fundamentally changes how our court should look at

12   granting a stay of an agency rule.  That's why we filed

13   our petition for review just last -- on July 5th actually

14   and we're very hopeful that that may gain some traction

15   with the court.

16       But just to tell you quickly what that argument

17   was, when EPA issued the proposed rule, that was two

18   months after this case had been filed.  And in that

19   proposed result, as Your Honor knows, they had proposed a

20   two-year limitation period for Denka and all the other

21   200 facilities that are impacted by the rule.  And by

22   definition, as a matter of law, to give us that two-year

23   period, they had to have found that there was no imminent

24   endangerment.  Otherwise, they couldn't give it.

25       Now, we argued in summary judgment before this

1    Court that that means they've admitted there is no

2    imminent and substantial endangerment because they were

3    giving us a two-year compliance period.  And we frankly

4    think that the jig was up on summary judgment.  The EPA

5    realized that and so they went and they changed the rule.

6    They changed it to a 90-day implementation period.  And

7    the key thing is, they gave no notice of that in the

8    proposed rule.  In fact, during the rulemaking process,

9    they gave a full-throated defense of the two-year period

10   when the Office of Management and Budget asked about

11   that.  So the EPA was all in favor of the two-year period

12   until they changed it.

13          And, you know, in the words of the DC Circuit and

14   the Fifth Circuit and other cases, that's a classic

15   surprise switcheroo.  We think that makes the rule

16   invalid.

17          But worse, in the rule, EPA failed to explain why

18   Denka was being singled out and only given a 90-day

19   period.  Because, Your Honor, there are -- there are two

20   facilities out of the 200 that the EPA estimates that has

21   far higher risk levels than Denka and yet those

22   facilities got the two -- the full two-year period.  Does

23   that mean they're not posing an imminent endangerment?

24   We don't know.

25          I mean, the EPA has not explained how it can

1    single out Denka and say that it's causing an

2    endangerment, when these other facilities are not, who

3    admittedly pose a higher level of risk.

4         And I've got to address this finding they're

5    talking about.  The only, the only explanation they gave

6    in a 140-page preamble for why Denka was being singled

7    out was because of a so-called finding that Denka is

8    posing an imminent and substantial --

9         THE COURT:  You're talking about what they filed

10   in this court?

11        MR. SUPER:  Well, actually --

12        THE COURT:  Is that -- is that what you're talking

13   --

14        MR. SUPER:  It's even more slippery than that,

15   Your Honor.  They cited this case, but they didn't cite

16   anything in this case.

17        THE COURT:  No.  But you said 140 pages.  Where

18   are you talking about?  In the Circuit, in the DC --

19        MR. SUPER:  That's in the preamble to the rule.

20        THE COURT:  Oh, in the preamble to the rule.

21   Okay.

22        MR. SUPER:  So there's one sentence in the entire

23   preamble to the rule --

24        THE COURT:  Okay.

25        MR. SUPER:  -- purporting to explain why we're

1    only given 90 days --

2            THE COURT:  Okay.

3            MR. SUPER:  -- and the sentence says there's a

4    finding of an imminent and substantial endangerment

5    related to Denka and they cite to this case.

6            When we argued, okay, fine, there has been no

7    finding in this case, yet clearly we haven't had a trial

8    yet, but tell us what evidence you're pointing to, they

9    said no.  They're not pointing to the evidence in this

10   case.  They're just pointing to the existence of the

11   case.

12           We have no idea who made that finding and, again,

13   it's important to point out allegedly the finding was

14   made two months before they issued the proposed rule

15   giving us the two-year period, which is fundamentally

16   inconsistent with saying there is no imminent

17   endangerment.

18           So we know nothing about this finding.  The EPA

19   has explained nothing about it and we think it's critical

20   because if there is a finding that Denka is causing an

21   imminent endangerment and yet there is at least two

22   facilities under the rule who admittedly pose a higher

23   risk, where's the finding about whether they're causing

24   an imminent endangerment or not?  Apparently, the EPA

25   found that they're not because the EPA gave them the

1    two-year period.  And, again, they cannot do that as a

2    matter of law unless they found no imminent endangerment.

3         So we do think that when we spell all of this out

4    to the DC Circuit, as we did in our petition for review,

5    we're very hopeful the Circuit will take another look at

6    this case and enter the stay.

7         We have clear eyes about this though.  It's very

8    difficult to obtain a reversal of a denial of a stay by

9    the DC Circuit.  The DC Circuit has stayed one EPA rule

10   since 2011.  So it's a daunting -- it's a daunting task.

11   So that's where we are in the DC Circuit.

12        Fifth Circuit, on June 27th, the Louisiana

13   Department of Environmental Quality issued an extension

14   to Denka of the 90-day compliance period out to July 15,

15   2026.  Now, it's our position that the LDEQ had full

16   authority to do that for multiple reasons on the merits.

17   I mean, probably the simplest is, in the rule itself, the

18   EPA amended a provision purporting to remove LDEQ's

19   ability to grant extensions.  Well, that rule doesn't

20   come into effect -- it wasn't in effect at the time that

21   LDEQ granted the extension.  So that's one reason.

22        Another is LDEQ has separate authority to issue

23   extensions just because of the fact that it's the

24   permitting authority under the Clean Air Act and there

25   are other reasons as well, but that's for the Fifth

1    Circuit to decide.  EPA has taken the position that the

2    extension issued by LDEQ is invalid.  And so Denka cannot

3    rely upon that extension come October 15, and beyond --

4    without knowing -- without having some certainty that it

5    is valid.  Otherwise, the EPA is going to bring its full

6    civil and criminal enforcement liability to bear against

7    Denka after October 15th.

8         So what we've done is, we've gone to the Fifth

9    Circuit.  We filed a petition for review that asks for a

10   declaratory judgment that the LDEQ extension is valid --

11        THE COURT:  But why does that go directly to a

12   circuit?

13        MR. SUPER:  Because it's --

14        THE COURT:  That's what I'm trying to -- that's

15   what I'm trying to understand.

16        MR. SUPER:  Under Section 307(b) of the Clear Air

17   Act, it covers final EPA actions of a local or regional

18   nature.  And so EPA, taking a final position that the

19   LDEQ extension is invalid, is a local matter that goes to

20   the local circuit.  And that's why it's in the Fifth

21   Circuit instead of the DC Circuit.

22        Now, we've also asked the DC Circuit to issue an

23   emergency stay precluding EPA from taking any action in

24   contravention of what we view as a -- as a valid

25   extension granted by the LDEQ.  And mind you --

1    THE COURT:  So you raise the Louisiana LDEQ

2    extension.  If someone is valid -- if -- I mean,

3    obviously, you think it is valid, they think it's not,

4    but you've raised that in the DC Circuit also?

5    MR. SUPER:  We have not.  In the DC Circuit, we're

6    challenging other aspects of the rule.

7    THE COURT:  Okay.

8    MR. SUPER:  This really -- this really isn't the

9    rule.  This is seeking to get a declaration of the

10    validity of all the other reasons why LDEQ has authority

11    to issue this extension.

