IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. 2:23-cv-735 |
| v. | ) ) | SECTION J(5) |
| **DENKA PERFORMANCE ELASTOMER LLC and DUPONT SPECIALTY PRODUCTS USA, LLC,** | ) ) ) ) | JUDGE BARBIER MAGISTRATE JUDGE NORTH |
| Defendants. | ) ) ) | |

**DENKA PERFORMANCE ELASTOMERS LLC'S RESPONSE TO
EPA'S MOTION TO REOPEN CASE AND SET STATUS HEARING**

Denka Performance Elastomer, LLC ("DPE") submits this response to EPA's Motion to Reopen Case and Set Status Hearing. R. Doc. 181-3. DPE is prepared to attend a status conference at the Court's convenience and has no objection to reopening this case. However, DPE responds to two positions taken by EPA on which DPE strongly disagrees, as set forth in Parts A and B below.

As EPA's motion notes, on July 31, the Fifth Circuit granted DPE's motion for a stay precluding EPA from taking action in contravention of the validity of the extension granted by the Louisiana Department of Environmental Quality ("LDEQ") of DPE's deadline to comply with the rule issued by EPA regarding the DPE Facility's chloroprene emissions ("Rule"). The Fifth Circuit's stay order also denied EPA's motion to dismiss, in which EPA argued that its determination that the LDEQ extension was invalid was not a reviewable final agency action. Although EPA continues to litigate the validity of the LDEQ extension, as a result of the stay

order, DPE is spared, for now, from having to close the Facility on the Rule's impossible-to-meet October 15 deadline.

Aside from providing that basic background, however, Parts I and II of EPA's motion read like an opening statement and DPE will refrain here from responding point-by-point.  Notably, in granting DPE's extension request, LDEQ was not persuaded by the same harm arguments that EPA is making here.[1]  Likewise, in granting DPE's stay request, the Fifth Circuit necessarily was not persuaded by those same arguments.[2]  Moreover, EPA's urgent demand "for immediate relief in this case" (Motion at 3) continues to stand in stark contrast to EPA's conduct.  As the Court is well aware, EPA's unilateral request last February to cancel the March 11 trial date has led to an eight-month-and-counting hiatus in this "emergency" action.  Most recently, EPA inexplicably waited six weeks after the Fifth Circuit issued the stay on July 31 to ask this Court to renew this emergency litigation.  That conduct continues to belie the existence of a real emergency in this case and is consistent with EPA's undisputed decision, for seven years, not to allege an emergency, even though (with EPA's knowledge) the Facility's chloroprene emissions were far higher than in February 2023 when EPA filed this lawsuit.  R. Doc. 131-2 at 19-22 (chronicling undisputed facts regarding EPA's seven-year delay); *id.* at 3 (EPA figure showing steep decline in emissions between 2016 and 2023).  The Facility has continued to reduce chloroprene emissions and drive down concentrations in the vicinity of the Facility.

---

[1] *See* Letter from Amanda Vincent, LDEQ, to Jeffrey Holmstead, DPE, *re Extension of Compliance* (June 27, 2024) at 2 (attached as Exhibit 1) ("LDEQ finds that steps will be taken during the period of the extension to assure that the health of persons will be protected from imminent endangerment.").

[2] *See* EPA's Opp. to DPE's Emergency Stay Motion at 21-23 (relevant portions attached as Exhibit 2).

A. **EPA's Proposal Regarding Summary Judgment Should Be Rejected.**

DPE believes that due to EPA's undisputed seven-year delay and other reasons, summary judgment can and should be granted in this case and that addressing summary judgment should be the first order of business when the case resumes. EPA's proposal that summary judgment briefing should be limited to "a short sur reply" (Motion at 5) is equal parts unworkable and unreasonable and should be rejected.

First, during the July 17 status conference, this Court already expressed a preference that the parties "start anew" with the summary judgment briefing rather than submit supplemental briefs. *See* Tr. of July 17 Status Conference at 34:23-35:1 (relevant portions attached as Exhibit 3). The Court stated that DPE would have 30 days from the status conference to file its "new brief," EPA would have 30 days to file its opposition, and DPE would have ten days to file a reply. *Id.* at 64:18-24. Counsel for both parties agreed, with counsel for EPA expressing the view that EPA would want 30 days to file its renewed opposition brief because "we don't know how that summary judgment motion would change." *Id.* at 64:7-17.