12    THE COURT:  I know.  But it creates -- it creates

13    quite an interesting procedural --

14    MR. SUPER:  It does, Your Honor.

15    THE COURT:  -- where you have a DC Circuit -- you

16    have this proceeding in the DC Circuit where the EPA

17    wants to enforce their rule, which is with the 90 days.

18    You've asked to stay that --

19    MR. SUPER:  Right.

20    THE COURT:  The Circuit at this point has denied

21    your request for a stay.  You've applied for a rehearing

22    I guess *en banc*.

23    MR. SUPER:  That's right, rehearing by the panel

24    and rehearing *en banc*.

25    THE COURT:  Okay.  And while all that's pending,

1    you now go to the Circuit, the Fifth Circuit --

2              MR. SUPER:  Right.

3              THE COURT:  -- ask them to give you the two-year

4    extension that the DC Circuit may or may not -- what if

5    the DC Circuit says, no, you can't get a stay -- you have

6    to comply with this rule and the Fifth Circuit says you

7    have a two-year extension.  We have one circuit against

8    another circuit.  Meanwhile, I'm sitting down here

9    between both of them.

10             MR. SUPER:  I'm going to get to your position on

11   this --

12             THE COURT:  Okay.

13             MR. SUPER:  -- in a moment --

14             THE COURT:  Okay.

15             MR. SUPER:  -- if you don't mind.

16             What I would say to you there, Your Honor -- this

17   was on page 1 of our motion for stay in the Fifth

18   Circuit.  The arguments we are making to the Fifth

19   Circuit can assume that the rule is valid because, again,

20   we're saying that LDEQ acted under other authority.  It

21   doesn't matter that that rule is out there, that LDEQ had

22   separate and independent and lawful authority to issue

23   this extension.  So that's what we've got before the

24   Fifth Circuit right now.

25             Now, what we've asked the Court to do --

1      THE COURT:  Could you have -- could you have gone

2  to the DC Circuit with the argument about the extension

3  granted by the LDEQ?

4      MR. SUPER:  I believe we -- I believe we could.

5  My colleagues may correct me on this, but I think when

6  you're talking about a final agency action of local or

7  regional application, you can either go to the local

8  circuit or you can go to the DC Circuit.  We elected to

9  go to the Fifth Circuit.

10      And, again, in our view and we spelled this out to

11  the Fifth Circuit, there was no overlap between the two

12  cases, because in the DC Circuit, we're talking about a

13  rule; in the Fifth Circuit, we're talking about other

14  authority that the State maintains to issue extensions.

15      THE COURT:  Well, I see a lot of potential overlap

16  from where I sit here, but anyway.  Go ahead.

17      MR. SUPER:  We will undoubtedly be faced with

18  those arguments and we'll wade through them, but to kind

19  of -- just one other point about the Fifth Circuit.

20      We've asked for the Court to rule on our stay

21  motion by the 12th of August.  Very significant date.

22      October 14th, again, that is when the 90-day

23  implementation period kicks it.  Denka cannot comply with

24  it.  It's gonna have to shut down.  But it can't shut

25  down on October 14th.  It has to start that process

1    earlier and many of the things that need to be done will

2    be starting in mid-August and that is why we need --

3         THE COURT:  Give me an example of why -- why it

4    takes two months to shut down a plant.

5         MR. SUPER:  Yeah.  One major one is there's

6    the W-A-R-N, the WARN Act, obligations with respect to

7    employees.  We have to tell them --

8         THE COURT:  I'm very familiar with that.

9         MR. SUPER:  -- we have to tell them well in

10   advance.  But it's not an -- it's not an easy task to

11   shut down a facility, particularly if it's shut down

12   potentially permanently.  There's just a lot of

13   engineering steps that go into it to ensure safety, to

14   ensure the removal of all of the ingredients that go into

15   the products.  So it's something that does need to start

16   in August, again, which is why we with some temerity

17   asked the Fifth Circuit to rule pretty quickly.

18        THE COURT:  Well, what would be -- what would be

19   the practical consequences if nothing changes, the 90-day

20   requirement stays in effect and Denka chooses not to shut

21   down or says we can't shut down by that time?  Are they

22   continuing to challenge on the merits, but they're not --

23        MR. SUPER:  Denka, Your Honor, is not -- is

24   sensibly not willing to operate beyond October 15th

25   without an assurance that it has a valid extension

1    permitting it to do so due to the substantial criminal

2    and civil liabilities that could be brought to merit --

3         THE COURT:  So you can ensure the Court there's no

4    question, no doubt that if Denka does not get a stay from

5    either the DC Circuit or the Fifth Circuit, it's going to

6    shut down by October 15th.

7         MR. SUPER:  Yes, Your Honor.  Yes, Your Honor.

8    There's no other -- there's no other options.

9         And that kind of leads to where I believe the

10   matter sits before this Court, and as you saw in our

11   portion of the status report, we were suggesting that the

12   case should be held in abeyance to find out what's going

13   to happen in the Fifth Circuit and the DC Circuit, which

14   would certainly happen before October 14th and may happen

15   much sooner in the next, I don't know, six to

16   eight weeks.  But if we don't obtain relief from the

17   90-day implementation period, just as I said, the plant

18   will shut down and the litigation alleging an imminent

19   and substantial endangerment will render moot.

20        And so in our view, it doesn't make much sense and

21   it's not very prudent for the parties to be preparing for

22   a trial, I think -- actually I know that the United

23   States proposed the second half of October, that the

24   parties should be preparing for a trial that could be

25   rendered moot, like days before the trial begins, nor

1    frankly should the Court be wrestling with fairly complex

2    motion for judgment, a motion to dismiss, DuPont's motion

3    for judgment on the pleadings, I think there's a couple

4    of motions in limine out there, I think there are a lot

5    of party and judicial resources that would be wasted

6    unless -- and believe you me, I'm very hopeful that we

7    get relief from the DC Circuit or the Fifth Circuit.  But

8    we recognize that we have some daunting challenges in

9    front of us before those courts.

10        If we don't get that relief, again, it doesn't

11   make much sense to have been preparing for a trial that

12   has been rendered moot and that was the basis for our

13   abeyance suggestion.

14        THE COURT:  In light of -- in light of speaking of

15   the pending motions, there's a pending motion for --

16   there's still a renewed, I guess, motion on the -- on

17   your counterclaims, right?

18        MR. SUPER:  That is correct.

19        THE COURT:  And then your motion for summary

20   judgment, of course.

21        MR. SUPER:  And our motion for summary judgment.

22   As I alluded to before, we think that motion has -- the

23   strength of that motion has doubled since the rule came

24   out.

25        THE COURT:  So here's my question and does it --

1   do you envision that it would -- the court should or

2   would be -- would be asked to file additional -- allow

3   additional briefing on those motions?

4           MR. SUPER:  I do --

5           THE COURT:  In light of everything that's going on

6   that we've talked about and the couple of recent U.S.