The Court's preference that the parties renew the summary judgment briefing makes perfect sense and is the only workable approach. Contrary to EPA's assertion, DPE's summary judgment is hardly "moot." Motion at 5. Based on EPA's conclusions in the Rule, DPE's arguments for summary judgment are even stronger than before because the Rule flatly contradicts EPA's allegations of an "imminent and substantial endangerment" in this action. For example, as DPE previously argued, summary judgment should be granted in this case because the incremental risk level of 1-in-10,000 that EPA alleges as an "emergency" threshold here has been routinely exceeded by EPA in prior rulemakings. *See* R. Doc. 131-1 at 8-18. Now, in the Rule, EPA concludes that two facilities that EPA estimates present more than *three-times* the risk of the DPE Facility are *not* causing an imminent endangerment. And those two higher-risk facilities are

among 34 facilities in the past four years that exceeded EPA's alleged "emergency" threshold of 1-in-10,000; they are also among 16 facilities in the past four years that have a higher estimated risk than DPE but were determined by EPA to not be causing an imminent endangerment. To fully and fairly present these and other Rule-related arguments to the Court, DPE intends to make substantial additions and revisions throughout its existing motion for summary judgment (which was filed more than three months before the Rule was issued), and EPA no doubt will want to respond to DPE's new and modified arguments, as EPA counsel stated during the status conference. *Id.* July 17 Tr. at 64:7-17 (Ex. 3).[3]

Further, it would be an enormous waste of judicial resources for this Court to have to read the three existing "pre-Rule" briefs on summary judgment, and then read EPA's proposed new post-Rule "supplemental" briefs in an attempt to piece together which arguments are new and whether and how the original arguments have changed. Under EPA's proposal, DPE's "supplemental" brief would of necessity read like an amendment to a piece of legislation, hardly conducive to facilitating the Court's efficient resolution of this important motion, which, again, DPE believes should obviate the need for a trial.

Accordingly, DPE requests that the Court confirm its view as expressed during the July 17 status conference that the parties renew the summary judgment briefing by submitting a new motion, opposition and reply. DPE is ready to commence that briefing process as soon as the Court deems it appropriate.

---

[3] Moreover, contrary to EPA's assertion, the Supreme Court's ruling in *Loper Bright v. Raimondo*, 144 S.Ct. 2244 (2024), will be highly instructive in resolving DPE's motion for summary judgment, as DPE will explain fully in the renewed motion. EPA, if it wishes, may respond to that point in its opposition to the summary judgment motion.

**B.     DPE Should Be Permitted Targeted Discovery Regarding The Rule.**

DPE should be granted targeted discovery relating to the Rule because it directly impacts issues that are critical to this case. EPA acknowledges that "the carcinogenic potency of and resulting cancer risks from Denka's chloroprene emissions" are "central questions" here. Motion at 7. On May 16, 2024, EPA published the Rule, which confronted these questions and evaluated risk from DPE's Facility. DPE should be permitted discovery to understand how EPA most recently addressed these "central questions" in the Rule, especially because EPA reversed course on issues specific to the risk of chloroprene. Such discovery is critical to informing the Court's assessment of whether an "imminent and substantial endangerment" exists. Specifically, DPE seeks discovery on the following three points.

   **1.     Data underlying the risk assessment supporting the Rule.**

EPA conducted a risk assessment in support of the Rule, including modeling of how chloroprene emissions from the Facility disperse in the ambient air around the Facility. *See* Risk Assessment at 11-14 (relevant portions attached as Exhibit 4). DPE and its experts should be permitted to review the underlying data because DPE intends to show that the Rule flatly contradicts EPA's allegations in this case.