7   Supreme Court cases.

8           MR. SUPER:  No, I do, Your Honor, and I apologize

9   for sort of the separate status reports, but this was one

10  point that we sort of agreed on, that the United States,

11  for example, in the motion for summary judgment, would

12  file a sur-reply updating the court on the issues and we

13  would file an opposition.  I think where we disagreed is

14  we felt like we needed about 15 pages to make all of

15  these points clear and I think they had mentioned eight,

16  but, you know, going forward with the summary judgment

17  actually makes a lot of sense because we think that can

18  make this case go away.

19          By the same token, we would be -- we would be

20  happy to submit a supplemental brief relating to the

21  motion to dismiss our counterclaim as well because there

22  have been some developments there that --

23          THE COURT:  Would it be cleaner to allow or to

24  start anew with the briefing?  In other words, instead of

25  filing a supplemental brief for each side, just dismiss

1    the -- let's just file a renewed brief --

2          MR. SUPER:  I will say an emphatic yes.  We were

3    thinking this might be easier for the Court, but if the

4    Court would rather have an omnibus motion for summary

5    judgment with all the points, we're happy to do that.

6          THE COURT:  I mean, that's kind of what I have

7    been thinking, but I'll let the other side respond, too.

8          Okay.  All right.  Let me hear from the government

9    again, please.

10         Thank you.

11         Who wants to speak?

12         Mr. Shermer?

13         MS. GANGE:  Your Honor, I apologize for the

14   shuffle.  Just one quick point.

15         Is Your Honor more concerned at this point about

16   hearing about the schedule and potentially renewed

17   briefing for summary judgment?

18         THE COURT:  Well, that and whether we should hold

19   things in abeyance until at least October 15th to see

20   where we are, because I'm really concerned about spending

21   not only my time, but time of the parties and counsel on

22   something that could become essentially moot.

23         If -- if Denka loses on their request for stays in

24   either the circuit -- either circuit, they've represented

25   to the Court that there's no question that they will have

1    to shut down.  So that would seem to me moot the

2    immediate endangerment issue in this court, right?

3             MS. GANGE:  If I could have --

4             THE COURT:  If they're not operating, they can't

5    have a -- that's what you're effectively asking me to do

6    anyway.

7             Mr. Shermer.

8             MR. SHERMER:  So, Your Honor, if, in fact, Denka

9    permanently shuts down, then, yes, this case is moot, but

10   Denka --

11            THE COURT:  Well, even if they temporarily shut

12   down, it's moot.  The immediacy of this whole case is

13   not -- not present it seems to me.

14            MR. SHERMER:  Until they restart, which --

15            THE COURT:  Well, yeah.  But, I mean, there would

16   be no -- I wouldn't see any need to go forward on an

17   injunction hearing as opposed to a trial on the merits if

18   that's necessary at some point down the line.

19            MR. SHERMER:  So, Your Honor, we do think it makes

20   sense to restart the litigation schedule.  Denka's

21   arguments about not wanting to spend time and resources

22   on this litigation seem to fall away pretty quickly when

23   it comes to submitting additional briefing, which they

24   seem more than willing to do.  They obviously have filed

25   multiple pieces of other litigation.  So they have the

1    resources and the determination to file litigation when

2    they want to --

3           THE COURT:  Well, how about if we just held

4    everything in abeyance until October 15th and then we

5    hold another status conference around that time and see

6    where we are?

7           MR. SHERMER:  So, Your Honor, the -- until that

8    time, Denka has made it clear that they will continue to

9    emit their chloroprene emissions at their current levels,

10   and if they get their extension from the Fifth Circuit or

11   they get their extension from the DC Circuit, they will

12   continue to emit for as long as whatever relief they get

13   in either of those circuits.  During that time, their

14   emissions are causing cancer risks to the people --

15          THE COURT:  We're not going to be able to hold

16   this trial and have that decided earlier than that

17   anyway, right?

18          MR. SHERMER:  So, Your Honor, we can provide the

19   Court with status updates, the status of the circuit

20   court litigation, which is on fast-track to keep you

21   apprised of the decisions in that case or how that may or

22   may not affect the schedule, but the harm associated with

23   Denka's emissions will continue until they're ordered to

24   stop and reduce them.

25          THE COURT:  Well, if -- but if they get stays from

1  one or both of those circuits, I don't know how -- I

2  don't know how that does not impact our schedule here,

3  our litigation here.

4      MR. SHERMER:  If they get a stay, Your Honor, then

5  it's all the more reason for this case to continue.  This

6  case is based on a separate statute under the Clean Air

7  Act, Section 303, which makes -- the text makes clear

8  that authority stands and gives this Court authority to

9  order relief to abate endangerments to public health,

10  notwithstanding any other provision of the Clean Air Act,

11  notwithstanding Section 112 rulemaking like is going on

12  in DC Circuit.  This action stands alone based on

13  independent legal authority, which is a lot of what our

14  summary judgment briefing is about.

15      Denka disagrees with that position.  We think

16  that's contrary to the text of the statute, but if they

17  get a stay for a year, eighteen months, two years from

18  either one of these courts, then they will continue their

19  current level of emissions, which depending on the

20  monitor we're looking at, it can be as much as seven

21  times in the past year, that 0.2 number.

22      So seven times the --

23      THE COURT:  How long --

24      MR. SHERMER:  -- acceptable --

25      THE COURT:  -- has the Denka Plant been in

1  operation?  Do you know?

2      MR. SHERMER:  Roughly 1968, but DuPont's counsel

3  might know that better.

4      THE COURT:  So has the emissions since 1968 been

5  more or less the same?  Has it increased?  Has it gone

6  down?  What's the general sense of that?

7      MR. SHERMER:  Since Denka has bought the plant, it

8  is undeniable that they have reduced their emissions

9  substantially, Your Honor, in no small part due to the

10  government's efforts to do that.

11      In 2017 they talk about this.  They entered into

12  an agreement with the State that required them to take on

13  multiple projects to install air pollution control

14  equipment that reduced their emissions by about

15  85 percent from when they bought the plant from DuPont.

16  So the emissions are dramatically lower, but they are

17  still too high and Denka has explained that it will not

18  reduce them further without being ordered to do so.  It's

19  filed litigation, multiple pieces of litigation in the

20  circuit courts of appeal so that it can avoid ever having

21  to comply with the final rule, because that's its end

22  game, is to invalidate the final rule, in which case,

23  this case is abundantly necessary.  It will be the last

24  legal action that's available to address the public

25  health endangerment caused by Denka's chloroprene

1    emissions.

2            THE COURT:  Okay.  Thank you.

3            I got a couple more questions for Mr. Super,

4    please.

5            Maybe you can answer.  Do you know -- is Denka the

6    only plant in the entire United States that produces

7    chloroprene?

8            MR. SUPER:  Yes.

9            THE COURT:  Okay.  I understand there was a plant

10   in Kentucky that was shut down.