EPA conducted similar modeling in support of the *proposed* rule. DPE's air dispersion modeling expert, Eric Farstad, specifically addressed EPA's modeling for the proposed rule in a declaration, explaining that the modeling showed that complying with the requirements of the proposed rule would result in annual average concentrations as high as 0.75 $\mu g/m^3$—*i.e.*, 2-to-3.5-times *higher* than the air standards that EPA demands in this litigation, depending on the

monitoring method.[4]  *See* Farstad Declaration dated Dec. 8, 2023, at ¶ 35 (relevant portions attached as Exhibit 5) ("EPA's post-control model results indicate that DPE would not achieve [EPA's litigation demands] if DPE implemented the requirements of the Proposed Rule. The highest modeled annual average chloroprene concentration from EPA's post-control model was 0.75 µg/m$^3$).  Mr. Farstad was able to opine on the proposed rule modeling because EPA provided the modeling data to DPE in discovery.

However, EPA has *not* provided the same modeling data relied upon in the Rule.  Based on the preamble to the Rule, DPE expects that the updated air dispersion modeling supporting the Rule will likewise show that chloroprene concentrations after all the Rule's requirements are implemented will still exceed EPA's litigation demands by a factor of more than 2 or 3.5, depending on the standard demanded by EPA.  *See* Rule at 42,999 (relevant portions attached as Exhibit 6) ("For chloroprene, instead, the action level has been adjusted upward to 0.8 ug/m$^3$ . . . to reflect the modeled expected fenceline concentration resulting from the other final standards and work practices [for] chloroprene.").  DPE is entitled to confirm that pivotal fact using the underlying data.  Mr. Farstad should be permitted to update his declaration, and testify at trial, regarding the most recent information supporting the Rule that post-dates his declaration.

To obtain this critical information, DPE would need no more than a single document request seeking modeling data and other information generated in support of EPA's risk assessment supporting the Rule.

---

[4] EPA's statement of final relief demands that the Facility immediately shut down and not return to operation until DPE can "demonstrate" an ability to maintain annual average chloroprene concentrations of 0.2 µg/m$^3$ based on monitoring using EPA Method TO-15 *and* 0.3 µg/m$^3$ based on monitoring using EPA Method 325.  R. Doc. 131-15 at 2.

### 2. The basis for the Rule's reversal of DPE's compliance period from two years to only 90 days.

When EPA published the proposed rule in April 2023, it conceded as a matter of law that the DPE Facility was *not* presenting an "imminent endangerment" by proposing a compliance "waiver" and a two-year implementation deadline for the Rule's most stringent requirements. After DPE pointed out EPA's concession in its motion for summary judgement, R. Doc. 131-2 at 5-8, EPA reversed course in the Rule and shortened DPE's compliance deadline to only 90 days. Unless EPA was wielding its rulemaking authority solely to salvage this lawsuit, EPA's reversal from the proposed rule to the final Rule *must* be based on some change in facts or analysis. But EPA has failed to articulate any substantive basis for its reversal in the Rule. Instead, the preamble to the Rule merely cited to the docket in *this case*:

> In a change from the proposed rule, the EPA is shortening the compliance deadline for affected sources producing neoprene, due to the EPA's finding that chloroprene emissions from the only such source pose an imminent and substantial endangerment under CAA section 303, 42 U.S.C. § 7603. *United States v. Denka Performance Elastomer, LLC, et al.*, No. 2:23-cv-00735 (E.D. La. filed Feb. 28, 2023).

Rule at 42,955 (Ex. 6).

Of course, there have been no "findings" in this case and EPA's unprecedented allegation of an "imminent and substantial endangerment" remains unadjudicated. The only two possible conclusions are either that (i) some facts or analyses have changed and impacted how EPA evaluates carcinogenic risk for DPE's Facility; or (ii) EPA has no basis for its reversal of DPE's compliance period other than to salvage this lawsuit. DPE should be permitted discovery to understand (i) any alleged changed facts or any analyses prompting EPA's unprecedented action of setting an impossible 90-day compliance deadline; and (ii) EPA's purported justification for the change.

To obtain this information, DPE requests a single document request, one or two interrogatories, and one deposition under Rule 30(b)(6) covering the facts and analyses underlying the change in compliance period and how it relates to an alleged imminent endangerment.