11           MR. SUPER:  Yes.  And that actually sort of

12   relates to the merits of this action because there was a

13   study conducted at that plant of chloroprene workers by

14   Dr. Gary Marsh back in 20 -- 2007 and then updated in

15   2021 and those workers inhaled orders of magnitude higher

16   levels of chloroprene than anyone in connection with the

17   vicinity of the Denka facility.  And Dr. --

18           THE COURT:  And why was that?

19           MR. SUPER:  They worked there.  And so just by

20   working in a chloroprene plant, they were exposed to much

21   higher levels.

22           And Dr. Marsh's study found there was no linkage

23   between the types of cancers that the EPA attributes to

24   chloroprene and these massive exposures of chloroprene.

25   But we think that's pretty --

1          THE COURT:  So why was that plant shut down in

2    Kentucky?

3          MR. SUPER:  That I don't know.

4          THE COURT:  Who shut it down?

5          MR. SUPER:  I don't know the answer to that.

6          THE COURT:  You don't know -- you don't know if

7    the EPA or the State of Kentucky shut it down?

8          MR. SUPER:  I don't know.  Maybe one of my

9    colleagues --

10          MR. JARRELL:  If Your Honor is really interested

11    --

12          THE COURT:  Give us your name, please.

13          MR. JARRELL:  Eric Jarrell, Your Honor, for DuPont

14    --

15          THE COURT:  Oh, yeah, DuPont.  Why don't you come

16    up?

17          MR. JARRELL:  That facility, Your Honor, was shut

18    down for marketing reasons.  It wasn't -- it wasn't

19    environmental health and safety reasons.

20          THE COURT:  Marketing reasons.

21          That was a DuPont plant also?

22          MR. JARRELL:  Right.  It was -- it produced a

23    product that wasn't needed in the place it wasn't needed

24    and so that's why it was shut down.  No one --

25          THE COURT:  It wasn't --

1          MR. JARRELL:  -- shut it down.

2          THE COURT:  Didn't it produce the same product as

3     Denka?

4          MR. JARRELL:  It did.

5          THE COURT:  So why is Denka's product needed, but

6     not that plant?

7          MR. JARRELL:  Oh, it's just the -- as I appreciate

8     it -- now I'm going off of memory here.  But as I

9     appreciate it, it was simply because of what was needed

10    in the market worldwide and whether multiple facilities

11    were needed for that, but the remaining operations in

12    LaPlace were needed and continued.  That facility has

13    been operating since the early 1960s.  I have been

14    representing it since the early 1980s and going out there

15    regularly.  It's a relatively modest facility, but serves

16    a very important purpose.

17         THE COURT:  So since Denka took it over -- I read

18    something on Denka's website.  I know this is not

19    evidence, but I assume this is accurate information.

20         Denka took -- bought it from DuPont November 1,

21    2015, correct?

22         MR. JARRELL:  Correct, Your Honor.

23         THE COURT:  And then it says that Denka -- Denka

24    Company, Limited -- whose polychloroprene business is

25    based in Japan, has long business experience with this

1    product.

2            So Denka had been in a business -- Denka had been

3    in a business of manufacturing chloroprene long before it

4    bought the Denka Plant?  I mean, the LaPlace plant,

5    right?

6            MR. JARRELL:  Correct, Your Honor.  They were a

7    market competitor.

8            THE COURT:  Of DuPont?

9            MR. JARRELL:  Of DuPont.

10           THE COURT:  Okay.

11           MR. JARRELL:  And that was the only facility that

12   E.I. du Pont de Nemours and Company had at the time doing

13   that.  Denka had other facilities.

14           THE COURT:  So if you can't compete, buy out your

15   competition, huh?

16           MR. JARRELL:  That's certainly one thing that

17   someone can argue.

18           THE COURT:  You don't have to answer that.

19           MR. JARRELL:  I think we were just happy someone

20   was willing to buy it for a price we were willing to

21   accept.  That's how the world works, right?

22           THE COURT:  Okay.  I have another question for Mr.

23   Super.  It looks like he wants to say something anyway.

24           MR. SUPER:  My colleague --

25           THE COURT:  Come up, Mr. Super --

1          MR. SUPER:  -- may have historical knowledge --

2          THE COURT:  Wait.

3          MR. SUPER:  -- of Denka.

4          THE COURT:  Well, here's my question and I don't

5    know which one of you wants to answer this.  But Denka,

6    based on the statement that they have a long business

7    experience with this product that they manufactured in

8    Japan?

9          MR. SUPER:  I'm going to let my colleague, Jason

10   Hutt, address these points.

11         THE COURT:  Okay.

12         MR. HUTT:  Good morning, Your Honor, Jason Hutt,

13   for Denka Performance Elastomer.

14         THE COURT:  Okay.

15         MR. HUTT:  So Denka, one of the joint venture

16   partners of DPE, the Defendant in this case, owns a

17   neoprene manufacturing facility in Japan, but the way in

18   which they make neoprene is not the same as the way

19   neoprene is made here in LaPlace, Louisiana, or in the

20   way in which it was made at the Kentucky facility by the

21   prior owner and operator of DuPont.

22         The Kentucky facility and the LaPlace plant make

23   the neoprene in the same way in that chloroprene is one

24   of the key ingredients that is used to make the neoprene.

25   The neoprene that is made in Japan is not made with

1  chloroprene as the input ingredient.  They use a settling

2  process, so it's a different process, has a different

3  emission profile, different public health considerations

4  associated with that.

5      THE COURT:  So in Japan, Denka is not emitting

6  chloroprene.  Is that what you're saying?

7      MR. HUTT:  Not in the same way that this -- this

8  facility uses two fundamental ingredients -- butadiene,

9  1,3-butadiene and chloroprene -- that they combine to

10  make neoprene at the plant.

11      THE COURT:  So apparently -- are you a chemist,

12  too?

13      MR. HUTT:  No, sir.  An aspiring chemist.

14      THE COURT:  Okay.  So it seems like based on what

15  you said you can make neoprene without using chloroprene.

16      MR. HUTT:  That's correct.  If your plant is

17  configured in that fashion.

18      No?

19      MR. HOLDEN:  Can I weigh in?

20      MR. HUTT:  Yeah.  Sure.

21      MR. HOLDEN:  Your Honor, this is Bob Holden with

22  Jones Walker on behalf of Denka Performance Elastomer and

23  I have had the privilege of representing DPE since 2016.

24      Neoprene is polychloroprene.  It is a polymerized

25  version of chloroprene.  So in Japan and the United

1   States, you have to use chloroprene in order to make

2   neoprene.  How you make the chloroprene is the difference

3   between the Japanese plant and the United States plant.

4        And in the United States at the LaPlace plant,

5   butadiene is the raw material along with chlorine that's

6   purchased separately in order to make the chloroprene,

7   and from the chloroprene, you go through a polymerized

8   process, but it is correct that DPE is the only

9   significant emitter of chloroprene in the United States.

10  So everything else that my colleagues have said is

11  correct, but I don't think we were really prepared to get

12  into an elaborate discussion of the chemical processes

13  that make the chloroprene.