3.  **The basis for EPA in the Rule providing two-year compliance periods to facilities that EPA estimated pose higher risks than the DPE Facility.**

Although the Rule treats DPE's Facility as posing an "imminent endangerment," the Rule simultaneously found that two other facilities with much higher estimated risk levels did *not* pose an "imminent endangerment." Again, EPA provided no substantive explanation for why it was treating DPE differently from these higher-risk facilities. EPA's action in the Rule is highly relevant here. In the midst of this litigation in which EPA claims that the 1-in-10,000 risk level is a threshold for an "imminent and substantial endangerment," EPA has determined that two facilities posing risks *20-times higher* than that threshold do *not* pose an "imminent endangerment."

DPE's motion for summary judgment explained that EPA's 1-in-10,000 "emergency" threshold is incompatible with EPA's long-standing acceptance of facilities with higher estimated risks based on prior EPA rulemakings. *See* R. Doc. 131-2 at 15-18. This point is now fully cemented by the Rule's acceptance of risks 20 times higher than 1-in-10,000. And because the Rule was published *after* EPA initiated this case, the Rule provides the most recent and compelling evidence in support of DPE's argument. DPE should be permitted discovery to explore the basis for EPA's contradictory risk evaluation in the Rule.

To obtain this information, DPE would propound one request for production and one or two interrogatories related to EPA's finding in the Rule that facilities with higher estimated risk than DPE do not pose an imminent endangerment. This subject would also be covered by the single Rule 30(b)(6) deposition proposed above.

\*\*\*

Finally, EPA's argument that this highly relevant Rule-based discovery should be disallowed because there has already been some discovery taken in this case is wrong and should be rejected. Motion at 6-8. First, the Rule obviously was issued long after any discovery was taken in this case. While the Rule was expected to be published after the trial date originally insisted upon by EPA, EPA now points to the Rule as relevant here. There is no legitimate basis for EPA to block any and all relevant discovery on the Rule, which post-dates by months the prior discovery.

Second, EPA tries to portray the prior discovery in this case as complete but that discovery was limited and taken on an expedited basis in the shadow of EPA's preliminary injunction motion and a March 2024 trial date. After using the March trial date as a basis to limit discovery, EPA unilaterally moved to cancel the trial and has continually resisted any discovery on the Rule (which could have been completed over the summer). The fact that prior discovery in this case was expedited provides no justification for EPA to shield highly relevant and discoverable information regarding the Rule. If DPE is permitted to take the targeted discovery described above, there is no reason it could not be completed in a matter of a few weeks.

Dated:  September 24, 2024

JONES WALKER LLP

James C. Percy (La. Bar No. 10413)
445 N. Boulevard, Suite 800
Baton Rouge, LA 70802
Telephone: (225) 248-2130
Facsimile: (225) 248-3130
jpercy@joneswalker.com

Robert E. Holden (La. Bar No. 06935)
Brett S. Venn (La. Bar No. 32954)
201 St. Charles Ave., Suite 5100
New Orleans, LA 70170
Telephone: (504) 582-8000
Facsimile: (504) 582-8583
bholden@joneswalker.com
bvenn@joneswalker.com

Respectfully submitted,

  /s/ David A. Super
David A. Super (*pro hac vice*)
Jason B. Hutt (*pro hac vice*)
Jeffrey R. Holmstead (*pro hac vice*)
Kevin D. Collins (*pro hac vice*)
Britt Cass Steckman (*pro hac vice*)
Kevin M. Voelkel (*pro hac vice*)
BRACEWELL LLP
2001 M Street NW, Ste. 900
Washington, DC 20006
Telephone: (202) 828-5800
david.super@bracewell.com
jason.hutt@bracewell.com
jeff.holmstead@bracewell.com
kevin.collins@bracewell.com
britt.steckman@bracewell.com
kevin.voelkel@bracewell.com

***Counsel for Denka Performance Elastomer LLC***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of September 2024, a true and complete copy of the foregoing was filed with the Clerk of Court via CM/ECF and served by electronic means on all attorneys of record.

                                             */s/ David A. Super*
                                             David A. Super (*pro hac vice*)