14       THE COURT:  Well, I'm only -- I'm trying to

15  understand downstream, so to speak, downstream from this

16  litigation what the practical consequences of any of this

17  would be, if -- I know neoprene, you know -- yeah,

18  neoprene is apparently an important product that's

19  produced in the country for -- that can make everything

20  from gloves to diving suits and so forth, right?

21       MR. HOLDEN:  That is correct, Your Honor.

22       THE COURT:  And a lot of other things I'm sure.

23       MR. HOLDEN:  Used in all sort of industrial,

24  automotive --

25       THE COURT:  But I guess what I'm -- I'm just

1    wondering out loud here, if this same product can be

2    produced in a different way, perhaps a safer way in

3    Japan, why can't that be done in the United States?

4          MR. HOLDEN:  There are also chloroprene emissions

5    in Japan, but Japan is not subject to the same sorts of

6    EPA risk analyses that resulted in ultimately the 0.2,

7    0.3, 0.8 types of argument and analyses.

8          THE COURT:  And do you know -- does someone know

9    what the emission levels are in Japan from that plant?

10         MR. HOLDEN:  We would have to take that under

11   advisement and respond to Your Honor separately.  I don't

12   think we're prepared to address that.

13         THE COURT:  Okay.  All right.  Thank you.

14         You want to say something?

15         MR. SUPER:  May I just address one point that Mr.

16   Shermer made about the alleged harms that might accrue

17   during an abeyance period?

18         I think it's important to keep in mind that

19   they're the ones who asked the Court to cancel the March

20   trial and that led to -- if they get a trial in October,

21   which they want, that would have led to a seven-month

22   delay.  So the harm during that seven-month delay would

23   be longer or more than any potential harm during a

24   four-month abeyance period.

25         So I think it's -- you know, pointing out there

1   will be substantial harms during this abeyance period

2   isn't really accurate.  I mean, they assess their whole

3   risk profile based on a 70-year lifetime, so a four-month

4   abeyance period is something like 0.005 percent of that

5   70-year lifetime.  So it's an infinitesimal increase in

6   risk if the Court were to grant an abeyance.  And, again,

7   it's less than the delay that was caused by the United

8   States canceling the trial last March.

9          THE COURT:  While you're up, tell me about this:

10  One of the issues that was raised in the status report to

11  the court, it says that Denka suggests or argues that it

12  would like to conduct additional discovery.

13         I'm not clear on what additional -- assuming if or

14  when this litigation goes forward, what would be the need

15  for that and the scope of that discovery?

16         MR. SUPER:  I'm glad you asked that because it is

17  very targeted and limited discovery that goes directly to

18  the rule and it relates to issues we've already discussed

19  today, you know.  One is, again, the fact that once all

20  of the projects that are required by the rule are

21  implemented, the EPA admits that you're left with a 0.8

22  micrograms per cubic meter concentration which is

23  entirely consistent with the emergency they're alleging

24  in this case, that 0.2.

25         And there are -- there's modeling.  It's called

1  Human Exposure Modeling or HEMs that EPA performed in

2  connection with the rule that would lay all of that --

3  lay all of that out and we really need that modeling.

4  Interestingly enough, they actually made it available

5  with respect to the proposed rule, but they have not made

6  it available with respect to the final rule.  And that is

7  something that they should be able to produce to us and

8  we should be able to receive.

9       But it doesn't end there because, you know, as

10  we've talked earlier today, this notion that Denka was

11  singled out and given the 90-day period when other

12  facilities with higher risk profiles were given two

13  years, we think we're entitled to know why, what analysis

14  was done by the EPA to say -- as they had to as a matter

15  of law, to say this facility that has a four times higher

16  risk profile than Denka gets two years, thus no imminent

17  endangerment, but Denka doesn't.  Why?  How?  Who made

18  that decision?  What is it based on?

19       We have nothing on that other than one sentence in

20  the 140-page preamble, which is this finding associated

21  with this case.  And I know Your Honor has made no

22  findings in this case.  We have no idea what they're

23  talking about with respect to these findings.  So we

24  think we should be able to get some basic simple

25  discovery on who made the finding, where does it exist,

1    is it on a piece of paper, what is it supported by,

2    because they can't stand up here and tell you that it has

3    anything to do with what's happened in this case because

4    we made that point.

5        We said, all right, if you're making a finding

6    based on the case before Judge Barbier, then let's put

7    that whole district court record into the administrative

8    record as support for the finding.  They said no.  It's

9    not that.  It's something else.  It's this mysterious

10   finding that someone made sometime presumably in February

11   of 2023 and we need to know what that finding is all

12   about.  And it's critical because if the finding was made

13   by the EPA that Denka is causing an imminent

14   endangerment, then who made the finding that these higher

15   profile facilities are not causing an imminent

16   endangerment and why?  What's the difference?

17       That is a fundamental point of administrative law.

18   If you're going to single out a party and then treat it

19   in a disparate fashion, you've got to explain why and we

20   see no explanation why other than this one sentence

21   referring to the case before you where there have been no

22   findings.  So that in a nutshell is the discovery.

23       What I would propose is that we write it up in a

24   very short motion, explain to you exactly what we want

25   and why we want it and why it's important both as to the

1    summary judgment and to the trial and we can get that

2    prepared pretty quickly or after the abeyance period if

3    the Court thinks that's appropriate.

4         THE COURT:  So we talked about what happened --

5    what the effect would be if Denka does not get its relief

6    in either circuit.  You represent to the Court it would

7    require a shutdown.

8         What if you do get the relief from either circuit?

9    Where does that leave this case in your view?

10        MR. SUPER:  I think if we do get the relief, that

11   means we are alive until July 15, 2026, to try to comply

12   with the rule.  Under those circumstances, if the United

13   States thinks it's important to renew this imminent and

14   substantial litigation, then they can take that position

15   and maybe we'll try to find a trial date.

16        What I will say though is, if we do get relief,

17   that means one of the circuit courts has basically

18   undercut this notion that Denka is causing an imminent

19   endangerment because that would be the basis upon which

20   we receive the extension.  If, you know, that happens, we

21   think in addition to the various points about the rules

22   that I've been talking about, our summary judgment motion

23   would be very strong at that point.

24        So if the United States wants to bring the case

25   back, that's the first thing we want to do, is make sure

1  we get the summary judgment motion in front of you.

2  THE COURT:  And just to be clear, finally, Denka

3  really doesn't want to ever comply with this rule, right?

4  MR. SUPER:  Denka cannot comply with the rule.

5  THE COURT:  So it's not just a matter of 90 days

6  or two years.

7  MR. SUPER:  I know -- I can represent to the Court

8  that 90 days is impossible.  It's not going to work.  I

9  can't really say that with respect to July 2026.  It

10  gives the company hope that it can continue.  I'm not

11  sure how that will play out.

12  THE COURT:  And why couldn't it comply in two

13  years?

14  MR. SUPER:  Why couldn't it comply --

15  THE COURT:  Why could it not comply if given the

16  two years?

17  MR. SUPER:  Well, I think that's an analysis

18  that's beyond my ability to discuss at this point.  It

19  involves a lot of engineering issues.  But I think it's

20  on the table.

21  I'm not standing here saying to you the plant

22  would shut down after two years.  I just don't know the

23  ends and outs of how the rule would be complied with.

24  What I do know right now is they cannot possibly do it by

25  October 15th.

1          THE COURT:  Okay.  Thank you, Mr. Super.

2          Anybody want to respond briefly before we

3    conclude?

4          MS. GANGE:  I would like to make a couple of quick

5    points about the discovery --

6          THE COURT:  Okay.  Sure.

7          MS. GANGE:  -- that we had spoken about earlier.

8          With respect to information and data and analyses

9    that were used to develop the terms of the final rule,

10   that all is available to Denka today.

11         The United States --

12         THE COURT:  When you say it's available, you mean

13   it has been provided or it's publicly available or what?

14         MS. GANGE:  It is publicly available.

15         Under Section 42, U.S. Code, Section 7607(d), the

16   statute specifies that the EPA is required to put all of

17   the information that it based its final rules on into the

18   administrative record and all of those materials have to

19   be posted to that record by the time the rule is

20   finalized and that is available online at

21   regulations.gov.  And every rule in the Federal Register

22   Notice it specifies the internet address and the rule

23   number that you simply type in to access all of that

24   information.

25         So Denka's counsel -- everyone can Google today,

1   right -- they should -- they should be able to download

2   that.  If they have electronic issues, we're happy to

3   talk to the EPA about it.

4        THE COURT:  Well, if they -- if they for some

5   reason need information that is not available as you

6   just -- as easily as you just said, you have no problem

7   -- the EPA would have no problem providing that, correct?

8        MS. GANGE:  All they need to do is contact us and

9   ask for it and we'll either point to the regulations.gov

10  page or discuss whether it's legitimate.

11       THE COURT:  Okay.

12       MS. GANGE:  With respect to a finding, I just

13  wanted to clarify, when people talk about an agency

14  finding, let's say of an imminent and substantial

15  endangerment, most people are thinking of some final and

16  reviewable agency action.  There is not a final and

17  reviewable agency action as that's codified under the

18  Clean Air Act.  There is no magic document that was, say,

19  published in the Federal Register.

20       But this lawsuit is an imminent and substantial

21  endangerment lawsuit.  The claim that the EPA brought has

22  to by definition and by statute be based on a scientific

23  conclusion that an imminent and substantial endangerment

24  is being created and that had to be substantiated in the

25  EPA.  The EPA had to refer the case to DOJ and DOJ had to

1    make its determinations about filing and all of the

2    information about that and how it was determined and

3    calculated, all the information supporting it, is the

4    evidence in this case.

5         THE COURT:  What's the -- what's the case law

6    under Section 303?  That's what this case is based on,

7    right?

8         MS. GANGE:  Yes, it is, Your Honor.

9         THE COURT:  Is there any case law supporting using

10   that section in the way the EPA seeks to use it in this

11   case?

12        MS. GANGE:  I'm sorry, Your Honor.  I don't quite

13   understand.

14        THE COURT:  Well, I mean, I can envision things

15   happening, you know, something blows up and creates an

16   immediate endangerment to the surrounding community,

17   whatever, but the -- I believe the other side suggests

18   that this is an unprecedented use of Section 303 in the

19   context of this kind of case is -- what's your response

20   to that?

21        And I know we're not arguing a motion for summary

22   judgment right now, but I believe I've stated that

23   correctly.

24        MS. GANGE:  Could I hand this to Mr. Shermer?

25        THE COURT:  Okay.  Sure.  Sure.

1          MS. GANGE:  Thank you.

2          THE COURT:  Okay.

3          MR. SHERMER:  Thank you, Your Honor.

4          So, Your Honor, in our preliminary injunction

5   briefing, we discussed the state of the law under

6   Section 303 and how those elements have been interpreted

7   by different courts and the statute provides very broad

8   authority for the court to stop an endangerment to public

9   health and welfare caused by air pollution.  There is

10  really no limit in terms of what basis the EPA can use,

11  what evidence it can rely upon, to bring this type of

12  claim.

13          Here, a while ago, Your Honor, you asked how is

14  this endangerment determined.  And the EPA determined

15  that based on a very site specific investigation using

16  air monitoring data, multiple sets of air monitors,

17  that have been collecting data for years --

18          THE COURT:  I guess what I'm -- that's the issue

19  here, because you've got a plant that's been in existence

20  since 1968 --

21          MR. SHERMER:  I believe so.

22          THE COURT:  -- with emitting certain chemicals, a

23  certain chemical that I don't think there's any question

24  that can cause, you know, a danger to people over a

25  period of time, but it's been emitting this for decades

1  and you even admitted that they've made substantial

2  progress in reducing those emissions since Denka bought

3  the plant in 2015.  So I'm trying to -- I'm just trying

4  to envision how this fits into the idea of an immediate

5  endangerment, where this has been going on for so long.

6  What's the immediacy of it?

7        MR. SHERMER:  So cases that we -- I can point you

8  to --

9        THE COURT:  Again, this is not like something

10  explodes and causes catastrophe in an immediate area or

11  whatever.

12        MR. SHERMER:  So the legislative history in a

13  companion statute, the Safe Drinking Water Act, talks

14  about the long-term cancer risks as being an example of

15  an endangerment that these types of environmental

16  endangerment statutes are supposed to cover.  It cites --

17  and it is sort of particularly for the reasons that we've

18  been talking about, that cancer -- you don't step on

19  something and get cancer.  It takes years, if not

20  decades, to develop.

21        THE COURT:  Right.

22        MR. SHERMER:  And so because of that very

23  secretive, very slow moving harm, it's important to still

24  make progress, even if emission levels have gone down.

25        The cases have cited that legislative history as

1    acknowledging that is an actionable type of endangerment

2    under similar environmental endangerment statutes.  I

3    mean, it's probably a poor analogy, but, Your Honor, if

4    you're driving your car at 150 miles an hour and you drop

5    it down to 100, you're still speeding and you're still

6    being --

7              THE COURT:  Yeah --

8              MR. SHERMER:  -- dangerous.

9              THE COURT:  -- but that's a little different than

10   this.  But okay.

11             I guess when we get around to maybe the motion for

12   summary judgment -- I'm just trying to -- I'm inclined to

13   just grant the suggestion of -- agree with the suggestion

14   that we should hold this in abeyance until October 15th

15   and then hold a status conference at that time.

16             I mean, the only other thing we could do is have

17   the parties file additional or new briefing in the

18   interim.  Perhaps that makes sense.  I don't know.

19             What are your thoughts on that?

20             MR. SHERMER:  Your Honor, we would be amenable to

21   filing additional briefing in the interim.

22             MS. GANGE:  I think Your Honor would respect -- I

23   think with respect to the amended counterclaim, the

24   fundamental issue hasn't changed and that's that this

25   court does not have subject matter jurisdiction for legal

1    reasons.  It's not a factual or fact based issue --

2          THE COURT:  So you think there's no need for

3    additional briefing on that issue?

4          MS. GANGE:  That is correct, Your Honor.  And the

5    United States would be more than happy to provide

6    argument or stand on its briefs.

7          THE COURT:  What about the DuPont issue?  Because

8    we haven't talked about that very much.

9          MR. SHERMER:  Your Honor, I don't think we need

10   additional briefing on that as well.  It's ready to be

11   decided.  I think you observed back in February that

12   DuPont's motion didn't raise any new issues from the

13   motion to dismiss that it filed in the middle of last

14   year and that you denied.  It's re-casted as a motion for

15   judgment on the pleadings, but it really doesn't change

16   much and I think you recognized that.  So we

17   don't believe there would be additional briefing

18   necessary --

19         THE COURT:  Let me ask Mr. Jarrell to respond to

20   that, if he would like.

21         MR. JARRELL:  Your Honor --

22         THE COURT:  What's changed from when I denied your

23   motion to -- originally, it was a -- it's a motion to

24   dismiss.  Is that what it is?  Okay.

25         MR. JARRELL:  What's changed -- and it's

1    everything that matters, Your Honor.  While we didn't

2    necessarily completely agree with what was in the Court's

3    ruling --

4         THE COURT:  Well, I suspected that.

5         MR. JARRELL:  But having said that, it doesn't

6    matter because the Court's ruling then perfectly fits

7    what happens when they change the relief they were

8    requesting.  They got out from under the 12(b)(6) by

9    convincing the Court that they were going to be coming in

10   here and directing that Denka would make specific changes

11   at the facility and they were going to have to do this to

12   this air emission point and they were going to have to

13   change this facility this way.  They had specific

14   projects that they said they were going to have the Court

15   force Denka to do.  And so, therefore, they had to

16   involve us because we could stand in the way of the

17   specific relief that the Court was going to grant.  And

18   that's how they tried to hook into the All Writs Act.

19        THE COURT:  Well, are they still going to try to

20   require that?

21        MR. JARRELL:  Absolutely not, Your Honor.

22        When Your Honor required that they give a

23   statement of final relief requested, they shifted from

24   saying they were going to require Denka to do specific

25   projects, possibly because Denka was saying those

1    projects won't work and so they were going to have a big

2    fight about that.  And so they shifted to not that Denka

3    would do specific projects, but that they would shut down

4    unless and until they could meet certain standards, and

5    how they got there, if they ever got there, was up to

6    Denka --

7         THE COURT:  Well, I mean, obviously, to get to

8    this much lower standard that the EPA is requesting or

9    requiring, would a necessity require Denka to do some

10   substantial changes at that plant?  Would it not?  I

11   mean, it just strikes me as common sense.

12        MR. JARRELL:  Well, there's two aspects to that.

13   First, Your Honor, that assumes they would ever do the

14   projects, because you've heard folks come up here and

15   tell you already today they can't get there.  The

16   standard that the government is asking them to meet,

17   there is no way to get there.

18        THE COURT:  But I asked Mr. Super and he said they

19   are not prepared to say absolutely that they can't

20   eventually lower their emissions.

21        MR. JARRELL:  I don't wish to speak for them, but

22   it was always my understanding the point, too, is just an

23   absolutely no-go.

24        But aside from that, the truth of the matter is,

25   there's a massive distinction between an order that this

1  Court would issue that says you have to stop operating

2  unless and until you can do these things and an order

3  that this Court was going to issue, which what they --

4  what they said they were going to have the Court do

5  before, to get out from under our 12(b)(6), was the Court

6  was going to order specific changes at the facility.  So

7  the actual order from this Court would direct specific

8  projects to be done and that's how they tried to hook

9  into the All Writs Act to say that if we stood in the way

10  of the specific project that was ordered, then we could

11  potentially interfere with the jurisdiction of the court

12  because we could get in the way of that specific project.

13  The notion that some project might be done on down the

14  road at some point in some way is completely different.

15       The All Writs Act requires that you present an

16  extraordinary circumstance of undermining the court's

17  jurisdiction.  We're just not there now.  There's no way

18  to get there.  What we're at right now is very simply

19  they're requesting an order that says you shut down until

20  you can meet this, you figure out how to do it.  All

21  Writs Act doesn't come into play.

22       THE COURT:  All right.

23       MR. JARRELL:  We got no involvement with that

24  order.

25       THE COURT:  Okay.  I'll look at that again, but

1    I'm kind of -- I think I'm at the same view that I was

2    the last time when we argued your motion, you know.

3         Thank you.  Thank you, Mr. Jarrell.

4         MR. JARRELL:  If Your Honor would like, I am happy

5    to provide additional briefing.

6         THE COURT:  No, no, no, I don't need any

7    additional briefing on this.

8         Okay.  Thank you.

9         Okay.  So anybody need to say anything else?

10        MR. SUPER:  Your Honor, I just wanted to address

11   the notion of a briefing on the summary judgment.

12        THE COURT:  Okay.  Okay.

13        MR. SUPER:  I agree with Mr. Shermer that we

14   should go ahead and do that and I think Your Honor

15   preferred the full brief --

16        THE COURT:  Yeah --

17        MR. SUPER:  -- instead of just a --

18        THE COURT:  -- it would be cleaner, I think, to do

19   it that way.

20        MR. SUPER:  We'll do that.

21        And with the Court's indulgence, we would like to

22   submit --

23        THE COURT:  So we're talking about your motion for

24   summary judgment?

25        MR. SUPER:  That's correct.

1          THE COURT:  So how much time would you need to do

2     that?

3          MR. SUPER:  Three weeks.

4          THE COURT:  Okay.  I'll tell you what, I'll give

5     you 30 days.  How about that?  30 days.

6          MR. SUPER:  30 days.

7          THE COURT:  And how much time will the government

8     need to file an opposition after that?

9          MR. SHERMER:  Your Honor, that's tough to say

10    since we don't know how that summary judgment motion

11    would change, but we would ask for a similar amount of

12    time to respond.

13         THE COURT:  I'm sorry.  What?

14         MR. SHERMER:  We would ask for -- it's tough for

15    us to budget for a response if we don't know how the

16    arguments are going to change, but we would ask for a

17    similar amount of time --

18         THE COURT:  Okay.  So what we'll do -- here's what

19    we'll do.  I'm going to order the parties to file, I

20    guess, their new briefs in support of your motion for

21    summary judgment and new brief and opposition by the

22    government, 30 days for Denka, 30 days for the

23    government, 10 days after that for any reply by Denka.

24    Okay?

25         MR. SUPER:  That's good.

1          THE COURT:  At which time I'll look at it and

2    decide where we are in terms of whether I schedule oral

3    argument on that or we may be -- otherwise, I'm not --

4    I'm holding everything else in abeyance in this case

5    until at least October 15th.  Okay?

6          MR. SUPER:  And, Your Honor, with your indulgence,

7    we would like to submit a very short motion to compel,

8    the rule-related discovery that I had mentioned.  We can

9    get that in almost immediately.  Some of it is relevant

10   to the summary judgment and we think it supports the

11   summary judgment, particularly that Human Exposure

12   Modeling information I was talking about.

13          And, of course, we will meet and confer with the

14   government before we submit that.  And if there is

15   something that we're just not looking at the right spot

16   on the website to find it, then, of course, we won't

17   include that in the motion.  But I can promise you, Your

18   Honor, that it will be a short motion, very targeted,

19   explaining exactly what we need and when we would like to

20   get it.  So we can submit that within a week.

21          THE COURT:  All right.  Submit that in a week and

22   we'll see what the response is.  But hopefully you-all

23   can work that out.  Okay?

24          MR. SUPER:  And I have one last point --

25          THE COURT:  Okay.

1        MR. SUPER:  -- because it relates to the amended

2    counterclaim.

3        I agree with Ms. Gange that the -- otherwise the

4    amended counterclaim and the motion to dismiss are ripe,

5    but there is one issue that's arisen based on a recent

6    Supreme Court ruling.

7        Your Honor, in the August 30th ruling dismissing

8    five of the counterclaims, dismissed counterclaim number

9    one and counterclaim number one, was a challenge to the

10   2010 toxicological review which ended up in the 0.2

11   concentration that we've been fighting about.  And Your

12   Honor dismissed that claim based on a Fifth Circuit case

13   called *Dunn-McCampbell Royalty Interest v. National Park*

14   *Service* from 1997 on the grounds that the claim was in

15   violation of the six-year statute of limitations.

16       Well, last month, in the *Corner Post* case, the

17   Supreme Court expressly overruled *Dunn-McCampbell* and how

18   that six-year statue of limitations --

19       THE COURT:  When it starts to run.

20       MR. SUPER:  Yeah.  It doesn't start -- it's once

21   -- it's once the agency action is being applied to a

22   plaintiff.  That's when the statute of limitations

23   starts.  So we think we've got a very strong argument

24   that the results of the 2010 toxicological review, the

25   0.2 level, were not applied to us until many years later,

1    so the statute of limitations wouldn't be a problem.

2         The Court, I believe, is free to reconsider its

3    decision based on intervening Supreme Court authority and

4    we would propose submitting a very short motion to

5    reconsider just that aspect of the August 30th order

6    because it does impact the amended counterclaim in a

7    pretty important way.

8         THE COURT:  What's the goal of your amended

9    counterclaim?  Because I said when I denied your motion

10   that you can raise the same -- attack the standard

11   regardless as a defense to this case, right?

12        MR. SUPER:  Yeah.  That is --

13        THE COURT:  So I've always had a hard time

14   understanding the purpose of your counterclaim.

15        MR. SUPER:  If I -- the way to address that, I

16   think, is -- if they decided to dismiss the imminent and

17   substantial endangerment claim for whatever reason, they

18   still have -- we describe it as an *ultra vires* standard

19   of 0.2 that they're trying to get Denka to comply with

20   and it's completely separate from the rule.  This is a

21   standard they've tried to impose upon us in this case,

22   through rigger enforcement actions, through pressuring

23   LDEQ to impact our permits.

24        THE COURT:  Wasn't that issue -- was it raised,

25   litigated, somehow in 2010?  Wasn't Denka involved in

1   that?

2       MR. SUPER:  I'm not sure what you're referring to,

3   Your Honor.

4       THE COURT:  I thought there was some -- what

5   happened in 2010 when that -- what you're talking about

6   occurred?

7       MR. SUPER:  Well, when the toxicological review of

8   chloroprene came out and established the inhalation unit

9   risk that led to the 0.2 concentration, Denka did

10  ultimately file administrative challenges before the

11  agency.  But those were denied by the agency.

12      THE COURT:  So how does -- I'm trying to

13  understand how this *Corner Post* case would make a

14  difference.

15      MR. SUPER:  Well, the *Corner Post* case --

16      THE COURT:  I know what the *Corner Post* case says

17  --

18      MR. SUPER:  Yeah.

19      THE COURT:  -- but it seems that to me that Denka

20  was aware in 2010 that there were -- that the EPA was

21  going to enforce the 0.2 standard, right?

22      MR. SUPER:  No, because Denka didn't enter the

23  picture until 2015.  So that may have been DuPont, but it

24  wasn't Denka.

25      So Denka -- our argument would be that when the

1    EPA tries to start enforcing this 0.2 standard against

2    us, it was in May of 2022, when they -- when one of the

3    EPA officials said we're going to bring all the tools the

4    agency can bring to bear to make sure that you get down

5    to 0.2.  That was applying what we describe as an *ultra*

6    *vires* ambient air standard against Denka and that was

7    what was applied to us and a six-year statute of

8    limitations wouldn't apply to preclude that action

9    because we didn't learn about it until 2022.  So that's

10   why we think that --

11         THE COURT:  Well, I don't -- I can't believe you

12   didn't know about it.  Denka buys this plant in 2015.

13   They have no clue that this is hanging out there, that

14   the EPA -- I mean, I'm assuming these are smart people

15   that bought Denka and they would know what they're buying

16   here, right?

17         MR. SUPER:  We do have an argument that Denka --

18   that the 0.2 level was brought to bear against Denka

19   within the six-year statute of limitations.

20         THE COURT:  All right.  Well, I'm not

21   reconsidering that right now and I'm going to -- the more

22   we talk, the more I might say don't do anything until

23   October 15th.  I'll tell you, you-all keep adding stuff

24   here.

25         MR. SHERMER:  Can I say one thing to that point,

```
 1   Your Honor?
 2           THE COURT:  Yeah.
 3           MR. SHERMER:  I think I would agree with you, Your
 4   Honor.  We object to --
 5           THE COURT:  You know, we talked about briefing.
 6   Then we talked about now more discovery before the
 7   briefing.  And now we're talking about the counterclaim
 8   and all of that.
 9           MR. SHERMER:  Your Honor, the United States
10   certainly objects to the discovery and we would ask
11   for --
12           THE COURT:  Well, I'll tell you what I'm going to
13   do.  I'm going to hold everything in abeyance.  We're not
14   going to have anymore briefing or anything until at least
15   October 15th.  You-all have managed to change my mind
16   here.  And so we will hold everything in abeyance.  By
17   October 15th, I think, you -- the parties shall file
18   another status report, tell me where things stand, we'll
19   set a status conference and we'll go from there.  Okay?
20           All right.  Everyone have a good day.
21           THE DEPUTY CLERK:  All rise.
22                           *  *  *  *
23           (WHEREUPON, the proceedings were adjourned.)
24                           *  *  *  *
25
```

1          REPORTER'S CERTIFICATE

2          I, Nichelle N. Wheeler, RMR, CRR, Official
   Court Reporter, United States District Court, Eastern
3  District of Louisiana, do hereby certify that the
   foregoing is a true and correct transcript, to the best
4  of my ability and understanding, from the record of the
   proceedings in the above-entitled and numbered matter.

5

6              /s/ Nichelle N. Wheeler
                Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25